**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| LAKE COUNTY, ILLINOIS<br><br>       Plaintiff,<br><br>   v.<br><br>ELI LILLY AND COMPANY; NOVO NORDISK INC.; SANOFI-AVENTIS U.S. LLC; EVERNORTH HEALTH, INC. (FORMERLY EXPRESS SCRIPTS HOLDING COMPANY); EXPRESS SCRIPTS, INC., EXPRESS SCRIPTS ADMINISTRATORS, LLC; MEDCO HEALTH SOLUTIONS, INC.; ESI MAIL PHARMACY, INC.; EXPRESS SCRIPTS PHARMACY, INC.; CVS HEALTH CORPORATION; CVS PHARMACY, INC; CAREMARK RX, LLC; CAREMARK PCS HEALTH, LLC; CAREMARK, LLC; UNITEDHEALTH GROUP, INC.; OPTUMRX INC.; AND OPTUMINSIGHT, INC.,<br><br>       Defendants. | Case No. 1:23-CV-2402 |

**MEMORANDUM OF LAW IN SUPPORT OF MANUFACTURERS' MOTION TO DISMISS PLAINTIFF'S COMPLAINT UNDER FED. R. CIV P. 12(B)(6)**

## TABLE OF CONTENTS

**Page**

I.    THE DISTRIBUTION OF BRANDED PRESCRIPTION DRUGS. ................................. 3

II.    MANUFACTURERS REPORT THEIR LIST PRICES AS REQUIRED BY FEDERAL LAW. ............................................................................................ 5

III.    THIS LAWSUIT ................................................................................................. 6

I.    LAKE COUNTY'S CLAIMS ARE TIME-BARRED. ....................................... 7

    A.    The Applicable Limitations Period Is, At Most, Four Years ................. 7

    B.    Lake County Was Fully Aware of the So-Called Scheme ..................... 8

    C.    No Tolling Doctrine Salvages Lake County's Claims .......................... 12

II.    LAKE COUNTY'S RICO CLAIMS FAIL ON THE MERITS TOO. ............................. 14

    A.    The Indirect Purchaser Rule Bars Lake County's RICO Claims Against Manufacturers ....................................................................... 14

    B.    Lake County Fails To Plead That Manufacturers Conducted The Affairs Of A RICO Enterprise. ............................................................ 16

    C.    Lake County Fails To Plead RICO Predicate Acts. .............................. 17

    D.    Lake County's RICO Conspiracy Claims Fall With Its RICO Claims ................. 19

III.    LAKE COUNTY DOES NOT STATE A CONSUMER FRAUD CLAIM .................... 19

    A.    Lake County's Claims Are Barred By The Acts' Safe Harbor Provisions. .......... 19

        1.    Manufacturers Reported Their List Prices As Required By Law. ............ 20

        2.    Manufacturer Rebates Are "Authorized" By Federal and Illinois Law. ........ 21

    B.    Lake County Does Not State A Deception Claim. ................................ 22

    C.    Lake County Does Not State A Claim For Unfairness. ......................... 24

IV.    LAKE COUNTY'S UNJUST ENRICHMENT CLAIM FAILS. ................................... 27

V.    LAKE COUNTY HAS NOT STATED A CONSPIRACY CLAIM. .............................. 29

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Assoc. of Am. Physicians & Surgeons, Inc. v. Am. Bd. of Med. Specialties*,
   15 F.4th 831 (7th Cir. 2021) ....................................................................22

*Attorney General v. Eli Lilly & Co.*,
   2023 WL 4141169 (Mich. Ct. App. June 22, 2023) ..................................22

*Batson v. Live Nation Ent., Inc.*,
   746 F.3d 827 (7th Cir. 2014) ..............................................................25, 26

*Bible v. United Student Aid Funds, Inc.*,
   799 F.3d 633 (7th Cir. 2015) ....................................................................17

*Blythe Holdings, Inc. v. DeAngelis*,
   750 F.3d 653 (7th Cir. 2014) ....................................................................28

*Bober v. Glaxo Wellcome PLC*,
   246 F.3d 934 (7th Cir. 2001) ...........................................................2, 21, 22

*Bonilla v. Ancestry.com Operations Inc.*,
   628 F. Supp. 3d 812 (N.D. Ill. 2022) . Civil ..............................................8

*Borsellino v. Goldman Sachs Grp., Inc.*,
   477 F.3d 502 (7th Cir. 2007) ..............................................................29, 30

*Borto v. First Am. Title Co.*,
   2017 WL 1270353 (Ill. App. Ct. Mar. 31, 2017)......................................12

*Boyd v. U.S. Bank, N.A.*,
   787 F. Supp. 2d 747 (N.D. Ill. 2011) .......................................................25

*Butler v. Mayer, Brown & Platt*,
   704 N.E.2d 740 (Ill. App. Ct. 1998) .........................................................13

*Camasta v. Jos. A. Bank Clothiers, Inc.*,
   761 F.3d 732 (7th Cir. 2014) .....................................................................23

*Carter v. Berger*,
   777 F.2d 1173 (7th Cir. 1985) ..................................................................14

*Chiapetta v. Kellogg Sales Co.*,
   2022 WL 602505 (N.D. Ill. March 1, 2022)..............................................23

i

*City of Rockford v. Mallinckrodt ARD, Inc.*,
    360 F. Supp. 3d 730 (N.D. Ill. 2019) ................................................................29

*Clay v. Kuhl*,
    727 N.E.2d 217 (Ill. 2000) ................................................................12

*Cnty. Bd. of Sch. Trs. of DuPage Cnty. v. Ass'n of Franciscan Fathers*,
    364 N.E.2d 691 (Ill. App. Ct. 1977) ................................................................12

*Cothron v. White Castle Sys., Inc.*,
    477 F. Supp. 3d 723 (N.D. Ill. 2020) ................................................................13

*Cunningham v. Huffman*,
    609 N.E.2d 321 (Ill. 1993) ................................................................13

*D.M. Robinson Chiropractic, S.C. v. Encompass Ins. Co. of Am.*,
    2013 WL 1286696 (N.D. Ill. Mar. 28, 2013) ................................................16, 21

*People ex rel. Daley v. Datacom Sys. Corp.*,
    531 N.E.2d 839 (Ill. App. Ct. 1988) ................................................................20

*Dancor Int'l, Ltd. v. Friedman, Goldberg & Mintz*,
    681 N.E.2d 617 (Ill. App. Ct. 1997) ................................................................13

*Doe v. Hastert*,
    133 N.E.3d 1249 (Ill. App. Ct. 2019) ................................................................12

*Donnellan v. Travelers Co., Inc.*,
    2022 WL 170046 (N.D. Ill. Jan. 18, 2022) ................................................................27

*EBCF Enters., Inc. v. Erie Ins. Exch.*,
    572 F. Supp. 3d 489 (N.D. Ill. 2021) ................................................................26

*In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Practices and Antitrust Litig.*,
    44 F.4th 959 (10th Cir. 2022) ................................................................17

*Fiala v. Wasco Sanitary Dist.*,
    2012 WL 917851 (N.D. Ill. Mar. 16, 2012) ................................................2, 14, 15

*Flores v. United Airlines*,
    426 F. Supp. 3d 520 (N.D. Ill. 2019) ................................................................26

*Galanis v. Starbucks Corp.*,
    2016 WL 6037962 (N.D. Ill. Oct. 14, 2016) ................................................................22

*Galvan v. Northwestern Mem'l Hosp.*,
    888 N.E.2d 529 (Ill. App. Ct. 2008) ................................................................26

*Garrett v. RentGrow Inc.*,
2005 WL 1563162 (N.D. Ill. July 1, 2005)..................................................................25

*Gentleman v. Massachusetts Higher Educ. Assistance Corp.*,
272 F. Supp. 3d 1054 (N.D. Ill. 2017) .......................................................................7

*Goren v. New Vision Int'l, Inc.*,
156 F.3d 721 (7th Cir. 1998) .........................................................................18, 19

*Harris Cnty. v. Eli Lilly & Co.*,
2022 WL 479943 (S.D. Tex. Feb. 16, 2022) ............................................................16, 29

*Illinois Brick Co. v. Illinois*,
431 U.S. 720 (1977).....................................................................................14, 15

*Indeck N. Am. Power Fund, L.P. v. Norweb PLC*,
735 N.E.2d 649 (Ill. App. Ct. 2000) ........................................................................29

*J.B.D.L. Corp. v. Wyeth-Ayerst Labs, Inc.*,
2005 WL 1396940 (S.D. Ohio June 13, 2005) ...........................................................17

*Jackson v. Kraft Heinz Foods Co.*,
2022 WL 4591749 (N.D. Ill. Aug. 3, 2022) ..............................................................22

*Jay E. Hayden Found. v. First Neighbor Bank, N.A.*,
610 F.3d 382 (7th Cir. 2010) ....................................................................... *passim*

*United States ex rel. John v. Hastert*,
82 F. Supp. 3d 750 (N.D. Ill. 2015) ........................................................................10

*Johnson v. Marshall Field & Co.*,
312 N.E.2d 271 (Ill. 1974)................................................................................20, 22

*Knauf Insulation, Inc. v. S. Brands, Inc.*,
820 F.3d 904 (7th Cir. 2016) ..............................................................................9

*Lane v. Direct Energy Serv., LLC*,
2020 WL 3211435 (S.D. Ill. June 15, 2020).............................................................25

*Lanier v. Assocs. Fin., Inc.*,
499 N.E. 2d 440 (Ill. 1986) ...............................................................................21

*Limestone Dev. Corp. v. Vill. of Lemont*,
520 F.3d 797 (7th Cir. 2008) .............................................................................13

*LoggerHead Tools, LLC v. Sears Holding Corp.*,
19 F. Supp. 3d 775 (N.D. Ill. 2013) ......................................................................30

*Mario's Butcher Shop & Food Center, Inc. v. Armour & Co.*,
 574 F. Supp. 653 (N.D. Ill. 1983) ...................................................................21, 22

*Marion Diagnostic Ctr., LLC v. Becton Dickinson & Co.*,
 29 F.4th 337 (7th Cir. 2022) ....................................................................................15

*Mauvais–Jarvis v. Wong*,
 987 N.E.2d 864 (Ill. App. Ct. 2013) ........................................................................8

