# Exhibit 12



# Audit of Pharmacy Benefit Management Services Agreement
## (Performed by StoneBridge Business Partners)

## Office of the County Auditor

### Audit Report

**Robert Melton, CPA, CIA, CFE, CIG**
**County Auditor**

**Audit Conducted By:**
Laura Rogers, CIA, CFE, CGAP, Audit Specialist
Stacey Thomas, CGAP, Audit Senior

**Report No. 18-13**
**December 7, 2017**



**OFFICE OF THE COUNTY AUDITOR**
115 S. Andrews Avenue, Room 520 • Fort Lauderdale, Florida 33301 • 954-357-7590 • FAX 954-357-7592

December 7, 2017

Honorable Mayor and Broward County Board of County Commissioners

Based on the unique nature of pharmacy claims auditing, we engaged the services of a specialized commercial auditor, StoneBridge Business Partners (SBP), to conduct an audit of the County's pharmacy benefit manager from January 1, 2013 through December 31, 2015. The County's pharmacy benefit manager is OptumRx (Optum), formerly Catamaran of Illinois II, Inc. (Catamaran). During this time, the County's self-insured plan served approximately 9,300[1] active, COBRA and retiree members, and Optum processed 272,826 claims for County members at a cost of $46,143,052.

SBP's audit objectives were to ensure the overall accuracy of Optum's claims payments and administration according to plan documents; reconcile rebate payments based on contractual terms; determine if performance guarantees have been met, or exceeded; verify claims were paid for benefit eligible members; and, confirm accuracy of clinical programs and plan edit administration. A copy of their report is enclosed herein.

### SBP's Overall Conclusion

In summary, SBP reports that:

- Claims have been adjudicated in accordance with the plan.
- Rebate minimum requirements have been met.
- Claims have been paid for only benefit eligible members.
- Optum is appropriately administering clinical and plan edit administration as required and has achieved return on investment guarantees.

However, the audit also revealed the following findings:

- Optum did not allow access to manufacturer rebate contracts, preventing SBP from completing their review and confirming if the rebate amounts paid to the County by Optum are reflective of actual amounts received from the manufacturers. This situation is significant, as discussed below in County Auditor's Concerns.
- Optum incorrectly calculated and reported performance guarantees; a recalculation of these amounts by SBP indicates that Optum did not meet certain guarantees and an estimated $88,000 is due to the County.

---

[1] Also includes Work Force One (Career Source Broward) employees and their dependents.

Audit of Pharmacy Benefit Management Services Agreement
Performed by StoneBridge Business Partners
December 7, 2017
Page 2

- Optum erroneously invoiced the County administrative and clinical management service fees, resulting in an approximate balance of $28,000[2] due to the County.

**SBP's Recommendations**

SBP provides the following recommendations in their report:

1. Broward should consider invoking its right to gain access to supporting details to assess adherence to the rebate terms of the contract. (page13)

2. Broward should pursue reimbursement of approximately $88,000 for net under-achievement of performance guarantees in 2014 and 2015. (page 10)

3. Broward should pursue reimbursement of approximately $28,000 in overcharged administrative fees over the audit period. (page 12)

Our Office concurs with SBP's findings and recommendations. We have further concerns as discussed below.

**County Auditor's Concerns Regarding Rebates**

***Due to Optum's Non-Compliance With Audit Right requirements, SBP is Unable to Determine Whether County has Received 100% of Rebate Amounts Due***

Exhibit B of the Agreement requires Optum to "pass through to the County 100% of rebates it receives that can be attributed to allowable utilization of members hereunder." The Exhibit also specifies within a table minimum guarantee amounts per prescription type.

In their report, SBP acknowledges that the County received amounts in excess of the minimum guarantee in each of three years addressed in the audit period, for a total amount of $2,662,701 (page 15). However, during their audit, SBP was not granted access to pharmaceutical manufacturer's contracts, and could not verify whether the County received 100% of the manufacturer's rebates attributable to the County's member utilization, as required by contract.

We requested that SBP estimate the potential amounts which might have been received from manufacturers. As a result, SBP re-calculated the minimum guarantees for prescription quantities filled in 2013, 2014, and 2015, utilizing minimum guarantee amounts in the current 2017 Agreement with Optum. It is noted that the 2017 Agreement reflects significant increases in minimum rebate requirements over the 2013 Agreement. SBP's illustrative calculation is shown on page 14 of their report, and demonstrates that a minimum of $10 million in rebates may have been available to the County, or an additional $7.4 million over what was actually received, if 2017 rates were applied. SBP indicated to us that they are not aware of any substantial changes in manufacturer rebate

---

[2] Optum originally overbilled the County $88,000 but has credited a portion of the fees in the amount of $60,000, leaving a balance of $28,000 in amounts due to the County.

Audit of Pharmacy Benefit Management Services Agreement
Performed by StoneBridge Business Partners
December 7, 2017
Page 3

amounts that would invalidate their estimation. However, since the records could not be reviewed, the actual amount of potential recovery, if any, could be significantly less than this estimate.

In response to SBP and our Office's concerns regarding this audit limitation, Optum has stated that it engaged the services of an aggregator to manage its rebate activity. Optum shared that under their model, they are paid by their aggregator a certain amount per prescription referred. Then, the aggregator, through another entity[3], seeks rebates from the drug manufacturers, based upon the referred Broward County prescription utilization, and retains any rebate amounts that may be received. Optum states that they have paid Broward County all amounts it has received from its aggregator, and that they do not have access to the contracts between the aggregator (and its contractors) and the manufacturer. However, our understanding is that Optum has an affiliate relationship with its aggregator.

Optum's position appears to be in violation of Section 9.3 of the Agreement, which states "County shall have the right to audit the books, records, and accounts of Vendor and its subcontractors that are related to this Project". Further, Section 1.27 of the Agreement, Pass Thru Transparency Pricing, requires "retrospective rebates, discounts, and any other revenues which are paid directly to Vendor from various sources that are attributable to members as a result of this Agreement, shall be paid to COUNTY..."

**We recommend** management work with the County Attorney to:

1. Require Optum to immediately comply with contract provisions regarding Audit Right, and provide access to manufacturer's contracts related to rebate amounts received by Optum and/or its subcontracted aggregators, on behalf of Broward County member utilization. If this review indicates that additional monies are due to the County for previously under-reported rebate amounts, Management should require Optum to immediately remit all amounts due.

2. Amend the contract to clearly ensure 100% of the manufacturer's rebates earned on behalf of County members are passed through to the County and to allow the County to verify such.

**County Management's Response to SBP's and County Auditor's Recommendations:**

Management agrees that a periodic audit of the County's self-insured pharmacy plan is necessary, and fully supports the County Auditor's engagement of an external auditor with expertise in auditing pharmacy benefit managers to conduct the audit.

Management has reviewed the County Auditor's memo regarding the external audit of the Pharmacy Benefit Management Services Agreement performed by StoneBridge Business Partners (SBP). Management supports the recommendations contained in SBP's report.

