# EXHIBIT 1

**MEDICARE PART D**
**EMPLOYER-ONLY SPONSORED GROUP WAIVER PLAN**
**PRESCRIPTION DRUG SERVICES AGREEMENT**

THIS MEDICARE PART D EMPLOYER-ONLY SPONSORED GROUP WAIVER PLAN PRESCRIPTION DRUG SERVICES AGREEMENT ("Agreement"), made as of the date of execution as set forth on the signature page (the "Execution Date"), is entered into by and between Express Scripts Insurance Co., an Arizona corporation ("ESIC"), and LAKE COUNTY GOVERNMENT, organized under the laws of the state of Illinois, on its own behalf and on behalf of the Client Group Health Plan (as defined below) ("Client").

<u>RECITALS</u>

A.      ESIC is an approved CMS-contracted prescription drug plan ("PDP") sponsor for an Employer Group Waiver Plan PDP in accordance with CMS regulations has received approval from the Centers for Medicare and Medicaid Services ("CMS") to serve as a Prescription Drug Plan Sponsor (a "PDP Sponsor") and to provide prescription drug coverage that meets the requirements of, and pursuant to, the Voluntary Prescription Drug Benefit Program set forth in Part D of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, 42 U.S.C. §1395w-101 through 42 U.S.C. §1395w-152 (the "Act") and all applicable and related rules and regulations promulgated, issued or adopted by CMS or other governmental agencies with jurisdiction over enforcement of the Act, including, but not limited to, 42 C.F.R. §423.1 through 42 C.F.R. §423.910 (with the exception of Subparts Q, R, and S), and the terms of any PDP Sponsor contract between CMS and ESIC (collectively, the "Medicare Drug Rules"); and

B.      Pursuant to the waivers granted by CMS under 42 U.S.C. §1395w-132(b), ESIC offers employer-only sponsored group waiver plans ("EGWPs") to employers that wish to provide prescription drug benefits to their Part D Eligible Retirees (as defined below) in accordance with the Medicare Drug Rules; and

C.      Client currently provides a prescription drug benefit (the "Current Benefit") to its Part D Eligible Retirees (as defined below) pursuant to a non-Medicare, self-insured welfare benefit plan (the "Client Group Health Plan"); and

D.      Client desires to contract with ESIC to offer a prescription drug benefit to Client's Part D Eligible Retirees pursuant to an EGWP that is substantially similar in design to the Current Benefit (the "EGWP Benefit," as further defined below), and as part of the Client Group Health Plan; and

E.      Provided that the EGWP Benefit meets the actuarial equivalence standards of the Medicare Drug Rules, as more fully described below, ESIC desires to offer the EGWP Benefit to Client's Part D Eligible Retirees in accordance with the Medicare Drug Rules and pursuant to the terms and conditions of this Agreement.

NOW, THEREFORE, in consideration of the mutual representations, warranties and covenants herein contained, and pursuant to the terms and subject to the conditions set forth below, ESIC and Client hereby agree as follows:

<u>TERMS AND CONDITIONS</u>

**ARTICLE I - DEFINITIONS**

Terms not otherwise defined in this Agreement shall have the meanings ascribed to them as set forth below, or as defined in the Medicare Drug Rules.

"Affiliate" means, with respect to ESIC, individually or collectively, any other individual, corporation, partnership, limited liability company, trust, joint venture or other enterprise or entity directly or indirectly

controlling (including without limitation all directors and executive officers of such entity), controlled by or under direct or indirect common control of or with ESIC.

"Ancillary Supplies, Equipment, and Services" or "ASES" means ancillary supplies, equipment, and services provided or coordinated by ESIC Specialty Pharmacy in connection with ESIC Specialty Pharmacy's dispensing of Specialty Products. ASES may include all or some of the following: telephonic and/or in-person training, nursing/clinical services, in-home infusion and related support, patient monitoring, medication pumps, tubing, syringes, gauze pads, sharps containers, lancets, test strips, other supplies, and durable medical equipment. The aforementioned list is illustrative only (not exhaustive) and may include other supplies, equipment, and services based on the patient's needs, prescriber instructions, payer requirements, and/or the Specialty Product manufacturer's requirements.

"Average Wholesale Price" or "AWP" means the average wholesale price of a prescription drug as identified by drug pricing services such as Medi-Span or other source recognized in the retail prescription drug industry selected by ESIC (the "Pricing Source"). The AWP used to price pharmacy claims will be the actual NDC-11 submitted by the pharmacy and used to fill the prescription on the date it was dispensed. If the Pricing Source discontinues the reporting of AWP or materially changes the manner in which AWP is calculated, then ESIC reserves the right to make an equitable adjustment as necessary to maintain the parties' relative economics and the pricing intent of this Agreement. ESIC shall provide Client with at least ninety (90) days' notice of the change (or if such notice is not practicable, as much notice as is reasonable under the circumstances), and written illustration of the financial impact of the pricing source or index change (e.g., specific drug examples). If the Client disputes the illustration or the financial impact of the pricing source, the parties agree to cooperate in good faith to resolve such disputes.

"Brand/Generic Algorithm" or "BGA" means ESIC's standard and proprietary brand/generic algorithm, a copy of which may be made available for review by Client or its Auditor upon request. The purposes of the algorithm are to utilize a comprehensive and logical algorithm to determine the brand or generic status of products in the ESIC master drug file using a combination of industry standard attributes, to stabilize products "flipping" between brand and generic status as may be the case when a single indicator is used from industry pricing sources, and to reduce Client, EGWP Enrollee and provider confusion due to fluctuations in brand/generic status. Client or its Auditor may audit ESIC's application of its BGA to confirm that ESIC is making brand and generic drug determinations consistent with such algorithm.

"Brand Drug" means a prescription drug identified as such in ESIC's master drug file using indicators from First Databank (or other source nationally recognized in the prescription drug industry) on the basis of a standard Brand/Generic Algorithm, a copy of which may be made available for review by Client or its Auditor upon request. Notwithstanding the foregoing, certain prescription drug medications that are licensed and then currently marketed as brand name drugs, where there exists at least one (1) competing prescription medication that is a generic equivalent and interchangeable with the marketed brand name drug, may process as "Generic Drugs" for Prescription Drug Claim adjudication and EGWP Enrollee Copayment purposes.

"Copayment" or "Copay" means that portion of the charge for each Covered Product dispensed to an EGWP Enrollee that is the responsibility of such EGWP Enrollee (e.g., copayment, coinsurance, cost sharing, and/or deductibles under initial coverage limits and up to annual out-of-pocket thresholds) as provided under the EGWP Benefit, as shown in the Set-Up Forms.

"Coverage Gap" means the stage of the benefit between the initial coverage limit and the catastrophic coverage threshold, as described in the Medicare Part D prescription drug program administered by the United States federal government.

"Coverage Gap Discount" means the manufacturer discounts available to eligible Medicare beneficiaries receiving applicable, covered Medicare Part D drugs, while in the Coverage Gap.

"Coverage Gap Discount Program" means the Medicare program that makes manufacturer discounts available to eligible Medicare beneficiaries receiving applicable, covered Medicare Part D drugs, while in the Coverage Gap.

"Covered Drug(s)" means those prescription drugs, supplies, Specialty Products and other items that are covered under the EGWP Benefit, or treated as covered pursuant to a coverage determination or appeal.

"Enrollee Submitted Claim" means (a) a claim submitted by an Enrollee for Covered Drugs dispensed by a pharmacy other than a Participating Pharmacy, (b) a claim submitted by an Enrollee for a vaccination, or (c) a claim for Covered Drugs filled at a Participating Pharmacy for which the Enrollee paid the entire cost of the Covered Product.

"Enrollment File" means the list(s) submitted by Client to ESIC, in accordance with Article II, indicating the Part D Eligible Retirees that Client has submitted for enrollment in the EGWP Benefit, as verified by ESIC through CMS eligibility files.

"EGWP Benefit" means the prescription drug benefit to be administered by ESIC under this Agreement, as defined in the Recitals above and as further described in the Client Group Health Plan document, its summary plan description, and its summary of benefits, the latter of which is attached hereto as Exhibit A, as may be amended from time to time in accordance with the terms of this Agreement.

"EGWP Enrollee" means each Part D Eligible Retiree who is enrolled in the EGWP Benefit in accordance with the terms of this Agreement.

"EGWP Plus" means a prescription drug benefit plan design that provides non-Medicare EGWP coverage supplemental to the standard Part D benefit, and is defined by CMS as other health or prescription drug coverage, and as such, the Coverage Gap Discount is applied before any additional coverage beyond the standard Part D benefit.

"ERISA" means the Employee Retirement Income Security Act, as amended, 29 U.S.C. §1001 et seq.

"ESIC Specialty Pharmacy" means CuraScript, Inc., Accredo Health Group, Inc., Express Scripts Specialty Distribution Services, Inc., or another pharmacy or home health agency wholly-owned or operated by ESIC or one or more of its affiliates that primarily dispenses Specialty Products or provides services related thereto; provided, however, that when the Mail Service Pharmacy dispenses a Specialty Product, it shall be considered an ESIC Specialty Pharmacy hereunder.

"Formulary" means the list of FDA-approved prescription drugs and supplies developed by ESIC's Pharmacy and Therapeutics Committee and/or customized by Client, which meets the requirements of the Medicare Drug Rules, and which is selected and/or adopted by Client. Subject to the requirements of the Medicare Drug Rules, the drugs and supplies included on the Formulary will be modified by ESIC from time to time as a result of factors, including, but not limited to, medical appropriateness, manufacturer Rebate arrangements, and patent expirations. Additions and/or deletions to the Formulary are hereby adopted by Client, subject to Client's discretion, subject to the requirements of the Medicare Drug Rules, to elect not to implement any such addition or deletion through the Set-Up Form process, which such election shall be considered a Client change to the Formulary.

"Generic Drug" means a prescription drug, whether identified by its chemical, proprietary, or non-proprietary name, that is therapeutically equivalent and interchangeable with drugs having an identical amount of the same active ingredient(s) and approved by the FDA, and which is identified as such in ESIC's master drug file using indicators from First Databank (or other source nationally recognized in the prescription drug industry) on the basis of a standard Brand/Generic Algorithm utilized by ESIC for all of its clients, a copy of which may be made available for review by Client or its Auditor upon request.

"HIPAA" means the Health Insurance Portability and Accountability Act of 1996, as amended, and the regulations promulgated thereunder.

"Ingredient Cost Charge" means the ingredient cost portion of the amount charged by ESIC to Client for each Prescription Drug Claim, subject to the "lesser of" logic set forth on Exhibit B-1, as applicable.

"Late Enrollment Penalty" or "LEP" means the financial penalty incurred under the Medicare Drug Rules by Medicare Part D beneficiaries who have had a continued gap in creditable coverage of sixty-three (63) days or more after the end of the beneficiary's initial election period, adjusted from time to time by CMS.

"MAC List" means a list of prescription drug products identified as readily available as Generic Drugs, generally equivalent to a Brand Drug (in which case the Brand Drug may also be on the MAC List) and which are deemed to require pricing management due to the number of manufacturers, utilization and pricing volatility. ESI acknowledges and agrees that the mail order MAC list is at least identical in breadth of products or more comprehensive than the MAC list offered at retail. ESI acknowledges and agrees that the mail order MAC list price points for individual drugs/GCNs must be equal to or less than (i.e., more deeply discounted) than the retail MAC price points for the same drugs/GCNs except for claims that pay at U&C at retail.

"Mail Service Pharmacy" means a duly licensed pharmacy wholly-owned or operated by ESIC or one or more of its affiliates, other than an ESIC Specialty Pharmacy, where prescriptions are filled and delivered to EGWP Enrollees via mail delivery service.

"Manufacturer Administrative Fees" means those administrative fees paid by manufacturers to ESIC or its Affiliate pursuant to a contract between ESIC or its Affiliate and the manufacturer in connection with ESIC or its Affiliate administering, invoicing, allocating and collecting the Rebates under the Medicare Rebate Program.

"Medicare Formulary" means the list of prescription drugs and supplies developed, implemented and maintained in accordance with the Medicare Drug Rules for the EGWP Benefit.

"Medicare Rebate Program" means ESIC's or its Affiliate's manufacturer rebate program under which ESIC or its Affiliate contracts with pharmaceutical manufacturers for Rebates payable on selected Covered Drugs that are reimbursed, in whole or in part, through Medicare Part D, as such program may change from time to time.

"Members" has the meaning as set forth in that certain Pharmacy Benefit Management Agreement, dated January 1, 2014, by and between Express Scripts, Inc. ("ESI") and Client, as amended from time to time (the "Commercial Agreement").

"MRA" or "Maximum Reimbursement Amount" is the price charged to Client for a prescription drug product on the MAC List.

"Multi-Source Products" means a prescription medication that: (i) is licensed and then currently marketed by more than two (2) generic drug manufacturers; (ii) is not subject to patent litigation; and (iii) either (1) is adjudicated with a generic Copayment or (2) includes an Ancillary Charge to the EGWP Enrollee when dispensed based on Client defined plan design and coverage policies.

"Part D" or "Medicare Part D" means the Voluntary Prescription Drug Benefit Program set forth in Part D of the Act.

"Part D Eligible Retiree" means an individual who is (a) eligible for Part D in accordance with the Medicare Drug Rules, (b) not enrolled in a Part D plan (other than the EGWP Benefit), and (c) eligible to participate in Client's Current Benefit.

"Participating Pharmacy" means any licensed retail pharmacy with which ESIC or one or more of its Affiliates has executed an agreement to provide Covered Drugs to EGWP Enrollees, but shall not include

any mail order or specialty pharmacy affiliated with any such Participating Pharmacy. Participating Pharmacies are independent contractors of ESIC.

"Pharmacy" or "Pharmacies" refers from time to time to any or all Participating Pharmacies, Mail Service Pharmacy, or ESIC Specialty Pharmacy as the context of the provision dictates.

"PHI" means protected health information as defined under HIPAA.

"PMPM" means, if applicable, per EGWP Enrollee, per month, as determined by ESIC from the Enrollment Files for the applicable time period.

"Prescription Drug Claim" means an EGWP Enrollee Submitted Claim or claim for payment of a Covered Product submitted to ESIC by a Participating Pharmacy, Mail Service Pharmacy, or Specialty Pharmacy as a result of dispensing Covered Drugs to an EGWP Enrollee.

"Prescription Drug Plan" or "PDP" shall have the meaning set forth in the Medicare Drug Rules.

"Rebates" means retrospective rebates that are paid to ESIC or its Affiliate pursuant to the terms of a rebate contract negotiated independently by ESIC or its Affiliate with a pharmaceutical manufacturer and directly attributable to the utilization of certain Covered Drugs by EGWP Enrollees under the EGWP Benefit. Rebates do not include Manufacturer Administrative Fees: product discounts or fees related to the procurement of prescription drug inventories by or on behalf of ESIC or its Affiliates owned and operated specialty or mail order pharmacies, as more fully described in Exhibit D; fees received by ESIC from manufacturers for care management or other services provided in connection with the dispensing of Specialty Products; or other fee-for-service arrangements whereby pharmaceutical manufacturers generally report the fees paid to ESIC or its Affiliates for services rendered as "bona fide service fees" pursuant to federal laws and regulations, including, but not limited to the Medicaid "Best Price" rule (collectively, "Other Pharma Revenue"). Such laws and regulations, as well as ESIC's contracts with pharmaceutical manufacturers, generally prohibit ESIC from sharing any such "bona fide service fees" earned by ESIC, whether wholely or in part, with any ESIC client. ESIC represents and warrants that it will not enter into any agreement with a pharmaceutical manufacturer for Other Pharma Revenue in exchange for a reduction of Rebates.

"Set-Up Forms" means any standard ESIC document or form, which when completed and signed by Client (electronic communications from Client indicating Client's approval of a Set-Up Form shall satisfy the foregoing), will describe the essential benefit elements and coverage rules adopted by Client.

"Single Source Products" means a prescription medication that is: (i) licensed and then currently marketed by up to two (2) generic drug manufacturers; or (ii) subject to patent litigation.

"Specialty Product List" means the standard list of Specialty Products and their reimbursement rates under the applicable (exclusive or open) option as updated from time to time. The Specialty Product List is available to Client upon request.

"Specialty Products" means those injectable and non-injectable drugs on the Specialty Product List. Specialty Products typically have one or more of several key characteristics, including frequent dosing adjustments and intensive clinical monitoring to decrease the potential for drug toxicity and increase the probability for beneficial treatment outcomes; intensive patient training and compliance assistance to facilitate therapeutic goals; limited or exclusive product availability and distribution; specialized product handling and/or administration requirements and/or cost in excess of $500 for a 30 day supply.

"True Out-of-Pocket Costs" or "TrOOP" means costs incurred by an EGWP Enrollee or by another person on behalf of an EGWP Enrollee, such as a deductible or other cost-sharing amount, with respect to Covered Drugs, as further defined in the Medicare Drug Rules.

"UM Company" means MCMC, LLC or other independent third party utilization management company

contracted by ESIC, subject to and as further described herein.