*McCarthy v. Recordex Serv., Inc.*,
 80 F.3d 842 (3d Cir. 1996)......................................................................................14

*McMahon v. Bumble Bee Foods LLC*,
 148 F. Supp. 3d 708 (N.D. Ill. 2015) .................................................................8, 28

*In re Midway Games, Inc. Sec. Litig.*,
 332 F. Supp. 2d 1152 (N.D. Ill. 2004) ....................................................................10

*MSP Recovery Claims, Series, LLC v. Sanofi Aventis U.S. LLC*,
 2019 WL 1418129 (D.N.J. Mar. 29, 2019) .............................................................16

*Murphy v. Foster Premier, Inc.*,
 2018 WL 3428084 (N.D. Ill. July 16, 2018) ...........................................................27

*Perry v. Am. Tobacco Co.*,
 324 F.3d 845 (6th Cir. 2003) ...................................................................................14

*Petrich v. MCY Music World, Inc.*,
 862 N.E.2d 1171 (Ill. App. Ct. 2007) ......................................................................24

*Phillips v. DePaul Univ.*,
 19 N.E. 3d 1019 (Ill. App. Ct. 2014) .......................................................................24

*Price v. Philip Morris, Inc.*,
 848 N.E.2d 1 (Ill. 2005) ......................................................................................20, 21

*Randels v. Best Real Estate, Inc.*,
 612 N.E.2d 984 (Ill. App. Ct. 1993) ........................................................................24

*RBS Citizens, N.A. v. Bentley Motors, Inc.*,
 2012 WL 1565457 (N.D. Ill. May 2, 2012) .............................................................28

*Reves v. Ernst & Young*,
 507 U.S. 170 (1993)..................................................................................................16

*Ridings v. Am. Fam. Ins. Co.*,
 2021 WL 722856 (N.D. Ill. Feb. 24, 2021) .............................................................24

iv

*Robinson v. Toyota Motor Credit Corp.*,
  775 N.E.2d 951 (Ill. 2002) ........................................................................................21

*Rockford Mem'l Hosp. v. Havrilesko*,
  858 N.E.2d 56 (Ill. App. Ct. 2006) ...........................................................................26

*Rodrigue v. Olin Emps. Credit Union*,
  406 F.3d 434 (7th Cir. 2005) .....................................................................................14

*Rotella v. Wood*,
  528 U.S. 549 (2000).....................................................................................................7

*Saunders v. Mich. Ave. Nat. Bank.*,
  662 N.E.2d 602 (Ill. App. Ct. 1996) .........................................................................26

*Schmude v. Sheahan*,
  312 F. Supp. 2d 1047 (N.D. Ill. 2004) ......................................................................10

*Sears v. Likens*,
  912 F.2d 889 (7th Cir. 1990) .....................................................................................18

*Siegel v. Shell Oil Co.*,
  612 F.3d 932 (7th Cir. 2010) ...............................................................2, 19, 25, 27

*Siegel v. Shell Oil Co.*,
  656 F. Supp. 2d 825 (N.D. Ill. 2009) ........................................................................27

*Spector v. Mondelez Int'l Inc.*,
  178 F. Supp. 3d 657 (N.D. Ill. 2016) ........................................................................24

*Toulon v. Cont'l Cas. Co.*,
  877 F.3d 725 (7th Cir. 2017) ...............................................................................25, 26

*United Food & Com. Workers Unions & Emps. Midwest Health Benefits Fund v.
  Walgreen Co.*,
  719 F.3d 849 (7th Cir. 2013) .............................................................................2, 16, 17

*Utility Audit, Inc. v. Horace Mann Serv. Corp.*,
  383 F.3d 683 (7th Cir. 2004) .....................................................................................28

*Vicom, Inc. v. Harbridge Merch. Servs., Inc.*,
  20 F.3d 771 (7th Cir. 1994) .................................................................................18, 19

*Wal-Mart Stores, Inc. v. Kickrehm*,
  101 F. Supp. 2d 749 (E.D. Ark. 2000).................................................................4, 22

*Walls v. VRE Chicago Eleven, LLC*,
  344 F. Supp. 3d 932 (N.D. Ill. 2018) ........................................................................30

**Statutes**

18 U.S.C. § 1341 ...................................................................................................18

18 U.S.C. § 1343 ...................................................................................................18

18 U.S.C. § 1961 ...................................................................................................18

18 U.S.C. § 1962 ...................................................................................................19

42 U.S.C. § 1320b-23(b) ...................................................................................6, 22

42 U.S.C. § 1395w-3a(c)(6)(B) ........................................................................ *passim*

42 U.S.C. § 1396r-8(a)(1) ............................................................................2, 4, 22

Ill. Comp. Stat. 5/356Z.41(c) ...............................................................................21

Ill. Comp. Stat. 5/513b1(b)(5) .........................................................................6, 22

Ill. Comp. Stat. 505/2 ............................................................................................19

Ill. Comp. Stat. 505/10a .........................................................................................7

Ill. Comp. Stat. 505/10b(1) ..............................................................................20, 21

Ill. Comp. Stat. 510/2 ............................................................................................19

Ill. Comp. Stat. 510/4 ............................................................................................20

**Rules**

Fed. R. Civ. P. 8(b)(2) ...........................................................................................30

Fed. R. Civ. P. 9(b) ......................................................................................... *passim*

## INTRODUCTION

Pharmaceutical manufacturers have long and openly paid rebates to Pharmacy Benefit Managers ("PBMs"), because without those rebates, PBMs and their clients—like Lake County—will not provide insurance coverage for Manufacturers' insulins.  The entire healthcare industry is aware of that system, and Lake County has participated in it and benefited from it—by negotiating contracts that require PBMs to pass rebates through to the County—for years.  Nevertheless, Lake County now alleges that this well-known system somehow violates RICO and Illinois's consumer fraud statutes, on the theory that rebates "artificially inflate" insulin list prices.  Compl. ¶¶ 19, 329–30.  The County tacks on claims for unjust enrichment and civil conspiracy based on the same theory.  None of these allegations state a claim.

To start, all of Lake County's claims are time-barred by the governing statutes of limitations, the longest of which is four years.  The factual allegations in its lawsuit have been public knowledge for years:  Congress and the Illinois General Assembly have legislated on the subject of rebates, national and Illinois media have reported about their impact on pharmaceutical prices, and Manufacturers have repeatedly disclosed how rebates affect the net prices that Manufacturers receive.  Indeed, Lake County has indisputably known about the gravamen of its action—that there is a difference between the prices wholesalers pay and the net prices Manufacturers receive after accounting for rebates—since at least 2014.  And other plaintiffs have challenged the same supposed "scheme" for the last six years, using identical allegations.  Nothing about Lake County's claims is new, and they are all time-barred.

Lake County's claims also all fail on their merits.  Its RICO claims should be dismissed for several independent reasons.  *First*, by its own admission, the County does not directly purchase insulin from Manufacturers.  And "a plaintiff cannot seek damages under RICO where it is an indirect purchaser, meaning where it alleges that it paid the costs of a RICO scheme that were

1

passed on by the scheme's direct victim." *Fiala v. Wasco Sanitary Dist.*, 2012 WL 917851, at *6 (N.D. Ill. Mar. 16, 2012). That is itself fatal. ***Second***, Seventh Circuit precedent forecloses the County's attempt to transform an ordinary-course, arms-length contractual relationship into a RICO enterprise, because it fails to allege "cooperation that fell outside the bounds of the parties' normal commercial relationships." *United Food & Com. Workers Unions & Emps. Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849, 856 (7th Cir. 2013). ***Third***, the County has not alleged RICO predicate acts. It asserts that Manufacturers have committed mail and wire fraud, pointing to Manufacturers' "inflated" Wholesale Acquisition Cost ("WAC") prices. But those prices cannot be fraudulent, because they are exactly what Manufacturers hold them out as being: i.e., Manufacturers' wholesale prices.

Lake County's consumer fraud claims should also be dismissed. Both statutes have safe-harbor provisions forbidding claims that "impose higher disclosure requirements" than those "sufficient to satisfy federal regulations." *Bober v. Glaxo Wellcome PLC*, 246 F.3d 934, 941 (7th Cir. 2001). And federal law requires manufacturers to report list prices *without* subtracting "discounts, rebates or reductions in price." 42 U.S.C. §§ 1396r-8(a)(1), 1395w-3a(c)(6)(B). Illinois's General Assembly has also considered the specific policy concerns Lake County raises and *declined* to cap Manufacturers' list prices. Under these circumstances, Illinois law's safe harbors prohibit Lake County's attempt to accomplish policy goals through the courts.

The consumer fraud claims would still fail even without the safe harbors. Lake County's failure to explain how Manufacturers' accurately reported list prices were deceptive is as fatal to the County's deception claim as to the County's RICO claim. And the County gets no further with its claim that insulin prices are unconscionably high because an "unconscionably high price generally is insufficient to establish a claim for unfairness." *Siegel v. Shell Oil Co.*, 612 F.3d 932,

935 (7th Cir. 2010). Lake County also fails to allege—as is required—that Manufacturers violated a law or rule and that their conduct has no countervailing benefits.

The County's unjust enrichment claim falls with its RICO and consumer fraud claims, because it is based on the same conduct. It also fails on its own terms, as Lake County describes at length how contracts cover the alleged misconduct, and the existence of those contracts bars an unjust enrichment recovery. In addition, the County fails to allege the essential element of an unjust enrichment claim: that Manufacturers retained a benefit the County conferred.

Finally, the County's conspiracy claim fails both because it has failed to allege an underlying wrong, and because it has not alleged the existence of an agreement.

The Court should dismiss Lake County's claims against Manufacturers with prejudice.