---

[3] Optum contracted with Coalition for Advanced Pharmacy Services (CAPS), and CAPS in turn contracted with Express Scripts, Inc. (ESI).

Audit of Pharmacy Benefit Management Services Agreement
Performed by StoneBridge Business Partners
December 7, 2017
Page 4

Specifically, Management concurs with the finding that the current vendor, Optum, did not allow access to manufacturer rebate contracts, preventing SBP from completing its review and confirming that amounts paid to the County are reflective of actual amounts received from the manufacturers. Since the County's auditors have been denied access to these contracts, the Auditor correctly notes that the actual amount of potential recovery, if any, cannot be accurately determined.

Management is working with the County Attorney's Office to gain access to the manufacturer's contracts and all additional required information to determine the amount of any additional rebates due the County. Management will work with the County Attorney's Office to seek to recover any amounts, once determined to be owed.

It should be noted that the County's current vendor, Optum, assumed the applicable agreement near the end of the audit period (December 2015) from a prior vendor, Catamaran. Catamaran had used a drug rebate aggregator which aggregated rebates for multiple subcontracted entities. It should be further noted that Optum does not use a drug rebate aggregator, which should provide more transparency going forward.

**Post-Audit Additional Information:**

Subsequent to completion of audit fieldwork and SBP's final report, Optum voluntarily remitted $1,643,492 in additional rebate to the County for 2016. Optum noted that they "were able to realize additional rebate dollars based on 2016 for select Catamaran clients." Optum acknowledged that this was an additional rebate payout, above and beyond what they originally paid. This check was received in November 2017, after Optum was fully aware of the rebate issues found in our audit for the preceding years. This additional payout by Optum was more than the **total** rebate amount previously paid by Optum for 2016. The total originally paid for 2016 was $1,302,463, and the amount of the November 2017 check was $1,643,492.

Respectfully submitted,

Bob Melton

Bob Melton
County Auditor

RM/Attachment

cc:    Bertha Henry, County Administrator                Andrew Meyers, County Attorney
       Monica Cepero, Deputy County Administrator        Rene Harrod, Deputy County Attorney
       George Tablack, CPA, Chief Financial Officer      Adam Katzman, Assistant County Attorney
       Kevin Kelleher, Deputy Chief Financial Officer    Lisa Morrison, Human Resources Manager
       Mary McDonald, Acting Director, Human Resources



**Business Partners**

# AUDIT OF PHARMACY BENEFIT MANAGEMENT SERVICES AGREEMENT BETWEEN BROWARD COUNTY AND OPTUMRX (F/K/A CATAMARAN PBM OF ILLINOIS II, INC.)

**Broward County Board of County Commissioners**
**115 S. Andrews Avenue**
**Ft. Lauderdale, Florida 33301**

July 7, 2017

280 Kenneth Drive, Suite 100 | Rochester, New York 14623 | P 585.295.0550 | TF 888.247.9764 | F 585.427.8947 | StoneBridgeBP.com

Prepared by StoneBridge Business Partners.

## Table of Contents             Page

AUDIT DETAILS        3

BACKGROUND/OBJECTIVE        3

INFORMATION REQUESTED/PROVIDED        4

AUDIT SCOPE OF SERVICES        5

PROCEDURES APPLIED        5

SCOPE LIMITATIONS        6

EXECUTIVE SUMMARY        6

DETAIL OF AUDIT FINDINGS        7

CLOSING COMMENTS        16

Prepared by StoneBridge Business Partners.

## AUDIT DETAILS:

| | |
|---|---|
| Audit Contacts: | Kathleen Tilden, Senior Director, Client Review |
| | John Younan, Internal Audit Analyst |
| | Stephanie Gaffney, Strategic Account Executive |
| Auditors: | Jason L. Turrell |
| | Thomas F. Niles |
| | Jim Marasco |
| Audit Period: | January 1, 2013 – December 31, 2015 |

## BACKGROUND/OBJECTIVE:

The Broward County Board of County Commissioners ("Broward County") retained the services of StoneBridge Business Partners ("SBP" or "StoneBridge") to perform an audit of their Pharmacy Benefit Services Agreement ("the Agreement") with OptumRx ("Optum" formerly known as Catamaran). OptumRx provides pharmacy benefit management services for the plans offered by Broward County. The administrative services provided by OptumRx for the plans are defined by the respective underlying Agreement and incorporates financial and non-financial services to be provided.

Summarized activity for Broward County over the course of the audit period is presented below:

| | Rx Volume | Submitted Cost | Broward County Cost | Patient Paid | Total Cost | Rebates |
|---|---|---|---|---|---|---|
| 2013 | 93,011 | $ 24,751,312 | $ 12,422,990 | $ 1,085,460 | $ 13,508,450 | $ 784,709 |
| 2014 | 90,017 | 28,810,707 | 15,776,127 | 1,145,650 | 16,921,777 | 686,010 |
| 2015 | 89,798 | 32,809,262 | 17,943,935 | 1,372,195 | 19,316,130 | 1,191,982 |

StoneBridge was engaged by Broward County to audit the Prescription Benefit Management Services Agreement to assess compliance with the financial and non-financial terms of the Agreement for the period January 1, 2013 through December 31, 2015. The objectives of our engagement included ensuring the overall level of accuracy of Optum's performance relative to the Contract terms, to include financial accuracy, application of copayments, application of rebates, coordination of benefits, etc.

Exhibit B of the Agreement administered by Optum identifies the key financial terms that address the pricing methodologies that will be employed for Mail Order, Maintenance Choice, Retail and Specialty claims/dispensations, dispensing fees, as well as per claim rebates for dispensations of brand drugs. The key terms of the Financial Proposal include:

Prepared by StoneBridge Business Partners.

**BACKGROUND/OBJECTIVE (*Continued*):**

1.) Administrative Fees:
- a. Retail 30: $0.80 per net paid claim
- b. Retail 90: $0.70 per net paid claim
- c. Mail Service: $0.70 per net paid claim
- d. Specialty: $0.80 per net paid claim

2.) Retail Pharmacy Network (<84):
- a. Brand: Effective Rate AWP – 16%; $1.20 dispensing fee per Rx
- b. Generic: Effective Overall Rate guarantee of AWP – 74.50%; $1.20 dispensing fee per Rx

3.) Retail Pharmacy Network (>84):
- a. Brand: Effective Rate AWP – 22%; $0 dispensing fee per Rx
- b. Generic: Effective Overall Rate guarantee of AWP – 78.25% (Year 1); AWP – 78.50% (Years 2 and 3); $0 dispensing fee per Rx.

4.) Vendor Mail Service Pharmacy
- a. Brand: Effective Rate AWP – 23%; $0 dispensing fee per Rx
- b. Generic: Effective Overall Rate guarantee of AWP – 77% (Year 1); AWP – 77.25% (Years 2 and 3); $0 dispensing fee per Rx.