"Usual and Customary Price" or "U&C" means the retail price charged by a Participating Pharmacy for the particular drug in a cash transaction on the date the drug is dispensed as reported to ESIC or its Affiliate by the Participating Pharmacy.

"Vaccine Claim" means (i) a Medicare Part D covered vaccine claim for reimbursement submitted by a Participating Pharmacy, ESI Mail Pharmacy, ESIC Specialty Pharmacy, physician, or other entity and (ii) a Medicare Part B covered vaccine claim submitted by a Participating Pharmacy. Vaccine Claim is a Prescription Drug Claim for purposes of this Agreement.

**ARTICLE II – PLAN STATUS UNDER APPLICABLE LAWS; ENROLLMENT AND DISENROLLMENT IN THE EGWP BENEFIT**

2.1   <u>Medicare Part D</u>.  Client and ESIC acknowledge and agree as follows:

(a)   Under the Medicare Drug Rules, the EGWP Benefit will be deemed to be an EGWP administered by ESIC, and each EGWP Enrollee will be deemed to be a Part D enrollee of ESIC who is covered by the EGWP Benefit.

(b)   The design of and administration of the EGWP Benefit is subject to the applicable requirements of the Medicare Drug Rules.  Client shall cooperate with ESIC and, upon ESIC's request, do, execute, acknowledge, deliver, and provide such further acts, reports, information, and instruments as may be reasonably required or appropriate to administer the EGWP Benefit in compliance with the Medicare Drug Rules, applicable state insurance laws and other applicable laws.

(c)   If the number of Client's Part D Eligible Retirees is materially reduced or eliminated for any reason, ESIC may communicate with those persons at ESIC's expense regarding alternative Medicare Part D options, including alternative Medicare Part D services offered by ESIC or one or more of its Affiliates, and the program pricing terms hereunder may be equitably modified by ESIC to reflect the reduction or elimination of the number of Part D Eligible Retirees.

2.2   <u>ERISA</u>.  Client acknowledges and agrees that, in providing services under this Agreement and administering the EGWP Benefit, neither ESIC nor any of ESIC's Affiliates is acting as a fiduciary (as defined in Section 3.21(a) of ERISA) of the Client Group Health Plan, and Client shall not name ESIC or any of ESIC's Affiliates as a plan fiduciary.  Neither ESIC nor any of ESIC's Affiliates have nor shall have any power to make any decisions as to the Client Group Health Plan's policy, interpretations, practices or procedures, but rather provides ministerial services within a framework of policies, guidelines, interpretations, rules, practices, and procedures chosen by Client.  Client acknowledges that neither ESIC nor any of ESIC's Affiliates have nor shall have any discretionary authority or control respecting management of the Client Group Health Plan, nor exercise any authority or control respecting management or disposition of the plan assets of the Client Group Health Plan, if any exist.  Client further acknowledges that all such discretionary authority with respect to the Client Group Health Plan is retained by Client or some other person or entity as designated in writing by Client to act with such discretionary authority.

2.3   <u>HIPAA</u>.  Each of Client, the Client Group Health Plan and ESIC agrees to take reasonable and necessary actions to safeguard the privacy and security of information that identifies a particular EGWP Enrollee in accordance with state and federal privacy and security requirements, including HIPAA and the confidentiality and security provisions stated in 42 C.F.R. §423.136.   Without limiting the generality of the foregoing, the parties acknowledge that, for the purposes of HIPAA compliance, each of ESIC and the Client Group Health Plan is a Covered Entity, and that, with respect to the EGWP Benefit, ESIC and the Client Group Health Plan shall be deemed to be an Organized Health Care Arrangement.  ESIC and the Client Group Health Plan may transmit and receive PHI as necessary for the operation of the EGWP Benefit.  In addition, ESIC may transmit PHI to the Client Group Health Plan for payment purposes and any other purpose permitted by HIPAA.   Client hereby represents and warrants that: (i) the Client Group

Health Plan's documents have been amended to meet the specification requirements set forth at 45 C.F.R. §164.504(f); (ii) Client will use and disclose PHI solely in accordance with these provisions; and (iii) accordingly, ESIC, at the direction of the Client Group Health Plan, may disclose PHI to Client consistent with the terms of this Section 2.3. The parties shall take reasonable steps to ensure that all uses and disclosures of PHI by ESIC, the Client Group Health Plan and Client only include information that is minimally necessary to accomplish the purpose(s) of the use or disclosure. Capitalized terms used in this Section 2.3 and not otherwise defined in this Agreement shall have the meaning set forth in HIPAA. ESIC may use and disclose both during and after the term of this Agreement the anonymized claims data (de-identified in accordance with HIPAA) including drug and related medical data collected by ESIC or provided to ESIC by Client for research; provider profiling; benchmarking, drug trend, and cost and other internal analyses and comparisons; clinical, safety and/or trend programs; ASES; or other ESIC business purposes, in all cases subject to applicable law.

2.4     Group Enrollment. Subject to each individual's right to opt out, as described below, Client shall enroll Part D Eligible Retirees in the EGWP Benefit through a group enrollment process, as further described in and permitted under the Medicare Drug Rules. Client agrees that it will comply with all applicable requirements for group enrollment in EGWPs as set forth in the Medicare Drug Rules and related CMS guidance, and as described and required by ESIC's policies and procedures.

2.5     Enrollment File. No later than thirty (30) days prior to the Effective Date and the first day of each EGWP Benefit enrollment period thereafter, so long as this Agreement is in effect, Client shall provide an Enrollment File to ESIC via the communication medium reasonably requested by ESIC that lists those Part D Eligible Retirees for whom Client intends to make application for enrollment in the EGWP Benefit (i.e., those Part D Eligible Retirees who have not opted out of the group enrollment process) for that contract year. Client represents and warrants that all information it provides to ESIC in the Enrollment File will be complete and correct. Client shall communicate all new enrollments (i.e., individuals who become eligible to participate in the EGWP Benefit outside of an annual election period), requested retroactive enrollments of Part D Eligible Retirees, and disenrollments from the EGWP Benefit via the communication medium reasonably requested by ESIC. ESIC agrees to process retroactive enrollment requests pursuant to the requirements of the Medicare Drug Rules.

2.6     Implementation.

        (a)     ESIC's Responsibilities. ESIC shall implement the Enrollment File following confirmation of the eligibility of the Part D Eligible Retirees listed on the Enrollment File with CMS eligibility files. A Part D Eligible Retiree will not be enrolled in the EGWP Benefit unless such individual is listed on both the Enrollment File submitted by Client and the CMS eligibility files. If an individual is listed on the Enrollment File provided by Client, but is not eligible for participation according to CMS eligibility files, then ESIC shall notify Client in a timely manner regarding such individual's ineligibility. ESIC will work with Client to determine if such individual has been rejected due to an administrative or clerical error (e.g., data field standards errors, rejections related to information input by ESIC related to the EGWP Benefit into the CMS system, etc.), or an error requiring individual retiree contact, and if so in either case, ESIC will take appropriate action and attempt to correct such error and resubmit the individual through the CMS system. Client acknowledges and agrees that ESIC may update in the Enrollment File any and all information concerning Part D Eligible Retirees upon receipt of corrected information from CMS, and ESIC may use such corrected information to obtain a Part D Eligible Retiree's enrollment in the EGWP Benefit. For all Part D Eligible Retirees that have been included by Client in the Enrollment File, but who are ultimately determined to be ineligible for participation in the EGWP Benefit, ESIC or its Affiliate shall notify the individual of his or her ineligibility in the EGWP Benefit and take all other action as required by applicable law. ESIC shall communicate to Client any changes to a Part D Eligible Retiree's information in the Enrollment File based upon updates or corrections received from CMS.

        (b)     Incomplete Enrollment File Information. Client's submission to ESIC of an inaccurate or incomplete Enrollment File (e.g., missing date of birth, last name, first name, etc.) or otherwise incomplete information with respect to any individual Part D Eligible Retiree may result in a rejection of the Part D Eligible Retiree's enrollment in the EGWP Benefit. ESIC will provide Client with regular reports

providing the details of all such incomplete information needed to enroll Part D Eligible Retirees. Client acknowledges and agrees that ESIC may contact Client's Part D Eligible Retirees to obtain the information required hereunder and that ESIC will update the Enrollment File on Client's behalf to reflect additional information needed to complete enrollment of the Part D Eligible Retirees in the EGWP Benefit. If ESIC, using reasonable efforts, is not able to obtain all missing information from a Part D Eligible Retiree within twenty-one (21) days after receiving Client's initial request for enrollment of the Part D Eligible Retiree in the EGWP Benefit, then Client's request shall be deemed cancelled and ESIC or its Affiliate shall notify the individual of his or her non-enrollment in the EGWP Benefit and shall take all other action as required by applicable law.

(c)    <u>Effective Date of Application for Enrollment into EGWP Benefit</u>. Notwithstanding any provision of this Agreement to the contrary, the effective date of the application for any Part D Eligible Retiree who ESIC seeks to enroll in the EGWP Benefit hereunder shall be the date on which the application for enrollment is entered by ESIC into its enrollment system, subject however to any adjustments that ESIC may make for retroactive enrollments as necessary to enroll the Part D Eligible Retiree in the EGWP Benefit.

2.7    <u>Individual Disenrollment</u>. If Client or ESIC determines that an EGWP Enrollee is no longer eligible to participate as an EGWP Enrollee in the EGWP Benefit (an "Ineligible Enrollee"), such Ineligible Enrollee shall be disenrolled in accordance with the Medicare Drug Rules.

2.8    <u>Group Disenrollment</u>. If, upon the expiration of the then current term of this Agreement, Client plans to disenroll its EGWP Enrollees from the EGWP Benefit using a group disenrollment process, then Client shall implement the following procedures:

(a)    <u>Notification to EGWP Enrollees</u>. Client shall provide at least twenty-one (21) days (or such other minimum days' notice as required by the Medicare Drug Rules) prior written notice to each EGWP Enrollee that Client plans to disenroll him or her from the EGWP Benefit and shall include with such written notification an explanation as to how the EGWP Enrollee may contact CMS for information on other Medicare Part D options that might be available to the EGWP Enrollee; and

(b)    <u>Information to ESIC</u>. Client shall provide all the information to ESIC that is required for ESIC to submit a complete disenrollment request transaction to CMS, as set forth in the Medicare Drug Rules.

2.9    <u>Voluntary Disenrollment</u>. If an EGWP Enrollee makes a voluntary request to be disenrolled from the EGWP Benefit (the "Voluntary Disenrollee") to Client, then Client shall notify ESIC at least sixty (60) days prior to the effective date of such Voluntary Disenrollee's disenrollment, in a manner and format agreed upon by the parties. If Client does not timely notify ESIC of such Voluntary Disenrollee's disenrollment in the EGWP Benefit, then ESIC shall submit a retroactive disenrollment request to CMS. Client acknowledges that CMS may only grant up to a ninety (90) day retroactive disenrollment in such instances. If the Voluntary Disenrollee makes his or her request directly to ESIC, then ESIC shall direct the Voluntary Disenrollee to initiate the disenrollment with the Client.

2.10    <u>Responsibility for Claims After Loss of Eligibility or Disenrollment</u>. Except for Prescription Drug Claims that are paid due to ESIC's negligence, Client shall be responsible for reimbursing ESIC pursuant to Section 5.1 for all Prescription Drug Claims processed by ESIC: (a) with respect to an Ineligible Enrollee during any period in which the Enrollment File indicated that such Ineligible Enrollee was eligible; and (b) with respect to a Voluntary Disenrollee, in the event Client did not provide timely notice to ESIC of such disenrollment as set forth in this Article II.

2.11    <u>Effect On / Effect Of Commercial Agreement</u>. Except as expressly provided in this Agreement, the parties acknowledge that ESIC shall have no obligations under the Commercial Agreement with respect to the Client Group Health Plan, and that Client shall be solely responsible for determining the eligibility of Members covered by the prescription drug benefit administered pursuant to the Commercial Agreement (the "Commercial Benefit"). By requesting a Member's enrollment as an EGWP Enrollee in

the EGWP Benefit, Client represents that such EGWP Enrollee's eligibility as a Member in the Commercial Benefit (except for EGWP supplemental coverage) will immediately terminate. An EGWP Enrollee may not have dual coverage under the EGWP Benefit and the Commercial Benefit; and therefore, after any EGWP Enrollee's enrollment in the EGWP Benefit, all Prescription Drug Claims and Member Submitted Claims submitted to ESIC under the Commercial Agreement shall be treated as Prescription Drug Claims under this Agreement and shall be processed by ESIC in accordance with the EGWP Benefit.

2.12    Retroactive Payments / Enrollment and Disenrollment. ESIC may receive or recoup payments from CMS based upon retroactive enrollments to the EGWP Benefit or retroactive disenrollments from the EGWP Benefit under this Agreement. To the extent ESIC has agreed in this Agreement to pay Client amounts equal to such payments, ESIC shall pay such amounts to Client within forty-five (45) days of ESIC's receipt of payments from CMS; provided, further, that any related PMPM Fees (as defined in Section 5.2(b)) associated with the retroactive enrollment or disenrollment, as the case may be, shall be adjusted in accordance with the applicable terms of this Agreement.

## ARTICLE III – PRESCRIPTION DRUG SERVICES

3.1    Exclusivity. Client acknowledges and agrees that, in the event Client offers its Part D Eligible Retirees more than one Part D benefit option, the eligibility determinations, enrollment and disenrollment and other administration of such Part D options will require extensive coordination with the administration of the EGWP Benefit. For these reasons, Client agrees that Client shall use ESIC as Client's exclusive provider of all Medicare Part D services for its Part D Eligible Retirees during the term of this Agreement. The terms and conditions of Client's and ESIC's arrangements for Part D options other than the EGWP Benefit shall be set forth in separate agreements.

3.2    Prescription Drug Services. In exchange for the fees set forth in Exhibit B, ESIC will administer the EGWP Benefit for EGWP Enrollees in accordance with the terms and conditions of this Agreement. Such administrative services will include: pharmacy network contracting; Mail Service Pharmacy and Specialty Products services; Prescription Drug Claim processing; Formulary and Rebate administration; Medication Therapy Management; services cost containment, clinical, safety, adherence, and other like programs (collectively, "Prescription Drug Services"), as further described in Sections 3.7 through 3.10. All Prescription Drug Services shall be provided by ESIC in accordance with the Medicare Drug Rules and the terms of the EGWP Benefit. Client acknowledges and agrees that ESIC may provide Prescription Drug Services under this Agreement through one or more of its Affiliates. ESIC will have written agreements with each Affiliate that will perform services on behalf of ESIC in connection with the EGWP Benefit that meet the requirements the Medicare Drug Rules for subcontractors of PDP Sponsors.

3.3    The EGWP Benefit. The EGWP Benefit will satisfy all actuarial equivalence standards set forth in the Medicare Drug Rules. Client hereby agrees to cooperate with ESIC to perform the necessary actuarial equivalence calculations to determine whether the EGWP Benefit meets the foregoing actuarial equivalence standards prior to the Effective Date. If ESIC determines that the EGWP Benefit does not meet the actuarial equivalence standards, then Client shall cooperate with ESIC to make necessary adjustments to the EGWP Benefit design to meet the actuarial equivalence standards.

3.4    Changes to the EGWP Benefit. Client shall have the right to request changes to the terms of the EGWP Benefit from time to time by providing written notice to ESIC. ESIC shall implement any such requested changes, subject to the following conditions: (a) all changes to the EGWP Benefit must be consistent with the Medicare Drug Rules; (b) the EGWP Benefit, after implementation of such changes, must continue to meet the actuarial equivalence standards referenced in Section 3.3 above; (c) EGWP Benefit changes may be implemented only at times and in the manner permitted by the Medicare Drug Rules; and (d) any requested change that would increase ESIC's costs of administering the EGWP Benefit without an equivalent increase in reimbursement to ESIC from Client shall not be implemented unless and until Client and ESIC agree in writing upon a corresponding amendment to the reimbursement terms of this Agreement.

3.5    EGWP Enrollee Communications.  All standard EGWP Enrollee communications concerning the EGWP Benefit (i.e., summary plan description, evidence of coverage, etc.) shall be mutually developed by ESIC and the Client pursuant to the Medicare Drug Rules, including the CMS Marketing Guidelines contained therein.  ESIC shall be responsible, with assistance from Client, in completing the EGWP Enrollee communications and distributing them to EGWP Enrollees as appropriate.  Pursuant to the Medicare Drug Rules, ESIC must provide all such EGWP Enrollee communications to CMS for review.  If CMS notifies ESIC that any such EGWP Enrollee communication is deficient, Client agrees to assist ESIC to make necessary revisions to such EGWP Enrollee communication to correct such deficiency.