## BACKGROUND

### I. THE DISTRIBUTION OF BRANDED PRESCRIPTION DRUGS.

Manufacturers are pharmaceutical companies that research, develop, manufacture, and sell prescription drugs, including insulin and other diabetes medications. Compl. ¶¶ 5, 18(c), 46, 57, 68, 235–40. Manufacturers do not sell insulin directly to patients, insurers, or health plan payors like Lake County. Compl. ¶¶ 278, 283 Fig. 13. Instead, they sell to wholesalers, which then sell medications downstream to pharmacies. *Id.*

The only price Manufacturers set is the "initial list (wholesale) price." Compl. ¶¶ 13, 18(c). The "list price" is aptly named the Wholesale Acquisition Cost, or "WAC," because it is the cost at which wholesalers acquire Manufacturers' medicines. *Id.* WAC is defined by federal law as "the manufacturer's list price for the drug or biological … not including prompt pay or other discounts, rebates, or reductions in price." 42 U.S.C. § 1395w-3a(c)(6)(B); *see also* Compl. ¶ 18(c) (WAC is "defined by federal law as the undiscounted list price for a drug or biologic to wholesalers or direct purchasers"). After wholesalers purchase medications at WAC, they sell to

pharmacies, who in turn sell to patients.  Compl. ¶ 283 Fig. 13.

PBMs work directly with health plans and insurers to manage and administer prescription drug coverage for insured patients.  *Id.* ¶ 18(b).  Their clients include governmental entities that operate "self-insured" health plans, like Lake County.  Compl. ¶¶ 18(a)–(b), 467–68.  Among other things, PBMs develop lists of drugs, called "formularies," that dictate which drugs are covered by the County's health plan, and at what cost.  *Id.* ¶ 9, 18(b), 19.  Exclusion from a formulary "can render the drug virtually inaccessible for millions of covered persons," which allows PBMs to "wield enormous influence over drug prices and purchasing behavior."  Compl. ¶ 10–11.  PBMs use this leverage to negotiate discounts—called rebates—from drug manufacturers.  *Id.* ¶ 19.  Whenever a member buys a drug at the pharmacy counter, the manufacturer pays the negotiated rebate to the PBM.  Senate Insulin Report at 33, *cited at* Compl. ¶ 15 n.5.  The PBM, in turn, often shares the rebates with payors like Lake County, depending on the terms of the PBMs' contracts with their clients, which can help offset the cost of drugs.  Compl. ¶¶ 176, 367, 369, 459; *see also* Senate Insulin Report at 33 n.186 (99.6% of rebates "passed through … to plan sponsors").

Rebates are an embedded—and, in some cases, mandated—feature of the U.S. healthcare system.  Since 1991, the Centers for Medicare & Medicaid Services ("CMS") has required manufacturers to enter into "rebate agreement[s]" with federal and state entities.  42 U.S.C. § 1396r-8(a)(1).  Generally, "drug manufacturers" must "agree to rebate to the states the difference between the manufacturer's normal price and its 'best price' to any customer."  *Wal-Mart Stores, Inc. v. Kickrehm*, 101 F. Supp. 2d 749, 757–58 & n.5 (E.D. Ark. 2000) (emphasis omitted).  Rebates are a familiar feature of private health insurance coverage, too.  *See id*. at 760 n.6.  Local and national media, industry groups and researchers, local governments, and the federal and Illinois legislatures have publicly discussed rebates, including the impact they have on insulin

prices, for years.   So have Manufacturers—including at congressional hearings about the "significant demand for rebates" from PBMs.   Compl. ¶ 344.   At those hearings, Manufacturers explained that higher rebates lead to higher insulin prices because "[s]eventy-five percent of [the reported] price is paid for rebates and discounts … ."   *Id.* ¶ 345.   They also testified that refusing to provide rebates would have severe consequences because PBMs—and by extension, payors like Lake County—would stop covering Manufacturers' medications.   *Id.* ¶¶ 344–46.

Lake County is a participant in this system, having contracted with PBMs since at least 2014.   *Id.* ¶¶ 18, 137, 174–75, 391, 413, 468–72.   Its PBM contracts disclose that the PBM receives "formulary rebates" and "administrative fees."   *Id.* ¶ 403.   Indeed, the County requires that the PBMs it hires use a "transparent pricing model" that guarantees the County *100%* of the rebates its PBM receives from pharmaceutical manufacturers, and prohibits its PBM "retain[ing] any money associated with prescription drug rebates."   *Id.* ¶ 175.   Lake County nonetheless now alleges that rebates are somehow a "secret" that cause it harm.   *See, e.g.*, *id.* ¶¶ 391, 409.

## II.   MANUFACTURERS REPORT THEIR LIST PRICES AS REQUIRED BY FEDERAL LAW.

Although Lake County asserts that "[t]here is no transparency in this pricing system," it admits that Manufacturers "self-report list prices to publishing compendiums such as First DataBank, Medi-Span, or Redbook, who then publish those prices."   Compl. ¶¶ 18(c), 280.   As the charts in the Complaint show, the County—and everyone else—has decades of information on the WAC of every insulin medication Manufacturers sell.   *See, e.g., id.* ¶¶ 260–64, 271–74.

This reporting system is governed by federal law.   In particular, federal law expressly requires manufacturers *not* to subtract rebates and other discounts from their reported list prices, by defining WAC as "the manufacturer's list price for the drug or biological to wholesalers or direct purchasers in the United States, *not including prompt pay or other discounts, rebates, or*

*reductions in price.*" 42 U.S.C. § 1395w-3a(c)(6)(B) (emphasis added). In other words, federal law requires Manufacturers to include the price to wholesalers—and only that price—in the WACs they report. Reporting the manufacturer's "net price"—i.e., WAC less rebates and any other discounts—as WAC would run afoul of this federal requirement.

While the federal government forbids subtracting rebates and other discounts from the WAC that Manufacturers report, the federal government knows the rebate amounts—and so does Lake County. Federal law requires PBMs to report the "aggregate amount, and the type of rebates, discounts, or price concessions ... that [they] negotiate[]." 42 U.S.C. § 1320b-23(b)(2). And Illinois law requires all PBMs to provide their clients—like Lake County—with "an annual right to audit" that requires the "full disclosure of any and all rebate amounts secured" by the PBM from any manufacturer. 215 Ill. Comp. Stat. 5/513b1(b)(5).

## III.  THIS LAWSUIT

Despite rebates being common knowledge and its own participation in the rebate system, Lake County now alleges that the rebate system is an "Insulin Pricing Scheme" that increases the prices the County paid. *See, e.g.*, Compl. ¶¶ 12, 27. It contends that PBMs have used their "great leverage" and "market dominance" to require Manufacturers to pay rebates that "grew year-over-year" and were shared with payors like the County. *Id*. ¶¶ 324, 328, 331, 367. As a result, the County claims, list prices have increased while "the net price (i.e., the price realized by the Manufacturers [after paying rebates]) has not." *Id*. ¶ 275.

Lake County attempts to transform the rebate system into violations of RICO and Illinois's Consumer Fraud and Deceptive Trade Practices Acts, with unjust enrichment and civil conspiracy claims as a backstop. As to Manufacturers, the County has two core allegations. First, it contends that Manufacturers engaged in deception and fraud because they published their "list price[s]," and thereby purportedly represented that the list price was "reasonably related to" net price when,

in fact, net price and list price are different.  Compl. ¶¶ 538(a), 539, 588(a), 589(b).  Second, it argues that Manufacturers' list prices are "unfair" because they are "egregious[]."  *Id.* ¶ 590.

Lake County is not the first to make such claims.  Over six years ago, a putative consumer class made the same allegations.  *See* Complaint, *Chaires et al. v. Novo Nordisk Inc. et al.*, No. 3:17-cv-00699 (D.N.J. Feb. 2, 2017), ECF No. 1 ("Insulin Pricing Compl.").  Since then, over a dozen other plaintiffs have filed functionally identical complaints, from which Lake County copies extensively.  *Infra* at Part I.B.

## ARGUMENT

## I.  LAKE COUNTY'S CLAIMS ARE TIME-BARRED.

The Complaint makes clear that the County's claims are time-barred.  Lake County claims that it was harmed because Manufacturers' list prices for their diabetes medications did not reflect PBM rebates, allegedly causing the County to pay inflated prices.  *See, e.g.,* Compl. ¶¶ 369, 371, 372, 375, 403, 481.  But the County knew well before the longest limitations periods (four years) that Manufacturers' list prices excluded rebates, and that the PBMs used their leverage to demand increasing rebates from Manufacturers.  *See, e.g.*, *id.* ¶¶ 362, 371.  Lake County attempts to excuse its delay by citing tolling doctrines but alleges no facts supporting their application.

### A.  The Applicable Limitations Period Is, At Most, Four Years

The limitations periods governing Lake County's claims are all four years or less.  The consumer fraud claims are governed by a three-year statute of limitations, which begins to run when the plaintiff knows or reasonably should know of its wrongfully caused injury.  815 Ill. Comp. Stat. 505/10a; *Gentleman v. Massachusetts Higher Educ. Assistance Corp.*, 272 F. Supp. 3d 1054, 1069 (N.D. Ill. 2017).  RICO has a four-year statute of limitations, which begins to run once a plaintiff knows or should have known that it was injured, not when the plaintiff discovers the underlying cause of action.  *See Rotella v. Wood*, 528 U.S. 549, 551, 555 (2000) ("[D]iscovery

of the injury, not discovery of the other elements of a claim, is what starts the clock."); *Jay E. Hayden Found. v. First Neighbor Bank, N.A.*, 610 F.3d 382, 386 (7th Cir. 2010).

Lake County's remaining claims, for unjust enrichment and civil conspiracy, are derivative of the other two and thus governed by their statutes of limitations. The unjust enrichment claim therefore stretches back, at most, four years. *McMahon v. Bumble Bee Foods LLC*, 148 F. Supp. 3d 708, 715 (N.D. Ill. 2015); *Bonilla v. Ancestry.com Operations Inc.*, 628 F. Supp. 3d 812, 820 (N.D. Ill. 2022) (unjust enrichment claim failed with untimely right of publicity claim). Civil conspiracy claims, similarly, are governed by the statute of limitations for the underlying tort—here, at most, a four-year limitations period. *See Mauvais–Jarvis v. Wong*, 987 N.E.2d 864, 894 (Ill. App. Ct. 2013). Thus, Lake County's claims are barred if it was—or reasonably should have been—on notice of its claims before April 2019.