5.) Specialty Pharmacy
- a. Varied discounts by product

6.) Rebates:
- a. Retail Minimum: $19.40 per net paid brand claim
- b. Retail 90 Minimum: $46.65 per net paid brand claim
- c. Mail Minimum: $42.70 per net paid brand claim
- d. Specialty: $19.40 per net paid brand claim

**INFORMATION REQUESTED/PROVIDED:**

In performing our audit, SBP requested and/or was provided with the following information for each year of the audit period:

From Broward County:
1. Formulary (Optum's list of prescription drugs available to plan participants – generic, brand preferred, brand non-preferred, specialty)
2. Plan Benefit Design Documentation (document available to members that defines the plan design, including co-pays, out of pocket maximums, defines formulary, etc.)
3. Plan Enrollment Detail
4. Performance Outcome Reporting

From Optum:
1. Utilization detail accounting for dispensations for each year of the audit period
2. Formulary documentation and plan design documentation (PDL) for Commercial and Employer Group Waiver Plans (EGWP)
3. Monthly reports accounting for claims payment/reimbursements, administrative and clinical fees
4. Detail accounting for rebate activity for the audit period
5. Maximum Allowable Cost (MAC) price lists for the audit period
6. Detail supporting measurement of clinical services
7. Financial Guarantee measurement

July 7, 2017

Prepared by StoneBridge Business Partners.

## AUDIT SCOPE OF SERVICES

The Scope of Services to be performed, as detailed in the specifications required by Broward County were as follows:

1.) <u>Claims Pricing According to Contractual Terms</u> – Determine that claims have been accurately adjudicated in accordance with the contractual pricing terms.
2.) <u>Plan Design Administration According to Plan Documents</u> – Determine that prescription drug claims have been accurately adjudicated according to plan benefit documents and structure.
3.) <u>Rebate Payments</u> – Reconcile rebates based on contractual terms.
4.) <u>Performance Guarantee Standards According to Contractual Terms</u> – Determine that performance guarantees have been met or exceeded according to contractual terms.
5.) <u>Eligibility Accuracy</u> – Verify claims paid were only paid for benefit eligible members during the audit period.
6.) <u>Clinical and Plan Edit Administration According to Plan Documents, Including Confirmation of Return on Investment (ROI) Guarantees</u> – Determine the accuracy with clinical program and plan edit administration.

## PROCEDURES APPLIED:

Upon receipt of the information requested above, SBP performed the following procedures:

1.) Reconciled utilization detail to Financial Guarantee and billing detail. This included reconciling volumes based on dispensation type/classification (Mail Order, Retail 30, Retail 90, Specialty Brand, Generic, etc.).

2.) Reconciled the aggregate dollar values of plan costs, patient paid amounts, total prescription costs, dispensation fees.

3.) Analyzed the utilization detail to assess adherence the level of discounting on brand and generic dispensations established by Exhibit B (Fees/Discounts) of the Agreement.

4.) Estimated the expected rebates to be paid by Optum over the course of the audit period based on the utilization volume for each year.

5.) Reviewed and assessed adherence to Plan designs and co-payments established for each of the Plans.

6.) Reviewed and assessed documentation provided supporting adherence to Performance and ROI Guarantees.

7.) Reviewed Plan Enrollment Detail files with Eligibility Requirements for Family Members, and compared Plan Enrollment Detail files to member specific identifiers in the utilization data.

8.) Selected a sample of claims from each year of the audit period to assess the accuracy and validity of the utilization data, as well as confirm pricing, co-payments and dispensation fees, and adherence to plan formulary controls.

Prepared by StoneBridge Business Partners.

## SCOPE LIMITATIONS

The Scope of Services originally required a review of invoicing for rebates by Optum to manufacturers, along with a review of a sample of the underlying manufacturer rebate contracts. However, based on Optum's relationship with a third party aggregator (an external party presumably providing access to more favorable rebate terms), we were not provided with detailed rebate information. This will be further discussed in the report as an Audit Finding.

## EXECUTIVE SUMMARY:

The following summarizes the results and/or findings of our audit procedures:

### Findings that require responses from Optum

1.) It does not appear that Optum achieved the contractually indicated discounting for retail brand dispensations over the course of the audit period.

2.) With respect to generic utilization, it appears that Optum achieved the Effective Overall Generic Guarantee Effective Rate for Retail < 84 dispensations *in 2013 only*, while Optum achieved the Effective Overall Generic Guarantee Effective Rate for Retail > 84 for each year of the audit period.

3.) It appears that Broward may have been overbilled for administrative fees over the course of the audit period.

4.) SBP was unable to validate that Optum was receiving 100% of the rebates earned on Broward County utilization over the course of the audit period.

### Findings that do not require responses from Optum

5.) It appears that Optum has been adjudicating prescription drug claims in accordance with the plan provisions identified in the plan benefit documents.

6.) Our testing indicates that Optum has adhered to the "per net paid brand claim" rebate minimum requirements identified in Exhibit B of the Agreement.

7.) It appears that the Performance Guarantee Standards identified in the Contract have been achieved.

8.) We observed that claims paid over the course of the audit period only involve benefit-eligible members.

9.) It appears that Optum is appropriately administering clinical and plan edit administration requirements identified in the Agreement and plan documents. In addition, it appears that Optum has achieved the required ROI guarantees established by the Agreement.

July 7, 2017

Prepared by StoneBridge Business Partners.

## DETAIL OF AUDIT FINDINGS:

This section provides detail to any significant findings identified through the audit procedures:

### I. *Analysis of Claims Pricing According to the Contractual Terms*

As part of our information requests, SBP was provided with reporting in support of Optum's performance with respect to the financial terms established by the Agreement. Similar reporting is also provided to Broward County on an annual basis. SBP was able to reconcile the information provided to us with the information originally provided to Optum within a reasonable amount. In addition, SBP was able to reconcile the utilization data for each year of the audit period to the corresponding annual reporting provided to us by Optum. Over the course of the audit period, the discount performance reported by Optum is presented on *Table 1* below:

**Table 1 - Discount Performance Reported by Optum**

**2013**

| Description | Rx | AWP | Rx Cost | Actual Discount | Contracted Discount | Performance |
|---|---|---|---|---|---|---|
| Retail 30 Brand | 11,209 | $ 2,860,901 | $ 2,461,011 | 13.98% | 16.00% | $ (57,855) |
| Retail 90 Brand | 750 | 5,343,901 | 4,370,642 | 18.21% | 22.00% | (202,399) |
| Retail 30 Generic | 42,609 | 3,426,016 | 809,223 | 76.38% | 74.50% | 64,411 |
| Retail 90 Generic | 25,905 | 6,957,559 | 894,992 | 87.14% | 78.25% | 618,277 |
| Mail Brand | 313 | 232,550 | 178,330 | 23.33% | 23.00% | 763 |
| Mail Generic | 1,105 | 290,356 | 69,187 | 76.17% | 77.00% | (2,405) |
| | | | Net Performance | | | $ 420,792 |