3.6    Pharmacy Network.  ESIC will maintain a network(s) of Participating Pharmacies, and will make available an updated list of Participating Pharmacies on-line. The network of Participating Pharmacies will at a minimum, be sufficient to meet the needs of the EGWP Enrollees as required pursuant to the Medicare Drug Rules.  Neither ESIC nor its Affiliate direct or exercise any control over the Participating Pharmacies or the professional judgment exercised by any pharmacist in dispensing prescriptions or otherwise providing pharmaceutical related services at a Participating Pharmacy.  ESIC shall have no liability to Client, any EGWP Enrollee or any other person or entity for any act or omission of any Participating Pharmacy or it agents or employees. Upon Client's written request, ESIC will make good faith efforts to add any additional retail pharmacy to the Participating Pharmacy network for Client, provided that such pharmacy meets ESIC's network participation requirements and agrees to ESIC's standard terms and conditions.   If ESIC pays any such Participating Pharmacy a higher rate than ESIC's standard network rate (i.e. the particular pharmacy will only agree to higher than standard reimbursement rates), the rate charged to Client for Prescription Drug Claims processed through such pharmacy will be the net ingredient cost plus the dispensing fee paid by ESIC to such Participating Pharmacy (plus applicable sales or excise tax or other governmental surcharge, if any).  All such Prescription Drug Claims will be excluded from the pricing guarantees set forth in Exhibit B.

3.7    Audits of Participating Pharmacies; Fraud and Abuse.  ESIC shall periodically audit Participating Pharmacies to determine compliance with their agreements with ESIC or its Affiliate and in order to meet the anti-fraud provisions of the Medicare Drug Rules applicable to PDPs.  ESIC also shall perform fraud and abuse reviews of EGWP Enrollees and physicians as required under the Medicare Drug Rules for PDPs.  The audits and reviews may be conducted by ESIC's or its Affiliate's internal auditors or its outside auditors, and at the pharmacy or at ESIC by a review of electronically transmitted claims.  Any recovered overpayments will be credited to Client on the next billing cycle after the correction.  ESIC shall attempt recovery of identified overpayments through offset, demand or other reasonable means.  ESIC shall not be required to institute litigation to collect any overpayments, but shall cooperate with Client in the event Client elects to pursue litigation, provided ESIC has implement measures to recover overpayments made to pharmacies or members and employ a mechanism to ensure the Client receives credit for these overpayments.

3.8    Mail Service Pharmacy. EGWP Enrollees may have prescriptions filled through the Mail Service Pharmacy. Subject to applicable law, ESIC may communicate with EGWP Enrollees regarding benefit design, cost savings, availability and use of the Mail Service Pharmacy, as well as provide supporting services. ESIC may suspend Mail Service Pharmacy services to an EGWP Enrollee who is in default of any Copayment amount due ESIC.

3.9    Claims Processing.  Subject to Sections 3.9(a)-(i), ESIC will perform claims processing services for Covered Drugs dispensed to EGWP Enrollees by Participating Pharmacies, Mail Service and ESIC Specialty Pharmacy consistent with the applicable standard transaction rules required under HIPAA.  The "per Rx" administrative fees set forth in Exhibit B shall be charged for all claims processing services, including initial, rejected, reversed and reprocessed Prescription Drug Claim processing.  ESIC also shall process EGWP Enrollee Submitted Claims.

    (a)    Application of Discounts.  Prescription Drug Claims will be processed based on the rates set forth in Exhibit B, including Prescription Drug Claims for which no benefits are payable to the EGWP Enrollee for Covered Drugs because of the application of any deductible or 100% co-insurance requirement following satisfaction of any initial coverage limit consistent with the Medicare Drug Rules.

(b)     COB.  ESIC will coordinate benefits with state pharmaceutical assistance programs and entities providing other prescription drug coverage consistent with the Medicare Drug Rules.  If Client provides self-funded non-Medicare EGWP supplemental coverage ("EGWP supplemental coverage") for EGWP Enrollees in accordance with the Medicare Drug Rules, the parties agree that such EGWP supplemental coverage will be subject to and managed under the terms of the Commercial Agreement. ESIC will perform the following additional coordination of benefits with Client's EGWP supplemental coverage: Coordination of benefits for Medicare Part D applicable drugs throughout the EGWP Benefit and the EGWP supplemental coverage; single transaction for Members at POS utilizing Medicare Part D eligibility and a single ID card; EGWP supplemental coverage management; utilize EGWP Enrollee eligibility established under Medicare Part D plan; comprehensive EGWP Enrollee communications package on the EGWP supplemental coverage; all CMS required reporting; claims reporting detailing primary and secondary payments; and financial reporting detailing application of Coverage Gap Discount Program.

(c)     Utilization Management.  Consistent with the terms of the EGWP Benefit, ESIC will establish a reasonable and appropriate drug management program that includes incentives to reduce costs when medically appropriate; maintains policies and systems to assist in preventing over-utilization and under-utilization of prescribed medications, according to guidelines specified by CMS and in accordance with the Medicare Drug Rules.  Further, in connection with each prescription submitted for processing on-line by a Participating Pharmacy, ESIC will perform standard drug utilization review ("DUR") in order to assist the dispensing pharmacist and prescribing physician in identifying potential drug interactions, incorrect prescriptions or dosages, and certain other circumstances that may be indicative of inappropriate prescription drug usage. ESIC's DUR processes are not intended to substitute for the professional judgment of the prescriber, the dispensing pharmacist or any other health care professional providing services to the EGWP Enrollee.

(d)     Quality Assurance.   Consistent with the terms of the EGWP Benefit, ESIC will establish quality assurance measures and systems to reduce medication errors and adverse drug interactions and improve medication use in accordance with the Medicare Drug Rules.

(e)     TrOOP.  Consistent with the terms of the EGWP Benefit, ESIC will establish and maintain a system to record EGWP Enrollees' TrOOP balances, and shall communicate TrOOP balances to EGWP Enrollees upon request.

(f)     Coverage Determinations and Appeals.  The parties acknowledge and agree that ESIC is required under the Medicare Drug Rules to maintain oversight of coverage determinations under the EGWP Benefit, including prior authorizations and EGWP Enrollee Submitted Claims determinations, and to maintain an appeals process for EGWP Enrollees.  Client acknowledges and agrees that ESI may perform such services through the UM Company.  ESIC or the UM Company, as applicable, will be responsible for conducting the appeal in a manner consistent with the requirements of the Medicare Drug Rules and shall ensure that the contract with the UM Company complies with the applicable delegation requirements of the Medicare Drug Rules, including without limitation 42 C.F.R. §423.505.   ESI represents to Client that UM Company has contractually agreed that: (A) UM Company will conduct appeals in accordance with the Medicare Drug Rules and the EGWP Benefit, (B) Client is a third party beneficiary of UM Company's agreement with ESIC or its Affiliate (a copy of which is available upon request) and the remedies set forth therein, and (C) UM Company will indemnify Client for third party claims caused by the UM Company's negligence or willful misconduct in providing the appeal services.

(g)     EOBs.  ESIC will furnish EGWP Enrollees, in a manner specified by CMS, a written explanation of benefits ("EOB") when prescription drug benefits are provided under qualified prescription drug coverage consistent with the requirements of the Medicare Drug Rules.

(h)     EGWP Enrollee Services.  ESIC will provide 24-hours a day, 7-days a week toll-free telephone, IVR and Internet support to assist Client and EGWP Enrollees with EGWP Enrollee eligibility,

benefits and TrOOP verification, location of Participating Pharmacies and other related EGWP Enrollee concerns.

(i)    Prior Authorization. For the fees set forth in the Clinical Programs described in Exhibit B-2 (if applicable), ESIC will provide prior authorization ("PA") services as specified and directed by Client for drugs designated on the Set-Up Form. Prior authorized drugs must meet Client-approved guidelines ("Guidelines") before they are deemed to be Covered Drugs. Unless Client otherwise directs, Client hereby authorizes coverage for an otherwise excluded use in the event of co-morbidities, complications and other factors not otherwise expressly set forth in the Guidelines, unless Client directs that Client be provided such issue for determination. In determining whether to authorize coverage of such drug under the PA Program, ESIC will apply only the Guidelines and may rely entirely upon information about the EGWP Enrollee and the diagnosis of the EGWP Enrollee's condition provided to it from the prescriber. ESIC will not undertake to determine medical necessity, make diagnoses or substitute ESIC's judgment for the professional judgment and responsibility of the physician prescriber.

3.10    Formulary and Medication Management.

(a)    P&T Committee and Medicare Formulary. ESIC or its Affiliate will maintain a pharmacy and therapeutics committee ("P&T Committee") in accordance with the Medicare Drug Rules, which will develop a Medicare Formulary to be selected by Client for the EGWP Benefit consistent with the requirements of the Medicare Drug Rules.  In accordance with the Medicare Drug Rules, all Covered Drugs on the Medicare Formulary shall be Part D drugs (within the meaning of the Medicare Drug Rules) or otherwise permitted to be covered by a PDP under the Medicare Drug Rules.  Client acknowledges and agrees that the Medicare Formulary may not be modified by removing Covered Drugs, adding additional utilization management restrictions, making the cost-sharing status of a drug less beneficial or otherwise modified in a manner not consistent with the Medicare Drug Rules.  To the extent permitted by the Medicare Drug Rules, Client may request enhancements to the Medicare Formulary such as adding additional drugs, removing utilization management restrictions, and improving the cost-sharing status of drugs; provided, however, that any such requested change shall be subject to the ultimate determination of the P&T Committee.  Client further acknowledges and agrees that if any such enhancement has the effect of increasing the cost to ESIC in offering the EGWP Benefit, then ESIC shall have the right to make an equitable adjustment to the fees charged to Client under this Agreement and Client hereby agrees to pay any and all such fee adjustments.

(b)    Medication Therapy Management.  Consistent with the terms of the EGWP Benefit and for the fees identified on Exhibit B, ESIC or its Affiliate will implement a Medication Therapy Management program that is designed to ensure that Covered Drugs prescribed to targeted EGWP Enrollees are appropriately used to optimize therapeutic outcomes through improved medication use; and reduce the risk of adverse events, including adverse drug interactions, in accordance with the Medicare Drug Rules.

3.11    Medicare Rebate Program.

(a)    ESIC or its Affiliate will negotiate with pharmaceutical manufacturers regarding the terms of the Medicare Rebate Program and will, on its own behalf, enter into agreements with such manufacturers for Rebates for certain Covered Drugs.  ESIC will pay to Client the amounts as set forth on Exhibit B-3, subject to the following:

(i)    Client's election of, and conformance to, the Medicare Formulary identified on Exhibit B and applicable benefit designs;

(ii)    Distribution of the Medicare Formulary (or a summary thereof) to EGWP Enrollees and/or physicians, as applicable; and

(iii)    Client's compliance with other reasonable, generally applicable requirements for participation in the Medicare Rebate Program for the EGWP Benefit.

(b)     Rebates are not payable on Member Submitted Claims, Subrogation Claims, OTC products, claims older than 180 days, claims through Sponsor-owned or 340b pharmacies, and claims pursuant to a 100% Member Copayment plan.  ESIC and Client each acknowledge and understand that market conditions, patent status and other factors may influence Medicare Formulary decisions from time to time. Rebate guarantees will not be reduced based on patent expirations, OTC introductions of branded drugs, actions by drug manufacturers, brand products moving off-patent to generic status, recalls or withdrawals of branded products or unexpected generic introductions for the term of the proposed contract or for changes made by ESIC to its standard formulary.

(c)     Amounts representing the Rebates allocated to the Client pursuant to the terms of this Agreement shall be paid on a quarterly basis approximately 150 days following the end of each quarterly period; provided, however, that ESIC shall make quarterly payments as provided herein only to the extent of the payments it receives approximately 120 days following the end of the quarterly period.  Payments attributable to amounts that ESIC or its Affiliate receives later than 120 days following the end of a quarter shall be included by ESIC in the next quarterly payment.  ESIC and its Affiliate retain all right, title and interest to any and all actual Rebates received from manufacturers, except that ESIC shall pay Client amounts equal to the Rebate amounts allocated to Client, as specified on Exhibit B, from ESIC's or its Affiliate's general assets (neither Client nor its EGWP Enrollees retain any beneficial or proprietary interest in ESIC's or its Affiliate's general assets).  Client acknowledges and agrees that neither it nor its EGWP Enrollees shall have a right to interest on, or the time value of, any Rebate payments received by ESIC or its Affiliates during the collection period or moneys payable under this Section.  No Rebates shall be paid until this Agreement is executed by Client.  ESIC shall have the right to apply Client's allocated Rebate amount to unpaid Fees and shall have the right to delay payment of Rebates to allow for final adjustments upon termination of this Agreement.

(i)     On an annual and aggregate basis, and in the aggregate with Rebates under the Commercial Agreement, ESIC shall reconcile the guaranteed amounts set forth in Section A.(ii) of Exhibit B-3 (against the percentage amount paid to Client quarterly) within two hundred and forty (240) days following the end of each calendar year and shall credit Client for any deficit on the same invoice accompanying the reconciliation to the extent such deficit is not offset by ESIC against excesses achieved in other guarantees pursuant to this Agreement.   If, upon reconciliation, the annual aggregate percentage amount paid to Client for the calendar year pursuant to Section A.(i) of Exhibit B-3 and subsection (c)(ii) of this Section 3.10 is greater than the guaranteed aggregate amounts set forth in Section A.(ii) of Exhibit B-3 ESIC shall be entitled to make up for, and offset a shortfall in other guarantee(s) set forth in this Agreement with such excess annual aggregate percentage amount, and such excess amount shall be applied either directly to the other shortfall guarantee(s) or applied as a credit against future Rebate payments and payments (or as a direct invoice amount to be paid by Client, if a credit is not feasible).

(ii)     ESIC and its Affiliate retain all right, title and interest to any and all actual Rebates received from manufacturers, except that ESIC shall pay Client amounts equal to the Rebate amounts allocated to Client, as specified on Exhibit B, from ESIC's or its Affiliate's general assets (neither Client nor its EGWP Enrollees retain any beneficial or proprietary interest in ESIC's or its Affiliate's general assets).  Client acknowledges and agrees that neither it nor its EGWP Enrollees shall have a right to interest on, or the time value of, any Rebate payments received by ESIC or its Affiliates during the collection period or moneys payable under this Section.  No Rebates shall be paid until this Agreement is executed by Client.  ESIC shall have the right to apply Client's allocated Rebate amount to unpaid Fees and shall have the right to delay payment of Rebates to allow for final adjustments upon termination of this Agreement.

(d)     Client acknowledges that it may be eligible for Rebate amounts under this Agreement only so long as Client, its affiliates, or its agents do not contract directly or indirectly with anyone else for discounts, utilization limits, rebates or other financial incentives on pharmaceutical products or formulary programs for claims processed by ESIC pursuant to this Agreement, without the prior written consent of ESIC.  In the event that Client negotiates or arranges with a pharmaceutical manufacturer for Rebates or similar discounts for any Covered Drugs hereunder, but without limiting ESIC's or its Affiliate's right to

other remedies, ESIC may immediately withhold any Rebate amounts earned by, but not yet paid to, Client as necessary to prevent duplicative rebates on Covered Drugs.  To the extent Client knowingly negotiates and/or contracts for discounts or rebates on claims for Covered Drugs without prior written approval of ESIC, such activity shall be deemed to be a material breach of this Agreement, entitling ESIC to suspend payment of Rebate amounts hereunder and to renegotiate the terms and conditions of this Agreement.

(e)     On at least an annual basis, and as otherwise required under the Medicare Drug Rules, ESIC shall disclose to Client the amount of all Rebates received from Manufacturers or otherwise retained by ESIC or its Affiliate with respect to the Rebate eligible EGWP Benefit utilization.  Client and ESIC shall coordinate disclosure to CMS of all Rebates and, if applicable, , reported to Client by ESIC in connection with any Medicare utilization to the extent required by the Medicare Drug Rules.

(f)     Under its Rebate program, ESIC may implement ESIC's Formulary management programs and controls, which may include, among other things, cost containment initiatives, and communications with EGWP Enrollees, Participating Pharmacies, and/or physicians.  ESIC reserves the right to modify or replace such programs from time to time.  Guaranteed Rebate amounts, if any, set forth herein, are conditioned on adherence to various Formulary management controls, benefit design requirements, claims volume, and other factors stated in the applicable pharmaceutical manufacturer agreements, as communicated by ESIC to Client from time to time.  If any government action, change in law or regulation, change in the interpretation of any law or regulation, or any action by a pharmaceutical manufacturer has an adverse effect on the availability of Rebates, then ESIC may make an adjustment to the Rebate terms and guaranteed Rebate amounts, if any, hereunder.

(g)     Rebate paid to Client pursuant to this Agreement are intended to be treated as "discounts" pursuant to the federal anti-kickback statute set forth at 42 U.S.C. §1320a-7b and implementing regulations.   Client is obligated if requested by the Secretary of the United States Department of Health and Human Services, or as otherwise required by applicable law, to report the Rebate amounts and to provide a copy of this notice.  ESIC will refrain from doing anything that would impede Client from meeting any such obligation.