### B.     Lake County Was Fully Aware of the So-Called Scheme

Lake County was on notice well over four years before it sued. To start, Lake County's own conduct shows it has known of its claims for years. The County's complaint is that it paid too much for insulin because the list price is higher than the net price. Compl. ¶¶ 19, 562. But what it pays for insulin is set by contracts that *it* negotiates—and it specifically negotiates to receive rebates. *Id*. ¶ 175; *see also id*. ¶¶ 366-69, 379 (discussing how payors contract to receive rebates). The County has been contracting with PBMs, and therefore has known about rebates and their role in insulin pricing, since at least 2014. *Id*. ¶¶ 403, 413.

Public—and well-publicized—lawsuits going back to early 2017 have further ensured that Lake County was on notice. The earliest lawsuit, *In re Insulin Pricing Litigation*, was filed over six years ago—and in Lake County's own words, involved "identical questions of fact and substantial overlap." *In re Insulin Pricing Litig.*, MDL No. 3080 (J.P.M.L. June 2, 2023), ECF No. 35, at 10–11. In that case, a putative consumer class alleged a "scheme" in which

8

Manufacturers "inflated" insulins' wholesale acquisition cost to facilitate payment of rebates "in exchange for formulary status." *Insulin Pricing* Compl. ¶¶ 14, 21; *see also id*. ¶¶ 2, 10–12 (alleging that Manufacturers conspire with PBMs to inflate the spread between list and net prices as a "quid pro quo" for formulary access). Lake County's Complaint copies word-for-word from the *Insulin Pricing* complaint. *Compare, e.g., id.* ¶ 55 ("The prescription drug industry consists of an opaque and complex network of entities engaged in multiple distribution and payment structures.") *with* Compl. ¶ 277 ("The prescription drug industry is comprised of a deliberately opaque network of entities engaged in multiple distribution and payment structures."). And that lawsuit's filing was publicized in major news outlets.[1]

Since that first lawsuit in 2017, over a dozen similar lawsuits have been filed, including several filed before April 2019. *See MSP Recovery Claims Series, LLC v. Sanofi-Aventis U.S. LLC et al.,* No. 18-cv-2211 (D.N.J.) (filed Feb. 15, 2018); *State of Minnesota v. Sanofi-Aventis U.A. LLC et al.*, No. 18-cv-14999 (D.N.J.) (filed Oct. 16, 2018). These lawsuits, too, alleged an "insulin pricing scheme" in which rebates paid "in exchange for" formulary status "inflated" the list prices for insulin. *MSP Recovery* Compl. ¶¶ 106, 261; *Minnesota* Compl. ¶ 62 (alleging a "deceptive pricing scheme"), 74, 141.

This long litigation history further confirms that the facts underlying this lawsuit have been publicly known—and used by plaintiffs—since long before Lake County filed suit, foreclosing its claims under the statute of limitations. *See, e.g., Knauf Insulation, Inc. v. S. Brands, Inc.*, 820 F.3d

---

[1] *See, e.g.*, Ex. 1, Katie Thomas, *Drug Makers Accused of Fixing Prices on Insulin*, NEW YORK TIMES (Jan. 30, 2017), https://www.nytimes.com/2017/01/30/health/drugmakers-lawsuit-insulin-drugs.html; Ex. 2, Carolyn Y. Johnson, *Diabetes Patients Sue Insulin Makers for 'Pricing Fraud'*, Wash. Post (Jan. 30, 2017), https://www.washingtonpost.com/news/wonk/wp/2017/01/30/diabetes-patients-sue-insulin-makers-for-pricing-fraud; Ex. 3, *Lawsuit Accuses Drug Makers of Conspiring to Hike Insulin Prices*, CBS News (Feb. 22, 2017), https://www.cbsnews.com/news/insulin-price-hike-lawsuit-accuses-drug-makers-of-conspiring.

904, 909 (7th Cir. 2016) (suit time-barred where plaintiff "should have known" of prior suit). And even if those lawsuits somehow were not enough to put Lake County on notice, they still confirm that Lake County could easily have filed suit long before it did, like the many other plaintiffs who did precisely that.

Congressional reports, regulatory filings, and the news media have also discussed the challenged conduct for years.[2] As early as 2007, Congress began an inquiry into the use of rebates in the pharmaceutical industry. That year, the Congressional Budget Office issued a report that noted "[m]anufacturers set their prices to wholesalers … keeping in mind that they will pay rebates to … a PBM" and that PBMs provided "Preferred Placement on Formular[ies]" in exchange for "Negotiated Rebate[s] for Brand-Name Drugs."[3] By at least 2012, news outlets across the country, including in northern Illinois, were reporting on the supposedly "secret" rebates manufacturers pay and the impact on insulin pricing.[4] Lake County itself relies on such articles.[5]

---

[2] "[I]t is routine for courts to take judicial notice of … newspaper articles … ." *Schmude v. Sheahan*, 312 F. Supp. 2d 1047, 1064 (N.D. Ill. 2004). The Court can also consider sources which indicate what "was in the public realm" at the motion to dismiss stage. *United States ex rel. John v. Hastert*, 82 F. Supp. 3d 750, 764 (N.D. Ill. 2015); *see also In re Midway Games, Inc. Sec. Litig.*, 332 F. Supp. 2d 1152, 1155 n.1 (N.D. Ill. 2004) ("The Court may take judicial notice of SEC filings without converting a motion to dismiss to a motion for summary judgment[.]").

[3] Ex. 4, Cong. Budget Office, Pub. No. 2703, *Prescription Drug Pricing In The Private Sector*, at 10–11 (2007), https://tinyurl.com/yc5zahpr.

[4] *See, e.g.*, Ex. 5, David Tridgell, *Insulin is too expensive for many of my patients. It doesn't have to be*, CHICAGO TRIBUNE (June 23, 2017); Ex. 6, Katie Thomas, *Drug Prices Keep Rising Despite Intense Criticism*, NEW YORK TIMES (Apr. 26, 2016); Ex. 7, Andrew Pollack, *Health Insurers Pressing Down on Drug Prices*, NEW YORK TIMES (June 20, 2014); Ex. 8, Matthew Herper, *Inside the Secret World of Drug Company Rebates*, FORBES (May 10, 2012).

[5] Ex. 9, David Balto, *How PBMs Make the Drug Price Problem Worse*, THE HILL (Aug. 31, 2016, 5:51 PM), https://thehill.com/blogs/pundits-blog/healthcare/294025-how-pbms-make-the-drug-price-problem-worse, cited at Compl. ¶ 353 n.60; Ex. 10, Dave Muoio, *Insulin Prices: Are PBMs and Insurers Doing Their Part?*, Population Health Learning Network (Dec. 2016), https://www.hmpgloballearningnetwork.com/site/frmc/article/insulin-prices-are-pbms-and-insurers-doing-their-part, cited at Compl. ¶ 434 n. 89; Ex. 11, Lynn R. Webster, *Who Is To Blame For Skyrocketing Drug Prices?*, The Hill (July 27, 2017, 11:40 AM), https://thehill.com/blogs/pundits-blog/healthcare/344115-who-is-to-blame-for-skyrocketing-drug-prices, cited at Compl. ¶ 436 n.100; Ex. 12, Laura Rogers & Stacey Thomas, Broward County Florida, *Audit of Pharmacy*

Indeed, Manufacturers themselves disclosed that competitive pressures were increasing rebate payments. Over a decade ago, Eli Lilly reported that "[i]n response to competitive pressures, [it] ha[d] entered into arrangements with [purchasers] which provide for discounts or rebates on one or more Lilly products." Similarly, Novo Nordisk's 2013 Annual Report disclosed that it paid $5 billion to obtain "formulary status." Sanofi, too, has repeatedly disclosed this point.[6]

Manufacturers discussed the role of rebates in pricing again at the April 10, 2019 high-profile Congressional hearing about insulin pricing that Lake County relies on—a key event that predates Lake County's April 18, 2023 lawsuit by more than four years. *See* Compl. ¶¶ 340–46. As Lake County concedes, Eli Lilly disclosed that it must "provide rebates [to PBMs] in order to provide and compete for that [formulary position]." *Id*. ¶ 345. Novo Nordisk, too, explained that in the rebate system, "there is increased pressure to keep list prices high," including insulin prices. *Id*. ¶ 344. And Sanofi "acknowledged that … payments based on a percentage of list price result in a higher margin [for PBMs] for the higher list price product … ." *Id*. ¶ 346.

Over a decade of public discussion and disclosure—on top of a steady stream of functionally identical lawsuits and Lake County's own involvement in the underlying conduct— was more than sufficient to put the County on notice of its claims well before the limitations period.

---

*Benefit Management Services Agreement*, No. 18-13 (Dec. 7, 2017), https://cragenda.broward.org/docs/2018/CCCM/20180109_555/25990_2017_1212%20Exh1_OptumRx%20-%20Revised%20Item.pdf, *cited at* Compl. ¶ 387 n.70.

[6] *See* Eli Lilly & Co., 2009 Annual Report (Form 10-K) at 3, 26 (Feb. 22, 2010), *available at* https://tinyurl.com/5n6v4rke (warning of "pressures for increased pharmaceutical discounts and rebates"); Novo Nordisk, 2013 Annual Report (Form 6-K) at 64 (Feb. 5, 2014), *available at* https://tinyurl.com/5256uvw9; Sanofi, 2014 Annual Report (Form 20-F) at 11 (Mar. 10, 2015), *available at* https://bit.ly/2WMCqKc (Sanofi "had to increase the level of rebates for Lantus required to maintain favorable formulary positions with key payers in the US."); *id*. at 105 ("To maintain [favorable formulary] position, we had to significantly increase the level of discounts offered in order to match the substantial rebates offered by our competitors."); Sanofi, Half-Year Management Report (Ex. 99.2 to Form 6-K) at 15 (July 31, 2015), *available at* https://bit.ly/3FSPlCD.

*Borto v. First Am. Title Co*., 2017 WL 1270353, at *4 (Ill. App. Ct. Mar. 31, 2017) ("[P]laintiff should have known of his injury [based on] the public record").

### C.  No Tolling Doctrine Salvages Lake County's Claims

In an attempt to excuse its delay, the County invokes four tolling doctrines: (1) the discovery rule, (2) fraudulent concealment, (3) estoppel, and (4) continuing violation.  Compl. ¶¶ 497–513.  But it does not plausibly allege facts supporting those doctrines' application here.