**2014**

| Description | Rx | AWP | Rx Cost | Actual Discount | Contracted Discount | Performance |
|---|---|---|---|---|---|---|
| Retail 30 Brand | 8,874 | $ 2,471,272 | $ 2,117,870 | 14.30% | 16.00% | $ (42,001) |
| Retail 90 Brand | 7,107 | 5,858,935 | 4,795,313 | 18.15% | 22.00% | (225,344) |
| Retail 30 Generic | 40,857 | 3,614,738 | 1,024,776 | 71.65% | 74.50% | (103,016) |
| Retail 90 Generic | 27,316 | 7,491,328 | 1,365,511 | 81.77% | 78.50% | 245,125 |
| Mail Brand | 292 | 227,037 | 174,734 | 23.04% | 23.00% | 85 |
| Mail Generic | 1,017 | 289,180 | 79,299 | 72.58% | 77.25% | (13,511) |
| | | | Net Performance | | | $ (138,662) |

**2015**

| Description | Rx | AWP | Rx Cost | Actual Discount | Contracted Discount | Performance |
|---|---|---|---|---|---|---|
| Retail 30 Brand | 8,357 | $ 2,817,934 | $ 2,370,656 | 15.87% | 16.00% | $ (3,592) |
| Retail 90 Brand | 6,326 | 6,002,161 | 4,870,628 | 18.85% | 22.00% | (188,942) |
| Retail 30 Generic | 40,750 | 3,832,423 | 1,010,926 | 73.62% | 74.50% | (33,658) |
| Retail 90 Generic | 27,873 | 8,365,233 | 1,458,830 | 82.56% | 78.50% | 339,695 |
| Mail Brand | 321 | 299,923 | 230,539 | 23.13% | 23.00% | 402 |
| Mail Generic | 1,280 | 335,918 | 91,932 | 72.63% | 77.25% | (15,511) |
| | | | Net Performance | | | $ 98,394 |

As illustrated on *Table 1*, it does not appear that Optum attained the contracted aggregate discount percentages for Retail 30 Brand and Retail 90 Brand in any year of the audit period. Optum attained the contracted aggregate discount (Effective Overall Generic Guarantee) for Retail 30 Generic (Retail < 84) in 2013 only. As illustrated, Optum attained the contracted aggregate discount (Effective Overall Generic Guarantee) for Retail 90 Generic (Retail > 84) each year of the audit period. As reported, Optum achieved a net positive performance for 2013 and 2015. However, in 2014, Optum had a net negative performance, which requires reimbursement to the County per the Agreement.

July 7, 2017

Prepared by StoneBridge Business Partners.

## DETAIL OF AUDIT FINDINGS (*Continued*):

Upon review of the utilization data, it was noted that the pricing methodology for the most significant pharmacies in terms of dispensation volumes (primarily Walgreen's and CVS), incorporated discounting that was lower than the contracted discounting thresholds for the Retail 30 Brand and Retail 90 Brand categories. For example, in 2013 over 90% of Retail 30 Brand dispensations were discounted at either 13.24% or 13.75% off the Average Wholesale Price (AWP), while over 90% of Retail 90 Brand dispensations were discounted at 17.91% off AWP. This trend continued in 2014 and 2015, but it should be noted that the discounting percentages increased to 14.7% off AWP for Retail 30 Brand and 18.3% off AWP for Retail 90 Brand during 2014.

With respect to generic utilization, it appears that Optum utilized its MAC price list for discounting off of the AWP, which varies by product. Generally speaking, MAC pricing for 2013 was, in aggregate, on average lower than the contracted discount percentages for Retail 30 and Retail 90 dispensations. Furthermore, it appears that the average MAC pricing for Retail 90 in 2014 and 2015 was in aggregate lower than the contracted discount percentages. However, it was noted that the aggregate MAC pricing for Retail 30 dispensations for significant pharmacies (Walgreen's and CVS) appeared lower than the contracted discounting percentages for 2014. In 2015, it appears that the aggregate MAC pricing for these two pharmacies in the Retail 30 category was relatively equivalent to the contracted discount percentage.

### Recommendation and Follow up:

SBP provides this finding for informational purposes as it directly relates to Finding II described below. Optum should respond as to the issues affecting the discount variances noted.

## II.   *Analysis of Financial Guarantee Performance Reporting*

On an annual basis, Optum is required to measure and report its performance with respect to Brand Effective Rates, Effective Overall Rates Guarantees and dispensing fee guarantees relative to the terms of the Agreement. The Agreement identifies the methodology that will be employed in this measurement, including certain exceptions that will not be incorporated, including Over The Counter (OTC) drugs, specialty pharmacy drugs, drugs dispensed from Long-Term Care (LTC) or on-site pharmacies and injectables/vaccinations. It also indicates that the performance will be measured in aggregate and netted – essentially all overachievements/underachievement's with respect to the performance measurement will be added. If there is a net underachievement, then Broward County will be reimbursed the net difference. Over the course of the audit period, Optum reported overall performance overachievements in 2013 and 2015, and paid for an underachievement in 2014 of approximately $161k ($138k net underachievement and $23k dispensing fee overcharges).

As part of our review procedures, SBP reviewed the discount performances provided to Broward County and compared to the utilization and Financial Guarantee Performance Reporting provided for the audit. In recalculating the performance reporting for each year, SBP reviewed the underlying utilization in order to confirm the appropriate inclusion/exclusion into the calculations, as well as the appropriate classification of generic/brand dispensations. Based on this review, we noted dispensations identified as brand drugs in the Financial Guarantee Performance Reporting that appeared to be generic medications. In addition, by applying the formulary documentation provided for the audit, we noted dispensations of medications identified as "specialty" in the Financial Guarantee Performance Reporting that were not identified as specialty medications on the

Prepared by StoneBridge Business Partners.

## DETAIL OF AUDIT FINDINGS (*Continued*):

formulary for Broward County. While not specifically defined in the Agreement, specialty medications are usually high cost drugs that treat specific, less common diagnoses (for example, hemophilia, cystic fibrosis, infertility, multiple sclerosis, etc.) and typically require special handling. These drugs are often dispensed by specialty pharmacies and are represented on a specialty formulary. In addition, the discounting methodology applied specialty drugs is typically different than that applied to standard brand and generic drugs.