3.12     Late Enrollment Penalty.  Client agrees to comply with the applicable CMS requirements of the LEP and shall comply with ESIC's LEP policy, inducing participating with ESIC in the following process:

(a)     Client has an option to: (i) provide an initial global attestation to ESIC to attest to a creditable coverage for all of its EGWP Enrollees; or (ii) periodically provide an attestation to ESIC to attest to a creditable coverage for its EGWP Enrollees listed on the LEP report periodically provided to Client by ESIC.

(b)     If Client elects to periodically attest to ESIC under Section 3.12(a)(ii) above, then:

(i)     Client's response shall be delivered to ESIC within five (5) business days from the receipt of LEP report from ESIC;

(ii)     Client shall provide ESIC with the file listing all EGWP Enrollees for whom Client was unable to attest; and

(iii)     ESIC shall also mail an attestation to each EGWP Enrollee that has gap in coverage as defined by CMS.

(c)     Client will provide ESIC with the attestation in the form attached as Exhibit E of this Agreement, and a file listing of all the EGWP Enrollees included in the attestation.

(d)     ESIC will collect responses to the attestations from Client or EGWP Enrollees and submits EGWP Enrollees information to CMS for processing and determination of applicable LEP.

(e)     CMS calculates the LEP amount and transmits the LEP amount to ESIC on the daily TRR file, which is communicated to Client.  ESIC shall invoice Client for payment of the LEP, which shall be due and owing by the Client to ESIC.  Per the Medicare Drug Rules, Client may elect to either pay for the LEP on behalf of the EGWP Enrollee, or seek reimbursement of the LEP amount from the EGWP Enrollee.  This election must be made prior to the beginning of the plan year and must be applied consistently by Client for all EGWP Enrollees throughout the plan year.

## ARTICLE IV – PROGRAM OPERATIONS

4.1     Program Reporting.  ESIC or its Affiliate shall make available to Client ESIC's or its Affiliate's standard management information reporting applications.  At the request of Client, ESIC or its Affiliate may develop special reporting packages at ESIC's or its Affiliate's standard hourly rate for such services, as set forth on Exhibit B-2.

4.2     Regulatory Reporting.  ESIC also agrees to comply with the reporting requirements set forth in 42 C.F.R. §423.514, including reporting significant business transactions with parties in interest to CMS, notifying CMS of any loans or other financial arrangements that it makes with contractors, subcontractors, and related entities, and making such information available to EGWP Enrollees upon reasonable request.

4.3     Claims Data Retention.  ESIC will maintain claims data for Covered Products adjudicated by ESIC during the term of this Agreement and the applicable books, contracts, medical records, patient care documentation, and other records relating to covered services under this Amendment for a period of ten (10) years or such longer period as may be required under the Medicare Drug Rules; provided that, after expiration of the retention period, ESIC shall dispose of such data in accordance with its standard policies and practices and applicable state and federal law.

4.4      Client Audits.  Provided that this Agreement has been duly executed by Client and Client is current in the payment of invoices under this Agreement, Client may, upon written request, audit the pharmacy benefit management services provided pursuant to this Agreement, on an annual basis (unless additional audits are warranted) consistent with the Audit Protocol set forth in Exhibit C.  Client may use an independent third party auditor ("Auditor"), so long as such Auditor does not have a conflict of interest with ESIC (as determined by ESIC acting reasonably and in good faith), and provided that Client's Auditor executes a mutually acceptable confidentiality agreement.  Any request by Client to permit an Auditor to perform an audit will constitute Client's direction and authorization to ESIC to disclose PHI to the Auditor.

4.5     Government Audits.  ESIC and Client agree to allow the United States Department of Health and Human Services ("DHHS") and the Comptroller General, or their designees, the right to audit, evaluate, inspect books, contracts, medical records, patient care documentation and other records of ESIC or Pharmacy, its subcontractors or transferees, as are reasonably necessary to verify the nature and extent of the costs of the services provided to EGWP Enrollees under this Agreement, for a period of the then current plan year, plus an additional ten (10) years following termination or expiration of the Amendment for any reason, or until completion of any audit, whichever is later.

4.6     Liability Insurance.  Each party shall maintain such policies of general liability, professional liability and other insurance of the types and in amounts customarily carried by their respective businesses.  Proof of such insurance shall be available upon request.  ESIC agrees, at its sole expense, to maintain during the term of this Agreement or any renewal hereof, commercial general liability insurance, pharmacists professional liability insurance for the ESIC Mail Service and ESIC Specialty Pharmacies, and managed care liability with limits, excess of a self-insured retention, in amounts of not less than $5,000,000 per occurrence, and in the aggregate.  ESIC or its Affiliate does not maintain liability insurance on behalf of any Participating Pharmacy, but does contractually require such pharmacies to maintain a minimum amount of commercial liability insurance or, when deemed acceptable by ESIC or its Affiliate, to have in place a self-insurance program.

4.7     Pharmacy Management Funds ("PMF").

(a)



**ARTICLE V – MONTHLY PREMIUMS; FEES; BILLING AND PAYMENT**

5.1     Monthly Premiums.

(a)     Collection of Monthly Premium Amounts.  In accordance with the Medicare Drug Rules, ESIC hereby delegates the premium collection function to Client and hereby directs Client, on behalf of ESIC, to collect all monthly premium payments due from EGWP Enrollees for participation in the EGWP Benefit.  In connection with ESIC's delegation of the premium collection function to Client under this Section 5.1(a), Client hereby agrees as follows:

(i)     That in no event, including, but not limited to, nonpayment by ESIC of any amounts due by ESIC to Client pursuant to this Agreement, ESIC's insolvency, or ESIC's breach of this Agreement, will Client bill, charge, collect a deposit from, seek compensation, remuneration or reimbursement from, or have any recourse against an EGWP Enrollee or persons acting on his or her behalf for payments that are the financial responsibility of ESIC under this Agreement.  The foregoing is not intended to prohibit Client from collecting premium amounts due by EGWP Enrollees for participation in the EGWP Benefit;

(ii)     That the DHHS, the Comptroller General, or their designees shall have the right to inspect, evaluate, and audit pertinent contracts, books, documents, papers and records of the Client involving Client's collection of premium amounts from EGWP Enrollees, and that DHHS', the Comptroller General's, or their designees' right to inspect, evaluate, and audit any such pertinent information will exist through ten (10) years from the date of termination or expiration of this Agreement, or from the date of completion of any audit, whichever is later;

(iii)    That if ESIC or CMS determines that Client is not performing the premium collection function in compliance with all applicable Medicare Drug Rules and Client is unable to cure such noncompliance within thirty (30) days following notice from ESIC or CMS, then ESIC may, at its sole discretion, either: (i) upon prior written notice to Client, revoke all or a portion of such delegated function as ESIC deems necessary to effectuate ESIC's ultimate responsibility to CMS for the performance of such delegated function under ESIC's contract with CMS; or (ii) negotiate an alternative remedy in lieu of revocation of delegation, so long as such remedy conforms to the requirements of the Medicare Drug Rules; and

(iv)    That Client shall not further delegate or subcontract the performance of the premium collection function to a third party without ESIC's prior written consent, which consent will not be unreasonably withheld.  If Client does further delegate or subcontract the performance of the premium collection function or any other delegated function under this Agreement, then Client agree that it shall: (i) amend its written agreement with such subcontractor or enter into a separate written agreement with such subcontractor that contains the terms, conditions, and provisions set forth in Schedule 5.1(a)(iv) attached hereto and incorporated herein by reference; and (ii) ensure that such subcontractor's performance of the premium collection function or other delegate function complies with the provision set forth on Schedule 5.1(a)(iv).

(b)     Determination of Monthly Premium Amounts (if any) to be Subsidized by Client.  In determining the amount of the EGWP Enrollee's monthly premium for participation in the EGWP Benefit that Client will subsidize, if any, Client shall make such determination subject to the following restrictions and any other restrictions that may be imposed by CMS:

(i)     Client may subsidize different amounts for different classes of EGWP Enrollees provided such classes are reasonable and based on objective business criteria, such as years of service, business location, job category, and nature of compensation (e.g., salaried vs. hourly). Different classes cannot be based on eligibility for the Low Income Subsidy;

(ii)    Client may not vary the premium subsidy for individuals within a given class of EGWP Enrollees;

(iii)   Client may not charge an EGWP Enrollee more than the sum of his or her monthly beneficiary premium attributable to basic prescription drug coverage and 100% of the monthly beneficiary premium attributable to his or her supplemental prescription drug coverage, if any;

(iv)    Client shall directly refund to the EGWP Enrollee (or shall allow ESIC to do so), within forty-five (45) days of original receipt from CMS of the Low Income Subsidy premium, the full premium subsidy amount up to the monthly beneficiary premium amount previously collected from the EGWP Enrollee; provided, however, that to the extent there are Low Income Subsidy premium amounts remaining after Client refunds the full monthly beneficiary premium amount to the EGWP Enrollee, then Client may apply that remaining portion of the Low Income Subsidy premium to the portion of the monthly premium paid by Client;

(v)     If Client is not able to reduce the up-front monthly beneficiary premium as described in subsection (iv) above, Client shall directly refund to the EGWP Enrollee (or shall allow ESIC to do so), within forty-five (45) days of original receipt from CMS of the Low Income

Subsidy premium, the full premium subsidy amount up to the monthly beneficiary premium amount previously collected from the EGWP Enrollee;

(vi)     If the Low Income Subsidy amount for which an EGWP Enrollee is eligible is less than the portion of the monthly beneficiary premium paid by the EGWP Enrollee, then Client must communicate to the EGWP Enrollee the financial consequences for the beneficiary of enrolling in the EGWP Benefit as compared to enrolling in another Medicare Part D plan with a monthly beneficiary premium equal to or below the Low Income Subsidy amount; and

(vii)     In the event of a change in an EGWP Enrollee's Low Income Subsidy status or an EGWP Enrollee otherwise becomes ineligible to receive the Low Income Subsidy after payment of the Low Income Subsidy premium amount to the EGWP Enrollee, and upon ESIC's receipt of notification from CMS that such Low Income Subsidy premium amount will be recovered from ESIC or withheld from future payments to ESIC, then ESIC in its sole discretion will invoice Client or set off from amounts otherwise owed from ESIC to Client, and in either case Client shall reimburse ESIC for, all amounts deemed by CMS to be ineligible Low Income Subsidy premium payments with respect to the EGWP Enrollee.

(c)     <u>Reporting and Auditing of Premium Amounts; Non-Payment by EGWP Enrollees</u>.  Upon reasonable advance written notice, ESIC or its Affiliate shall have access to Client's records in order to audit the monthly premium amounts collected from EGWP Enrollees for the purposes of fulfilling reporting requirements under the Medicare Drug Rules or applicable state insurance laws related to collection of such premium amounts or to otherwise assess compliance with the Medicare Drug Rules in connection with the collection of such premium amounts.  Any audits performed by ESIC or its Affiliate pursuant to this Section 5.1(c) will be at ESIC's expense.  Client acknowledges and agrees that neither ESIC nor its Affiliate shall be responsible to Client for non-payment by any EGWP Enrollee of any monthly premium amount due by such EGWP Enrollee for participation in the EGWP Benefit.  Client further acknowledges and agrees that in the event that either Client or ESIC (through any audit) determines that Client has collected a greater premium amount from an EGWP Enrollee than is due, that Client shall promptly refund any such overpayment to the EGWP Enrollee.

5.2     <u>Billing</u>.  Twice a month, ESIC or its Affiliate will bill Client for, and Client shall pay ESIC or its Affiliate, the Claims Reimbursement Amount (as defined below) for such billing period.  In addition, on a monthly basis, ESIC will bill Client for, and Client shall pay ESIC, the sum of: (i) the PMPM Fees (as defined below) due for such period; and (ii) any Administrative Services Fees (as defined below) incurred by Client during the previous month (or earlier if not yet invoiced to Client) (Claims Reimbursement Amount, PMPM Fees, and Administrative Services Fees to be referred to collectively as "Fees").  For purposes of this Section 5.2:

(a)     "Claims Reimbursement Amount" means, with respect to any period, the amount equal to:

(i)     The aggregate amount of reimbursement due from Client to ESIC for Covered Drugs dispensed to EGWP Enrollees by the Pharmacies, and, if applicable, for EGWP Enrollee Submitted Claims during such period, including dispensing fees and all associated claims processing administrative fees, based on the reimbursement rates and pricing terms set forth on <u>Exhibit B</u>.

(b)     "PMPM Fees" means, with respect to any period, all per EGWP Enrollee per month administrative fees ("PMPM Fees") as set forth on <u>Exhibit B-2</u> for such period.

(c)     "Administrative Services Fees" means the fees incurred by Client, if any, for ESIC's or its Affiliate's performance of the administrative services listed in the Administrative Fees table set forth on <u>Exhibit B</u>.

5.3     <u>CMS Reimbursement</u>.

(a)     CMS Reimbursement Payment Terms.  ESIC will pay Client an amount equal to the total amount paid to ESIC by CMS for the following: (1) advance direct subsidy monthly payments paid to ESIC, if any, by CMS with respect to EGWP Enrollees, (2) reinsurance subsidy payments, if any, paid to ESIC by CMS with respect to the EGWP Benefit, (3) low-income subsidy payments paid to ESIC by CMS, if any, with respect to EGWP Enrollees and subject to the provisions of Section 5.1(b) of this Agreement, and (4) any other reimbursement payment by CMS to ESIC, if any, for coverage provided to EGWP Enrollees under the EGWP Benefit for such period (each as further defined in the Medicare Drug Rules) (collectively, "CMS Reimbursement").   ESIC will pay amounts representing CMS Reimbursement, allocated pursuant to the terms of this Agreement, on a monthly basis approximately forty-five (45) days after ESIC's receipt of the CMS Reimbursement from CMS.  ESIC and its Affiliate retain all right, title and interest to any and all actual CMS Reimbursement received from CMS, except that ESIC shall pay Client amounts equal to the CMS Reimbursement amounts allocated to Client, as specified in this Agreement, from ESIC's or its Affiliate's general assets (neither Client nor its EGWP Enrollees retain any beneficial or proprietary interest in ESIC's or its Affiliate's general assets).   Client acknowledges and agrees that neither it nor its EGWP Enrollees shall have a right to interest on, or the time value of, any CMS Reimbursement payments received by ESIC or its Affiliates during the collection period or moneys payable under this Section.  No CMS Reimbursements shall be paid until this Agreement is executed by Client.  ESIC shall have the right to apply Client's allocated CMS Reimbursement amount to unpaid Fees and shall have the right to delay payment of CMS Reimbursement to allow for final adjustments upon termination of this Agreement.

(b)     CMS Reimbursement Reporting.   At least annually, ESIC will provide Client an accounting of all CMS Reimbursement received by ESIC from CMS pursuant to the Medicare Drug Rules with respect to the EGWP Benefit.

5.4     CMS-Required Reconciliation / Reinsurance.

(a)     End-of-Year Reconciliation.  The parties acknowledge that pursuant to the Medicare Drug Rules, approximately eleven (11) months after the conclusion of each plan year, CMS will reconcile payment year disbursements, including, but not limited to, CMS Reimbursements (as defined above) and Coverage Gap Discount Payments (as defined below), with updated enrollment and health status data, actual low-income cost-sharing costs, actual allowable reinsurance costs, and other pertinent information.  Upon any payment adjustments made by CMS as a result of such reconciliation the following shall occur: (i) if ESIC receives any additional payments from CMS as a result of previous underpayments discovered during the reconciliation, ESIC will pay amounts equal to such amounts to Client subject to the remaining terms of this Agreement; and (ii) with respect to any amounts requested, recovered or withheld by CMS as a result of previous overpayments discovered during the reconciliation, if ESIC has paid amounts to Client pursuant to this Agreement for CMS Reimbursement received by ESIC and CMS determines during the reconciliation process that such CMS Reimbursement has been overpaid to ESIC, Client shall repay to ESIC such amounts previously paid by ESIC.   All such payments resulting from a CMS reconciliation will be due and owing within forty-five (45) days from the date of ESIC's receipt of the reconciliation results.

(b)     End-of-Year Reinsurance Payments.   The parties acknowledge that pursuant to the Medicare Drug Rules, approximately eleven (11) months after the conclusion of each plan year and after CMS' end-of-year reconciliation described in subsection (a) immediately above, CMS will make final payment to ESIC for reinsurance for the immediately preceding coverage year based upon CMS obtaining all information necessary to determine the amount of the reinsurance payment.  No later than forty five (45) days after ESIC's receipt of such reinsurance payment, if any, ESIC agrees to pay an amount equal to such reinsurance payment received by ESIC to Client subject to the remaining terms of this Agreement; provided, however, that if CMS subsequently recovers any such reinsurance payments from ESIC due to a CMS reconciliation or other process described in the Medicare Drug Rules, then Client shall be obligated to repay to ESIC such amounts previously paid to Client.

(c)     Plan-to-Plan Reconciliation.  The parties acknowledge that the Medicare Drug Rules provide ESIC with a process through which to coordinate EGWP Enrollees' prescription drug benefits with other providers of prescription drug coverage.  ESIC will perform such plan-to-plan coordination and any related reconciliation; provided, that within forty-five (45) days after completion of such coordination or reconciliation process, ESIC shall pay to Client an amount equal to payments recovered for the EGWP Benefit, but at the same time ESIC shall have a right to recoup from Client any amount which ESIC is obligated to pay to any other prescription drug plan pursuant to a plan-to-plan reconciliation.