*First*, the discovery rule does not help the County.  The County says that its claims are timely because it did not "possess sufficient information … to put Plaintiff or any reasonable person on inquiry notice to determine whether actionable conduct was involved."  *Id*. ¶ 498.  As shown above, that is not the case.  The County not only unquestionably knew about its own PBM contracts, but the substantially similar lawsuits, government publications, news articles, and Manufacturer disclosures also gave it notice years before the limitations period elapsed.  The fact that, based on readily accessible public information, numerous other parties were able to discover and publicly discuss—and sue over—the same conduct belies the County's claim.

*Second*, fraudulent concealment and equitable estoppel fare no better.  Lake County does not allege that Manufacturers took "affirmative acts … designed to prevent the discovery of [an] action," or that they "misrepresented or concealed material facts."  *Clay v. Kuhl*, 727 N.E.2d 217, 223 (Ill. 2000) (fraudulent concealment); *Doe v. Hastert*, 133 N.E.3d 1249, 1257 (Ill. App. Ct. 2019) (equitable estoppel).  Its suit is instead premised on Manufacturers' public disclosures. *See, e.g.*, Compl. ¶¶ 421-24, 426.  And Manufacturers publicly disclosed the relevant facts well before the limitations period.  *See supra*, Part I.B; *Cnty. Bd. of Sch. Trs. of DuPage Cnty. v. Ass'n of Franciscan Fathers*, 364 N.E.2d 691, 696 (Ill. App. Ct. 1977) ("The rule that the statute begins to run only from the discovery of the fraud does not apply when the party affected might with ordinary care have discovered it."); *Doe*, 133 N.E.3d at 1258 ("To claim the benefit of equitable

estoppel, a plaintiff must have had no knowledge or means of knowing the true facts within the applicable limitations period."). Lake County has long known or "by ordinary care could have discovered" Manufacturers' allegedly "inflated" prices. *Dancor Int'l, Ltd. v. Friedman, Goldberg & Mintz*, 681 N.E.2d 617, 624 (Ill. App. Ct. 1997); Compl. ¶¶ 417, 420, 424, 528.

Even if Lake County had alleged any concealment or misrepresentation, equitable estoppel "will not apply if the defendant's conduct ended within ample time to allow a plaintiff to avail himself of his legal rights under the statute of limitations." *Butler v. Mayer, Brown & Platt*, 704 N.E.2d 740, 745 (Ill. App. Ct. 1998). If "as little as six months remain[s] in a statute of limitations," plaintiff must still bring suit within the limitations period. *Id.* Here, Lake County contends Manufacturers publicly "admitted" the "scheme" as of April 2019. Compl. ¶¶ 340–49. It has no explanation for its four-year delay in bringing suit.

***Finally***, the continuing violation doctrine similarly fails to salvage the Complaint. The doctrine is a "limited exception to the general rule of accrual," which applies only to "a certain sort of injury." *Cothron v. White Castle Sys., Inc.*, 477 F. Supp. 3d 723, 730 (N.D. Ill. 2020). Specifically, it applies to "cumulative" violations, in which no injury exists until a "series of wrongful acts blossoms into" an actionable harm. *Limestone Dev. Corp. v. Vill. of Lemont*, 520 F.3d 797, 801 (7th Cir. 2008); *see also Cunningham v. Huffman*, 609 N.E.2d 321, 325 (Ill. 1993) (applying doctrine to medical negligence, because "a single dosage of radiation or medicine might be harmless, whereas treatment over time might be either disabling or even fatal").

Lake County has not alleged a continuing violation. It contends Manufacturers violated the statute each time they "publish[ed] artificially inflated prices for insulin" and that Lake County was injured each time it paid "artificially inflated prices for diabetes medications." Compl. ¶¶ 538, 539, 541. This alleged wrongdoing and injury did not "blossom" within the limitations period

13

because "[n]othing about the repeated or ongoing nature of [Manufacturers'] conduct affected the nature or validity of [Plaintiff]'s suit." *Rodrigue v. Olin Emps. Credit Union*, 406 F.3d 434, 443 (7th Cir. 2005). The continuing violation doctrine therefore has no application here.

For all these reasons, the County's claims are all untimely. That alone requires dismissal.

## II.    LAKE COUNTY'S RICO CLAIMS FAIL ON THE MERITS TOO.

### A.    The Indirect Purchaser Rule Bars Lake County's RICO Claims Against Manufacturers

Under the indirect purchaser rule, indirect purchasers of a product lack standing to assert RICO claims. This is a bright-line rule: "a plaintiff cannot seek damages under RICO where it is an indirect purchaser, meaning where it alleges that it paid the costs of a RICO scheme that were passed on by the scheme's direct victim." *Fiala*, 2012 WL 917851, at *6; *see also Carter v. Berger*, 777 F.2d 1173, 1175–76 (7th Cir. 1985) (holding that in RICO cases "an indirectly injured party should look to the recovery of the directly injured party, not to the wrongdoer, for relief"). The indirect purchaser rule exists to avoid "injecting extremely complex issues" of "apportionment of the recovery throughout the distribution chain," and to foreclose the "overlapping recoveries" that "are certain to result" from allowing indirect purchasers to sue. *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 730–31, 745 (1977).

Since *Illinois Brick*, courts across the country—including this Court and the Seventh Circuit—have held that the rule applies to RICO claims. *See Carter*, 777 F.2d at 1175–76; *Fiala*, 2012 WL 917851, at *6 (applying rule in RICO case); *McCarthy v. Recordex Serv., Inc.*, 80 F.3d 842, 855 (3d Cir. 1996) ("The precepts taught by *Illinois Brick* and *UtiliCorp* apply to RICO claims, thereby denying RICO standing to indirect victims."); *Perry v. Am. Tobacco Co.*, 324 F.3d 845, 849 (6th Cir. 2003) ("We reject Plaintiffs' claim that standing to bring a RICO claim is not always limited to parties who are directly injured.").

14

The indirect purchaser rule therefore bars Lake County's RICO claim as a matter of law, as it does not purchase insulin directly from Manufacturers. As the Complaint recognizes, the direct purchasers of insulin are wholesalers and mail-order pharmacies, *see* Compl. ¶ 278, and the County is neither. Instead, it is a payor. Payors like Lake County are not first, second, or even third in the insulin distribution chain. *Id*. ¶ 18(a), 283 Fig. 13. First in the chain are wholesalers. *Id*. ¶ 283 Fig. 13. Pharmacies come second, selling to patients, who are third in the chain alongside the PBMs who reimburse pharmacies for insulin sales. Payors like Lake County reimburse the PBMs, and thus enter the payment system at the very end. *Id.* Accordingly, Lake County lacks standing to pursue RICO claims. *Fiala*, 2012 WL 917851, at *6; *see also Marion Diagnostic Ctr., LLC v. Becton Dickinson & Co.*, 29 F.4th 337, 343 (7th Cir. 2022) (noting that *Illinois Brick* allocates the right to sue "to direct purchasers alone").

This case exemplifies the concerns that led the Supreme Court to establish the indirect purchaser rule in *Illinois Brick*. The direct purchasers of insulin—wholesalers—have also brought RICO claims against Manufacturers. *See* Second Am. Compl., *In re Direct Purchaser Insulin Pricing Litig.*, No. 20-cv-3426 (D.N.J. Nov. 11, 2022), ECF No. 261. Declining to apply the rule here would create the exact circumstances *Illinois Brick* aims to avert. Both wholesalers and Lake County would contend that they are entitled to recover the difference between insulin's actual wholesale price and what the price should have been—wholesalers, because they paid that difference in the first instance, and Lake County, because that difference was supposedly passed on to them. This Court would be tasked with determining who in the supply chain absorbed how much of the overcharge, and Manufacturers would face the risk of duplicative liability. Courts adjudicating functionally identical RICO claims have, unsurprisingly, consistently barred payors' insulin-pricing RICO claims. *See MSP Recovery Claims, Series, LLC v. Sanofi Aventis U.S. LLC*,

2019 WL 1418129, at *16 (D.N.J. Mar. 29, 2019); *Harris Cnty. v. Eli Lilly & Co.*, 2022 WL 479943, at *8–11 (S.D. Tex. Feb. 16, 2022). This Court should reach the same result.

### B. Lake County Fails To Plead That Manufacturers Conducted The Affairs Of A RICO Enterprise.

Lake County's RICO claims also fail because the County does not allege that Manufacturers conducted the affairs of a RICO enterprise. To state a RICO claim, "a plaintiff must identify an 'enterprise'" that is "distinct" from the defendants. *United Food*, 719 F.3d at 853. Lake County must then allege that Manufacturers "conducted … the '*enterprise's* affairs,' not just [their] own affairs." *Id.* at 854 (quoting *Reves v. Ernst & Young,* 507 U.S. 170, 185 (1993)). Seventh Circuit precedent is clear: Lake County must explain how Defendants' "cooperation … fell outside the bounds of [their] normal commercial relationships." *Id.* at 856.

According to Lake County, Defendants operate six separate RICO enterprises, each consisting of a combination of one Manufacturer and one PBM. Compl. ¶ 519. To satisfy the conduct element, it alleges that Manufacturers "control[]" their own payments to PBMs, "control[] the publication of the false list prices," and "control the creation and distribution of marketing, sales and other materials." Compl. ¶ 552(a), (d), (e). But those are actions Manufacturers take on their own: "*[e]ach* Manufacturer Defendant" pays *its own* rebates, publishes *its own* list prices and distributes *its own* marketing materials unilaterally. *Id.* There are no allegations that Manufacturers cooperated with or controlled the PBMs in a way that establishes the Defendants jointly "conducted" an enterprise. Nor are there any allegations that Manufacturers "involved themselves in the affairs" of the PBMs or vice versa. To the contrary, Lake County has not identified "any specific role that [Manufacturers] may have played in [the PBMs'] … decisions." *United Food*, 719 F.3d at 854; *D.M. Robinson Chiropractic, S.C. v. Encompass Ins. Co. of Am.*, 2013 WL 1286696, at *10 (N.D. Ill. Mar. 28, 2013). The County alleges only that Manufacturers

paid rebates, set and published prices, and created and distributed marketing materials—the same actions that every pharmaceutical company takes. Compl. ¶ 552(a), (d), (e). Indeed, courts have recognized that rebates are a "normal competitive tool" and a "widespread industry practice." *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Practices and Antitrust Litig.*, 44 F.4th 959, 989 (10th Cir. 2022); *J.B.D.L. Corp. v. Wyeth-Ayerst Labs, Inc.*, 2005 WL 1396940, at *2 (S.D. Ohio June 13, 2005). The allegations here are "entirely consistent with" Manufacturers each "going about [their] own business," and cannot support a RICO claim. *United Food*, 719 F.3d at 855.