Following this analysis, we recalculated the Financial Guarantee Performance for each year of the audit period by reallocating generic claims that appear to be brand products and the specialty drugs that do not appear to have been identified as specialty on the Broward formulary. The recalculated Financial Guarantee Performance Reports are presented on *Table 2* below:

*Table 2 - Discount Performance Recalculated by SBP*

**2013**

| Description | Rx | AWP | Ingred. Cost | Actual Discount | Contracted Discount | Performance |
|---|---|---|---|---|---|---|
| Retail 30 Brand | 11,348 | $ 3,092,804 | $ 2,653,042 | 14.22% | 16.00% | $ (55,087) |
| Retail 90 Brand | 8,003 | 7,220,555 | 5,905,464 | 18.21% | 22.00% | (273,431.10) |
| Retail 30 Generic <84 | 42,389 | 3,412,579 | 810,281 | 76.26% | 74.50% | 59,926.65 |
| Retail 90 Generic >84 | 25,620 | 6,914,811 | 878,575 | 87.29% | 78.25% | 625,396.39 |
| Mail Brand | 453 | 438,234 | 337,376 | 23.01% | 23.00% | 64.18 |
| Mail Generic | 1,363 | 361,445 | 82,383 | 77.21% | 77.00% | 749.35 |
| | | | | | Net Performance | $ 357,619 |

**2014**

| Description | Rx | AWP | Ingred. Cost | Actual Discount | Contracted Discount | Performance |
|---|---|---|---|---|---|---|
| Retail 30 Brand | 8,963 | $ 2,600,035 | $ 2,219,155 | 14.65% | 16.00% | $ (35,126) |
| Retail 90 Brand | 7,570 | 8,008,303 | 6,525,424 | 18.52% | 22.00% | (278,947.66) |
| Retail 30 Generic <84 | 40,805 | 3,591,113 | 1,021,469 | 71.56% | 74.50% | (105,735.19) |
| Retail 90 Generic >84 | 27,158 | 7,442,902 | 1,360,912 | 81.72% | 78.50% | 239,311.93 |
| Mail Brand | 378 | 385,671 | 297,357 | 22.90% | 23.00% | (390.33) |
| Mail Generic | 1,187 | 346,871 | 87,556 | 74.76% | 77.25% | (8,643) |
| | | | | | Net Performance | $ (189,530) |

**2015**

| Description | Rx | AWP | Ingred. Cost | Actual Discount | Contracted Discount | Performance |
|---|---|---|---|---|---|---|
| Retail 30 Brand | 8,238 | $ 3,258,446 | $ 2,745,230 | 15.75% | 16.00% | $ (8,135) |
| Retail 90 Brand | 6,565 | 8,079,190 | 6,540,962 | 19.04% | 22.00% | (239,193.80) |
| Retail 30 Generic <84 | 41,108 | 3,903,665 | 1,053,157 | 73.02% | 74.50% | (57,722.42) |
| Retail 90 Generic >84 | 28,105 | 8,461,106 | 1,506,851 | 82.19% | 78.50% | 312,286.79 |
| Mail Brand | 321 | 368,131 | 291,972 | 20.69% | 23.00% | (8,511.13) |
| Mail Generic | 1,302 | 347,494 | 105,201 | 69.73% | 77.25% | (26,146.11) |
| | | | | | Net Performance | $ (27,422) |

As illustrated on *Table 2*, the recalculated Performance Reports indicate that the net performance for 2013 would still be a position of overachievement. With respect to 2014 and 2015, it appears that the net performance is at a position of underachievement, and lower than what was originally reported to Broward or indicated on the reporting provided to SBP. As previously noted, the total performance is calculated net of performance incorporating dispensation fees. Keeping these calculations consistent for each year, net underachievement for 2014 would approximate ($211,256) [($189,530) pricing + ($21,726) dispense fees] and net underachievement for 2015 would approximate ($38,664) [$27,422) pricing + ($11,242) dispense fees].

Prepared by StoneBridge Business Partners.

## DETAIL OF AUDIT FINDINGS (*Continued*):

### Recommendation and Follow up:

The updated Financial Guarantee Performance Report appears to show a net underachievement in 2014 greater than what was previously reimbursed to Broward County ($211k vs. $161k = $50k). In addition, it appears to show a net underachievement for 2015 ($38k) for total exposure of approximately $88k. SBP will provide the detail for the updated calculations to Optum for their review and input. If confirmed, it is our recommendation that Broward pursue reimbursement for the net underachievement in each year.

### Optum Response and Follow-Up:

Optum's formal response to the audit has been included as an Appendix to the report. Based on Optum's response, two conference calls between SBP, Optum and Broward County were conducted in order to discuss the audit findings. With respect to the generic utilization allocated as brand drugs, it is Optum's position that the drugs are identified and allocated for purposes of the financial guarantee based on the Medi-Span characterization. It should be noted that the Agreement between Broward County and Optum does not formally define a methodology for identifying and allocating drugs for the financial guarantee.

With respect to the exclusion of certain drugs as specialty medications, it is Optum's position that these medications were allocated based on an internal specialty list utilized for purposes of calculating the financial guarantee. It should be noted that it was indicated by Optum that the internal list utilized is different than the formulary and specialty price list that is provided to Broward County and available to plan members.

SBP does not agree with Optum's position on either matter, and it is our recommendation that Broward County continue to pursue reimbursement for the updated net underachievement in 2014 and 2015.

### III. *Adherence to terms related to administrative fees and fees related to additional services*

Exhibit B of the Agreement defines the following per claim Administrative Fees for Broward utilization:

| Base Administrative Fees | |
|---|---|
| Retail 30: | $0.80 per net paid claim |
| Retail 90: | $0.70 per net paid claim |
| Mail Service: | $0.70 per net paid claim |
| Specialty: | $0.80 per net paid claim |

SBP requested and obtained detail supporting billings for claims, administrative fees and other fees related to the administration of the Agreement. Through our review of this detail, it was noted that for each year of the audit period, Broward was being billed at $0.80 for all claims, regardless of the type. As defined by the Agreement, claims for Retail 90 and Mail Service dispensations were to be subject to a per claim fee of $0.70. Upon further review of the billing detail provided by Optum, it appeared that this information was incomplete for 2014 and 2015 – it does not appear that all of the claims and activity were provided for each month in both years.

Prepared by StoneBridge Business Partners.

## DETAIL OF AUDIT FINDINGS (*Continued*):

SBP estimated administrative fees attributable to Broward County by utilizing the claims utilization for each year of the audit period. Our analysis of estimated administrative fees compared to administrative fees per the terms of the Agreement is presented on *Table 3* below:

**Table 3 - Admininstrative Fee Recaciculation**

| 2013 | Claims | Optum | | SBP | Variance | |
|---|---|---|---|---|---|---|
| Retail 30: | 55,516 | $ | 44,413 | $ | 44,413 | |
| Retail 90: | 34,158 | | 27,326 | | 23,911 | |
| Mail Service: | 1,824 | | 1,459 | | 1,277 | |
| Specialty: | 1,521 | | 1,217 | | 1,217 | |
| | | $ | 74,415 | $ | 70,817 | $ 3,598 |
| **2014** | | | | | | |
| Retail 30: | 51,252 | $ | 41,002 | $ | 41,002 | |
| Retail 90: | 35,514 | | 28,411 | | 24,860 | |
| Mail Service: | 1,581 | | 1,265 | | 1,107 | |
| Specialty: | 1,627 | | 1,302 | | 1,302 | |
| | | $ | 71,979 | $ | 68,270 | $ 3,710 |
| **2015** | | | | | | |
| Retail 30: | 50,665 | $ | 40,532 | $ | 40,532 | |
| Retail 90: | 35,519 | | 28,415 | | 24,863 | |
| Mail Service: | 1,667 | | 1,334 | | 1,167 | |
| Specialty: | 1,676 | | 1,341 | | 1,341 | |
| | | $ | 71,622 | $ | 67,903 | $ 3,719 |
| | | | Total Variance | | | $ 11,026 |

As illustrated, it appears that Broward may have been overbilled for administrative fees over the course of the audit period by approximately $11,000. In addition, it should be noted that the billing detail for 2013 appears to indicate that Broward was billed approximately $91,000 for administrative fees. Based on the claims volume in the data provided, it appears that Broward would have been overbilled by approximately $17,000 for this year ($91k - $74k). As noted, it appears that the billing information for 2014 and 2015 is incomplete, and as a result we are unable to assess the accuracy of administrative fees for these years. Total exposure could approximate $28k ($11k + $17k).