5.5    Payment.  Client shall pay all Fees to ESIC by wire or ACH transfer, debit or other electronic method within two (2) business days from the date of Client's receipt of the ESIC invoice.  Client shall be responsible for all costs of collection and shall reimburse ESIC for such costs and expenses, including reasonable attorneys' fees.  Any amounts not paid by the due date thereof shall bear interest at the rate of prime lending rate as published by *The Wall Street Journal* plus two percent (2%) per annum, or, if lower, the highest interest rate permitted by law.  If Client disputes any item on any invoice, Client shall state the amount in dispute in writing within thirty (30) days of the date of the invoice.  Client shall pay the full amount invoiced and shall notify ESIC of the disputed amount.  ESIC also shall have the option to retain amounts owed to Client based on CMS Reimbursement and Rebates with respect to EGWP Enrollee utilization to apply against unpaid Fees.

5.6    Manufacturer Coverage Gap Discount.

(a)     Pursuant to its CMS contract, ESIC has agreed to administer for EGWP Enrollees at point-of-sale the Coverage Gap Discount authorized by section 1860D-14A of the Social Security Act.  In connection with the Coverage Gap Discount, CMS will coordinate the collection of discount payments from manufacturers, and payment to ESIC, through a CMS contractor (the "Coverage Gap Discount Payments").  Subject to Section 5.4(a) above, ESIC agrees to periodically remit to Client amounts equal to 100% of the Coverage Gap Discount Payments received by ESIC within forty-five (45) days following ESIC's receipt of such Coverage Gap Discount Payments.  ESIC and its Affiliate retain all right, title and interest to any and all actual Coverage Gap Discount Payments received from CMS, except that ESIC shall pay Client amounts equal to the Coverage Gap Discount Payments amounts allocated to Client, as specified in this Agreement, from ESIC's or its Affiliate's general assets (neither Client nor its EGWP Enrollees retain any beneficial or proprietary interest in ESIC's or its Affiliate's general assets).  Client acknowledges and agrees that neither it nor its EGWP Enrollees shall have a right to interest on, or the time value of, any Coverage Gap Discount Payments received by ESIC or its Affiliates during the collection period or moneys payable under this Section.  No Coverage Gap Discount Payments shall be paid until this Agreement is executed by Client.  ESIC shall have the right to apply Client's allocated Coverage Gap Discount Payments amount to unpaid Fees and shall have the right to delay payment of Coverage Gap Discount Payments to allow for final adjustments upon termination of this Agreement.  Notwithstanding anything contained in this Section 5.6, Client shall retain all right, title, and interest to the amounts that ESIC is contractually obligated to pay Client hereunder, and failure by ESIC to pay such amounts will constitute a breach of this Agreement.

(b)     If the EGWP Benefit administered by ESIC under this Agreement for Client includes EGWP Plus design elements, then the Coverage Gap Discount will be coordinated with the Client Group Health Plan consistent with Medicare Part D Rules.

5.7    Deposit.  If, at any time: (i) Client has two or more invoices past due and outstanding, or (ii) ESIC has reasonable grounds to believe Client may be delinquent in payment of fees based on Client's financial data (e.g., persistent negative cash flow, bankruptcy or insolvency), ESIC may require that the Client provide to ESIC a one (1) month deposit amount using the last three (3) months of billing history as the basis for determining the one (1) month deposit amount or, if three (3) months billing history is not available, the most recent month of billing history as the basis.  ESIC will retain the deposit until the earlier of termination of this Agreement (following any run-off period), or six (6) consecutive months of timely payments of all Fees following submission of the deposit, and may apply the deposit to delinquent fees until return of the deposit.

**ARTICLE VI - CONFIDENTIALITY**

6.1     Proprietary Information. Each party agrees that information of the other party, including, but not limited to the following, shall constitute confidential and proprietary information ("Proprietary Information") of the other party unless otherwise public: (a) with respect to ESIC and its Affiliate: reporting and system applications, (web-based and other media), and system formats, databanks, clinical and formulary management operations and programs, fraud, waste and abuse tools and programs, and manuals, anonymized claims data (de-identified in accordance with HIPAA), ESIC Specialty Pharmacy and Mail Service Pharmacy data, information concerning Rebates, prescription drug evaluation criteria, drug choice management, drug pricing information, and Participating Pharmacy agreements; and (b) with respect to Client: Participating Pharmacy Client and EGWP Enrollee identifiable health information and data, Client information files, business operations and strategies. Neither party shall use the other's Proprietary Information or disclose it to any third party, at any time during or after termination of this Agreement, except as specifically contemplated by this Agreement, upon prior written consent or as required by the Medicare Drug Rules or other applicable law. Upon termination of this Agreement, each party shall cease using the other's Proprietary Information, and all such information shall be returned or destroyed upon the owner's direction.

6.2     Non-Access to ESIC's or its Affiliate's Systems. Client will not, and will not permit any third party acting on Client's behalf to, access, attempt to access, test or audit ESIC's or its Affiliate's systems or any other system or network connected to ESIC's or its Affiliate's systems. Without limiting the foregoing, Client will not: (i) access or attempt to access any portion or feature of ESIC's or its Affiliate's systems, by circumventing such systems' access control measures, either by hacking, password "mining" or any other means; or (ii) probe, scan, audit or test the vulnerability of such systems, nor breach the security or authentication measures of such systems.

**ARTICLE VII - COMPLIANCE WITH LAW; FINANCIAL DISCLOSURE**

7.1     Compliance with Law; Change in Law. ESIC and Client hereby agree to perform their respective obligations under this Agreement in a manner that is consistent with and complies with the Medicare Drug Rules and with ESIC's contractual obligations under its contract with CMS. In addition, each party shall be responsible for ensuring its compliance with all federal, state, and local laws and regulations applicable to its business, including maintaining any necessary licenses and permits. Client shall be responsible for any government or regulatory charges and taxes imposed upon or related to the services provided hereunder. If the scope of ESIC's duties under this Agreement is made materially more burdensome or expensive due to a change in federal, state or local laws or regulations or the interpretation thereof, including actions by CMS, the parties shall negotiate an appropriate modification of the services and/or an adjustment to the Fees paid to ESIC. If the parties cannot agree on a modification or adjusted Fees, then either party may terminate this Agreement on thirty (30) days prior written notice to the other. In addition, if any change in Federal or applicable state law or regulation (including the interpretation of existing laws or regulations by a court or administrative agency) occurs during the term of this Agreement, and in consequence thereof ESIC is required to increase payments for Covered Drugs to Participating Pharmacies in the applicable jurisdiction under its provider agreements, the Pharmacy Reimbursement Rates set forth in Exhibit B-1 will be increased by the same amount upon prior notice to Client.

7.2     Disclosure of Certain Financial Matters. Client acknowledges and agrees that ESIC will contract with its Affiliate, ESI, to provide the pharmacy benefit management services contemplated by this Agreement on ESIC's behalf. In addition to the administrative fees paid to ESIC by Client, ESIC and ESI's wholly-owned subsidiaries or Affiliates derive revenue in one or more of the ways as further described in the ESI Financial Disclosure to PBM Clients set forth in Exhibit D hereto ("Financial Disclosure"), as updated by ESI from time to time. Unlike the administrative fees, the revenues described in the Financial Disclosure are not direct or indirect compensation to ESIC from Client for services rendered to Client or the Client Group Health Plan under this Agreement. In negotiating any of the fees and revenues described in the Financial Disclosure, ESI and ESI's wholly-owned subsidiaries and Affiliates act on their own behalf, and not for the benefit of or as agents for Client, EGWP Enrollees or the

EGWP Benefit.  Except for the Rebate amounts set forth in Exhibit B, if any, Client acknowledges and agrees that ESIC and ESIC's wholly-owned subsidiaries and Affiliates retain all interest, revenues, any or all Rebates and Manufacturer Administrative Fees not payable to Client, and all Participating Pharmacy discounts, if any, in addition to any administrative and other fees paid by Client.  Client acknowledges for itself and its EGWP Enrollees that, except as may be expressly provided herein, neither it nor any EGWP Enrollee has a right to receive, or possesses any beneficial interest in, any such discounts or payments.

## ARTICLE VIII - TERM AND TERMINATION; DEFAULT AND REMEDIES

8.1     Term.  The initial term of this Agreement (the "Initial Term") shall commence on the Execution Date, and coverage of EGWP Enrollees under the EGWP Benefit shall begin as of January 1, 2014 (the "Effective Date").  Unless earlier terminated as provided herein, the Initial Term shall continue for two (2) years until December 31, 2015 (the "Initial Term").  Thereafter, this Agreement may, upon approval by the County, renew  for successive three (3) one (1) year renewal terms, unless and until either party notifies the other of its intent not to renew the Agreement in writing at least ninety (90) days prior to the expiration of the then current term.  This Agreement may be terminated earlier during the Initial Term or any renewal terms pursuant to Section 8.2 below.

8.2     Termination.

(a)     Breach or Default.  Either party may give the other written notice of a material, substantial and continuing breach of this Agreement.  If the breaching party has not cured said breach within thirty (30) days from the date such notice was sent, this Agreement may be terminated at the option of the non-breaching party.  If the amount of time commercially reasonable for the breach to be cured is longer than thirty (30) days, this Agreement may not be terminated by the non-breaching party pursuant to this provision until such commercially reasonable period of time has elapsed; provided, however, that in no event shall such period exceed sixty (60) days.

(b)     Termination of ESIC's Contract with CMS.  If at any time throughout the term of this Agreement, CMS either does not renew its contract with ESIC or terminates its contract with ESIC such that ESIC may no longer provide services as a PDP Sponsor under the Medicare Drug Rules, then this Agreement shall be automatically terminated conterminously with such CMS contract termination.

(c)     Non-Payment.   To the extent permitted by the Medicare Drug Rules and other applicable laws, ESIC and its Affiliate may terminate or suspend their performance hereunder and cease providing or authorizing provision of Covered Drugs to EGWP Enrollees upon forty-eight (48) hours written notice if Client fails to pay ESIC or provide a deposit, if required, in accordance with the terms of this Agreement.  ESIC also may offset amounts overdue to ESIC with CMS Reimbursement amounts, Rebate amounts or other fees owed, if any, by ESIC to Client.  To the extent permitted by law, ESIC may suspend Mail Service Pharmacy and/or ESIC Specialty Pharmacy services to any EGWP Enrollee who is in default of payment of any Copayments or deductibles to the applicable Pharmacy.

(d)     Insolvency; Regulatory Action. To the extent permitted by applicable law, ESIC may terminate this Agreement, or suspend performance hereunder, upon the insolvency of Client, and Client may terminate this Agreement upon the insolvency of ESIC.  The "insolvency" of a party shall mean the filing of a petition commencing a voluntary or involuntary case (if such case is an involuntary case, then only if such case is not dismissed within sixty (60) days from the filing thereof) against such party under the United States Bankruptcy Code or applicable state law; a general assignment by such party for the benefit of creditors; the inability of such party to pay its debts as they become due; such party's seeking or consenting to, or acquiescence in, the appointment of any trustee, receiver or liquidation of it, or any material part of its property; or a proceeding under any state or federal agency declaration or imposition of receivership, composition, readjustment, liquidation, insolvency, dissolution, or like law or statute, which case or proceeding is not dismissed or vacated within sixty (60) days.   Notwithstanding the preceding, in the event of Client's insolvency or other cessation of operations, ESIC agrees to require Participating Pharmacies to continue to provide prescription drug services to EGWP Enrollees if required

by the Medicare Drug Rules and all other applicable federal and state laws relating to insolvency or other cessation of operations or termination. Nothing herein shall be interpreted to require ESIC or Pharmacies to provide services without being paid for Covered Drugs or Prescription Drug Services.

8.3     Remedies.

     (a)     Remedies Not Exclusive. A party's right to terminate this Agreement under Article VIII shall not be exclusive of any other remedies available to the terminating party under this Agreement or otherwise, at law or in equity.

     (b)     Force Majeure. Neither party shall lose any rights under this Agreement or be liable in any manner for any delay to perform its obligations under this Agreement that are beyond a party's reasonable control, including, without limitation, any delay or failure due to riots, earthquakes, storms, floods or other extreme weather conditions, fires, explosions, acts of terrorism, epidemics or pandemics, embargoes, war or other outbreak of hostilities, government acts or regulations, the failure or inability of carriers, suppliers, delivery services, or telecommunications providers to provide services necessary to enable a party to perform its obligations hereunder, or any other reason where failure to perform is beyond the party's reasonable control, and is not caused by the negligence, intentional conduct or misconduct of the defaulting party; provided, however, that this clause may not be invoked to excuse a party's payment obligations hereunder.

     (c)     Limitation of Liability. Except for the indemnification obligations set forth in Section 8.3(d), each party's liability to the other hereunder shall in no event exceed the actual proximate losses or damages caused by breach of this Agreement. In no event shall either party or any of their respective affiliates, directors, employees or agents, be liable for any indirect, special, incidental, consequential, exemplary or punitive damages, or any damages for lost profits relating to a relationship with a third party, however caused or arising, whether or not they have been informed of the possibility of their occurrence.

     (d)     Indemnification.

         (i)     ESIC will indemnify and hold Client harmless from and against any loss, cost, damage, expense or other liability, including, without limitation, reasonable costs and attorney fees ("Costs") incurred in connection with any and all third party claims, suits, investigations or enforcement actions, including claims of infringement of any intellectual property rights ("Claims") which may be asserted against, imposed upon or incurred by Client and arising as a result of (A) ESIC's negligent acts or omissions or willful misconduct, (B) ESIC's breach of this Agreement, (C) ESIC's unauthorized use or disclosure of EGWP Enrollee PHI, or (D) ESIC's breach of any representation or warranty made by ESIC under this Agreement.

         (ii)     Client will indemnify and hold ESIC harmless from and against any Costs for Claims which may be asserted against, imposed upon or incurred by ESIC and arising as a result of (A) Client's negligent acts or omissions or willful misconduct, (B) Client's breach of this Agreement, (C) Client's, the Client Group Health Plan's, or any Auditor's unauthorized use or disclosure of EGWP Enrollee PHI, or (D) Client's breach of any representation or warranty made by Client under this Agreement.

         (iii)     As a condition of indemnification, the party seeking indemnification shall notify the indemnifying party in writing promptly upon learning of any Claim for which indemnification may be sought hereunder, and shall tender the defense of such claim to the indemnifying party. No party shall indemnify the other with respect to any claim settled without the written consent of the other.

8.4     Obligations Upon Termination. Client or its agent shall pay ESIC in accordance with this Agreement for all claims for Covered Drugs dispensed and services provided to Client and EGWP Enrollees on or before the later of: (i) the effective date of termination, or (ii) the final date that all EGWP

Enrollees have been transitioned to a new Part D plan, as applicable (the "Termination Date"). Claims submitted by Participating Pharmacies or EGWP Enrollee Submitted Claims filed with ESIC after the Termination Date shall be processed and adjudicated in accordance with a mutually determined run-off plan. The parties shall cooperate regarding the transition of Client and its EGWP Enrollees to a successor PDP Sponsor in accordance with all applicable Medicare Drug Rules and ESIC will take all reasonable steps to mitigate any disruption in service to EGWP Enrollees. Upon Client request at termination, ESIC shall provide open refill files and standard claims data for transition to the successor pharmacy benefit manager (PBM) in accordance with industry protocol. Notwithstanding the preceding, ESIC may (a) delay payment of any final CMS Reimbursement amounts, Rebate amounts or other amounts due Client, if any, to allow for final reconciliation of any outstanding amount owed by Client to ESIC, or (b) request that Client pay a reasonable deposit in the event ESIC is requested to process after the Termination Date claims incurred on or prior to such date.

8.5     Survival.  The parties' rights and obligations under Sections 3.7 and 3.8(f); Articles V, VI and VII; and Sections 8.3, 8.4, and 8.5 shall survive the termination of this Agreement for any reason.

## ARTICLE IX - MISCELLANEOUS

9.1     Notice.  Any notice or document required or permitted to be delivered pursuant to this Agreement must be in writing and shall be deemed to be effective upon mailing and must be either (a) deposited in the United States Mail, postage prepaid, certified or registered mail, return receipt requested, or (b) sent by recognized overnight delivery service, in either case properly addressed to the other party at the address set forth below, or at such other address as such party shall specify from time to time by written notice delivered in accordance herewith:

|   |   |   |
|---|---|---|
| ESIC: | | Express Scripts Insurance Co. |
| | | Attn:  President |
| | | One Express Way |
| | | St. Louis, Missouri 63121 |
| | with copy to: | General Counsel |
| | | Fax:  800-417-8163 |
| | | |
| Client: | | Lake County Government |
| | | Attn: Robert Szarzynski |
| | | 18 N. County Street, 7th Floor |
| | | Waukegan, IL 60085-4350 |

9.2     Independent Parties.  No provision of this Agreement is intended to create or shall be construed to create any relationship between ESIC or its Affiliate and Client other than that of independent entities contracting with each other solely for the purpose of effecting the provisions of this Agreement.  Neither party, nor any of their respective representatives, shall be construed to be the partner, agent, fiduciary, employee, or representative of the other and neither party shall have the right to make any representations concerning the duties, obligations or services of the other except as consistent with the express terms of this Agreement or as otherwise authorized in writing by the party about which such representation is asserted.