The Seventh Circuit has affirmed dismissal of cases that suffer from the same defect. In *United Food*, a drug manufacturer convinced a pharmacy to fill prescriptions for capsules of a given drug with the more-expensive tablet form of that drug. *Id.* at 851–52. Although the two companies implemented that "illegal drug-switching scheme," "regularly communicated" with each other, and made purchases from each other, the Seventh Circuit held that the complaint failed to state a RICO claim because it did not explain "how one might infer that these communications or actions were undertaken on behalf of the *enterprise*," rather than "to advance their individual self-interests." *Id.* at 854–56. The plaintiffs needed to allege conduct outside the bounds of a normal commercial relationship, which would require something like "officials from [one] company involv[ing] themselves in the affairs of the other" or "siphon[ing] off" profits from a company to the enterprise. *United Food*, 719 F.3d at 854–55; *see also Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633, 656 (7th Cir. 2015) (abnormal conduct includes "an unusual degree of economic interdependence" and failure to "operate as completely separate entities"). Lake County's attempt to satisfy the "conduct" element has the same fatal flaw.

## C. Lake County Fails To Plead RICO Predicate Acts.

Lake County's RICO claims also founder on the requirement that it allege at least

two predicate acts of "racketeering activity" by each Manufacturer. 18 U.S.C. § 1961(1) & (5). The County seeks to satisfy this requirement by cursorily claiming that Manufacturers committed mail and wire fraud. *See, e.g.*, Compl. ¶ 516. But it has not pleaded any fraud or misrepresentation by Manufacturers at all, much less with the particularity required by Rule 9(b).

To plead mail or wire fraud, Lake County had to allege a "scheme or artifice to defraud." 18 U.S.C. §§ 1341, 1343. Lake County claims Manufacturers' list prices are "fraudulent" because they were not "reasonably related to the actual prices realized by Defendants." Compl. ¶ 538(a). But that allegation cannot substantiate the County's fraud claims, because the County does not claim that Manufacturers ever *represented* that their list prices were "the actual prices [they] realized." Nor could they have, as federal law unambiguously states that a "manufacturer's list price" does "*not* includ[e] prompt pay or other discounts, rebates or reductions in price." 42 U.S.C. §1395w-3a(c)(6)(B) (emphasis added). And Lake County admits that Manufacturers reported WACs as "defined by federal law." Compl. ¶ 18(c). Lake County never explains how it could be fraudulent for Manufacturers to *accurately* report their own wholesale prices.

The failure of Lake County's fraud allegations becomes even clearer when they are measured against Rule 9(b)'s heightened standard. "[A] plaintiff alleging predicate acts of mail and wire fraud must do so with particularity." *Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 729 (7th Cir. 1998). Lake County was required to state "the identity of the person who made the misrepresentation," the misrepresentation's "time, place and content," and "the method by which [it] was communicated." *Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 777 (7th Cir. 1994). It did not. It fails to differentiate among the three Manufacturers, "lump[ing] all the defendants together." *Sears v. Likens*, 912 F.2d 889, 893 (7th Cir. 1990); *see, e.g.*, Compl. ¶¶ 416–43. Nor does it identify the "time" and "place" of *any* allegedly misrepresented price, or "the

18

method by which [it] was communicated," *Vicom*, 20 F.3d at 777, instead vaguely asserting that Manufacturers "published list prices … throughout the United States and Illinois through publishing compendia, in various promotional and marketing materials distributed by entities … , and directly to pharmacies." Compl. ¶ 421. Absent specific allegations of deceit, Rule 9(b) requires dismissal.

### D.   Lake County's RICO Conspiracy Claims Fall With Its RICO Claims

Finally, the County's RICO conspiracy claim is just as deficient as its substantive RICO claim. Lake County alleges that Manufacturers violated § 1962(d) by "agreeing and conspiring to violate 18 U.S.C. § 1962(b)." Compl. ¶ 575. But "the touchstone of liability under § 1962(d) is an agreement to participate in an endeavor which, if completed, would constitute a violation of the substantive statute." *Goren*, 156 F.3d at 731–32. Because the County cannot bring a valid substantive RICO claim, its RICO conspiracy claim fails as well. *Id.* at 733.

## III.   LAKE COUNTY DOES NOT STATE A CONSUMER FRAUD CLAIM.

Lake County also contends that the rebate system amounts to consumer fraud under Illinois' Consumer Fraud and Uniform Deceptive Trade Practices Acts. But not only are rebates protected by those Acts' safe-harbor provisions exempting conduct in compliance with state and federal law, Lake County has also failed to allege that Manufacturers' conduct was either "deceptive or unfair," as required by the Acts. *Siegel*, 612 F.3d at 934; 815 Ill. Comp. Stat. 505/2; 815 Ill. Comp. Stat. 510/2.

### A.   Lake County's Claims Are Barred By The Acts' Safe Harbor Provisions.

Both consumer fraud statutes have a safe harbor provision foreclosing suits premised on Manufacturers' alleged conduct. The Illinois Consumer Fraud Act safe harbor exempts "actions or transactions specifically authorized by laws administered by any regulatory body or officer acting under statutory authority of this State or the United States." 815 Ill. Comp. Stat. 505/10b(1).

The authorization "need not be express." *Price v. Philip Morris, Inc.*, 848 N.E.2d 1, 42 (Ill. 2005). Rather, conduct is "specifically authorized" so long as the federal or Illinois government "contemplated" or "considered, without disapproving," the underlying conduct. *Johnson v. Marshall Field & Co.*, 312 N.E.2d 271, 276 (Ill. 1974) (affirming dismissal of Deceptive Trade Practices Act claim on these grounds). The Illinois Uniform Deceptive Trade Practices Act similarly exempts "conduct in compliance with the orders or rules of or a statute administered by a Federal, state or local government[] agency." 815 Ill. Comp. Stat. 510/4; *see People ex rel. Daley v. Datacom Sys. Corp.*, 531 N.E.2d 839, 847 (Ill. App. Ct. 1988). Lake County's claims fail because the conduct it challenges was authorized by and complied with federal and Illinois statutes.

### 1. Manufacturers Reported Their List Prices As Required By Law.

Lake County alleges that Manufacturers' list prices are "false" within the meaning of Illinois' consumer fraud statutes because they are "untethered" from the "net prices" Manufacturers receive after accounting for rebates, fees, and other discounts. *See, e.g.*, Compl. ¶¶ 22 n.10, 588(a), 589(b). That theory is not viable. Federal law expressly prohibits Manufacturers from subtracting rebates, fees, and other discounts from their list prices. As the County acknowledges, the "list price" Manufacturers "self-report" is the "Wholesale Acquisition Cost" or "WAC," which is "defined by federal law." *Id*. ¶ 18(c). Federal law states that a Manufacturer's WAC is "the manufacturer's *list price* for the drug or biological to wholesalers or direct purchasers in the United States, *not including* prompt pay or *other discounts, rebates or reductions in price*." 42 U.S.C. § 1395w-3a(c)(6)(B) (emphases added); *see also* Compl. ¶ 18(c) (WAC is "defined by federal law as the *undiscounted* list price for a drug or biologic to wholesalers or direct purchasers") (emphasis added). Because Manufacturers reported their list price exactly as federal law prescribes, their conduct was "specifically authorized" by "laws … of … the United States." 815 Ill. Comp. Stat. 505/10b(1); *Robinson v. Toyota Motor Credit Corp.*, 775 N.E.2d 951,

962–963 (Ill. 2002) (dismissing consumer fraud claim where defendant's disclosures complied with the Truth in Lending Act).

Nor can Lake County claim that Manufacturers should have explained the relationship between their list prices and their net prices. Illinois law's safe harbors forbid claims that impose a "higher disclosure requirement" than "sufficient to satisfy federal regulations." *Bober*, 246 F.3d at 941. Thus, to state a claim, Lake County must allege that Manufacturers' conduct was inconsistent with federal law. *Id.*; *Mario's Butcher Shop & Food Center, Inc. v. Armour & Co.*, 574 F. Supp. 653, 656 (N.D. Ill. 1983) (dismissing claim for failure to allege specific violations of applicable federal law). It has not and cannot, which dooms its claims. *Lanier v. Assocs. Fin., Inc.*, 499 N.E. 2d 440, 441-42 (Ill. 1986); *Robinson*, 775 N.E.2d at 962–963; *Price*, 848 N.E.2d at 54 (failure to disclose claim was "barred by this court's long-standing rule against imposing additional disclosure requirements beyond those established by statute or agency regulation").

### 2. Manufacturer Rebates Are "Authorized" By Federal and Illinois Law.

Not only is the way that Manufacturers report list prices specifically authorized by federal law—so, too, are the prices, rebates, and discounts about which the County complains. Lake County alleges that Manufacturers' list prices are "egregious[]." *See, e.g.*, Compl. ¶ 590. But the safe harbors bar any claim for relief predicated on that theory for multiple reasons.

The Illinois legislature has specifically addressed the affordability of insulin. And it chose to take action with respect to *payors*, who receive "some or all" of the rebates Manufacturers pay, and who must "limit the total amount that an insured is required to pay for a 30-day supply of covered prescription insulin drugs at an amount not to exceed $100." Compl. ¶¶ 283 Fig. 13; 367, 369, 371; 215 Ill. Comp. Stat. 5/356Z.41(c). It did not require additional disclosures from Manufacturers. Nor did it cap list prices for insulin, limit rebates, or curtail any of the practices Lake County challenges. The Consumer Fraud and Deceptive Trade Practices Acts therefore bar

Lake County's attempt to use the judiciary to bypass the legislature, because the legislature plainly "contemplated" the supposedly unfair practice, "considered" how to address policy concerns about it, and never "disapprov[ed]" the underlying conduct. *Johnson*, 312 N.E.2d at 276. That legislative activity puts the challenged conduct beyond the reach of the courts unless Lake County plausibly alleges the conduct actually violates state or federal law, *Mario's*, 574 F. Supp. at 656, which it has not attempted to do. *Cf. Attorney General v. Eli Lilly & Co.*, 2023 WL 4141169, at *1 (Mich. Ct. App. June 22, 2023) (holding Eli Lilly's conduct "specifically authorized by law").