Through our review of the billing detail provided by Optum, it was also noted that Broward County was being billed for the following Clinical Management programs, with the Per Member Per Month (PMPM) billing rates:

| | |
|---|---|
| Medical Management Clinical Prior Authorization | $0.29 PMPM |
| MedMonitor RetroDUR Program | $0.25 PMPM |
| MedMonitor MTM Program (which includes): | |
| MedMonitor Polypharmacy | $0.61 PMPM |
| MedMonitor Appropriateness of Therapy | $0.20 PMPM |
| MedMonitor Inappropriate Medications in the Elderly | $0.02 PMPM |
| MedMonitor Compliance and Persistency | $0.27 PMPM |
| Aggregate Clinical Management Services | $1.64 PMPM |

Prepared by StoneBridge Business Partners.

## DETAIL OF AUDIT FINDINGS (*Continued*):

In aggregate, the total Per Member Per Month charges for the Clinical Management services amounts to $1.64. Exhibit B of the Agreement indicates that a Clinical Bundle price of $1.45 Per Member Per Month will be applied if all of the services are utilized by Broward County. It appears that the monthly billings to Broward County were done individually for each of the services identified above. As noted in the terms of the Agreement, if all of the services are employed by Broward County then the Clinical Bundle pricing would be applied. However, it does not appear that this is the case. Over the course of the audit period, Broward was consistently billed for these programs on an individual basis each month. SBP attempted to quantify the potential exposure for Broward County, but similar to the billings for claims activity, it appears that the information related to the billing of these programs that was provided is incomplete. Based on the number of members incorporated in the billings for these programs that was provided, it appears that overbillings related to not applying the Clinical Bundle pricing over the course of the audit period would approximate $19,000 each year, for an aggregate overbilling of greater than $57,000 over the course of the audit period.

### Recommendation and follow-up:

It is possible that Broward County was overcharged for administrative fees and the bundling of Clinical Management services over the course of the audit period. The total potential exposure for these overbillings could approximate at least $85k over the audit period ($28k + $57k). SBP will provide the underlying detail to Optum for its review. If these overbillings are confirmed, Broward County should seek reimbursement.

### Optum Response and Follow-Up:

Optum's formal response acknowledged that Broward County was improperly charged for the administrative fees incurred over the course of the audit period, as well as the Clinical Management Services Clinical Bundle. Subsequent to the issuance of the draft report, Optum provided SBP with documentation supporting the repayment of overcharges related to not appropriately charging Broward County the Clinical Bundle price of $1.45 Per Member Per Month. A credit of $58,988.54 was issued to Broward County on Invoice #373222, issued on August 1, 2015. Optum acknowledged that the total overcharge amounted to $60,921.22. They are researching the difference between the calculated overcharge of $60,912.22 and the actual credit issued of $58,988.54. If they are unable to determine the reason for the difference, Optum has indicated it would issue a credit for the balance of $1,932.68.

SBP was ultimately provided with all of the invoices issued by Optum to Broward County for activity over the audit period. In reviewing the invoices, it was determined that the administrative fees charged to Broward for 2014 and 2015 were only overcharged to the extent of the misapplication of the per claim fees identified in the Agreement. It is our continued recommendation that Broward County pursue reimbursement for approximately $28,000 in overcharged administrative fees over the course of the audit period.

Prepared by StoneBridge Business Partners.

**DETAIL OF AUDIT FINDINGS (*Continued*):**

*IV.*   *Visibility to Rebate Activity*

As part of the audit program and scope originally provided to Optum, SBP incorporated detailed testing procedures to validate that rebates earned on Broward County utilization were properly remitted. However, as noted in the Scope Limitations section, SBP was unable to obtain and review detailed information supporting rebates remitted to Broward County over the course of the audit period.

Upon discussing this portion of the Audit Plan with Optum, it was indicated by Optum that it does not have visibility or access to the underlying manufacturer rebate contracts. Optum utilizes the services of a third-party rebate aggregator which manages the manufacturer contracting process. Optum has contracted with the third-party rebate aggregator to receive a fixed dollar per net brand paid claim on a client by client basis. As part of the audit process, Optum provided SBP access to quarterly invoices to the Coalition for Advanced Pharmacy Services (CAPS) for Broward County activity and the corresponding remittances. However, we were not able to review manufacturer-specific rebate contracts.

Section 9.3, Audit Right And Retention of Records, of the contract between Optum and Broward County affords Broward County the right to audit the books, records and accounts of the Vendor (Optum) and its subcontractors. This right would presumably extend to the relationship between Optum and CAPS, with respect to the validating the rebate activity for the utilization related to members of Broward County's health plan.

**Recommendation and follow-up:**

Based on the nature of its relationship with the third party rebate aggregator, we are unable to validate that Broward is receiving 100% of the rebate activity related to its member utilization. On Page 2 of Exhibit B of the Contract, it is noted in italic, "*VENDOR will pass through to County 100% of rebates it receives that can be attributed to allowable utilization of Members hereunder*." As noted, it appears that the contract allows Broward County access to the underlying books and records of CAPS as it relates to the rebate activity. Broward County should consider invoking its right to gain access to detail retained by CAPS in order to assess adherence to the rebate terms of the contract.

**Optum Response and Follow-Up:**

Optum's formal response to this finding confirmed our assertion that SBP reviewed all rebate receivables from CAPS that were passed along. In a subsequent conference call and webinar, Optum provided SBP and Broward County with access to the per script rebate amounts attributable to Broward County that were identified in an Agreement between Optum and CAPS. Optum has reasoned that the rebates being passed along to Broward are in conformance with both agreements, and that Broward County was paid 100% of the rebates earned on member utilization.

Prepared by StoneBridge Business Partners.

## DETAIL OF AUDIT FINDINGS (*Continued*):

While the rebates paid to Broward County appear to be in line with the Agreements and documentation reviewed, SBP was not provided with visibility to the rebates being paid to CAPS by the manufacturers for the Broward County utilization or how the fees that Optum is paying CAPS for their services are being charged and paid. As a result, we are still unable to confirm that Broward County was paid 100% of the rebates earned on its member utilization. Further, it should be noted that the Agreement between Broward County does not identify the use of a rebate aggregator, nor is there an indication that the ability to gain access to subcontractor information would be restricted. It should also be noted that CAPS is a related entity to Optum/Catamaran.