9.3     Assignment and Subcontracting.  Client acknowledges and agrees that ESIC may perform certain services hereunder (e.g., mail service pharmacy and specialty pharmacy services) through one or more ESIC subsidiaries or Affiliates.  ESIC is responsible and liable for the performance of its subsidiaries and Affiliates in the course of their performance of any such service.  To the extent that ESIC subcontracts any PBM Service under this Agreement to a third party, ESIC is responsible and liable for the performance of any such third party. In addition, ESIC may contract with third parties to provide information technology support services and other ancillary services, which services are not PBM Services hereunder, but rather are services that support ESIC's conduct of its business operations.  This

Agreement will be binding upon, and inure to the benefit of and be enforceable by, the respective successors and permitted assigns of the parties hereto.

9.4     Integration.  This Agreement and any Exhibits hereto constitute the entire understanding of the parties hereto and supersede any prior oral or written communication between the parties with respect to ESIC's provision of Prescription Drug Services to Client and EGWP Enrollees as a PDP Sponsor of the EGWP Benefit under the Medicare Drug Rules.   The parties hereby expressly agree that this Agreement and the Commercial Agreement are separate and independent agreements that stand on their own and that, unless otherwise specifically set forth in this Agreement, no term or condition in one such agreement shall have any connection to or bear any force or effect on the other agreement.

9.5     Amendments.  No modification, alteration, or waiver of any term, covenant, or condition of this Agreement shall be valid unless in writing and signed by both parties or the agents of the parties who are authorized in writing.

9.6     Choice of Law.  Unless governed by the Medicare Drug Rules or applicable state insurance laws, this contract shall be governed by and construed according to the laws of the State of Illinois.  Jurisdiction and venue shall be exclusively found in the 19th Judicial Circuit Court, State of Illinois or Federal District Court Northern District whichever is applicable.

9.7     Waiver.  The failure of either party to insist upon the strict observation or performance of this Agreement or to exercise any right or remedy shall not be construed as a waiver of any subsequent breach of this Agreement or impair or waive any available right or remedy.

9.8     Taxes and Assessments.  Any applicable sales, use, excise, or other similarly assessed and administered tax, surcharge, or fee imposed on items dispensed, or services provided hereunder, or the fees or revenues generated by the items dispensed or services provided hereunder, or any other amounts ESIC or one or more of its subsidiaries or affiliates may incur or be required to pay arising from or relating to ESIC's or its subsidiaries' or affiliates' performance of services as a pharmacy benefit manager, third-party administrator, or otherwise in any jurisdiction, will be the sole responsibility of Client or the EGWP Enrollee. If ESIC is legally obligated to collect and remit, or to incur or pay, any such sales, use, excise, or other similarly assessed and administered tax, surcharge, or fee in a particular jurisdiction, such amount will be reflected on the applicable invoice or subsequently invoiced at such time as ESIC becomes aware of such obligation or as such obligation becomes due. ESIC reserves the right to charge a reasonable administrative fee for collection and remittance services provided on behalf of Client.

9.9     Severability.  In the event that any provision of this Agreement is invalid or unenforceable, such invalid or unenforceable provision shall not invalidate or affect the other provisions of this Agreement which shall remain in effect and be construed as if such provision were not a part hereof; provided that if the invalidation or unenforceability of such provision shall, in the opinion of either party to the Agreement, have a material effect on such party's rights or obligations under this Agreement, then the Agreement may be terminated by such party upon thirty (30) days written notice by such party to the other party.

9.10    Third Party Beneficiary Exclusion.  This Agreement is not a third party beneficiary contract, nor shall this Agreement create any rights on behalf of EGWP Enrollees as against ESIC.  Client and ESIC reserve the right to amend, cancel or terminate this Agreement without notice to, or consent of, any EGWP Enrollee.

9.11    Trademarks.  Each party acknowledges each other party's sole and exclusive ownership of its respective trade names, commercial symbols, trademarks, and service marks, whether presently existing or later established (collectively "Marks").  No party shall use the other party's Marks in advertising or promotional materials or otherwise without the owner's prior written consent.

9.12    Debarment.   ESIC or its Affiliate shall not knowingly employ, or subcontract with, an individual or an entity that employs or contracts with an individual, who is excluded from participation in Medicare under section 1128 or 1128A of the Act or from participation in a Federal health care program for the provision of health care, utilization review, medical social work, or administrative services.

9.13    Signatures.   Any documents required to implement the terms of this Agreement shall be signed by a representative of each party with legal authority to bind the entity.

9.14    Federal Funds.   The parties acknowledge that information provided in connection with this Agreement is used for purposes of obtaining federal funds and, as such, the parties are subject to certain laws that are applicable to individuals and entities receiving federal funds.

        IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the day and year below set forth.

EXPRESS SCRIPTS INSURANCE CO.            LAKE COUNTY GOVERNMENT

Printed Name: Steven Webb                By: _____
Vice President - Commercial Division     Printed Name: RUTHANNE HALL

Title: _____           Title: PURCHASING MANAGER

Date: 4-2-15                             Date: 4/1/15

                                         Federal ID Number: _____

**<u>EXHIBIT A</u>**

**EGWP BENEFIT**


**(See Attached)**

## SCHEDULE 5.1(a)(iv)

If Client engages a subcontractor ("Subcontractor") to perform any of the functions that ESIC has delegated to Client to perform under this Agreement, Client shall do so pursuant to a written agreement that includes the following terms, conditions, and provisions:

1.      The agreement between Client and Subcontractor (the "Subcontract") must clearly identify the parties to the Subcontract.

2.      The Subcontract must describe the functions that are being delegated to and performed by the Subcontractor.

3.      The Subcontract must describe the manner in which Client will monitor the performance of the Subcontractor on an ongoing basis; specifically to monitor compliance with the Medicare Drug Rules.

4.      The Subcontract must describe any reporting requirements that the Subcontractor has to Client.

5.      The Subcontract must describe the payment that the Subcontractor will receive for performance under the Subcontract.

6.      The Subcontractor must agree that the United States Department of Health and Human Services ("DHHS"), the Comptroller General, or their designees have the right to inspect, evaluate, and audit any pertinent contracts, books, documents, papers and records (including medical records and documentation) of the Vendor involving transactions related to the Centers for Medicare and Medicaid Services' ("CMS") contract with ESIC for a period of ten (10) years following the expiration or termination of the Subcontract or the date of any audit completion, whichever is later.

7.      The Subcontractor must agree pursuant 42 CFR § 423.505(i)(3)(iv) to produce upon request by CMS, or its designees, any books, contracts, records, including medical records and documentation of the PDP Sponsor, relating to the Part D program, to either the PDP Sponsor to provide to CMS, or directly to CMS or its designees.

8.      The Subcontractor must agree that in no event, including, but not limited to, nonpayment by Client, Client's insolvency, or breach of the Subcontract, will the Subcontractor bill, charge, collects a deposit from, seek compensation, remuneration or reimbursement from, or have any recourse against a beneficiary of Client or persons acting on his or her behalf for services provided by the Subcontractor pursuant to the Subcontract.

9.      The Subcontract must: (i) specify that the Subcontractor will perform all services under the Subcontract in a manner that is consistent with and that complies with ESIC's contractual obligations under its contract with CMS; (ii) specify that the Subcontractor agrees to comply with all applicable federal laws, regulations, and CMS instructions; and (iii) provide for revocation of the Subcontractor's delegated activities and reporting responsibilities or specify other remedies in instances when CMS, Client, or ESIC determine that the Subcontractor has not performed satisfactorily.

10.     The Subcontract must require the Subcontractor to agree to comply with state and federal privacy and security requirements, including the confidentiality and security provisions stated in 42 CFR §423.136.

11.     The Subcontract must include an acknowledgment by the parties that information provided in connection with the Subcontract is used for purposes of obtaining federal funds.

12.     If the Subcontract permits the Subcontractor to use a subcontractor to perform any of the services delegated to it under the Subcontract, the Subcontract must require that the Subcontractor include all of the above provisions in a written agreement with such subcontractor.

13.     The Subcontract must be signed by a representative of the Subcontractor with legal authority to bind the Subcontractor.

14.     The Subcontract must contain a representation by Client and the Subcontractor that they shall not knowingly employ, or subcontract with, an individual or an entity that employs or contracts with an individual, who is excluded from participation in Medicare under section 1128 or 1128A of the Act or from participation in a Federal health care program for the provision of health care, utilization review, medical social work, or administrative services.

15.     The Subcontract must contain language clearly indicating that the first tier, downstream, or related entity has agreed to participate in the PDP Sponsor's Medicare Prescription Drug Benefit program. This requirement is not applicable for a network pharmacy if the existing contract would allow participation in this program.

16.     The Subcontract must be for a term of at least the one-year contract period for which the PDP Sponsor's Medicare Part D Application is submitted. However, where the Subcontract is for services or products to be used in preparation for the next contract year's Part D operations (marketing, enrollment), the initial term of such Subcontract must include this period of performance (e.g., contracts for enrollment-related services must have a term beginning no later than November 15 extending through the full contract year ending on December 31 of the next year).

17.     Insofar as the Subcontractor establishes the pharmacy network or select pharmacies to be included in the network, the Subcontractor must agree: i) pursuant 42 CFR § 423.505(i)(5) that the PDP Sponsor retains the right to approve, suspend, or terminate any arrangement with a pharmacy; ii) pursuant 42 CFR §423.505(i)(3)(vi) and consistent with 42 CFR § 423.520 to issue, mail, or otherwise transmit payment of all clean claim to such pharmacies (excluding long-term care and mail order) submitted by or on behalf of pharmacies within 14 days for electronic claims and within 30 days for claims submitted otherwise; iii) pursuant 42 CFR § 423.505(i)(3)(viii)(B) and 42 CFR § 423.505(i)(3)(viii)(A) that if a prescription drug pricing standard is used for reimbursement, Subcontractor will identify the source used by the PDP Sponsor for the prescription drug pricing standard of reimbursement and agree to a contractual provision that updates to such a standard occur not less frequently than once every 7 (seven) days beginning with an initial update on January 1 of each year, to accurately reflect the market price of acquiring the drug.

**EXHIBIT B**

**PHARMACY REIMBURSEMENT RATES**
**ADMINISTRATIVE SERVICES AND FEES**
**STANDARD REPORTING**
**REBATES**

ESIC shall be Client's exclusive provider of EGWP Services for Client's Group Health Plans offering a prescription benefit. The financial terms set forth in Exhibit B are conditioned on such exclusive arrangement and all other specified conditions expressly incorporated in such exhibits, including, but not limited to the adoption by Client of the specified network, qualifying co-payment structures, Formulary, a minimum of 200 EGWP Enrollees implemented on the Effective Date of this Agreement, and no Enrollees in a 100% Copayment benefit plan (if applicable), and no greater than ten percent of total utilization for all Plans attributable to a consumer driven health plan (CDHP). In the event one or more of the following occurs (whether between the date of the Cost Proposal and the Effective Date, or during the Term), ESIC will have the right, upon notice, to make an equitable adjustment to the rates, administrative fees administrative fees and/or Rebates, solely as necessary to return ESIC to its contracted economic position as of the effective date of such event.  If Client disputes the illustration or the financial impact of the pricing amendment, the parties agree to cooperate in good faith to resolve such disputes:

(a)      There is a material change in: (i) the conditions or assumptions stated in this Agreement; or (ii) the size, demographics or gender distribution of Client's EGWP Enrollees compared to data provided by Client; and/or

(b)      Client changes its Formulary, benefit designs, implements OTC plans, clinical or trend programs or otherwise takes an action that has the effect of lowering the amount of Rebates earned hereunder or materially impacting any guarantee; and/or

(c)      Client elects to use on-site clinics or pharmacies to dispense prescription drugs to EGWP Enrollees which materially reduces Rebates and/or the number of Covered Drug claims submitted on-line; and/or

(d)      More than 5% of claims are incurred in Massachusetts, Hawaii, Alaska, or Puerto Rico; and/or

(e)      Rebate revenue is materially decreased because Brand Drugs move off-patent to generic status or due to a Change in Law.


The following are incorporated into Exhibit B:

**Exhibit B-1**

Pharmacy Reimbursement Rates

**Exhibit B-2**

Administrative and Clinical Program Fees

**Exhibit B-3**

Rebates

**Exhibit B-1**

**Pharmacy Reimbursement Rates**

**I.      Annual Average Ingredient Cost Discount Guarantees (Does Not Apply to Specialty Products)**

| ESI National Plus Network | Brand | Generic |
|---|---|---|
| **Participating Pharmacy** 1-34 Days' Supply | ████ | ████████ ████████ |
| **Participating Pharmacy** 35-90 Days' Supply[(1)] | ████ | ████████ ████████ |
| **Mail Service Pharmacy** 1-90 Days' Supply | ████ | ██████ |

Subject to annual reconciliation of the above average guarantees, Client will pay to ESI on a per Prescription Drug Claim basis amounts determined pursuant to the following, net of applicable Copayments:



An EGWP Enrollee's Copayment charged for a Covered Drug will be the lesser of the applicable Copayment, Ingredient Cost Charge, or U&C. ESIC will not be allowed to adjudicate based on "zero balance logic" or on a minimum copayment amount and Participating Pharmacies will not be allowed to collect a minimum Copayment. Participating Pharmacies shall not be permitted to recover any unpaid balances due from Client for any Eligible Members.

Applicable dispensing fees as well as additional per/Rx Administrative Fees, if any, are set forth in the table in Section II. below.  Sales or excise tax or other governmental surcharge, if any, will be the responsibility of Client.

All compound Prescription Drug Claims shall be excluded from the average annual ingredient cost discount guarantees set forth in the table above and will be paid by Client at the lesser of U&C or combined AWP plus applicable service fee for Participating Pharmacy and combined AWP plus applicable service fee for Mail Service Pharmacy.

Application of the average annual ingredient cost discount guarantees set forth in the table above shall be subject to the following criteria and reconciliation provisions:

**A.      Guarantee Methodology.**  The reconciliation of the generic average annual ingredient cost discount guarantees set forth in the table above shall not include Single Source Products in the calculation but shall include Multi-Source Products.  The reconciliation of

the brand average annual ingredient cost discount guarantees set forth in the table above shall not include Multi-Source Products in the calculation but shall include Single Source Products and "authorized" generics that are approved by the FDA under a brand name drug NDA.

**B.**     **Guarantee Exclusions.**   Prescription Drug Claims for Over-The-Counter (OTC) products, Specialty Products, biosimilar products, Member Submitted Claims, Subrogation Claims, vaccines, supplies, and products filled through in-house or 340b pharmacies shall be excluded from the reconciliation of all guarantees.

**C.**     **Guarantee Calculation.**  Separately for each pricing component in the table above, the following calculation will be performed on an aggregated basis for all Prescription Drug Claims processed during the applicable contract year in order to reconcile against the average annual ingredient cost discount guarantees set forth in the table above:

$$1 - (A/B)$$

A =    For Participating Pharmacy – Brand Prescription Drug Claims, the lesser of the Ingredient Cost Charge or U&C, and prior to application of Copayments

        For Participating Pharmacy – Generic Prescription Drug Claims, the lesser of the Ingredient Cost Charge, MRA, or U&C, and prior to application of Copayments

        For Mail Service Pharmacy – Brand Prescription Drug Claims, the Ingredient Cost Charge, and prior to application of Copayments

        For Mail Service Pharmacy – Generic Prescription Drug Claims, the lesser of the Ingredient Cost Charge or MRA, and prior to application of Copayments

B =    The actual AWP for the Covered Prescription

**D.**     **Guarantee Reconciliation.**  Guarantees will be measured and reconciled on an annual basis within ninety (90) days of the end of each contract year. The above guarantees are annual guarantees - if this Agreement is terminated prior to the completion of the then current contract year (hereinafter, a "Partial Contract Year"), then the above guarantees will not apply for such Partial Contract Year. To the extent Client changes its benefit design or Formulary during the term of the Agreement, the guarantee will be equitably adjusted if there is a material impact on the discount achieved. Subject to the remaining terms of this Agreement, ESIC will pay the difference of Client's net cost for any shortfall between the actual result and the guaranteed result; provided however, that ESIC may use an excess achieved in one or more of the above guarantees to make up for, and offset, a shortfall in another guarantee. ESIC may also use any excess achieved in any other guarantee offered pursuant to this Agreement to make up for, and offset, a shortfall in any of the above guarantees or any other guarantee(s) set forth in this Agreement.