The safe harbor provisions also bar Lake County's Complaint because Lake County blames price increases on rebates. Compl. ¶¶ 19, 289, 325. And paying rebates is both "specifically authorized" by and "conduct in compliance" with state and federal law. Both state and federal law regulate rebates, prescribing how and to whom they are reported. 42 U.S.C. § 1320b-23(b); 215 Ill. Comp. Stat. 5/513b1(b)(5). Both *require* Manufacturers to pay rebates in some circumstances. *See, e.g.*, 42 U.S.C. § 1396r-8(a)(1); *Wal-Mart Stores*, 101 F. Supp. 2d at 757–58 & n.5. This specific authorization of Manufacturers' rebate practices is an additional reason the Consumer Fraud and Deceptive Trade Practices claims must be dismissed.

### B. Lake County Does Not State A Deception Claim.

Lake County's consumer fraud claims independently fail on their merits. The County portrays Manufacturers' list prices as a deceptive "scheme." But a practice is not "deceptive" unless "it creates a likelihood of deception or has the capacity to deceive." *Bober*, 246 F.3d at 938; *Assoc. of Am. Physicians & Surgeons, Inc. v. Am. Bd. of Med. Specialties*, 15 F.4th 831, 834 (7th Cir. 2021). Courts assess deception allegations from a "reasonable consumer['s]" perspective. *Jackson v. Kraft Heinz Foods Co.*, 2022 WL 4591749, at *2 (N.D. Ill. Aug. 3, 2022); *Galanis v. Starbucks Corp.*, 2016 WL 6037962, at *3 (N.D. Ill. Oct. 14, 2016). Lake County must allege "more than a mere possibility" that a statement could be "misunderstood by some few consumers

viewing it in an unreasonable manner." *Chiapetta v. Kellogg Sales Co.*, 2022 WL 602505, at *3 (N.D. Ill. March 1, 2022). That is especially difficult here, where the relevant consumer population here consists of sophisticated payors like Lake County. *See, e.g.*, Compl. ¶¶ 18(a), 419 ("[P]ayors, including Plaintiff, relied on the false list prices … ."). The County never alleges that patients or the general public even see Manufacturers' list prices. The Lake County must also identify the misleading statement with the particularity required by Rule 9(b). *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 736–37 (7th Cir. 2014) (Consumer Fraud Act claims sounding in fraud are analyzed under Rule 9(b)).

Lake County's deception allegations against Manufacturers can be boiled down to one central claim: that Manufacturers published prices for drugs that were "artificially inflated and untethered from the cost of the drugs or the price Manufacturers were paid for them." Compl. ¶ 588(a). But those allegations fail to plausibly allege that list prices are *deceptive*. Lake County never explains how a reasonable payor could plausibly be misled by Manufacturers' list prices. *Chiapetta*, 2022 WL 602505, at *3. And it certainly never identifies any statement where any Manufacturer even *suggested* that list prices accounted for rebates, approximated net prices, were "tethered" to the net price, or were anything other than the wholesale acquisition cost of their medicines. Instead, it concedes that Manufacturers' list prices are what they purport to be: their drugs' "Wholesale Acquisition Cost," which, as Lake County itself alleges, is "defined by federal law as the *undiscounted* list price for a drug … to wholesalers." Compl. ¶¶ 13, 18(c) (emphasis added).

Once again, Rule 9(b) further confirms the failure of the County's theory. Statutory consumer fraud claims, like RICO claims, "must be pled with the same particularity and specificity as that required under common law fraud." *Spector v. Mondelez Int'l Inc.*, 178 F. Supp. 3d 657,

664 (N.D. Ill. 2016). Lake County's failure to meet that standard is as fatal to its consumer fraud claims as to its RICO claims. *See supra*, Part II.B; *Petrich v. MCY Music World, Inc.*, 862 N.E.2d 1171, 1181 (Ill. App. Ct. 2007) (affirming dismissal of consumer fraud claims which did not satisfy Rule 9(b)).

Lake County implies that Manufacturers should have said more about the relationship between their list and net prices. *See, e.g.*, Compl. ¶ 539. If the County pursues such an omissions theory, it fails for two reasons. ***First***, Illinois's consumer fraud statutes do "not require a company to affirmatively share how [a service or] product will affect its own profits." *Ridings v. Am. Fam. Ins. Co.*, 2021 WL 722856, at *5 (N.D. Ill. Feb. 24, 2021). Omissions are actionable only if they create "an affirmatively false impression." *Spector*, 178 F. Supp. 3d at 672 (internal quotation omitted). Because Lake County implies Manufacturers' prices are "incomplete," but cannot claim they are an "affirmative misstatement," its deception claims must fall. *Phillips v. DePaul Univ.*, 19 N.E. 3d 1019, 1030 (Ill. App. Ct. 2014).

***Second***, Manufacturers are not required to say more because concealing a material fact is actionable only when a defendant has "almost exclusive knowledge" of that fact. *Randels v. Best Real Estate, Inc.*, 612 N.E.2d 984, 988 (Ill. App. Ct. 1993). "[P]ublicly available and accessible" facts do not support a claim for deception. *Ridings*, 2021 WL 722856, at *5. As explained previously, the relationship between rebates and list prices has not only been publicly available and accessible for over a decade, Lake County has unquestionably known of that relationship from its contracts with PBMs. This, too, forecloses any omission theory. *See supra* Part I.B.

## C. Lake County Does Not State A Claim For Unfairness.

Lake County also attempts to allege an "unfair practice" by claiming that Manufacturers "egregiously driv[e] up the price of the at-issue drugs," and that those price increases "bear no reasonable relationship to manufacturing or production cost increases or changes in supply and

24

demand conditions." Compl. ¶ 590. "When assessing whether a practice is 'unfair'," courts consider: "(1) whether the practice offends public policy; (2) whether it is immoral, unethical, oppressive, or unscrupulous; and (3) whether it causes substantial injury to consumers." *Toulon v. Cont'l Cas. Co.*, 877 F.3d 725, 740 (7th Cir. 2017). The Complaint meets none of these criteria.

**First**, Lake County makes no effort to allege that Manufacturers violated public policy. Because the "Consumer Fraud Act is concerned with public policy as established by statutes and the common law," *Batson v. Live Nation Ent., Inc.*, 746 F.3d 827, 833 (7th Cir. 2014), Lake County must identify a statute, administrative rule, or common law doctrine that Manufacturers violated. *Boyd v. U.S. Bank, N.A.*, 787 F. Supp. 2d 747, 752 (N.D. Ill. 2011). This requirement is particularly rigorous where, as here, a plaintiff claims that prices are unfairly high. *See Lane v. Direct Energy Serv., LLC*, 2020 WL 3211435, at *4 (S.D. Ill. June 15, 2020) ("price-gouging" scheme did not offend public policy without allegation it violated "a standard of conduct articulated in an existing statute or common law doctrine"). Lake County does not attempt to do so, instead baldly asserting that Defendants' conduct "violates Illinois public policy." Compl. ¶ 591. That bare legal conclusion does not state a claim. *Garrett v. RentGrow Inc.*, 2005 WL 1563162, at *3 (N.D. Ill. July 1, 2005).

**Second**, the County fails to plead that Manufacturers' prices are "immoral, unethical, oppressive, or unscrupulous." Its main argument is that "diabetes medications have become unaffordable" due to "excessive" list prices. *See, e.g.*, Compl. ¶¶ 258, 276, 416, 425, 588(a). But an allegation of an "unconscionably high price generally is insufficient to establish a claim for unfairness." *E.g.*, *Siegel*, 612 F.3d at 935 (affirming dismissal of allegations regarding high gasoline prices); *see also Toulon*, 877 F.3d at 740–41 (insurance company raised premiums by 76%); *Batson*, 746 F.3d at 834 (unconscionably high ticket prices); *Flores v. United Airlines*, 426

F. Supp. 3d 520, 531-32 (N.D. Ill. 2019) (unconscionably high travel insurance fees); *Saunders v. Mich. Ave. Nat. Bank.*, 662 N.E.2d 602, 608 (Ill. App. Ct. 1996) (unconscionably high overdraft fees). And the fact that the putatively "unfair" practice involves the healthcare industry makes no difference. *See EBCF Enters., Inc. v. Erie Ins. Exch.*, 572 F. Supp. 3d 489, 498 (N.D. Ill. 2021) ("Plaintiffs allege that defendant's conduct was immoral, because it took advantage of COVID-19 'for its own financial gain.' That does not suffice." (internal citations omitted)); *Galvan v. Northwestern Mem'l Hosp.*, 888 N.E.2d 529, 535, 539 (Ill. App. Ct. 2008) (affirming dismissal of claim that a hospital charged "over double the net price" for emergency room stay); *Rockford Mem'l Hosp. v. Havrilesko*, 858 N.E.2d 56 (Ill. App. Ct. 2006) (affirming dismissal of claim that prices were excessive).

Lake County also fails to plead facts showing that it has no choice about what price it pays for insulin. *See, e.g.*, Compl. ¶ 409. Its allegations instead show that Lake County contracts for—or in other words, chooses—the price it pays and the rebates it receives. The County has chosen to engage PBMs to negotiate prices on its behalf, and it has chosen to use their formularies. Compl. ¶ 18(b); *id.* ¶ 328 ("most," but not all, payors choose to accept PBM formularies). The County has a choice about which PBM it engages. *Id.* ¶ 118. PBMs submit bids and compete with each other for Lake County's business. *Id.* ¶¶ 42, 401, 410, 439(e), 439(g), 439(h), 468–72. The County has a choice about the terms of its contracts with PBMs. *Id.* ¶¶ 42 (specifying contractual terms), 471–72. Lake County has chosen to participate in and benefit from the rebate system, contracting to receive all "money associated with prescription drug rebates," so that it does not pay the allegedly unfair price. *Id.* ¶ 175. That is fatal to its unfairness claim. *See, e.g.*, *Toulon*, 877 F.3d at 741 (price increases not unfair unless plaintiff had a "total absence" of choice); *Saunders*, 662 N.E.2d at 608–09 (overdraft fees not unfair where plaintiff could find another bank); *Siegel v. Shell Oil*

*Co.*, 656 F. Supp. 2d 825, 833 (N.D. Ill. 2009) (inflated gas prices not unfair where plaintiff had alternative options).