In September 2016, Optum and Broward County executed a new Agreement for Pharmacy Benefit Management Services for the period of January 1, 2017 through December 19, 2019. Incorporated in this new Agreement were new financial terms, including the establishment of an updated schedule for new minimum Per Brand Claim rebate values. The new Per Brand Claim rebates are as follows:

| All Brand | 2017 | 2018 | 2019 |
|-----------|------|------|------|
| Retail 30 | $85.00 | $90.00 | $100.00 |
| Retail 90 | $200.00 | $205.00 | $210.00 |
| Mail | $200.00 | $205.00 | $210.00 |
| Specialty | $550.00 | $600.00 | $650.00 |

These new rebate values are considerably higher than those utilized for the audit period (2013 – 2015). Please refer to the rebate minimums identified on page 4. Utilizing the updated rebate minimums over the course of the audit period, SBP recalculated potential rebates for eligible brand utilization over the audit period, and compared this to what was noted through the audit:

| Year | Old Agreement | New Agreement | Difference |
|------|---------------|---------------|------------|
| 2013 | $695,904 | $3,605,495 | $2,909,591 |
| 2014 | $637,656 | $3,348,020 | $2,710,364 |
| 2015 | $578,234 | $3,081,730 | $2,503,496 |

In discussing the new rebate terms, Optum was unable to satisfactorily explain the significant difference in the rebate minimums between the two Agreements. It is our recommendation that Broward County consider consulting legal counsel to determine what next steps should be appropriate.

## V. *Analysis of rebates earned on Broward utilization.*

The Financial Terms of the Agreement established per script rebate minimums that are required to be remitted to Broward, which varies based on the origin/type of dispensation. The per-script minimums are as follows:

| Guaranteed Rebate Minimums | |
|---|---|
| Retail Minimum | $ 19.40 |
| Retail 90 Minimum | 46.65 |
| Mail Minimum | 42.70 |
| Specialty Minimum | 19.40 |

July 7, 2017

Prepared by StoneBridge Business Partners.

## DETAIL OF AUDIT FINDINGS (*Continued*):

The terms of the Agreement requires that the greater of the per Brand Scripts or 100% of the rebates earned from manufacturers based on participant utilization are required to be remitted to Broward. As noted in the Scope Limitations section and Finding IV, SBP was unable to obtain manufacturer-specific rebate information as Optum claims this information is not available to them. The following table illustrates the guaranteed rebates based on information provided to us by Optum. SBP was able to reconcile the Rx counts in the information to the underlying utilization without material exception:

| Year | Retail Brand Rx | Retail 90 Brand Rx | Mail Brand Rx | Specialty Brand Rx | Minimum Guarantee | Net Rebates Received |
|---|---|---|---|---|---|---|
| 2013 | 12,917 | 8,596 | 463 | 1,265 | $ 696,758 | $ 784,709 |
| 2014 | 10,452 | 8,424 | 409 | 1,260 | 637,269 | 686,010 |
| 2015 | 9,508 | 7,502 | 464 | 1,237 | 578,234 | 1,191,982 |
| | | | | Total Rebates | $ 1,912,261 | $ 2,662,701 |

Note: 2015 Rebate Activity includes HepC Rebate Payments

We observed during our review that the 2015 rebate activity included rebates related to a Hepatitis C rebate arrangement. SBP requested the underlying contract/amendment documentation for this arrangement, but Optum indicated this was not available.

### Recommendation and follow-up:

Based on our review of the information provided, it appears that Optum has adhered to the minimum rebate requirements stated in the Agreement.

VI. *It appears that Optum is adhering to the nonfinancial terms of the Agreements, including formulary/utilization controls and performance standards.*

As part of our detailed review and testing of claims, SBP attempted to validate that Optum was adhering to the formulary controls and clinical/plan edit administration. The formulary controls identified and reviewed included copayment requirements/calculations, DAW (dispense as written) requirements, Maximum-Out-Of Pocket requirements, prior authorizations, and quantity, days supply and age restrictions. Through our detailed review of the utilization data and testing of claims documentation, SBP did not uncover any material departures from the formulary controls and/or requirements over the course of the audit period.

The Agreement also identified multiple Performance Guarantees, which included guarantees related to Total Claim Financial Accuracy, Total Claim Processing Accuracy, Member Satisfaction Surveys, Average Speed to Answer calls, Reporting Accuracy, Mail Service Dispensing Accuracy and several others. SBP requested reports from Optum, supporting adherence to the Performance Guarantees over the course of the audit period. Based on our review of the information provided, it appears that Optum is monitoring and adhering to the performance standards as identified in the Agreement.

Prepared by StoneBridge Business Partners.

## DETAIL OF AUDIT FINDINGS (*Continued*):

### Recommendation and follow-up:

There were no findings related to this area of our testing. It is being presented for informational purposes only.

## CLOSING COMMENTS:

This report has been updated to incorporate the formal response to our draft report provided by Optum. We would like to thank Optum for their cooperation throughout the audit process.

Subsequent to the issue of the final draft version of our audit report, issued May 2, 2017, Optum submitted an updated audit response. This response, dated June 23, 2017 and submitted on June 27, 2017, reiterated Optum's position that the recognition of brand and generic claims for purposes of the financial reconciliation guarantee was in accordance with the Agreement with Broward County. It did not address the exclusion of brand drugs as specialty, despite not being identified as specialty in documentation provided for the audit. Optum also reiterated its position that rebates paid over the course of the audit period was in line with the Agreement with Broward County. This updated response has been incorporated as an Appendix to this report.



June 23rd, 2017

# Prescription Benefit Management Audit

## Broward County

Audit Period: 01/01/2013 – 12/31/2015



1600 McConnor Pkwy
Schaumburg, IL 60173

www.optum.com

- ## **Stonebridge Business Partners**
  - ### **Executive Summary**
    - It does not appear that Optum achieved the contractually indicated discounting for retail brand dispensations over the course of the audit period.
    - With respect to generic utilization, it appears that Optum achieved the Effective Overall Generic Guarantee Rate for Retail < 84 dispensations *in 2013 only,* while Optum achieved the Effective Overall Generic Guarantee Rate for Retail > 84 for each year of the audit period.
    - It appears that Broward may have been overbilled for administration fees over the course of the audit period.
    - SBP was unable to validate that Optum was receiving 100% of the rebates earned on Broward County utilization over the course of the audit period.