**II.**     **Per Prescription Drug Claim Dispensing and Administrative Fees (Does Not Apply to Specialty Products).**

| ESI National Plus Network | Brand | Generic |
|---|---|---|
| **Participating Pharmacy Dispensing Fee/Rx** <br> 1-83 Days' Supply | $███ | ███ |
| **Participating Pharmacy Dispensing Fee/Rx** | $███ | $███ |

| 84-90 Days' Supply**(1)** | | |
|---|---|---|
| **Participating Pharmacy Administrative Fee/Rx** | $ ▆ | $ ▆ |
| | | |
| **Mail Service Pharmacy Dispensing Fee/Rx\*** | $ ▆ | $ ▆ |
| **Mail Service Pharmacy Administrative Fee/Rx** | ▆ | ▆ |

\*Dispensing Fees are inclusive of shipping and handling. If carrier rates (i.e., U.S. mail and/or applicable commercial courier services) increase during the term of this Agreement, the Dispensing Fees will be increased to reflect such increase(s).

\*\* U&C priced claims will NOT be assessed a separate dispensing fee and must be excluded from the dispensing fee guarantee reconciliation.

**(1)** Certain Participating Pharmacies have agreed to participate in the extended (84 – 90) day supply network ("Maintenance Network") for maintenance drugs. Pricing in the 84 – 90 Days' Supply column in the table set forth above is applicable only if Client implements a plan design that requires EGWP Enrollee's to fill such days' supply at a Maintenance Network Participating Pharmacy (i.e., Client must implement a plan design whereby EGWP Enrollees who fill extended days' supply prescriptions at a Participating Pharmacy other than a Maintenance Network Participating Pharmacy do not receive benefit coverage under the Plan for such prescription). If no such plan design is implemented, the pricing for such days' supply will be the same as for Prescription Drug Claims for less than an 84 days' supply, and pricing for an 84 – 90 days' supply in the table set forth above shall not apply, even if a Maintenance Network Participating Pharmacy is used.

## III.     Specialty Products

(a)     Specialty Products shall be available through ESIC Specialty Pharmacy and at Participating Pharmacies for the Specialty Product List for ESIC Specialty Pharmacy – Open, and Participating Pharmacy reimbursement rates.

| | **Ingredient Cost** | **Dispensing Fee** |
|---|---|---|
| **Open ESIC Specialty Pharmacy** | ▆▆▆ | ▆ |
| **Participating Pharmacy Specialty Products** | ▆▆▆▆▆ | ▆ |

(b)     Specialty Products will be excluded from any price guarantees set forth in the Agreement. ESIC Specialty Pharmacy or ESIC will be entitled to charge a reasonable fuel surcharge fee to cover fuel surcharges imposed by carriers in connection with the delivery of Specialty Products by ESIC Specialty Pharmacy. In no event will the Mail Service Pharmacy or Participating Pharmacy pricing specified in the Agreement apply to Specialty Products.

(c)     ESIC will notify Client no more frequently than monthly of new Specialty Products that are introduced to the market and added to the Specialty Product List on or after the Effective Date of this Agreement with their applicable Specialty Product List reimbursement rates ("Notice"). The parties agree as follows:

(i)     If Client has expressly excluded a specific therapy class or product, Specialty Products in such excluded classes will automatically be deemed excluded from coverage and will reject as "NDC Not Covered" through Participating Pharmacies, Mail Service Pharmacy and ESIC Specialty Pharmacy; otherwise, all other Specialty Products will be implemented as

Covered Drugs at the rate specified in the applicable Specialty Product List or Notice, and Client acknowledges and agrees to same. If Client desires to cover otherwise excluded Specialty Products, Client must notify ESIC in writing that it desires to cover the Specialty Product before ESIC will adjudicate as a Covered Drug, and if ESIC receives such confirmation of coverage from Client such Specialty Product will be loaded thereafter as a Covered Drug at the applicable Specialty Product List reimbursement rate set forth in the Notice.

(ii)     Client must notify ESIC in writing if it wants to exclude the Specialty Product from coverage. The exclusion will be implemented within seven (7) business days after the date of ESIC's receipt of such notification. There will not be any retroactive denials for Prescription Drug Claims processed prior to ESIC's receipt of the rejection notice and implementation of the exclusion as provided above and Client will be responsible for the payment of such Prescription Drug Claims processed prior to the rejection of coverage.

(d)     <u>Specialty Products and ASES</u>.  EGWP Enrollees may have prescriptions filled through ESIC Specialty Pharmacy and Participating Pharmacies. Subject to applicable law, ESIC and ESIC Specialty Pharmacy may communicate with EGWP Enrollees and physicians to advise EGWP Enrollees filling Specialty Products at Participating Pharmacies of the availability of filling prescriptions through ESIC Specialty Pharmacy. Specialty Products will be excluded from any price guarantees set forth in the Agreement. In no event will the Mail Service Pharmacy or Participating Pharmacy pricing specified in the Agreement apply to Specialty Products.

(i)     For Specialty Products filled through ESIC Specialty Pharmacy only, EGWP Enrollees may receive the following services from ESIC Specialty Pharmacy, depending on the particular therapy class or disease state:  ASES; patient intake services; pharmacy dispensing services and/or social services (patient advocacy, hardship reimbursement support, and indigent and patient assistance programs).

(ii)     Subject to Client's prior authorization requirements, if applicable, at the rates set forth in <u>Exhibit B-1</u>, ESIC will provide or coordinate ASES for EGWP Enrollees through ESIC Specialty Pharmacy or through other specialty pharmacies or other independent third party providers of ASES when ASES is required. If ESIC or ESIC Specialty Pharmacy engages a third party provider of ASES, ESIC or ESIC Specialty Pharmacy shall contractually obligate such third party provider of ASES to comply with all applicable laws, including, without limitation, all applicable laws relating to professional licensure. ESIC does not direct or exercise any control over any third party provider of ASES in administering Specialty Products or otherwise providing ASES.

(iii)     For Specialty Products needing an additional charge to cover costs of all ASES required to administer the Specialty Products, the following standard per diem and nursing fee rates shall apply. Exceptions to the standard per diem and nursing rates are set forth in (iv), below, which list may be updated from time to time by ESIC. Pricing for home infusion supplies and services provided at Participating Pharmacies (for example, limited distribution products not then available through ESIC Specialty Pharmacy or overrides) will be pass through.

| | |
|---|---|
| Standard Per Diem | $█ |
| Standard Nursing Fee/First 2 Hours | $█ |
| Standard Nursing Hourly | █ |

(iv)     Additional exceptions to AWP Discount Rates and Standard Per Diem & Nursing Fees

| Brand Name | AWP Discount | Per Diem |
|---|---|---|
| EPOPROSTENOL | █ | █ |
| REMODULIN | █ | █ |

The AWP discount includes Phone Support Nursing, Supplies, Pump, first two training visits, and Coordination of In-Person Nursing. In-home nursing that is requested/needed beyond the first two training visits will be charged at a rate of ████████████████████████

(e)    Any ancillary supplies, equipment, and services provided or coordinated in connection with the dispensing of Specialty Products at a Participating Pharmacy will be billed to Client at the cost charged to ESIC for such ancillary supplies, equipment, and services provided or coordinated, unless such ancillary supplies, equipment, and services provided or coordinated are included in the ingredient cost of the Specialty Product.

**IV.    Influenza and Other Vaccinations**

(a)    Medicare Part D vaccinations

| | Participating Pharmacies/Mail Service Pharmacy/ESIC Specialty Pharmacy | Other than Participating Pharmacies/Mail Service Pharmacy/ESIC Specialty Pharmacy [1] |
|---|---|---|
| **Vaccine Administration** | ██████████ ████ | ██████████ |
| **Ingredient Cost** | ████████████████ | ████████████ |
| **Administrative Fee/Vaccine Claim** | ██████████████ ████████████████ | ██████████ ██████████████ |

[1] Except for Vaccine Claims submitted electronically by physicians.   Pricing for Vaccine Claims submitted electronically by physicians is set forth below.

| | Vaccine Claims Submitted Electronically by Physicians |
|---|---|
| **Vaccine Administration[1]** | ██████████ |
| **Ingredient Cost** | ██████ |
| **Administrative Fee/Vaccine Claim** | ██████████████████ ██████████████ |
| **Vendor Transaction Fee** | ████████ |

[1] ██████ is the fee currently charged by DSI to ESIC.   This amount is subject to change.   ESIC will provide Client prior written notice of any change.

(b)    Optional Medicare Part B vaccinations

Medicare Part B Vaccinations shall adjudicate at the lower of:
(i)

| | Participating Pharmacy INFLUENZA | Participating Pharmacy PNEUMONIA |
|---|---|---|
| **Ingredient Cost** **+** | ██████████████ | ██████████████t |

| | | |
|---|---|---|
| **Dispensing Fee** **+** | ██████████ ██████████ | ██████████ ████ |
| **Professional Service Fee (PSF); cost for pharmacist to administer the vaccine** | ██████ | ███████ ████████ |
| **Vaccine Program Fee \*** | ████ | ████ |

\* The Vaccine Program Fee will be billed separately to Client as part of the administrative invoice according to the billing frequency set forth in the Agreement. This Vaccine Program Fee is in addition to any per Prescription Drug Claim administrative fee set forth in the Agreement.

**or**



(ii) ████████████████████████████████ ██████████████████████████████

Coverage is subject to Plan provisions. No vaccine claims will be included in any guarantees set forth in the Agreement and/or amendments thereto.

**V.**     **Long Term Care; I/T/U and IHS; Home Infusion Pricing**

| **LONG TERM CARE NETWORK PROVIDERS** | Pricing |
|---|---|
| *Brand Discount* | ██████████ |
| *Generic Discount* | ████████████ |
| *Brand Dispensing Fee Per Claim* | ██ |
| *Generic Dispensing Fee  Per Claim* | ██ |
| *Administrative Fee Per Claim* | ██ |
| **I/T/U and IHS PRESCRIPTION SERVICES** | ████████████████ ██████████ |
| **HOME INFUSION PROVIDERS** | Pricing |
| *Brand Discount* | ██████████ |
| *Generic Discount* | ████████████ |
| *Brand Dispensing Fee Per Claim* | ██ |
| *Generic Dispensing Fee  Per Claim* | ██ |
| *Administrative Fee Per Claim* | ██ |

\* ████████████████

**Exhibit B-2**

**Administrative and Clinical Program Fees**

**I.**      **Administrative Fees**

**Optional PBM Services**

| | |
|---|---|
| ████████████ | ███ |
| ███████████ | |
| ████████████████████████ | █████████ |
| ███ | |
| ████████████████ | ███████████████████ |
| | █████████████████████ |
| ████████████ | ████████████████████████ |
| | ██████████████████████████ |
| | █████████████████████ |
| | ████████████ |
| █████████████ | |
| █████████████ | ██████████████████ |
| ██████████ | |
| ████████████████ | █████████████████ |
| ███████████████ | |
| █████████████████ | ████████████████ |
| ███████████████ | ████████████████ |
| ████████████████████ | █████████████ |
| ███ | |
| ████████████████ | |
| ████████████████████████ | ████████████████ |
| █████████████ | |
| ▌ ████████████ | |
| ▌ ████████ | |
| ▌ ████████████ | |
| ███████████████████████ | ██ ██ ███████ |
| ███████████████████████ | |
| ▌ | |
| ▌ ████████████ | |
| ▌ █████████████████ | |
| ████████████████ | |
| ▌ ██████████ | |
| ████████████████████ | |
| ███████ | |
| ████████████████ | |
| ▌ ████████ | |
| ▌ ████████████ | |
| ▌ ████████████ | |







II.    **Clinical/Trend Programs**.



**EXHIBIT B-3**

**REBATES**

A.      Subject to the terms and conditions set forth below and in Section 3.11, ESIC will remit to Client amounts equal to the greater of the following:

(i)      100% Actual Rebates attributable to utilization of Plan Participants, or
(ii)     Minimum Rebate Guarantees as set forth below

| Formulary: | Medicare National Preferred | | |
|---|---|---|---|
| Copayment Design: | Minimum $15 Copayment Differential | | |
| | **Participating Pharmacies and ESI Specialty Pharmacy** 1-34 Days' Supply | **Participating Pharmacies and ESI Specialty Pharmacy** 35-90 Days' Supply | **Mail Service Pharmacy** 1-90 Days' Supply |
| **Per Brand Claim** | Year 1: $█████ Year 2: $█████ Year 3: $█████ | Year 1: $█████ Year 2: $█████ Year 3: $█████ | Year 1: $█████ Year 2: $█████ Year 3: $█████ |

B.      Long Term Care and Home Infusion claims are not eligible for Rebates.

**EXHIBIT C**

**AUDIT PROTOCOL**

1. **AUDIT PRINCIPLES**

   ESIC recognizes the importance of its clients ensuring the integrity of their business relationship by engaging in annual audits of their financial arrangements with ESIC, by auditing compliance with applicable regulatory requirements. ESIC provides this audit right to each and every client. In granting this right, ESIC's primary interest is to facilitate a responsive and responsible audit process. In order to accomplish this goal, for all clients, ESIC has established the following Protocol. Our intent is in no way to limit Client's ability to determine that ESIC has properly and accurately administered the financial aspects of the Agreement, but rather to create a manageable process in order to be responsive to our clients and the independent auditors that they may engage. If Client has any concern that this Protocol will prohibit Client from fully confirming its financial arrangement with ESIC, we encourage Client to express such concern at the audit kick-off meeting.

   ESIC strongly encourages clients to have their auditors, without jeopardizing the independent nature of the audit, review the auditor's initial findings and reports with ESIC prior to discussing with the client in order to avoid any unnecessary client confusion. We have found often times that items identified as issues during the initial audit turn out to be non-findings once a dialogue takes place between the auditor and ESIC. In other words, we believe it is in everyone's interest to ensure that the auditor and ESIC are not simply "missing each other" in the exchange of information prior to the auditor reviewing its findings with the client.

2. **AUDIT PREREQUISITES**

   A. There are three components of your arrangement with ESIC eligible for audit on an annual basis:
      - Retrospective Claims
      - Rebates
      - Performance Guarantees

      Balancing the need to adequately support the audit process for all ESIC clients, with an efficient allocation of resources, we encourage clients to audit all three components, as applicable, through a single annual audit. If you choose to audit the above components separately throughout the year, rather than combining all components into a single annual audit, you will be subject to ESIC's standard charges for each additional audit. All such fees shall be reasonable and based on ESIC's costs for supporting such additional audits.

   B. ESIC will provide all data reasonably necessary for Client to determine that ESIC has performed in accordance with contractual terms.

   C. ESIC engages a national accounting firm, at its sole cost and expense, to conduct a SSAE 16 audit on behalf of its clients. Upon request, ESIC will provide the results of its most recent SSAE 16 audit. Testing of the areas covered by the SSAE 16 is not within the scope of Client's audit rights (i.e., to confirm the financial aspects of the Agreement) and is therefore not permitted. However, if requested, ESIC will explain the SSAE 16 audit process and findings to Client in order for Client to gain an understanding of the SSAE 16.

3. **AUDITS**

   A. ESIC recommends that the initial audit period for a claims audit cover a timeframe not to exceed twenty-four (24) months immediately preceding the request to audit (the "Audit Period"). This Audit Period allows a reasonable amount of time for both parties to conclude the audit before claims data is archived off the adjudication system. ESIC will accommodate reasonable requests to extend the Audit Period, but this may delay ESIC's response time to audit findings due to the age of the claims. Due to the additional resources necessary to pull claims data older than twenty-four (24) months, if you request to extend the Audit Period, you will be subject to ESIC's standard charges for such additional data pulls. All such fees shall be reasonable and based on ESIC's additional costs associated with retrieval and reporting of such data. If the parties mutually determine, acting in good faith, that the initial audit demonstrates in any material respects that ESIC has not administered the financial arrangement consistent with the contract terms of the Agreement, then ESIC will support additional auditing beyond the Audit Period at no additional charge.

   B. When performing a Rebate audit, Client may perform an on-site review of the applicable components of manufacturer agreements, selected by Client, as reasonably necessary to audit the calculation of the Rebate payments made to Client by ESIC. Our ability to drive value through the supply chain and in our negotiations with manufacturers is dependent upon the strict confidentiality and use of these agreements. Providing access to these agreements to third parties that perform services in the industry beyond traditional financial auditing jeopardizes our ability to competitively drive value. For this reason, access to and audit of manufacturer agreements is restricted to a mutually agreed upon national CPA accounting firm whose audit department is a separate stand-alone division of the business, which carries insurance for professional malpractice of at least Two Million Dollars ($2,000,000).

C.  ESIC recommends that Client select an initial number of manufacturer contracts to enable Client to audit fifty percent (50%) of the total Rebate payments due to Client for two (2) calendar quarters during the twelve (12) month period immediately preceding the audit (the "Rebate Audit Scope and Timeframe"). ESIC will accommodate reasonable requests to extend this Rebate Audit Scope and Timeframe, but this may delay ESIC's on-site preparation time as well as response time to audit findings. Due to the additional resources necessary to support a Rebate audit beyond the Rebate Audit Scope and Timeframe, if you request to extend the Rebate Audit Scope and Timeframe, you will be subject to ESIC's standard charges for such additional audit support. All such fees shall be reasonable and based on ESIC's additional costs. If the parties mutually determine, acting in good faith, that the initial Rebate audit demonstrates in any material respects that ESIC has not administered Rebates consistent with the contract terms of the Agreement, then ESIC will support additional auditing beyond the Rebate Audit Scope and Timeframe at no additional charge.