**Finally**, to plead the required substantial injury, Lake County had to allege that the "unfair practice" is not "outweighed by any countervailing benefits to consumers or competition that the practice produces." *Siegel*, 612 F.3d at 935. Countervailing benefits include "ke[eping a business] competitive" and maintaining consumer access to products. *Donnellan v. Travelers Co., Inc.*, 2022 WL 170046, at *10 (N.D. Ill. Jan. 18, 2022); *Murphy v. Foster Premier, Inc.*, 2018 WL 3428084, at *4 (N.D. Ill. July 16, 2018) (holding that there were countervailing benefits to paying more for a product when access to that product increased).

Not only has Lake County failed to allege the *absence* of countervailing benefits, but its allegations show that rebates have countervailing benefits for payors like Lake County, who negotiate to receive 100% of them. *Id.* ¶¶ 175, 283 Fig. 13, 367. Rebates are thus a *specifically bargained-for* boon to the County. *Id.* The County has also affirmatively alleged that Manufacturers' conduct *does* benefit diabetics, by recognizing that a Manufacturer's failure to pay rebates will result in PBMs excluding that Manufacturer's drugs from formulary, which would restrict patients' access to them. Compl. ¶¶ 10 ("Conversely, exclusion of a drug from one or more of the PBMs' formularies can render the drug virtually inaccessible for millions of covered persons."), 325, 331, 344-45. For example, Lake County identifies examples of insulins that have lower list prices, but have not been put on formularies, and are therefore "widely unavailable." Compl. ¶¶ 491–92, 494–95. Because there are countervailing benefits both to Lake County and to patients, the County has failed to plead a substantial injury. *Donnellan*, 2022 WL 170046, at *10.

## IV.    LAKE COUNTY'S UNJUST ENRICHMENT CLAIM FAILS.

Because Lake County's consumer fraud claims and RICO claims fail, so, too, does its unjust enrichment claim. The County's unjust enrichment claim is premised on the same conduct

as its consumer fraud and RICO claims. *See, e.g.*, Compl. ¶¶ 521, 534, 539, 589, 620, 627. Where, as here, the unjust enrichment claim is "derivative" of another claim, the two claims rise and fall together; if the primary "claim falters so too will" the secondary claim. *McMahon v. Bumble Bee Foods LLC*, 148 F. Supp. 3d 708, 715 (N.D. Ill. 2015).

Additionally, Lake County's unjust enrichment claim fails on its own terms, for two reasons. ***First***, unjust enrichment is an obligation "implied in law" in the absence of an agreement between parties. Therefore, "a plaintiff may not state a claim for unjust enrichment when a contract governs the relationship between the parties." *Blythe Holdings, Inc. v. DeAngelis*, 750 F.3d 653, 658 (7th Cir. 2014). Nor can it sue non-parties to a contract who allegedly benefit from the contract's performance. *RBS Citizens, N.A. v. Bentley Motors, Inc.*, 2012 WL 1565457, at *3 (N.D. Ill. May 2, 2012) ("[A] party who performs services under a contract cannot sue third parties for unjust enrichment merely because they benefit from that performance."). The Complaint makes clear on its face that Lake County's claims arise out of its contracts with PBMs. Indeed, Lake County complains at length about the terms of those contracts and how they were carried out. *See, e.g.*, Compl. ¶¶ 20, 137, 196, 357, 367–69, 477. For example, it complains that in those contracts, "'rebates' are narrowly defined and qualified by vague exceptions," and that the PBMs "failed to adhere to principles of good faith and fair dealing in carrying out" their agreements. *Id*. ¶¶ 367, 477. Those issues must be raised with Lake County's contractual counterparties; they are not an appropriate basis for an unjust enrichment claim. *Utility Audit, Inc. v. Horace Mann Serv. Corp.*, 383 F.3d 683, 689 (7th Cir. 2004) ("The reason for prohibiting a claim of unjust enrichment between contracting parties is to prohibit a party whose expectations were not realized under the contract from nevertheless recovering … .").

Nor is Lake County's objection to the price it paid under those contracts an adequate basis

28

for an unjust enrichment claim. Compl. ¶ 409 ("Plaintiff directly contracts with, and … directly pays the PBMs artificially inflated costs."). As the Southern District of Texas recently explained in dismissing substantially identical allegations, a plaintiff cannot use unjust enrichment to revisit contractual terms and "object[] to [an] artificially inflated price that [it] paid." *Harris Cnty. v. Eli Lilly & Co.*, 2022 WL 479943, at *14 (S.D. Tex. Feb. 16, 2022); *see also City of Rockford v. Mallinckrodt ARD, Inc.*, 360 F. Supp. 3d 730, 771–72 (N.D. Ill. 2019) (holding plaintiff "cannot maintain an unjust enrichment claim" based on pharmaceutical company's alleged scheme to improperly keep price of drug high).

*Second*, Lake County has failed to plausibly allege that any Manufacturer retained a benefit from the alleged "Insulin Pricing Scheme." To the contrary, the County alleges that "the net price (i.e., the price realized by Manufacturers) has not" increased. Compl. ¶ 275. What is more, Lake County failed to allege that *it* conferred a benefit on Manufacturers. Nor would it be possible for the County to do so, as Manufacturers sell their medications *solely* to wholesalers and receive payment from wholesalers. Compl. ¶¶ 50, 61, 72, 278.

## V.  LAKE COUNTY HAS NOT STATED A CONSPIRACY CLAIM.

Lake County's conspiracy claim fails for two independent reasons. *First*, because Lake County's consumer fraud, RICO, and unjust enrichment claims fail, so does its civil conspiracy claim. The law is clear: "conspiracy is not an independent tort. Where … a plaintiff fails to state an independent cause of action underlying its conspiracy allegations, the claim for a conspiracy also fails." *Indeck N. Am. Power Fund, L.P. v. Norweb PLC*, 735 N.E.2d 649, 662 (Ill. App. Ct. 2000).

*Second*, Lake County has failed to plead an agreement. *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 509 (7th Cir. 2007) ("[A]greement is a necessary and important element of this cause of action."). Failure to allege "any facts that indicate agreement in the conspiracy" requires

dismissal. *Walls v. VRE Chicago Eleven, LLC*, 344 F. Supp. 3d 932, 955 (N.D. Ill. 2018). And where—as here—the conspiracy is "premised upon a course of fraudulent conduct," the conspiracy claim must satisfy Rule 9(b)'s heightened pleading standard. *Borsellino*, 477 F.3d at 507.

The County's conspiracy allegations fall far short. The Complaint simply makes blanket, conclusory assertions that "[t]he Insulin Pricing Scheme is a coordinated effort between the Manufacturer and PBM Defendants"; that Manufacturers "have routinely met privately with representatives from each PBM Defendant"; that the Defendants made similar pricing decisions and communicated unspecified information with each other; and that there have been government investigations. *See, e.g.*, Compl. ¶¶ 338, 315, 318, 611. None of those facially speculative allegations about routine interactions between members of the same industry comes close to pleading an actual *agreement* to commit the supposed misconduct. *See, e.g.*, *Walls*, 344 F. Supp. 3d at 955 ("[S]peculation as to [defendant's] involvement is insufficient to meet the pleading standards of Rule 8(b)(2), much less the heightened standards required by Rule 9(b).").

Once stripped of conclusory rhetoric, the allegations of an "agreement" amount to the assertion that Manufacturers "raised prices" and paid "correspondingly larger" rebates. Compl. ¶ 330. But as explained above, paying rebates is not illegal. The County's "Complaint lacks any specific factual content to support a claim of civil conspiracy and, instead, simply asserts as a legal conclusion that Defendants committed civil conspiracy," and must be dismissed. *See, e.g.*, *LoggerHead Tools, LLC v. Sears Holding Corp.*, 19 F. Supp. 3d 775, 784 (N.D. Ill. 2013).

## CONCLUSION

For all of these reasons, Manufacturers respectfully request that the Court dismiss the County's claims against them in their entirety with prejudice.

Dated: July 14, 2023

Respectfully submitted,

*/s/ Ryan J. Moorman*

James F. Hurst, P.C.
Andrew A. Kassof, P.C.
Diana M. Watral, P.C.
Ryan J. Moorman
Jason A. Feld
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Telephone: +1 312 862 2000
Facsimile: +1 312 862 2200
Email: james.hurst@kirkland.com
Email: akassof@kirkland.com
Email: diana.watral@kirkland.com
Email: ryan.moorman@kirkland.com
Email: jason.feld@kirkland.com

*Attorneys for Eli Lilly and Company*

Suyash Agrawal
Paul Berks
MASSEY & GAIL LLP
50 East Washington Street, Suite 400
Chicago, IL 60602
Telephone: +1 312 283 1590
Email: sagrawal@masseygail.com
Email: pberks@masseygail.com

James P. Rouhandeh
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
Telephone: +1 212 450 4835
Email: rouhandeh@davispolk.com

Neal A. Potischman
Andrew D. Yaphe
DAVIS POLK & WARDWELL LLP
1600 El Camino Real
Menlo Park, CA 94025
Telephone: +1 650 752 2000
Email: neal.potischman@davispolk.com
Email: andrew.yaphe@davispolk.com

*Attorneys for Novo Nordisk Inc.*

Jordan M. Matthews
JONES DAY
110 North Wacker Drive, Suite 4800
Chicago, IL 60606
Telephone: +1 312 782 3939
Email: jmatthews@jonesday.com

Shirlethia V. Franklin*
William D. Coglianese
Theresa C. Martin*
JONES DAY
51 Louisiana Avenue NW
Washington, DC 20001
Telephone: +1 202 879 3939
Email: sfranklin@jonesday.com
Email: wcoglianese@jonesday.com
Email: tcoughlin@jonesday.com
* *Pro hac vice application forthcoming*

*Attorneys for Sanofi-Aventis U.S. LLC*