### 2013

| Description | Rx | AWP | Ingred. Cost | Actual Discount | Contracted Discount | Performance |
|---|---|---|---|---|---|---|
| Retail 30 Brand | 11,348 | $ 3,092,804 | $ 2,653,042 | 14.22% | 16.00% | $ (55,087) |
| Retail 90 Brand | 8,003 | 7,220,555 | 5,905,464 | 18.21% | 22.00% | (273,431.10) |
| Retail 30 Generic <84 | 42,389 | 3,412,579 | 810,281 | 76.26% | 74.50% | 59,926.65 |
| Retail 90 Generic >84 | 25,620 | 6,914,811 | 878,575 | 87.29% | 78.25% | 625,396.39 |
| Mail Brand | 453 | 438,234 | 337,376 | 23.01% | 23.00% | 64.18 |
| Mail Generic | 1,363 | 361,445 | 82,383 | 77.21% | 77.00% | 749.35 |
| | | | | | Net Performance | $ 357,619 |

### 2014

| Description | Rx | AWP | Ingred. Cost | Actual Discount | Contracted Discount | Performance |
|---|---|---|---|---|---|---|
| Retail 30 Brand | 8,963 | $ 2,600,035 | $ 2,219,155 | 14.65% | 16.00% | $ (35,126) |
| Retail 90 Brand | 7,570 | 8,008,303 | 6,525,424 | 18.52% | 22.00% | (278,947.66) |
| Retail 30 Generic <84 | 40,805 | 3,591,113 | 1,021,469 | 71.56% | 74.50% | (105,735.19) |
| Retail 90 Generic >84 | 27,158 | 7,442,902 | 1,360,912 | 81.72% | 78.50% | 239,311.93 |
| Mail Brand | 378 | 385,671 | 297,357 | 22.90% | 23.00% | (390.33) |
| Mail Generic | 1,187 | 346,871 | 87,556 | 74.76% | 77.25% | $ (8,643) |
| | | | | | Net Performance | $ (189,530) |

### 2015

| Description | Rx | AWP | Ingred. Cost | Actual Discount | Contracted Discount | Performance |
|---|---|---|---|---|---|---|
| Retail 30 Brand | 8,238 | $ 3,258,446 | $ 2,745,230 | 15.75% | 16.00% | $ (8,135) |
| Retail 90 Brand | 6,565 | 8,079,190 | 6,540,962 | 19.04% | 22.00% | (239,193.80) |
| Retail 30 Generic <84 | 41,108 | 3,903,665 | 1,053,157 | 73.02% | 74.50% | (57,722.42) |
| Retail 90 Generic >84 | 28,105 | 8,461,106 | 1,506,851 | 82.19% | 78.50% | 312,286.79 |
| Mail Brand | 321 | 368,131 | 291,972 | 20.69% | 23.00% | (8,511.13) |
| Mail Generic | 1,302 | 347,494 | 105,201 | 69.73% | 77.25% | (26,146.11) |
| | | | | | Net Performance | $ (27,422) |



1600 McConnor Pkwy
Schaumburg, IL 60173

www.optum.com

- ## **OptumRx**
  - ### Executive Summary Response
    - In relation to pricing guarantee reconciliation OptumRx reviewed the claims data provided by Stonebridge in relation to the financial guarantee and noticed it does not appear the claims were calculated according to the Broward County contract. The financial reconciliation guarantee recognizes brand and generic as identified by Medi-span. OptumRx provided Stonebridge Business Partners with the data fields to utilize in order to recalculate their analysis and is currently awaiting a revised file.

      OptumRx notes Stonebridge Business Partners believes not all data was provided related to Administration Fees for the 2014 and 2015 calendar years. Administration fees are a moment in time, because of this they will never match the data one for one due to reversals and run out claims. Should Stonebridge Business Partners provide more detail as to why it is believed data was missing OptumRx would be more than willing to conduct additional research.

      OptumRx also agrees that Broward should have been set up with the bundled Clinical Management program at $1.45 PMPM. On 9/2/15 Broward was issued a credit in the amount of $60,921.22 for this issue.

      Furthermore, OptumRx agrees that the incorrect administration fee of $.80 was charged on mail and retail 90 claims. OptumRx is currently conducting a thorough review of the data to determine an impact amount.

      As it relates to rebates; a WebEx session was conducting to show all receivables from CAPS that were passed along to Broward. This was shown to allow Stonebridge Business Partners to reconcile the rebate dollars received. OptumRx allowed Stonebridge Business Partners to review all the reconciliation of claims and dollars between Catamaran and aggregator. OptumRx confirms the reconciliations of rebates was in line with the contractual arrangement.

- ## **Stonebridge Business Partners**
  - ### Updated Executive Summary 5-16-17
    - It does not appear that Optum achieved the contractually indicated discounting for retail brand dispensations over the course of the audit period.
    - With respect to generic utilization, it appears that Optum achieved the Effective Overall Generic Guarantee Rate for Retail < 84 dispensations *in 2013 only,* while Optum achieved the Effective Overall Generic Guarantee Rate for Retail > 84 for each year of the audit period.
    - It appears that Broward may have been overbilled for administration fees over the course of the audit period.
    - SBP was unable to validate that Optum was receiving 100% of the rebates earned on Broward County utilization over the course of the audit period.

- ## **OptumRx**
  - ### Updated Executive Response
    - OptumRx stands by their original response provided in relation to pricing guarantee reconciliation OptumRx reviewed the claims data provided by Stonebridge in relation to the financial guarantee and noticed it does not appear the claims were calculated according to the Broward County contract. The financial reconciliation guarantee recognizes brand and generic as identified by Medi-span. It is industry standard and in line with our contractually agreement with Broward County to reconcile based on the Medi-span indicator as Medi-span is the global Pharmacy Benefit Management source for identifying drug categories and price reconciliation.

    - OptumRx agrees that Broward should have been set up with the bundled Clinical Management program at $1.45 PMPM. On 8/1/15 Broward was issued a credit in the amount of $58,988.54 for this issue.

    - OptumRx agrees that the incorrect administration fee of $.80 was charged on mail and retail 90 claims. OptumRx has conducted a thorough review of the claims overbilled and total amount overbilled is $11,044.00 for all three contract years. This amount is broken down by $3,602.30



1600 McConnor Pkwy
Schaumburg, IL 60173

**www.optum.com**

overbilled in 2013 ($3,419.90 in the retail 90 channel and $182.40 in the mail channel), $3,713.20 overbilled in 2014 ($3,554.70 in the retail 90 channel and $158.50 in the mail channel) and $3,728.50 overbilled in 2015 ($3,555.60 in the retail 90 channel and $172.90 in the mail channel).

- As it relates to rebates; OptumRx stands by their original response. A WebEx session was conducting to show all receivables from CAPS that were passed along to Broward. This was shown to allow Stonebridge Business Partners to reconcile the rebate dollars received. OptumRx allowed Stonebridge Business Partners to review all the reconciliation of claims and dollars between Catamaran and aggregator. OptumRx confirms the reconciliations of rebates was in line with the contractual arrangement. OptumRx will continue discussions with Broward County directly in relation to rebate visibility.

- **Closing**
  - **OptumRx Conclusion**
    - A credit will be issued once an executed settlement agreement is in place at the close of this audit.