D.  If you have a Pass-Through pricing arrangement for Participating Pharmacy claims, ESIC will provide the billable and payable amount for a sampling of claims provided by you or your auditor (i.e., ESIC will provide the actual documented claim record) during the audit to verify that ESIC has administered such Pass-Through pricing arrangement consistent with the terms of the Agreement. If further documentation is required, ESIC may provide a statistically valid sample of claims remittances to the Participating Pharmacies to demonstrate ESIC's administration of Pass-Through pricing. In any instance where the audit demonstrates that the amount billed to you does not equal the Pass-Through amount paid to the Participating Pharmacy, you or your auditor may perform an on-site audit of the applicable Participating Pharmacy contract rate sheet(s).

## 4.  AUDIT FINDINGS

A.  Following Client's initial audit, Client (or its Auditor) will provide ESIC with a written report of suspected errors, if any. In order for ESIC to evaluate Client's audit report, Client shall provide an electronic data file in a mutually agreed upon format containing up to 300 claims for further investigation by ESIC.

B.  ESIC will use commercially reasonable best efforts to respond to the audit report in no more than thirty (30) days from ESIC's receipt of the report or at a later date if mutually determined to be more reasonable based on the number and type of findings. Please be aware, however, that audits that require evaluation of six (6) or more findings typically require additional time to respond due to the complex nature of such audits. Our pledge to respond within the foregoing timeframe is predicated on a good faith and cooperative effort between Client and/or its Auditor and ESIC.

C.  Client agrees that once audit results are accepted by both parties, the audit shall be considered closed and final. To the extent the mutually accepted audit results demonstrate claims errors, ESIC will reprocess the claims and make corresponding adjustments to Client through credits to a future invoice(s). If we are unable to reprocess claims and issue corresponding credits to Client through this process, ESIC will make adjustments to Client via a check or credit.

## 5.  AUDITS BY GOVERNMENT ENTITIES

A.  In the event CMS, the OIG, MEDIC, or another government agency has engaged in an audit of Client and/or its "first tier" and "downstream entities", Client shall contact the ESIC Account Management team and provide a written copy of the audit notice or request from the government agency promptly upon receipt.

B.  Client agrees that CMS may have direct access to ESIC's and any such "downstream entity's" pertinent contracts, books, documents, papers, records, premises and physical facilities, and that ESIC and such "downstream entity" will provide requested information directly to CMS unless otherwise agreed upon by ESIC and Client.

C.  Following the government audit of Client and its "first tier" and "downstream entities", Client shall provide ESIC with a written report of suspected non-compliant issues noted in the government audit that relate to services provided by ESIC, if any. If there are such findings, ESIC will work with Client and/or government agency to respond to any suspected non-compliant issues.

D.  Support for all such audits by government entities will be subject to ESIC's standard charges. All such fees shall be reasonable and based on ESIC's costs for supporting such audits.

## 6.  CONFIDENTIALITY

ESIC's contracts are highly confidential and proprietary. For this reason, ESIC only permits on-site review rather than provide copies to our clients. During on-site contract review, Client (or its Auditor) may take and retain notes to the extent necessary to document any identified errors, but may not copy (through handwritten notes or otherwise) or retain any contracts (in part or in whole) or related documents provided or made available by ESIC in connection with the audit. ESIC will be entitled to review any notes to affirm compliance with this paragraph.

## EXHIBIT D

*As provided in the Agreement, ESIC may provide services under this Agreement through one or more of its Affiliates, including Express Scripts, Inc. ("ESI"). The following financial disclosure statement relates to the rebate programs and other financial arrangements that may be used by Express Scripts, Inc. ("ESI") in connection with ESIC's administration of the EGWP Benefit under this Agreement.*

### FINANCIAL DISCLOSURE TO ESI PBM CLIENTS

This disclosure provides an overview of the principal revenue sources of Express Scripts, Inc. and Medco Health Solutions, Inc. (individually and collectively referred to herein as "ESI"), as well as ESI's affiliates. In addition to administrative and dispensing fees paid to ESI by our clients for pharmaceutical benefit management ("PBM") services, ESI and its affiliates derive revenue from other sources, including arrangements with pharmaceutical manufacturers, wholesale distributors, and retail pharmacies. Some of this revenue relates to utilization of prescription drugs by members of the clients receiving PBM services. ESI may pass through certain manufacturer payments to its clients or may retain those payments for itself, depending on the contract terms between ESI and the client.

Network Pharmacies – ESI contracts for its own account with retail pharmacies to dispense prescription drugs to client members. Rates paid by ESI to these pharmacies may differ among networks (e.g., Medicare, Worker's Comp, open and limited), and among pharmacies within a network, and by client arrangements. PBM agreements generally provide that a client pay ESI an ingredient cost, plus dispensing fee, for drug claims. If the rate paid by a client exceeds the rate contracted with a particular pharmacy, ESI will realize a positive margin on the applicable claim. The reverse also may be true, resulting in negative margin for ESI. ESI also enters into pass-through arrangements where the client pays ESI the actual ingredient cost and dispensing fee amount paid by ESI for the particular claim when the claim is adjudicated to the pharmacy. In addition, when ESI receives payment from a client before payment to a pharmacy, ESI retains the benefit of the use of the funds between these payments. ESI may maintain non-client specific aggregate guarantees with pharmacies. ESI may charge pharmacies standard transaction fees to access ESI's pharmacy claims systems and for other related administrative purposes.

Brand/Generic Classifications – Prescription drugs may be classified as either a "brand" or "generic;" however, the reference to a drug by its chemical name does not necessarily mean that the product is recognized as a generic for adjudication, pricing or copay purposes. ESI distinguishes brands and generics through a proprietary algorithm ("BGA") that uses certain published elements provided by First DataBank (FDB) including price indicators, Generic Indicator, Generic Manufacturer Indicator, Generic Name Drug Indicator, Innovator, Drug Class and ANDA. The BGA uses these data elements in a hierarchical process to categorize the products as brand or generic. The BGA also has processes to resolve discrepancies and prevent "flipping" between brand and generic status due to price fluctuations and marketplace availability changes. The elements listed above and sources are subject to change based on the availability of the specific fields. Updated summaries of the BGA are available upon request.

Maximum Allowable Cost ("MAC")/Maximum Reimbursement Amount ("MRA") – As part of the administration of the PBM services, ESI maintains a MAC List of drug products identified as requiring pricing management due to the number of manufacturers, utilization and/or pricing volatility. The criteria for inclusion on the MAC List are based on whether the drug has readily available generic product(s), is generally equivalent to a brand drug, is cleared of any negative clinical implications, and has a cost basis that will allow for pricing below brand rates. ESI also maintains MRA price lists for drug products on the MAC List based on current price reference data provided by MediSpan or other nationally recognized pricing source, market pricing and availability information from generic manufacturers and on-line research of national wholesale drug company files, and client arrangements. Similar to the BGA, the elements listed above and sources are subject to change based on the availability of the specific fields. Updated summaries of the MAC methodology are available upon request.

Manufacturer Formulary Rebates, Associated Administrative Fees, and PBM Service Fees – ESI contracts for its own account with manufacturers to obtain formulary rebates attributable to the utilization of certain brand drugs and supplies (and possibly certain authorized generics marketed under a brand manufacturer's new drug application). Formulary rebate amounts vary based on the volume of utilization as well as formulary position applicable to the drug or supplies, and adherence to various formulary management controls, benefit design requirements, claims volume, and other similar factors, and in certain instances also may vary based on the product's market-share. ESI often pays an amount equal to all or a portion of the formulary rebates it receives to a client based on the client's PBM agreement terms. ESI retains the financial benefit of the use of any funds held until payment of formulary rebate amounts is made to the client. In addition, ESI provides administrative services to formulary rebate contracted manufacturers, which include, for example, maintenance and operation of the systems and other infrastructure necessary for managing and administering the PBM formulary rebate process and access to drug utilization data, as allowed by law, for purposes of verifying and evaluating the rebate payments and for other purposes related to the manufacturer's products. ESI receives administrative fees from the participating manufacturers for these services. These administrative fees are calculated based on the price of the rebated drug or supplies along with the volume of utilization and do not exceed the greater of (i) ▮▮▮▮ of the average wholesale price, or (▮▮▮▮ of the wholesale acquisition cost of the products. In its capacity as a PBM company, ESI also may receive service fees from manufacturers as compensation for the performance of various services, including, for example, formulary compliance initiatives, clinical services, therapy management services, education services, medical benefit management

<mark>services, and the sale of non-patient identifiable claim information. These service fees are not part of the formulary rebates or associated administrative fees.</mark>

<mark>Copies of ESI's standard formularies may be reviewed at www.express-scripts.com/services/clientsadvisors. In addition to formulary considerations, other plan design elements are described in ESI's Plan Design Review Guide, which may be reviewed at www.express-scripts.com/services/clientadvisors.</mark>

<u>ESI Subsidiary Pharmacies</u> – ESI has several licensed pharmacy subsidiaries, including our specialty pharmacies. These entities may maintain product purchase discount arrangements and/or fee-for-service arrangements with pharmaceutical manufacturers and wholesale distributors. These subsidiary pharmacies contract for these arrangements on their own account in support of their various pharmacy operations. Many of these subsidiary arrangements relate to services provided outside of PBM arrangements, and may be entered into irrespective of whether the particular drug is on one of ESI's national formularies. Discounts and fee-for-service payments received by ESI's subsidiary pharmacies are not part of the PBM formulary rebates or associated administrative fees paid to ESI in connection with ESI's PBM formulary rebate programs. From time to time, ESI and its affiliates also may pursue and maintain for its own account other supply chain sourcing relationships not described below as beneficial to maximize ESI's drug purchasing capabilities and efficiencies, and ESI or affiliates may realize an overall positive margin with regard to these initiatives.

The following provides additional information regarding examples of ESI subsidiary discount arrangements and fee-for-service arrangements with pharmaceutical manufacturers, and wholesale distributors:

<u>ESI Subsidiary Pharmacy Discount Arrangements</u> – ESI subsidiary pharmacies purchase prescription drug inventories, either from manufacturers or wholesalers, for dispensing to patients. Often, purchase discounts off the acquisition cost of these products are made available by manufacturers and wholesalers in the form of either up-front discounts or retrospective discounts. These purchase discounts, obtained through separate purchase contracts, are not formulary rebates paid in connection with our PBM formulary rebate programs. Drug purchase discounts are based on a pharmacy's inventory needs and, at times, the performance of related patient care services and other performance requirements. When a subsidiary pharmacy dispenses a product from its inventory, the purchase price paid for the dispensed product, including applicable dispensing fees, may be greater or less than that pharmacy's acquisition cost for the product net of purchase discounts. In general, our pharmacies realize an overall positive margin between the net acquisition cost and the amounts paid for the dispensed drugs.

<u>ESI Subsidiary Fee-For-Service Arrangements</u> – One or more of ESI's subsidiaries, including, but not limited to, its subsidiary pharmacies also may receive fee-for-service payments from manufacturers or wholesalers in conjunction with various programs or services, including, for example, patient assistance programs for indigent patients, dispensing prescription medications to patients enrolled in clinical trials, various therapy adherence and fertility programs, administering FDA compliance requirements related to the drug, product reimbursement support services, and various other clinical or pharmacy programs or services. As a condition to having access to certain products, and sometimes related to certain therapy adherence criteria or FDA requirements, a pharmaceutical manufacturer may require a pharmacy to report selected information to the manufacturer regarding the pharmacy's service levels and other dispensing-related data with respect to patients who receive that manufacturer's product. A portion of the discounts or other fee-for-service payments made available to our pharmacies may represent compensation for such reporting.

<u>Other Manufacturer Arrangements</u> – ESI also maintains other lines of business that may involve discount and service fee relationships with pharmaceutical manufacturers and wholesale distributors. Examples of these businesses include a wholesale distribution business, a group purchasing organization, a medical benefit management company, and United BioSource Corporation ("UBC"). Compensation derived through these business arrangements is not part of the PBM formulary rebates or associated administrative fees paid to ESI in connection with ESI's PBM formulary rebate programs. Services related to these arrangements are provided to manufacturers irrespective of whether a drug is on one of ESI's national formularies. Of particular note, UBC partners with life sciences and pharmaceutical companies to develop, commercialize, and support safe, effective use and access to pharmaceutical products. UBC maintains a team of research scientists, biomedical experts, research operations professionals, technologists and clinicians who work with clients to conduct and support clinical trials, create, and validate and administer pre and post product safety and risk management programs. UBC also works on behalf of pharmaceutical manufacturers to provide product and disease state education programs, reimbursement assistance, and other support services to the patient public at large. Fees paid to UBC in connection with its services are unrelated to the ESI PBM formulary.

<u>Third Party Data Sales</u> – Consistent with any client contract limitations, ESI or its affiliates may sell non-patient identifiable claim information maintained in their capacity as a PBM, pharmacy, or otherwise to data aggregators, manufacturers, or other third parties on a fee-for-service basis. All such activities are conducted in compliance with applicable patient and pharmacy privacy laws and client contract restrictions.

**January 1, 2013**

**THIS EXHIBIT REPRESENTS ESI'S FINANCIAL POLICIES. ESI MAY PERIODICALLY UPDATE THIS EXHIBIT AND THE FINANCIAL DISCLOSURES CONTAINED HEREIN TO REFLECT CHANGES IN ITS BUSINESS PROCESSES; THE CURRENT FINANCIAL DISCLOSURE IS AVAILABLE UPON REQUEST AND ACCESSIBLE ON EXPRESS-SCRIPTS.COM FOR CLIENTS & ADVISORS.**

**EXHIBIT E**

**CERTIFICATION OF INFORMATION RELATING TO CREDITABLE
COVERAGE REQUIREMENT AND LATE ENROLLMENT PENALTY
FOR PART D EMPLOYER GROUP WAIVER PLAN**

Pursuant to the contract(s) between the Centers for Medicare & Medicaid Services ("CMS") and Express Scripts Insurance Co., **S7950** (collectively, the "PDP Organization"), governing the operation of the contract between the PDP Organization and _____ **("CLIENT")**, an Employer Group Waiver Plan (EGWP), the PDP Organization hereby requests from CLIENT a certification concerning the creditable coverage maintained for the Part D beneficiaries enrolled under the contract with CLIENT ("Enrollees").

**CMS REQUIREMENT -** Under applicable CMS Part D regulations, 42 CFR 423, CMS Manual Chapter 4, and related guidance as may be amended from time to time: plans, "using the Batch Eligibility Query (BEQ), [must] determine whether the beneficiary was either enrolled in a Part D plan or was covered by an employer receiving the retiree drug subsidy (RDS) since the IEP end date. If the beneficiary was enrolled in a Part D Plan or by an employer receiving RDS or in an employer-sponsored plan providing coverage at least as good as the standard Medicare part D plan since the end of the IEP, such that there is no gap in creditable coverage of sixty-three (63) or more days, [the plan must] report to CMS that the beneficiary had zero (0) uncovered months." This coverage is deemed to be continuous "creditable coverage."

Under the same guidance, plans may secure an attestation from employers and unions such as CLIENT, who enroll groups of retirees into Medicare prescription drug coverage. The attestation must provide that employer/ CLIENT has been maintaining continuous creditable coverage for each applicable retiree for the time during which the retiree was enrolled through CLIENT.

**ATTESTATION -** CLIENT attests by affixing its signature below that all Enrollees submitted by the CLIENT to ESIC for enrollment under an Enhanced Plan were either enrolled under another Prescription Drug Plan or had other creditable coverage as defined by the CMS applicable guidelines prior to their coverage under Enhanced Plan

**ACCURACY –** In providing said Certification, CLIENT acknowledges that the information directly affects the calculation of CMS payments to the PDP Organization and/or CLIENT or additional benefit obligations of the PDP Organization and that misrepresentations to CMS about the accuracy of such information may result in Federal civil action and/or criminal prosecution.

**RESPONSIBILITY –** CLIENT will indemnify and hold ESIC harmless from claims or causes of action asserted against ESIC arising from misrepresentation of information provided in this Attestation by CLIENT.

**APPEAL –** ESIC shall not be responsible for appealing CMS' determination of Enrollees' creditable coverage status, however, ESIC shall honor the final disposition of appeals that are filed by CLIENT.

**AGREEMENT –** This Attestation supplements and is made a part of the Agreement in effect between ESIC and CLIENT.

Based on best knowledge, information, and belief, as of the date indicated below, CLIENT is attesting that all information submitted to PDP Organization in this report is accurate, complete, and truthful.

Name:_____

Title:_____
on behalf of CLIENT

Date: _____