# EXHIBIT 2

**EXPRESS SCRIPTS, INC.**
**PHARMACY BENEFIT MANAGEMENT AGREEMENT**

THIS PHARMACY BENEFIT MANAGEMENT AGREEMENT ("Agreement") will be effective as of the date set forth in Section 6.1 and is entered into by and between EXPRESS SCRIPTS, INC., a Delaware corporation ("ESI"), and LAKE COUNTY GOVERNMENT, organized under the laws of the state of Illinois ("Sponsor").

**RECITALS**

A.    ESI, either directly or through its subsidiaries, engages in pharmacy benefit management services, including, among other things, pharmacy network contracting; pharmacy claims processing; mail and specialty drug pharmacy; cost containment, clinical, safety, adherence, and other like programs; and formulary and rebate administration ("PBM Services").

B.    Sponsor provides or arranges for the provision of health benefits, including a prescription drug benefit.

C.    ESI and Sponsor desire that ESI be the exclusive provider of PBM Services for Sponsor's Plan (as defined below) under the terms and conditions set forth herein.

THEREFORE, in consideration of the mutual promises contained herein, the parties hereto agree as follows:

**TERMS OF AGREEMENT**

**ARTICLE I - DEFINITIONS**

Ancillary Charge" means the difference between the price of the Brand Drug and the Generic Drug and is the additional charge paid by the Member, pursuant to Client defined plan design and coverage policies, due to the application of "dispensed as written" protocols or where the Member elects to fill a prescription with a Brand Drug when an equivalent Generic Drug is available.

"Ancillary Supplies, Equipment, and Services" or "ASES" means ancillary supplies, equipment, and services provided or coordinated by ESI Specialty Pharmacy in connection with ESI Specialty Pharmacy's dispensing of Specialty Products. ASES may include all or some of the following: telephonic and/or in-person training, nursing/clinical services, in-home infusion and related support, patient monitoring, medication pumps, tubing, syringes, gauze pads, sharps containers, lancets, test strips, other supplies, and durable medical equipment. The aforementioned list is illustrative only (not exhaustive) and may include other supplies, equipment, and services based on the patient's needs, prescriber instructions, payer requirements, and/or the Specialty Product manufacturer's requirements.

"Average Wholesale Price" or "AWP" means the average wholesale price of a prescription drug as identified by drug pricing services such as Medi-Span.  The applicable AWP shall be the 11-digit NDC for the product submitted by the Pharmacy and used to fill the prescription drug on the date it was dispensed.  If the Pricing Source discontinues the reporting of AWP or materially changes the manner in which AWP is calculated, then ESI reserves the right to make an equitable adjustment as necessary to maintain the parties' relative economics and the pricing intent of this Agreement. ESI shall provide Client with at least ninety (90) days' notice of the change (or if such notice is not practicable, as much notice as is reasonable under the circumstances), and written illustration of the financial impact of the pricing source or index change (e.g., specific drug examples). If the Client disputes the illustration or the financial impact of the pricing source, the parties agree to cooperate in good faith to resolve such disputes.

"Brand/Generic Algorithm" or "BGA" means ESI's standard and proprietary brand/generic algorithm, a copy of which may be made available for review by Sponsor or its Auditor upon request.  The purposes of the algorithm are to utilize a comprehensive and logical algorithm to determine the brand or generic status of products in the ESI master drug file using a combination of industry standard attributes, to stabilize products "flipping" between brand and generic status as may be the case when a single indicator is used from industry pricing sources, and to reduce Sponsor, Member and provider confusion due to fluctuations in brand/generic

status.  Sponsor or its Auditor may audit ESI's application of its BGA to confirm that ESI is making brand and generic drug determinations consistent with such algorithm.

"Brand Drug" means a prescription drug identified as such in ESI's master drug file using indicators from First Databank (or other source nationally recognized in the prescription drug industry) on the basis of a standard Brand/Generic Algorithm, a copy of which may be made available for review by Sponsor or its Auditor upon request.  Notwithstanding the foregoing, certain prescription drug medications that are licensed and then currently marketed as brand name drugs, where there exists at least one (1) competing prescription medication that is a generic equivalent and interchangeable with the marketed brand name drug, may process as "Generic Drugs" for Prescription Drug Claim adjudication and Member Copayment purposes.

"Copayment" means that portion of the charge for each Covered Drug dispensed to the Member that is the responsibility of the Member (e.g., copayment, coinsurance and/or deductible) as indicated on the Set-Up Forms.

"Covered Drug(s)" means those prescription drugs, supplies, Specialty Products and other items that are covered under the Plan, each as indicated on the Set-Up Forms.

"Eligibility Files" means the list submitted by Sponsor to ESI in reasonably acceptable electronic format indicating persons eligible for drug benefit coverage services under the Plan.

"ESI National Plus Network" means ESI's broadest Participating Pharmacy network.[1]

"ESI Specialty Pharmacy" means CuraScript, Inc., Accredo Health Group, Inc., Express Scripts Specialty Distribution Services, Inc., or another pharmacy or home health agency wholly-owned or operated by ESI or one or more of its affiliates that primarily dispenses Specialty Products or provides services related thereto; provided, however, that when the Mail Service Pharmacy dispenses a Specialty Product, it shall be considered an ESI Specialty Pharmacy hereunder.

"Formulary" means the list of FDA-approved prescription drugs and supplies developed by ESI's Pharmacy and Therapeutics Committee and/or customized by Sponsor, and which is selected and/or adopted by Sponsor.  The drugs and supplies included on the Formulary will be modified by ESI from time to time as a result of factors, including, but not limited to, medical appropriateness, manufacturer Rebate arrangements, and patent expirations.  Additions and/or deletions to the Formulary are hereby adopted by Sponsor, subject to Sponsor's discretion to elect not to implement any such addition or deletion through the Set-Up Form process, which such election shall be considered a Sponsor change to the Formulary.  Additions may occur on a daily basis, however single source product deletions will only occur twice a year. ESI will notify Sponsor at least 60 days in advance of any single source product removal.

"Generic Drug" means a prescription drug, whether identified by its chemical, proprietary, or non-proprietary name, that is therapeutically equivalent and interchangeable with drugs having an identical amount of the same active ingredient(s) and approved by the FDA, and which is identified as such in ESI's master drug file using indicators from First Databank (or other source nationally recognized in the prescription drug industry) on the basis of a standard Brand/Generic Algorithm utilized by ESI for all of its clients, a copy of which may be made available for review by Sponsor or its Auditor upon request.

"Home Delivery Education" or "HDE" means a program through which ESI provides information about Home Delivery to Members currently taking maintenance medications.  Members receive targeted messages that explain the benefits of using Home Delivery and instruction for getting started.

"Ingredient Cost Charge" means the ingredient cost portion of the amount charged by ESI to Sponsor for each Prescription Drug Claim, subject to the "lesser of" logic set forth on Exhibit A, as applicable.

"MAC List" means a list of prescription drug products identified as readily available as Generic Drugs, generally equivalent to a Brand Drug (in which case the Brand Drug may also be on the MAC List) and which

---

[1] The ESI National Plus Network was historically referred to as the "EN50 Network" in ESI's network provider agreements with Participating Pharmacies, and is subject to future name change.

are deemed to require pricing management due to the number of manufacturers, utilization and pricing volatility. ESI acknowledges and agrees that the mail order MAC list is at least identical in breadth of products or more comprehensive than the MAC list offered at retail. ESI acknowledges and agrees that the mail order MAC list price points for individual drugs/GCNs must be equal to or less than (i.e., more deeply discounted) than the retail MAC price points for the same drugs/GCNs except for claims that pay at U&C at retail.

"Mail Service Pharmacy" means a duly licensed pharmacy wholly-owned or operated by ESI or one or more of its affiliates, other than an ESI Specialty Pharmacy, where prescriptions are filled and delivered to Members via mail delivery service.

"Manufacturer Administrative Fees" means those administrative fees paid by manufacturers to ESI pursuant to a contract between ESI and the manufacturer in connection with ESI's administering, invoicing, allocating and collecting the Rebates under the Rebate program.

"Maximum Reimbursement Amount" or "MRA" means the maximum unit ingredient cost payable by Sponsor for a drug on the MAC List based on maximum reimbursement payment schedule(s) developed or selected by ESI. The application of MRA pricing may be subject to certain "dispensed as written" (DAW) protocols and Sponsor defined plan design and coverage policies.

"Member" means each person who Sponsor determines is eligible to receive prescription drug benefits as indicated in the Eligibility Files.

"Member Submitted Claim" means a paper claim submitted by a Member for Covered Drugs dispensed by a pharmacy for which the Member paid cash.

"MRA" or "Maximum Reimbursement Amount" is the price charged to Client for a prescription drug product on the MAC List.

"Multi-Source Products" means a prescription medication that: (i) is approved by the FDA under a generic drug ANDA application and licensed and then currently marketed by more than two (2) generic drug manufacturers under separate ANDA applications; and (ii) is not subject to patent litigation.

"Participating Pharmacy" means any licensed retail pharmacy with which ESI or one or more of its affiliates has executed an agreement to provide Covered Drugs to Members, but shall not include any mail order or specialty pharmacy affiliated with any such Participating Pharmacy. Participating Pharmacies are independent contractors of ESI.

"PMPM" means per Member per month fee, if applicable, as determined by ESI from the Eligibility Files.

"Plan" means the self-funded prescription drug benefit plan(s) administered and/or sponsored by Sponsor.

"Prescription Drug Claim" means a Member Submitted Claim, Subrogation Claim or claim for payment submitted to ESI by a Participating Pharmacy, Mail Service Pharmacy, or ESI Specialty Pharmacy as a result of dispensing Covered Drugs to a Member.

"Rebates" mean retrospective rebates that are paid to ESI pursuant to the terms of a rebate contract negotiated independently by ESI with a pharmaceutical manufacturer and directly attributable to the utilization of certain Covered Drugs by Members. Rebates do not include Manufacturer Administrative Fees; product discounts or fees related to the procurement of prescription drug inventories by ESI Specialty Pharmacy or the Mail Service Pharmacy; fees received by ESI from pharmaceutical manufacturers for care management or other services provided in connection with the dispensing of products; or other fee-for-service arrangements whereby pharmaceutical manufacturers generally report the fees paid to ESI or its affiliates for services rendered as "bona fide service fees" pursuant to federal laws and regulations (collectively, "Other Pharma Revenue"). Such laws and regulations, as well as ESI's contracts with pharmaceutical manufacturers, generally prohibit ESI from sharing any such "bona fide service fees" earned by ESI, whether wholly or in part, with any ESI client. ESI represents and warrants that it will not enter into any agreement with a pharmaceutical manufacturer for Other Pharma Revenue with the intent to reduce Rebates.

"Set-Up Forms" means any standard ESI document or form, which when completed and signed by Sponsor (electronic communications from Sponsor indicating Sponsor's approval of a Set-Up Form shall satisfy the foregoing), will describe the essential benefit elements and coverage rules adopted by Sponsor for its Plan.

"Single Source Products" means a prescription medication that is: (i) approved by the FDA under a generic drug ANDA application and is licensed and then currently marketed by up to two (2) generic drug manufacturers under separate ANDA applications; or (ii) subject to patent litigation.

"Specialty Product List" means the standard list of Specialty Products and their reimbursement rates under the applicable (exclusive or open) option maintained and updated by ESI from time to time. The Specialty Product List is available to Sponsor upon request.

"Specialty Products" means those injectable and non-injectable drugs on the Specialty Product List. Specialty Products typically have one or more of several key characteristics, including frequent dosing adjustments and intensive clinical monitoring to decrease the potential for drug toxicity and increase the probability for beneficial treatment outcomes; intensive patient training and compliance assistance to facilitate therapeutic goals; limited or exclusive product availability and distribution; specialized product handling and/or administration requirements and/or cost in excess of $500 for a 30-day supply.

"Subrogation Claim" means subrogation claims submitted by any state or a person or entity acting on behalf of a state under Medicaid or similar United States or state government health care programs, for which Sponsor is deemed to be the primary payor by operation of applicable federal or state laws.

"UM Company" means MCMC, LLC or other independent third party utilization management company contracted by ESI, subject to and as further described in Sections 2.3 (d) and (e).

"Usual and Customary Price" or "U&C" means the retail price charged by a Participating Pharmacy for the particular drug in a cash transaction on the date the drug is dispensed as reported to ESI by the Participating Pharmacy.

## ARTICLE II - PBM SERVICES

2.1     Eligibility/Set Up.  Sponsor will submit completed Set-Up Forms and Eligibility Files (initial and updated) on a mutually determined basis, which ESI will accurately implement. ESI will communicate any errors that occur during the loading of eligibility to Sponsor and work with Sponsor to resolve any issues in a mutually agreed upon timeframe. Changes to the Set-Up Forms must be documented on ESI's standard amendment forms.  Eligibility performed manually by ESI for Sponsor, or material changes to the Eligibility File processes requested by Sponsor during the term may be subject to additional fees set forth on Exhibit A. Sponsor will be responsible for all Prescription Drug Claims during the period of the Member's eligibility as indicated on the Eligibility File including for retroactively termed Members, except in the event of ESI's negligence.

2.2     Pharmacy Network.

(a)     Participating Pharmacies.  ESI will maintain a network(s) of Participating Pharmacies as identified in Exhibit A, and will make available an updated list of Participating Pharmacies on-line. ESI maintains multiple networks and subnetworks, and periodically consolidates networks or migrates clients to other networks and subnetworks.  Upon Sponsor's written request, ESI will make good faith efforts to add any additional retail pharmacy to the Participating Pharmacy network for Sponsor, provided that such pharmacy meets ESI's network participation requirements and agrees to ESI's standard terms and conditions. If any such pharmacy meets ESI's network participation requirements and agrees to ESI's standard terms and conditions except for ESI's standard network rates (i.e., the particular pharmacy will only agree to higher than standard reimbursement rates), and Sponsor nevertheless requests that ESI add such pharmacy, the rate charged to Sponsor for Prescription Drug Claims processed through such pharmacy (assuming ESI agrees to contract with such pharmacy) will be the net ingredient cost plus the dispensing fee paid by ESI to such Participating Pharmacy (plus applicable sales or excise tax or other governmental surcharge, if any).  All such Prescription Drug Claims will be excluded from the pricing guarantees set forth in Exhibit A.

(i)      ESI will require each Participating Pharmacy to meet ESI's network participation requirements, including but not limited to licensure, insurance and provider agreement requirements. ESI also performs audits (i.e., electronic or on-site) of Participating Pharmacies to determine compliance with their provider agreement billing requirements.  ESI will attempt recovery of identified overpayments through offset, demand or other reasonable means; provided that ESI will not be required to institute litigation. ESI must implement measures to recover overpayments made to pharmacies or members and employ a mechanism to ensure Sponsor receives credit for these overpayments. One hundred percent of recovered overpayments are credited to Sponsor.  To compensate ESI for the cost of conducting audits and audit-related services, ESI charges a standard fee in the amount set forth in Exhibit A upon recovery of overpayments.  Copies of participation requirements and auditing processes are available upon request.

(ii)      ESI does not direct or exercise any control over the Participating Pharmacies or the professional judgment exercised by any pharmacist in dispensing prescriptions or otherwise providing pharmaceutical related services at a Participating Pharmacy.  ESI shall have no liability to Sponsor, any Member or any other person or entity for any act or omission of any Participating Pharmacy or it agents or employees.

(b)      Mail Service Pharmacy.  Members may have prescriptions filled through the Mail Service Pharmacy.  Subject to applicable law, ESI may communicate with Members regarding benefit design, cost savings, availability and use of the Mail Service Pharmacy, as well as provide supporting services.  ESI may suspend Mail Service Pharmacy services to a Member who is in default of any Copayment amount due ESI.

(c)      Specialty Products and ASES.  As elected by Sponsor on the Set-Up Forms, Members may have prescriptions filled through ESI Specialty Pharmacy on an exclusive basis (i.e., "ESI Specialty Pharmacy – Exclusive Care") or at Participating Pharmacies and through ESI Specialty Pharmacy (i.e., "ESI Specialty Pharmacy – Open Care").  Subject to applicable law, ESI and ESI Specialty Pharmacy may communicate with Members and physicians to advise Members filling Specialty Products at Participating Pharmacies of the availability of filling prescriptions through ESI Specialty Pharmacy.  Specialty Products will be excluded from any price guarantees set forth in the Agreement.  In no event will the Mail Service Pharmacy or Participating Pharmacy pricing specified in the Agreement apply to Specialty Products.

(i)      ESI will notify Sponsor no more frequently than monthly of new Specialty Products that are introduced to the market on or after the Effective Date of this Agreement with their applicable reimbursement rates ("Notice").  The parties agree as follows:

(A)      If Sponsor has expressly excluded a specific therapy class or product on a Set-Up Form, Specialty Products in such excluded classes will automatically be deemed excluded from coverage and will reject as "NDC Not Covered" through Participating Pharmacies, Mail Service Pharmacy and ESI Specialty Pharmacy; otherwise, subject to (B) below, all other Specialty Products will be implemented as Covered Drugs at the rate specified in the applicable Specialty Drug list or Notice.  If Sponsor desires to cover otherwise excluded Specialty Products, Sponsor must notify ESI in writing that it desires to cover the Specialty Product before ESI will adjudicate as a Covered Drug, and if ESI receives such confirmation of coverage from Sponsor such Specialty Product will be loaded thereafter as a Covered Drug at the applicable reimbursement rate set forth in the Notice.

(B)      Sponsor must notify ESI in writing if it wants to exclude the Specialty Product from coverage.  The exclusion will be implemented within seven (7) business days after the date of ESI's receipt of such notification.  There will not be any retroactive denials for Prescription Drug Claims processed prior to ESI's receipt of the rejection notice and implementation of the exclusion as provided above and Sponsor will be responsible for the payment of such Prescription Drug Claims processed prior to the rejection of coverage.

(ii)      For Specialty Products filled through ESI Specialty Pharmacy only, Members may receive the following services from ESI Specialty Pharmacy, depending on the particular therapy class or disease state:  ASES; patient intake services; pharmacy dispensing services and/or social services (patient advocacy, hardship reimbursement support, and indigent and patient assistance programs).

5

(iii)  Subject to Sponsor's prior authorization requirements, if applicable, at the rates set forth in Exhibit A, ESI will provide or coordinate ASES for Members through ESI Specialty Pharmacy or through other specialty pharmacies or other independent third party providers of ASES when ASES is required. If ESI or ESI Specialty Pharmacy engages a third party provider of ASES, ESI or ESI Specialty Pharmacy shall contractually obligate such third party provider of ASES to comply with all applicable laws, including, without limitation, all applicable laws relating to professional licensure. ESI does not direct or exercise any control over any third party provider of ASES in administering Specialty Products or otherwise providing ASES.

(iv)  If Sponsor elects the ESI Specialty Pharmacy - Open Care option, then any ancillary supplies, equipment, and services provided or coordinated in connection with the dispensing of Specialty Products at Participating Pharmacies (for example, limited distribution products not then available through ESI Specialty Pharmacy or overrides) will be billed to Sponsor at the cost charged to ESI for such ancillary supplies, equipment, and services provided or coordinated, unless such ancillary supplies, equipment, and services provided or coordinated are included in the ingredient cost of the Specialty Product.

2.3  Claims Processing.

(a)  Claims Processing.

(i)  ESI will perform claims processing services for Covered Drugs dispensed by Participating Pharmacies, Mail Service and ESI Specialty Pharmacy. The "per Rx" administrative fees set forth in Exhibit A shall be charged for all claims processing services, including initial, rejected, reversed and reprocessed Prescription Drug Claim processing.

(ii)  In connection with each prescription submitted for processing on-line by a Participating Pharmacy, ESI will perform standard drug utilization review ("DUR") in order to assist the dispensing pharmacist and prescribing physician in identifying potential drug interactions, incorrect prescriptions or dosages, and certain other circumstances that may be indicative of inappropriate prescription drug usage. ESI's DUR processes are not intended to substitute for the professional judgment of the prescriber, the dispensing pharmacist or any other health care professional providing services to the Member.

(iii)  If elected by Sponsor, ESI will process Member Submitted Claims in accordance with the rules in the Set-Up Forms and ESI's standard procedures.

(iv)  If authorized by Sponsor on the Set-Up Forms, ESI will process Subrogation Claims in accordance with applicable federal and state laws, in which case Sponsor will pay such Subrogation Claims in accordance with Article III and Exhibit A. If Sponsor does not authorize ESI to process Subrogation Claims, ESI will reject the claim and refer claimants to Sponsor regarding such claims, in accordance with applicable federal and state laws. ESI is not legally responsible to pay Subrogation Claims to the extent Sponsor is not timely paying ESI with respect to such Subrogation Claims.

(v)  Sponsor or its third party designee (as applicable) will have the final responsibility for all decisions with respect to coverage of a Prescription Drug Claim and the benefits allowable under the Plan, including determining whether any rejected or disputed claim will be allowed.

(b)  Prior Authorization. For the fees set forth in the Clinical Addendum described in Exhibit A-2 (if applicable), ESI will provide prior authorization ("PA") services as specified and directed by Sponsor for drugs designated on the Set-Up Form. Prior authorized drugs must meet Sponsor-approved guidelines ("Guidelines") before they are deemed to be Covered Drugs. Unless Sponsor otherwise directs, Sponsor hereby authorizes coverage for an otherwise excluded use in the event of co-morbidities, complications and other factors not otherwise expressly set forth in the Guidelines. In determining whether to authorize coverage of such drug under the PA Program, ESI will apply only the Guidelines and may rely entirely upon information about the Member and the diagnosis of the Member's condition provided to it from the prescriber. ESI will not undertake to determine medical necessity, make diagnoses or substitute ESI's judgment for the professional judgment and responsibility of the prescriber.

(c)     Claims for Benefits.  ESI will process initial "claims for benefits" for Member Submitted Claims and PA requests consistent with the ERISA claims rules set forth in 29 CFR Part 2560 (or applicable state law if a non-ERISA plan) ("Claims Rules").  Sponsor may elect to have ESI perform appeals services in connection with denied "claims for benefits" for the fees set forth in Exhibit A, or facilitate such services through Sponsor or a third party of Sponsor's choice.  If Sponsor elects to conduct its own appeals or facilitate through a third party of Sponsor's choice, ESI will route Member appeals to Sponsor or other Sponsor designated entity.  If Sponsor elects to have ESI perform appeals services, Sponsor agrees that ESI may perform such services through the UM Company.  Through its contract with ESI, the UM Company has agreed to be, and will serve as, the named fiduciary for its performance of such appeals.  ESI also agrees to accept fiduciary status solely with respect to its performance of any appeal.

(d)     UM Company.  In the event ESI performs appeals services, or facilitates the performance of appeals services through the UM Company, ESI or the UM Company, as applicable, will be responsible for conducting the appeal on behalf of Sponsor in accordance with the Claims Rules.  ESI represents to Sponsor that UM Company has contractually agreed that: (A) UM Company will conduct appeals in accordance with the Claims Rules and Sponsor's plan, (B) Sponsor is a third party beneficiary of UM Company's agreement with ESI (a copy of which is available upon request) and the remedies set forth therein, and (C) UM Company will indemnify Sponsor for third party claims caused by the UM Company's negligence or willful misconduct in providing the appeal services.

(e)     External Review Services.

ESI will not conduct any external review services (as defined in the Patient Protection and Affordable Care Act of 2010 and its implementing regulations ("PPACA"));  provided, however, Sponsor may elect to have UM Company facilitate the provision of external review services through UM company contracted IROs (as such term is defined in PPACA), for the fees set forth on Exhibit A below (if applicable).  Sponsor must execute a standard ESI "External Appeals Services" Set-Up Form, which may be requested through ESI Account Management, in order to receive such services from UM Company.

In the event that Sponsor elects to utilize UM Company to facilitate the provision of external review services through UM Company contracted IROs, UM Company will be responsible for facilitating all such appeals (and the IROs will be responsible for providing all such appeals) in accordance with PPACA and all other applicable federal and state laws, and Sponsor hereby acknowledges and agrees that:

(i)     UM Company (with respect to facilitating the external reviews) and the IROs (with respect to performing the external reviews), and not ESI, will be providing external review services; UM Company is an independent contractor of ESI; the IROs are independent contractors of UM Company and not ESI; and ESI does not in any way control or direct either UM Company or the IROs with respect to facilitation or performance of external review services provided by each respectively.

(ii)     ESI represents to Sponsor that UM Company has contractually agreed that: (A) UM Company will facilitate all external review services in accordance with PPACA and all other applicable federal and state laws; (B) UM Company will contractually require its contracted IROs to perform all external reviews in accordance with PPACA and all other applicable federal and state laws; (C) to the extent not prohibited by law, UM Company will indemnify, defend and hold Sponsor harmless from and against any and all losses, damages, injuries, causes of action, claims, demands and expenses (including reasonable attorney's fees, costs and expenses), arising out of, resulting from, or related to any act, omission or default by the IROs in their performance of the external reviews; and (D) Sponsor has third party beneficiary rights to enforce the preceding indemnification and hold harmless provision.

(f)     Call Center.  ESI will provide 24-hours a day, 7-days a week toll-free telephone, IVR and Internet support to assist Sponsor, Sponsor's agents and Members with Member eligibility and benefits verification, location of Participating Pharmacies or other related Member concerns.

2.4     Formulary Support and Rebate Management.

(a)     Formulary Adherence and Clinical Programs.  ESI may provide clinical, safety, adherence, and other like programs as appropriate.  The Clinical Addendum described in Exhibit A-2 sets forth certain available adherence, clinical, safety and/or trend programs that require additional fees hereunder.  ESI will not implement

any program for which Sponsor may incur an additional fee without Sponsor's prior written approval and election of such program.

(b)    Rebate Program.  Subject to the remaining terms of this Agreement, ESI will pay to Sponsor the amounts set forth on Exhibit A.

2.5    Program Operations.

(a)    Reporting.  ESI will make available to Sponsor ESI's on-line standard management information reporting applications.  Upon Sponsor's request, ESI may develop special reporting packages or perform custom programming at ESI's standard hourly rate for such services, as set forth in Exhibit A.

(b)    Claims Data.

(i)    Claims Data Retention.  ESI will retain Sponsor's claims data for a total of ten (10) years from the date the prescription is filled.  Thereafter ESI will dispose of such data in accordance with its standard policies and practices and applicable state and federal law.  Disposition of PHI shall be in accordance with the Business Associate Agreement.

(ii)    Claims Data to Vendors.  Upon Sponsor's written request and at no additional charge, ESI will provide regular prescription claims data in ESI's standard format(s) to Sponsor's vendors ("Vendors") for disease management, flexible savings account and other "payment," "treatment" and "healthcare operations" purposes (as defined under HIPAA).  Requests for retrieval of data beyond thirty (30) months are subject to the hourly custom programming charge set forth in Exhibit A.

(iii)    De-Identified Claims Data.  ESI or its affiliates may use and disclose both during and after the term of this Agreement the anonymized claims data (de-identified in accordance with HIPAA) including drug and related medical data collected by ESI or provided to ESI by Sponsor for research; provider profiling; benchmarking, drug trend, and cost and other internal analyses and comparisons; clinical, safety and/or trend programs; ASES; or other business purposes of ESI or its affiliates, in all cases subject to applicable law.

(c)    Sponsor Audits.  Provided that this Agreement has been duly executed by Sponsor and Sponsor is current in the payment of invoices under this Agreement, Sponsor may, upon no less than thirty (30) days prior written request, audit the pharmacy benefit management services provided pursuant to this Agreement, on an annual basis (unless additional audits are warranted) consistent with the Audit Protocol set forth in Exhibit B.  Sponsor may use an independent third party auditor ("Auditor"), so long as such does not have a conflict of interest with ESI (as determined by ESI acting reasonably and in good faith), and provided that Sponsor's Auditor executes a mutually acceptable confidentiality agreement.  Any request by Sponsor to permit an Auditor to perform an audit will constitute Sponsor's direction and authorization to ESI to disclose PHI to the Auditor.  Sponsor will have the right to audit up to 24 months of data post termination.

(d)    Performance Standards.  ESI will conform to the performance standards set forth on Exhibit E hereto.  The payments set forth in Exhibit E will be Sponsor's sole monetary remedy for any failure by ESI to meet a performance standard in addition to any correction or reimbursement associated with payment or billing errors.

2.6    Pharmacy Management Funds ("PMF").

(a)    ████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████

206818.3



**ARTICLE III - FEES; BILLING AND PAYMENT**

3.1     Fees.  In consideration of the PBM Services provided by ESI, Sponsor will pay the applicable claims reimbursement amounts ("Claims Reimbursements") and other administrative fees ("Administrative Fees") pursuant to the terms set forth on Exhibit A ("Claims Reimbursements," "Administrative Fees" and any other charge or fee that is the responsibility of Sponsor as may be described elsewhere in this Agreement are hereinafter referred to collectively as "Fees").  ESI may use any excess achieved in any guarantee offered pursuant to this Agreement to make up for, and offset, a shortfall in any other guarantee set forth in this Agreement.

3.2     Billing and Payment.

        (a)     Billing.  ESI will invoice Sponsor weekly for all applicable Fees.

        (b)     Payment.  Sponsor will pay ESI by wire, ACH transfer or pre-authorized debit within two (2) business days from the date of Sponsor's receipt of each ESI invoice.  Sponsor will be responsible for all costs of collection, and agrees to reimburse ESI for such costs and expenses, including reasonable attorneys' fees.  All amounts not paid by the due date thereof will bear interest at the rate of 1.5% per month or, if lower, the highest interest rate permitted by law.  In addition to any rights under Section 6.2, ESI may apply Rebate amounts otherwise owed to Sponsor against any unpaid Fees.

        (c)     Deposit.  If, at any time: (i) Sponsor has two or more invoices past due and outstanding, or (ii) ESI has reasonable grounds to believe Sponsor may be delinquent in payment of fees based on Sponsor's financial data (e.g., persistent negative cash flow, bankruptcy or insolvency), ESI may require that the Sponsor provide to ESI a deposit in an amount equal to the average of the last three (3) months of billing history as the basis for determining the one (1) month deposit amount or, if three (3) months billing history is not available, the most recent month of billing history as the basis.  ESI will retain the deposit until the earlier of termination of this Agreement (following any run-off period), or six (6) consecutive months of timely payments of all Fees following submission of the deposit, and may apply the deposit to delinquent fees until return of the deposit.

**ARTICLE IV – HIPAA; CONFIDENTIAL INFORMATION**

4.1 <u>HIPAA</u>. The parties agree that as relates to use and disclosure of PHI, electronic transaction standards and security of electronic PHI under the Health Insurance Portability and Accountability Act of 1996, as amended, they are subject to the terms of the Business Associate Agreement set forth in <u>Exhibit C</u>. Notwithstanding the foregoing, the parties acknowledge that in providing services to Members, ESI Specialty Pharmacy and the Mail Service Pharmacy are acting as separate health care provider covered entities under HIPAA and not as business associates to the Plan covered by the Business Associate Agreement. In providing services, ESI Specialty Pharmacy and the Mail Services Pharmacy shall abide by all HIPAA requirements applicable to covered entities and shall safeguard, use and disclose Member PHI accordingly.

4.2 <u>Confidential Information</u>.

(a) Each party agrees that the terms of this Agreement and information of the other party, including, but not limited to the following, will constitute confidential and proprietary information ("Confidential Information"): (i) with respect to ESI: ESI's reporting and other web-based applications, eligibility and adjudication systems, system formats and databanks (collectively, "ESI's Systems"), clinical or formulary management operations or programs, fraud, waste and abuse tools and programs, anonymized claims data (de-identified in accordance with HIPAA); ESI Specialty Pharmacy and Mail Service Pharmacy data; information and contracts relating to Rebates and Manufacturer Administrative Fees, prescription drug evaluation criteria, drug pricing information, and Participating Pharmacy agreements; and (ii) with respect to Sponsor: Participating Pharmacy Sponsor and Member identifiable health information and data, Eligibility Files, Set-Up Form information, business operations and strategies. Neither party will use the other's Confidential Information, or disclose it or this Agreement to any third party (other than Sponsor attorneys and accountants), at any time during or after termination of this Agreement, except as specifically contemplated by this Agreement or upon prior written consent, which will not unreasonably be withheld. Upon termination of this Agreement, each party will cease using the other's Confidential Information, and all such information will be returned or destroyed upon the owner's direction. Confidential Information does not include information which is or becomes generally available to the public; was within the recipient's possession or knowledge prior to its being furnished to the recipient pursuant to this Agreement, or is independently developed by the recipient under circumstances not involving a breach of this Agreement.

(b) Sponsor will not, and will not permit any third party acting on Sponsor's behalf to, access, attempt to access, test or audit ESI's Systems or any other system or network connected to ESI's Systems. Without limiting the foregoing, Sponsor will not: access or attempt to access any portion or feature of ESI's Systems, by circumventing ESI's Systems access control measures, either by hacking, password "mining" or any other means; or probe, scan, audit or test the vulnerability of ESI's Systems, nor breach the security or authentication measures of ESI's Systems.

**ARTICLE V - COMPLIANCE WITH LAW; FIDUCIARY ACKNOWLEDGEMENTS; FINANCIAL DISCLOSURE**

5.1 <u>Compliance with Law; Change in Law</u>. Each party shall be responsible for ensuring its compliance with any laws and regulations applicable to its business, including maintaining any necessary licenses and permits. Sponsor shall be responsible for any governmental or regulatory charges and taxes imposed upon or related to the services provided hereunder. With respect to any Plan that is subject to the provisions of ERISA, the Sponsor or the plan sponsor shall ensure that its activities in regard to such program are in compliance with ERISA, and shall be responsible for disclosing to Members any and all information relating to the Plan and this Agreement as required by law to be disclosed, including any information relating to Plan coverage and eligibility requirements, commissions, rebates, discounts, or provider discounts referred to in Section 5.3 hereof. If there is a new or change in federal or state laws or regulations or the interpretation thereof, or any government, judicial or legal action that, among other things, materially burdens ESI, requires ESI to increase payments or shorten payment times for Covered Drugs to Participating Pharmacies, or materially changes the scope of services hereunder (a "Change in Law"), then there shall be an appropriate modification of the services, reimbursement rates, Administrative Fees and/or Rebates such that the parties are returned to their comparable economic position as of the Effective Date hereunder. If the parties cannot agree on a modification or adjusted fee or rates, then either party may terminate the Agreement on thirty (30) days prior written notice to the other.

5.2 <mark>Fiduciary Acknowledgements. ESI offers pharmacy benefit management services, products and programs ("PBM Products") for consideration by all clients, including Sponsor. The general parameters of the PBM Products, and the systems that support these products, have been developed by ESI as part of ESI's administration of its business as a PBM. The parties agree that they have negotiated the financial terms of this</mark>

Agreement in an arm's-length fashion. Sponsor acknowledges and agrees that, except for the limited purpose set forth in Section 2.3(c), neither it nor the Plan intends for ESI to be a fiduciary (as defined under ERISA or state law) of the Plan, and, except for the limited purpose as set forth in Section 2.3(c), neither will name ESI or any of ESI's wholly-owned subsidiaries or affiliates as a "plan fiduciary." Sponsor further acknowledges and agrees that neither ESI nor any of ESI's wholly-owned subsidiaries or affiliates: (a) have any discretionary authority or control respecting management of the Plan's prescription benefit program, except as set forth in Section 2.3(c), or (b) exercise any authority or control respecting management or disposition of the assets of the Plan or Sponsor. Sponsor further acknowledges that all such discretionary authority and control with respect to the management of the Plan and plan assets is retained by Sponsor or the Plan. Upon reasonable notice, ESI will have the right to terminate PBM Services to any Plan (or, if applicable, Members) located in a state requiring a pharmacy benefit manager to be a fiduciary to Sponsor, a Plan, or a Member in any capacity.

5.3    Disclosure of Certain Financial Matters. In addition to the Administrative Fees paid to ESI by Sponsor, ESI and ESI's wholly-owned subsidiaries or affiliates derive revenue in one or more of the ways as further described in the Financial Disclosure to ESI PBM Clients set forth in Exhibit D hereto ("Financial Disclosure"), as updated by ESI from time to time. Unlike the Administrative Fees, the revenues described in the Financial Disclosure are not direct or indirect compensation to ESI from Sponsor for services rendered to Sponsor or the Plan under this Agreement. In negotiating any of the fees and revenues described in the Financial Disclosure or in this Agreement, ESI and ESI's wholly-owned subsidiaries and affiliates act on their own behalf, and not for the benefit of or as agents for Sponsor, Members or the Plan. ESI and ESI's wholly-owned subsidiaries and affiliates retain all proprietary rights and beneficial interest in such fees and revenues described in the Financial Disclosure and, accordingly, Sponsor acknowledges that neither it, any Member, nor the Plan, has a right to receive, or possesses any beneficial interest in, any such fees or revenues; provided, that ESI will pay Sponsor amounts equal to the amounts expressly set forth on Exhibit A.

**ARTICLE VI - TERM AND TERMINATION; DEFAULT AND REMEDIES**

6.1    Term.

(a)    This Agreement will commence effective as of the later of January 1, 2014, or the date that is ten (10) business days following ESI's execution of this Agreement ("Effective Date"), and will continue for a period of two (2) years, ending on December 31, 2015 ("Initial Term"), and may be terminated earlier or extended in accordance with the terms of Section 6.2 below. Thereafter, this Agreement may upon approval by Sponsor renew for successive three (3) one (1) year renewal terms, subject to the right of termination as otherwise provided herein.

(b)    Not less than ninety (90) days prior to the end of the Initial Term or any renewal term of this Agreement either party may notify the other party in writing that it desires to terminate this Agreement effective as of the end of the then current term.

6.2    Termination.

(a)    Breach or Default. Either party may give the other written notice of a material, substantial and continuing breach of this Agreement. If the breaching party has not cured said breach within thirty (30) days from the date such notice was sent, this Agreement may be terminated at the option of the non-breaching party. If the amount of time commercially reasonable for the breach to be cured is longer than thirty (30) days, this Agreement may not be terminated by the non-breaching party pursuant to this provision until such commercially reasonable period of time has elapsed; provided, however, that in no event will such period exceed sixty (60) days.

(b)    Non-Payment. Notwithstanding anything to the contrary herein, ESI (and its wholly-owned subsidiaries) may terminate or suspend their performance hereunder and cease providing or authorizing provision of Covered Drugs to Members upon forty-eight (48) hours written notice if Sponsor fails to pay ESI or provide a deposit, if required, in accordance with the terms of this Agreement. ESI attempts collection through written and verbal communications with Sponsor prior to sending the notice described herein.

(c)    Obligations Upon Termination. Upon notice of termination of this Agreement, the parties will mutually develop a run-off plan providing for: (i) Sponsor notification to Members of the timing of any transition to a successor pharmacy benefit manager at least thirty (30) days prior to the effective date of such termination;

(ii) ESI provision of open Mail Service Pharmacy refill files and standard claims data and PA files for transition to the successor pharmacy benefit manager in accordance with then existing industry protocol; and (iii) whether Sponsor elects for ESI to process Participating Pharmacy or Member Submitted Claims for prescriptions filled during the Term but filed with ESI after the effective date of termination ("Termination Date"). Sponsor will continue to pay ESI in accordance with this Agreement for any Fees for PBM Services provided during the term and any run-off period. ESI will continue filing for Rebates for claims incurred prior to the Termination Date and will, subject to final reconciliation of any outstanding amounts owed by Sponsor to ESI, pay Sponsor Rebates for such claims in accordance with the Rebate payment schedule set out herein. Notwithstanding anything in this Agreement to the contrary, ESI shall not be obligated to provide post-transition services following the transition to the successor pharmacy benefit manager and conclusion of the run-off period, including, but not limited to, the provision of continued data reporting, reporting, consultation, or analysis.

6.3     Remedies.

      (a)     Remedies Not Exclusive. A party's right to terminate this Agreement under Article VI will not be exclusive of any other remedies available to the terminating party under this Agreement or otherwise, at law or in equity.

      (b)     Force Majeure. Neither party will lose any rights under this Agreement or be liable in any manner for any delay to perform its obligations under this Agreement that are beyond a party's reasonable control, including, without limitation, any delay or failure due to riots, earthquakes, storms, floods or other extreme weather conditions, fires, acts of terrorism, epidemics, embargoes, war or other outbreak of hostilities, government acts or regulations, the failure or inability of carriers, suppliers, or telecommunications providers to provide services necessary to enable a party to perform its obligations hereunder, or any other reason where failure to perform is beyond the party's reasonable control, and is not caused by the negligence, intentional conduct or misconduct of the defaulting party; *provided, however*, that this clause may not be invoked to excuse a party's payment obligations hereunder. ESI represents that it maintains and continually updates a business continuity plan designed to mitigate any disruption to the services provided by ESI under this Agreement.

      (c)     Limitation of Liability. Except for the indemnification obligations set forth in Section 6.3(d), each party's liability to the other hereunder will in no event exceed the actual proximate losses or damages caused by breach of this Agreement. In no event will either party or any of their respective affiliates, directors, employees or agents, be liable for any indirect, special, incidental, consequential, exemplary or punitive damages, or any damages for lost profits relating to a relationship with a third party, however caused or arising, whether or not they have been informed of the possibility of their occurrence.

      (d)     Indemnification.

           (i)     In addition to any indemnification obligations set forth in the Business Associate Agreement, ESI will indemnify and hold Sponsor harmless from and against any loss, cost, damage, expense or other liability, including, without limitation, reasonable costs and attorney fees ("Costs") incurred in connection with any and all third party claims, suits, investigations or enforcement actions ("Claims") which may be asserted against, imposed upon or incurred by Sponsor and arising as a result of (A) ESI's negligent acts or omissions or willful misconduct (including those of the Mail Service Pharmacy and ESI Specialty Pharmacy), or (B) ESI's breach of this Agreement.

           (ii)     Sponsor will indemnify and hold ESI harmless from and against any Costs for Claims which may be asserted against, imposed upon or incurred by ESI and arising as a result of (A) Sponsor's negligent acts or omissions or willful misconduct, benefit design and coverage decisions, or breach of this Agreement, or (B) any improper use Sponsor, an Auditor or Vendor may make of PHI or ESI System access provided to such party.

           (iii)     As a condition of indemnification, the party seeking indemnification will notify the indemnifying party in writing promptly upon learning of any Claim for which indemnification may be sought hereunder, and will tender the defense of such claim to the indemnifying party. No party will be obligated to indemnify the other with respect to any claim settled without the written consent of the other.

6.4     Survival. The parties' rights and obligations under the Sections 2.5, Articles III, IV and V; and Sections

6.2(c), 6.3, 6.4, 7.2, 7.3, 7.4 and 7.6 will survive the termination of this Agreement for any reason.

**ARTICLE VII – MISCELLANEOUS**

7.1    Liability Insurance.  Each party will maintain such policies of general liability, professional liability and other insurance of the types, including self insurance, and in amounts customarily carried by their respective businesses.  Proof of such insurance will be available upon request. ESI agrees, at its sole expense, to maintain during the term of this Agreement or any renewal hereof, commercial general liability insurance, pharmacists professional liability insurance for the Mail Service and ESI Specialty Pharmacy pharmacies, and managed care liability with limits, excess of a self insured retention, in amounts of not less than $5,000,000 per occurrence and in the aggregate.  ESI does not maintain liability insurance on behalf of any Participating Pharmacy, but does contractually require such pharmacies to maintain a minimum amount of commercial liability insurance or, when deemed acceptable by ESI, to have in place a self-insurance program

7.2    Notice.  Any notice or document required or permitted to be delivered pursuant to this Agreement must be in writing and will be deemed to be effective upon mailing and must be either (a) deposited in the United States Mail, postage prepaid, certified or registered mail, return receipt requested, or (b) sent by recognized overnight delivery service, in either case properly addressed to the other party at the address set forth below, or at such other address as such party will specify from time to time by written notice delivered in accordance herewith:

> Express Scripts, Inc.
> Attn:  President
> One Express Way
> St. Louis, Missouri 63121
> With copy to Legal Department
> Fax No. (800) 417-8163

> Lake County Government
> Attn: Robert Szarzynski
> 18 N. County Street, 7th Floor
> Waukegan, IL 60085-4350

7.3    Independent Parties.  No provision of this Agreement is intended to create or will be construed to create any relationship between ESI and Sponsor other than that of independent entities contracting with each other solely for the purpose of effecting the provisions of this Agreement.  Neither party, nor any of their respective representatives, will be construed to be the partner, agent, fiduciary, employee, or representative of the other and neither party will have the right to make any representations concerning the duties, obligations or services of the other except as consistent with the express terms of this Agreement or as otherwise authorized in writing by the party about which such representation is asserted.

7.4    Assignment and Subcontracting.  Sponsor may assign this Agreement upon first obtaining ESI's written consent, which consent will not be unreasonably withheld following a standard credit review of the proposed assignee.  Sponsor acknowledges and agrees that ESI may perform certain services hereunder (e.g., mail service pharmacy and specialty pharmacy services) through one or more ESI subsidiaries, affiliates, or designees.  ESI is responsible and liable for the performance of its subsidiaries and affiliates in the course of their performance of any such service.  To the extent that ESI subcontracts any PBM Service under this Agreement to a third party, ESI is responsible and liable for the performance of any such third party.  In addition, ESI may contract with third party vendors to provide information technology support services and other ancillary services, which services are not PBM Services hereunder, but rather are services that support ESI's conduct of its business operations.  This Agreement will be binding upon, and inure to the benefit of and be enforceable by, the respective successors and permitted assigns of the parties hereto.

7.5    Integration; Amendments.  This Agreement and any Exhibits hereto constitute the entire understanding of the parties hereto and supersedes any prior oral or written communication between the parties with respect to the subject matter hereof.  If there is a separate Business Associate Agreement between the parties, such an agreement will be incorporated herein for all applicable purposes.  No modification, alteration, or waiver of any term, covenant, or condition of this Agreement will be valid unless in writing and signed by the parties or the

206818.3

agents of the parties who are authorized in writing, except as may be otherwise permitted pursuant to the terms and conditions of this Agreement or any Exhibit hereto.

7.6     Choice of Law.  This contract shall be governed by and construed according to the laws of the State of Illinois.  Jurisdiction and venue shall be exclusively found in the 19th Judicial Circuit Court, State of Illinois or Federal District Court Northern District whichever is applicable.

7.7     Waiver.  The failure of either party to insist upon the strict observation or performance of this Agreement or to exercise any right or remedy will not be construed as a waiver of any subsequent breach of this Agreement or impair or waive any available right or remedy.

7.8     Trademarks.  Each party acknowledges each other party's sole and exclusive ownership of its respective trade names, commercial symbols, trademarks, and servicemarks, whether presently existing or later established (collectively "Marks").  No party shall use the other party's Marks in advertising or promotional materials or otherwise without the owner's prior written consent.

7.9     Taxes and Assessments.  Any applicable sales, use, excise, or other similarly assessed and administered tax, surcharge, or fee imposed on items dispensed, or services provided hereunder, or the fees or revenues generated by the items dispensed or services provided hereunder, or any other amounts ESI or one or more of its subsidiaries or affiliates may incur or be required to pay arising from or relating to ESI's or its subsidiaries' or affiliates' performance of services as a pharmacy benefit manager, third-party administrator, or otherwise in any jurisdiction, will be the sole responsibility of Sponsor or the Member.  If ESI is legally obligated to collect and remit, or to incur or pay, any such sales, use, excise, or other similarly assessed and administered tax, surcharge, or fee in a particular jurisdiction, such amount will be reflected on the applicable invoice or subsequently invoiced at such time as ESI becomes aware of such obligation or as such obligation becomes due.  ESI reserves the right to charge a reasonable administrative fee for collection and remittance services provided on behalf of Sponsor.

7.10    Third Party Beneficiary Exclusion.  This Agreement is not a third party beneficiary contract, nor will this Agreement create any rights on behalf of Members as against ESI.  Sponsor and ESI reserve the right to amend, cancel or terminate this Agreement without notice to, or consent of, any Member.

7.11    Authority to Contract.  Sponsor hereby represents and warrants that it has obtained due and proper authority to enter into this Agreement through its governing body.

7.12    Open Records Requests.  ESI acknowledges that Sponsor, as a government agency, may be subject to applicable freedom of information or open records laws and must, upon request, disclose such materials as are covered by and not exempted from such laws.  Pursuant to Section 4.2 hereof, Sponsor acknowledges that certain information contained herein or subject to this Agreement is proprietary and confidential to ESI and shall be exempt from that Act to the fullest extent permitted by law.  Sponsor agrees to give ESI notice and the minimum statutory or regulatory period of time to oppose, request redactions or limitations on any disclosures under a third party freedom of information or open records request pertaining to this Agreement or any proposal related hereto.  This provision shall survive termination of the Agreement.

IN WITNESS WHEREOF, the undersigned have executed this Pharmacy Benefit Management Agreement as of the day and year below set forth.

EXPRESS SCRIPTS, INC.

By: _David L. Brodsky_

Printed Name: **David L. Brodsky**

Title: **Vice President - Commercial Division**

Date: 1/6/15

LAKE COUNTY GOVERNMENT

By: _RuthAnne K. Hall_

Printed Name: RuthAnne K. Hall

Title: Purchasing Manager

Federal ID Number: E9995-7817-06

Date: 1 6 15

**EXHIBIT A**

**PHARMACY PROGRAM FEES**

ESI shall be Sponsor's exclusive provider of PBM Services for Sponsor's Plans offering a prescription benefit. The financial terms set forth in Exhibit A are conditioned on such exclusive arrangement and all other specified conditions expressly incorporated in such exhibits, including, but not limited to the adoption by Sponsor of the specified network, qualifying co-payment structures, Formulary, a minimum of 5,000 Members implemented on the Effective Date of this Agreement, no Members in a 100% co-payment plan, implementation of HDE, and no greater than ten percent of total utilization for all Plans attributable to a consumer driven health plan (CDHP). In the event one or more of the following occurs (whether between the date of the Cost Proposal and the Effective Date, or during the Term), ESI will have the right, upon notice, to make an equitable adjustment to the rates, Administrative Fees and/or Rebates, solely as necessary to return ESI to its contracted economic position as of the effective date of such event. If Sponsor disputes the illustration or the financial impact of the pricing amendment, the parties agree to cooperate in good faith to resolve such disputes:

(a)     There is a material change (20% or more) in: (i) the conditions or assumptions stated in this Agreement; or (ii) the size, demographics or gender distribution of Sponsor's Membership compared to data provided by Sponsor; and/or

(b)     Sponsor changes its Formulary, benefit designs, implements OTC plans, clinical or trend programs or otherwise takes an action that has the effect of lowering the amount of Rebates earned hereunder or materially impacting (20% or more) any guarantee; and/or

(c)     Sponsor elects to use on-site clinics or pharmacies to dispense prescription drugs to Members which materially reduces (20% or more) Rebates and/or the number of Covered Drug claims submitted on-line; and/or

(d)     More than 5% of claims are incurred in Massachusetts, Hawaii, Alaska, or Puerto Rico; and/or

(e)     Rebate revenue is materially decreased because Brand Drugs move off-patent to generic status or due to a Change in Law.

Exhibit A includes the following:

**Exhibit A-1**

Pharmacy Reimbursement Rates

**Exhibit A-2**

Administrative and Clinical Program Fees

**Exhibit A-3**

Rebates

206818.3

**Exhibit A-1**

**Pharmacy Reimbursement Rates**

I.   **Annual Average Ingredient Cost Discount Guarantees (Does Not Apply to Specialty Products)**

| ESI National Plus Network | Brand | Generic |
|---|---|---|
| **Participating Pharmacy** 1-83 Days' Supply | | |
| **Participating Pharmacy** 84-90 Days' Supply[(1)] | | |
| **Mail Service Pharmacy** 0-90 Days' Supply | | |

[(1)] Certain Participating Pharmacies have agreed to participate in the extended (84 – 90) day supply network ("Maintenance Network") for maintenance drugs.  Pricing in the 84 – 90 Days' Supply column in the table set forth above is applicable only if Sponsor implements a plan design that requires Members to fill such days' supply at a Maintenance Network Participating Pharmacy (i.e., Sponsor must implement a plan design whereby Members who fill extended days' supply prescriptions at a Participating Pharmacy other than a Maintenance Network Participating Pharmacy do not receive benefit coverage under the Plan for such prescription). If no such plan design is implemented, the pricing for such days' supply will be the same as for Prescription Drug Claims for less than an 84 days' supply, and pricing for an  84 – 90 days' supply in the table set forth above shall not apply, even if a Maintenance Network Participating Pharmacy is used.

Subject to annual reconciliation of the above average guarantees, Sponsor will pay to ESI on a per Prescription Drug Claim basis amounts determined pursuant to the following, net of applicable Copayments:

**Participating Pharmacy – Brand:** ▮▮▮▮▮▮▮▮▮▮▮
▮

**Participating Pharmacy – Generic:** ▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮

**Mail Service Pharmacy – Brand:** ▮▮▮▮▮▮▮▮

**Mail Service Pharmacy – Generic:** ▮▮▮▮▮▮▮▮▮▮
▮▮

A Member's Copayment charged for a Covered Drug will be the lesser of the applicable Copayment, Ingredient Cost Charge, or U&C.

Applicable dispensing fees as well as additional per/Rx Administrative Fees, if any, are set forth in the table in Section II. below.  Sales or excise tax or other governmental surcharge, if any, will be the responsibility of Sponsor.

All compound Prescription Drug Claims shall be excluded from the average annual ingredient cost discount guarantees set forth in the table above and will be paid by Sponsor at the lesser of U&C or combined AWP plus applicable service fee for Participating Pharmacy and combined AWP plus applicable service fee for Mail Service Pharmacy.

Application of the average annual ingredient cost discount guarantees set forth in the table above shall be subject to the following criteria and reconciliation provisions:

206818.3

A. **Guarantee Methodology.** The reconciliation of the generic average annual ingredient cost discount guarantees set forth in the table above shall not include Single Source Products in the calculation but shall include Multi-Source Products. The reconciliation of the brand average annual ingredient cost discount guarantees set forth in the table above shall not include Multi-Source Products in the calculation but shall include Single Source Products and "authorized" generics that are approved by the FDA under a brand name drug NDA.

B. **Guarantee Exclusions.** Prescription Drug Claims for Over-The-Counter (OTC) products, Specialty Products, biosimilar products, Member Submitted Claims, Subrogation Claims, vaccines, supplies, and products filled through in-house or 340b pharmacies and claims through Department of Veterans Affaris (VA) pharmacies, Long-Term Care, Home Infusion, and I/TIU (Indian/Tribal Indian Urban) providers shall be excluded from the reconciliation of all guarantees.

C. **Guarantee Calculation.** Separately for each pricing component in the table above, the following calculation will be performed on an aggregated basis for all Prescription Drug Claims processed during the applicable contract year in order to reconcile against the average annual ingredient cost discount guarantees set forth in the table above:

$$1 - (A/B)$$

A = For Participating Pharmacy – Brand Prescription Drug Claims, the lesser of the Ingredient Cost Charge or U&C, and prior to application of Copayments

For Participating Pharmacy – Generic Prescription Drug Claims, the lesser of the Ingredient Cost Charge, MRA, or U&C, and prior to application of Copayments

For Mail Service Pharmacy – Brand Prescription Drug Claims, the Ingredient Cost Charge, and prior to application of Copayments

For Mail Service Pharmacy – Generic Prescription Drug Claims, the lesser of the Ingredient Cost Charge or MRA, and prior to application of Copayments

B = The actual AWP for the Covered Prescription

D. **Guarantee Reconciliation.** Guarantees will be measured and reconciled on an annual basis within ninety (90) days of the end of each contract year. The above guarantees are annual guarantees - if this Agreement is terminated prior to the completion of the then current contract year (hereinafter, a "Partial Contract Year"), then the above guarantees will not apply for such Partial Contract Year. To the extent Sponsor changes its benefit design or Formulary during the term of the Agreement, the guarantee will be equitably adjusted if there is a material impact on the discount achieved. Subject to the remaining terms of this Agreement, ESI will pay the difference of Sponsor's net cost for any shortfall between the actual result and the guaranteed result within 90 days of the end of each contract year; provided however, that ESI may use an excess achieved in one or more of the above guarantees to make up for, and offset, a shortfall in another guarantee. ESI may also use any excess achieved in any other guarantee offered pursuant to this Agreement to make up for, and offset, a shortfall in any of the above guarantees or any other guarantee(s) set forth in this Agreement.

II. **Per Prescription Drug Claim Dispensing and Administrative Fees (Does Not Apply to Specialty Products).**

| ESI National Plus Network | Brand | Generic |
|---|---|---|
| **Participating Pharmacy Dispensing Fee/Rx** <br> 1-83 Days' Supply | ■ | ■ |
| **Participating Pharmacy** | ■ | ■ |

| | | |
|---|---|---|
| **Dispensing Fee/Rx** <br> **84-90 Days' Supply**[1] | | |
| **Participating Pharmacy** <br> **Administrative Fee/Rx** | ▆ | ▆ |
| | | |
| **Mail Service Pharmacy** <br> **Dispensing Fee/Rx\*** | ▆ | ▆ |
| **Mail Service Pharmacy** <br> **Administrative Fee/Rx** | ▆ | ▆ |

\*Dispensing Fees are inclusive of shipping and handling.  If carrier rates (i.e., U.S. mail and/or applicable commercial courier services) increase during the term of this Agreement, the Dispensing Fees will be increased to reflect such increase(s).
\*\* U&C priced claims will NOT be assessed a separate dispensing fee and must be excluded from the dispensing fee guarantee reconciliation.

[1] Certain Participating Pharmacies have agreed to participate in the extended (84 – 90) day supply network ("Maintenance Network") for maintenance drugs.  Pricing in the 84 – 90 Days' Supply column in the table set forth above is applicable only if Sponsor implements a plan design that requires Members to fill such days' supply at a Maintenance Network Participating Pharmacy (i.e., Sponsor must implement a plan design whereby Members who fill extended days' supply prescriptions at a Participating Pharmacy other than a Maintenance Network Participating Pharmacy do not receive benefit coverage under the Plan for such prescription). If no such plan design is implemented, the pricing for such days' supply will be the same as for Prescription Drug Claims for less than an 84 days' supply, and pricing for an  84 – 90 days' supply in the table set forth above shall not apply, even if a Maintenance Network Participating Pharmacy is used.

## III.    Specialty Products

(a)    Exclusive Care.  ESI Specialty Pharmacy is the exclusive provider of Specialty Products for the reimbursement rates shown on the Exclusive ESI Specialty Pharmacy Specialty Product List.  Any Specialty Product dispensed at a Participating Pharmacy (for example, limited distribution products not then available through ESI Specialty Pharmacy or overrides) will be reimbursed at the standard Participating Pharmacy Specialty Product rates shown below.  Upon ESI Specialty Pharmacy acquisition of limited distribution products, Members will obtain prescriptions through ESI Specialty Pharmacy.

(b)    Open Care.  Specialty Products shall be available through ESI Specialty Pharmacy and at Participating Pharmacies for the Participating Pharmacy Specialty Product reimbursement rates.

| | **Ingredient Cost** | **Dispensing Fee** |
|---|---|---|
| **Exclusive ESI Specialty** <br> **Pharmacy** | ▆ | ▆ |
| **Open ESI Specialty** <br> **Pharmacy** | ▆ | ▆ |
| **Participating Pharmacy** <br> **Specialty Products** | ▆▆ | ▆ |

(b)    Pricing for ASES is as follows:

(i)    For Specialty Products needing an additional charge to cover costs of all ASES required to administer the Specialty Products, the following standard per diem and nursing fee rates shall apply.  Exceptions to the standard per diem and nursing rates are set forth in (ii), below, which list may be updated from time to time by ESI.  Pricing for home infusion supplies and services provided at Participating Pharmacies (for example, limited distribution products not then available through ESI Specialty Pharmacy or overrides) will be pass through.

19

| Standard Per Diem | ███ |
|---|---|
| Standard Nursing Fee/ First 2 Hours | $█ |
| Standard Nursing Hourly | $█ |

(ii)     Additional exceptions to AWP Discount Rates and Standard Per Diem & Nursing Fees

| Brand Name | AWP Discount | Per Diem |
|---|---|---|
| EPOPROSTENOL | ██ | ███ |
| REMODULIN | ██ | ███ |

The AWP discount includes Phone Support Nursing, Supplies, Pump, first two training visits, and Coordination of In-Person Nursing.  In-home nursing that is requested/needed beyond the first two training visits will be charged at a rate of ███ ██████████████████████.

(c)     Specialty Products will be excluded from any price guarantees set forth in the Agreement.  In no event will the Mail Service Pharmacy or Participating Pharmacy pricing terms specified in the Agreement, including, but not limited to, the annual average ingredient cost discount guarantees, apply to Specialty Products.

(d)     Unless otherwise set forth in an agreement directly between ESI Specialty Pharmacy and Sponsor, if a Specialty Product dispensed or ASES provided by ESI Specialty Pharmacy is billed to Sponsor directly by ESI Specialty Pharmacy instead of being processed through ESI, Sponsor agrees to timely pay ESI Specialty Pharmacy for such claim pursuant to the rates above and within thirty (30) days of Sponsor's, or its designee's, receipt of such electronic or paper claim from ESI Specialty Pharmacy.  ESI Specialty Pharmacy shall have 360 days from the date of service to submit such electronic or paper claim.

(e) The list of Specialty Products and their corresponding rates set forth below are subject to addition, deletion, or modification by ESI from time to time.



206818.3

206818.3

206818.3

206818.3

206818.3

206818.3

206818.3

206818.3

206818.3

**IV.** **Influenza and Other Vaccinations**

Vaccinations shall adjudicate at the lower of:

(a)

| | Participating Pharmacy INFLUENZA | Participating Pharmacy OTHER VACCINES |
|---|---|---|
| **Ingredient Cost +** | ███████████████████ | █████████████████████ |
| **Dispensing Fee +** | ███████████████████ | █████████████████████ |
| **Professional Service Fee (PSF); cost for pharmacist to administer the vaccine** | ██████ ███████████████████ | ███████ █████████████████ |
| **Vaccine Program Fee \*** | ████ | █████ |

\* The Vaccine Program Fee will be billed separately to Sponsor as part of the administrative invoice according to the billing frequency set forth in the Agreement. This Vaccine Program Fee will apply to any vaccine claims, and is in addition to any per Prescription Drug Claim administrative fee set forth in the Agreement.

**or**

(b)

Coverage is subject to Plan provisions.  No vaccine claims will be included in any guarantees set forth in the Agreement and/or amendments thereto.

206818.3

**Exhibit A-2**

**Administrative Services and Clinical Program Fees**

**I.      Administrative Services**



| PBM Services | Fees |
|---|---|
| ██████████████ | ████████████████ |
| ██████████████████ | ██████ |
| ██████████████ | |
| ████████ | ████████████████████ |
| | ████████████████████████ |
| | ████████████████████ |
| | ██████ |
| ██████████████ | |
| ██████████████ | |
| ████████ | |
| ██████████████████ | ████████ |
| ██████████████ | ██████████████ |
| ████████████████████ | |
| ██████████████████ | ████████████ |
| ██████████████ | ████████████ |
| ██████████████████ | |
| ██████████████████████ | ████████████████████████ |
| █ | █ |
| • ██████████ | ████████████████ |
| • ██████████ | |
| • ██████████████ | |
| ██████████████████████ | ██████████ |
| • ██████████████ | |
| • ██████████████████ | |
| • ██████████ | |
| • ██████████████████ | |
| • ████ | |
| • ██████████████████ | |
| • ██████████████ | |
| • ██████████████ | |
| ██████████████████████ | ████████████████████████ |
| ████ | ██████████████████████ |
| ██████████████████ | ██████████ |
| ██████████████████████ | |
| ██████████████████ | ██████████ |
| ██████████ | |
| ██████████████████ | |

| PBM Services | Fees |
|---|---|
| ████████████ ███████ | ███████ |
| • ████ | ██████████████ |
| ██████████████████ | ██████████████████ |
| ████████████ | |
| • ████████ | ████████████████ |
| ████████████ | ██████████████████ |
| █████████ | █████████████████ |
| • █████ | |
| ██████████████ | |
| • ████ | |
| ██████████████ | |
| ████████ | ████████████████████ |
| ██████████████████ | ████████████████████ |
| ██████████ | ██ |
| ██████████████████ | ██████████████████████ |
| ██████████████████ | ██████████████ |
| ██████████████████ | ████████████████████ |
| ████████ | ██ |
| █ | |
| ██████████████ | ████████████████████ |
| • ██████ | █████████ |
| • ████████ | |
| ███████████ | ██████████████████ |
| ████ | █████████ |
| • ████████ | |

## II.  **Clinical/Trend Programs**.



**EXHIBIT A-3**

**Rebates**

1. **Rebate Amounts**

   Subject to: (i) the conditions set forth in Sections 2. – 4. below and elsewhere in this Agreement; and (ii) Sponsor meeting the Plan design conditions identified in the table below, ESI will pay to Sponsor the greater of:

   (i)    100% Actual Rebates attributable to utilization of Plan Participants, or
   (ii)   Minimum Rebate Guarantees as set forth below:

| Formulary: | ESI National Preferred | | |
|---|---|---|---|
| Copayment Design: | Minimum $15 Copayment Differential | | |
| | **Participating Pharmacies and ESI Specialty Pharmacy** 1-83 Days' Supply | **Participating Pharmacies and ESI Specialty Pharmacy** 84-90 Days' Supply[1] | **Mail Service Pharmacy** 0-90 Days' Supply |
| **Per Brand Claim** | Year 1: $▓ Year 2: $▓ Year 3: $▓ | Year 1: $▓ Year 2: $▓ Year 3: $▓ | Year 1: $▓ Year 2: $▓ Year 3: $▓ |

[1] Certain Participating Pharmacies have agreed to participate in the extended (84 – 90) day supply network ("Maintenance Network") for maintenance drugs. Rebate Amounts in the 84 – 90 Days' Supply column in the table set forth above are applicable only if Sponsor implements a plan design that requires Members to fill such days' supply at a Maintenance Network Participating Pharmacy (i.e., Sponsor must implement a plan design whereby Members who fill extended days' supply prescriptions at a Participating Pharmacy other than a Maintenance Network Participating Pharmacy do not receive benefit coverage under the Plan for such prescription). If no such plan design is implemented, Rebate Amounts for such days' supply will be the same as for Prescription Drug Claims for less than an 84 days' supply, and Rebate Amounts for an 84 – 90 days' supply in the table set forth above shall not apply, even if a Maintenance Network Participating Pharmacy is used.

2. **Exclusions**

   Member Submitted Claims, Subrogation Claims, biosimilar products, OTC products, claims older than 180 days, claims through Sponsor-owned or 340b pharmacies, and claims pursuant to a 100% Member Copayment plan are not eligible for the guaranteed Rebate amounts set forth in Section 1. above.

3. **Rebate Payment Terms**

   Subject to the conditions set forth herein, ESI shall pay Sponsor the guaranteed amounts set forth in Section 1 above within approximately one hundred and fifty (150) days following the end of each calendar quarter for utilization occurring during such quarter. Rebate guarantees will be reconciled in aggregate annually with any payment due to Sponsor within 240 days from the end of each annual period.

4. **Conditions**

   A.  ESI contracts with pharmaceutical manufacturers for Rebates on its own behalf and for its own benefit, and not on behalf of Sponsor. Accordingly, ESI retains all right, title and interest to any and

all actual Rebates received from manufacturers. ESI will pay Sponsor amounts equal to the Rebate amounts allocated to Sponsor, as specified above, from ESI's general assets (neither Sponsor, its Members, nor Sponsor's plan retains any beneficial or proprietary interest in ESI's general assets). Sponsor acknowledges and agrees that neither it, its Members, nor its Plan will have a right to interest on, or the time value of, any Rebate payments received by ESI during the collection period or moneys payable under this Section. No amounts for Rebates will be paid until this Agreement is executed by Sponsor. ESI will have the right to apply Sponsor's allocated Rebate amount to unpaid Fees.

B.   Sponsor acknowledges that it may be eligible for Rebate amounts under this Agreement only so long as Sponsor, its affiliates, or its agents do not contract directly or indirectly with anyone else for discounts, utilization limits, rebates or other financial incentives on pharmaceutical products or formulary programs for claims processed by ESI pursuant to the Agreement, without the prior written consent of ESI. In the event that Sponsor negotiates or arranges with a pharmaceutical manufacturer for Rebates or similar discounts for any Covered Drugs hereunder, but without limiting ESI's right to other remedies, ESI may immediately withhold any Rebate amounts earned by, but not yet paid to, Sponsor as necessary to prevent duplicative rebates on Covered Drugs. To the extent Sponsor knowingly negotiates and/or contracts for discounts or rebates on claims for Covered Drugs without prior written approval of ESI, such activity will be deemed to be a material breach of this Agreement, entitling ESI to suspend payment of Rebate amounts hereunder and to renegotiate the terms and conditions of this Agreement.

C.   Under its Rebate program, ESI may implement ESI's Formulary management programs and controls, which may include, among other things, cost containment initiatives, and communications with Members provided Sponsor has been given advance written notice and provided written confirmation to ESI, Participating Pharmacies, and/or physicians. ESI reserves the right to modify or replace such programs from time to time. Guaranteed Rebate amounts, if any, set forth herein, are conditioned on adherence to various Formulary management controls, benefit design requirements, claims volume, and other factors stated in the applicable pharmaceutical manufacturer agreements, as communicated by ESI to Sponsor from time to time. If any government action, change in law or regulation, change in the interpretation of any law or regulation, or any action by a pharmaceutical manufacturer has an adverse effect on the availability of Rebates, then ESI may make an adjustment to the Rebate terms and guaranteed Rebate amounts, if any, hereunder.

D.   Rebate paid to Sponsor pursuant to this Agreement are intended to be treated as "discounts" pursuant to the federal anti-kickback statute set forth at 42 U.S.C. §1320a-7b and implementing regulations. Sponsor is obligated if requested by the Secretary of the United States Department of Health and Human Services, or as otherwise required by applicable law, to report the Rebate amounts and to provide a copy of this notice. ESI will refrain from doing anything that would impede Sponsor from meeting any such obligation.

**EXHIBIT B**

**AUDIT PROTOCOL**

1. **AUDIT PRINCIPLES**

ESI recognizes the importance of its clients ensuring the integrity of their business relationship by engaging in annual audits of their financial arrangements with ESI, and, where applicable (i.e., Medicare Part D), by auditing compliance with applicable regulatory requirements. ESI provides this audit right to each and every client. In granting this right, ESI's primary interest is to facilitate a responsive and responsible audit process. In order to accomplish this goal, for all clients, ESI has established the following Protocol. Our intent is in no way to limit Sponsor's ability to determine that ESI has properly and accurately administered the financial aspects of the Agreement or complied with applicable regulatory requirements, but rather to create a manageable process in order to be responsive to our clients and the independent auditors that they may engage. If Sponsor has any concern that this Protocol will prohibit Sponsor from fully confirming its financial arrangement with ESI, we encourage Sponsor to express such concern at the audit kick-off meeting.

ESI strongly encourages clients to have their auditors, without jeopardizing the independent nature of the audit, review the auditor's initial findings and reports with ESI prior to discussing with the client in order to avoid any unnecessary client confusion. We have found often times that items identified as issues during the initial audit turn out to be non-findings once a dialogue takes place between the auditor and ESI. In other words, we believe it is in everyone's interest to ensure that the auditor and ESI are not simply "missing each other" in the exchange of information prior to the auditor reviewing its findings with the client.

2. **AUDIT PREREQUISITES**

A. There are four components of your arrangement with ESI eligible for audit on an annual basis:

- Retrospective Claims
- Rebates
- Performance Guarantees
- Compliance with Regulatory Requirements (i.e., Medicare Part D)

Balancing the need to adequately support the audit process for all ESI clients, with an efficient allocation of resources, we encourage clients to audit all four components, as applicable, through a single annual audit. If you choose to audit the above components separately throughout the year, rather than combining all components into a single annual audit, you will be subject to ESI's standard charges for each additional audit. All such fees shall be reasonable and based on ESI's costs for supporting such additional audits.

B. ESI will provide all data reasonably necessary for Sponsor to determine that ESI has performed in accordance with contractual terms.

C. ESI engages a national accounting firm, at its sole cost and expense, to conduct a SSAE 16 audit on behalf of its clients. Upon request, ESI will provide the results of its most recent SSAE 16 audit. Testing of the areas covered by the SSAE 16 is not within the scope of Sponsor's audit rights (i.e., to confirm the financial aspects of the Agreement) and is therefore not permitted. However, if requested, ESI will explain the SSAE 16 audit process and findings to Sponsor in order for Sponsor to gain an understanding of the SSAE 16.

3. **AUDITS**

A. ESI recommends that the initial audit period for a claims audit cover a timeframe not to exceed twenty-four (24) months immediately preceding the request to audit (the "Audit Period"). This Audit Period allows a reasonable amount of time for both parties to conclude the audit before claims data is archived off the adjudication system. ESI will accommodate reasonable requests to extend the Audit Period, but this may delay ESI's response time to audit findings due to the age of the claims. Due to the additional resources necessary to pull claims data older than twenty-four (24) months, if you request to extend the Audit Period, you will be subject to ESI's standard charges for such additional data pulls. All such fees shall be reasonable and based on ESI's costs associated with retrieval and reporting of such data. If the parties mutually determine, acting in good faith, that the initial audit demonstrates in any material respects that ESI has not administered the financial arrangement consistent with the contract terms of the Agreement, then ESI will support additional auditing beyond the Audit Period at no additional charge.

B. CMS generally modifies its requirements for administering the Medicare Part D annually. For this reason, ESI recommends that the initial audit period for a Medicare Part D compliance audit cover a timeframe not to exceed the twelve (12) months immediately preceding the request to audit (collectively, the "Medicare Part D Audit Period"). This Medicare Part D Audit Period is intended to assist our clients with the CMS annual oversight requirements.

C. When performing a Rebate audit, Sponsor may perform an on-site review of the applicable components of manufacturer agreements, selected by Sponsor, as reasonably necessary to audit the calculation of the Rebate payments made to Sponsor by ESI. Our ability to drive value through the supply chain and in our negotiations with manufacturers is dependent upon the strict confidentiality and use of these agreements. Providing access to these agreements to third parties that perform services in the industry beyond traditional financial auditing jeopardizes our

38

ability to competitively drive value. For this reason, access to and audit of manufacturer agreements is restricted to a mutually agreed upon accounting firm whose audit department is a separate stand-alone division of the business, which carries insurance for professional malpractice of at least Two Million Dollars ($2,000,000).

D. ESI recommends that Sponsor select an initial number of manufacturer contracts to enable Sponsor to audit fifty percent (50%) of the total Rebate payments due to Sponsor for two (2) calendar quarters during the twelve (12) month period immediately preceding the audit (the "Rebate Audit Scope and Timeframe"). ESI will accommodate reasonable requests to extend this Rebate Audit Scope and Timeframe, but this may delay ESI's on-site preparation time as well as response time to audit findings. Due to the additional resources necessary to support a Rebate audit beyond the Rebate Audit Scope and Timeframe, if you request to extend the Rebate Audit Scope and Timeframe, you will be subject to ESI's standard charges for such additional audit support. All such fees shall be reasonable and based on ESI's additional costs. If the parties mutually determine, acting in good faith, that the initial Rebate audit demonstrates in any material respects that ESI has not administered Rebates consistent with the contract terms of the Agreement, then ESI will support additional auditing beyond the Rebate Audit Scope and Timeframe at no additional charge.

E. If you have a Pass-Through pricing arrangement for Participating Pharmacy claims, ESI will provide the billable and payable amount for a sampling of claims provided by you or your auditor (i.e., ESI will provide the actual documented claim record) during the audit to verify that ESI has administered such Pass-Through pricing arrangement consistent with the terms of the Agreement. If further documentation is required, ESI may provide a statistically valid sample of claims remittances to the Participating Pharmacies to demonstrate ESI's administration of Pass-Through pricing. In any instance where the audit demonstrates that the amount billed to you does not equal the Pass-Through amount paid to the Participating Pharmacy, you or your auditor may perform an on-site audit of the applicable Participating Pharmacy contract rate sheet(s).

## 4. AUDIT FINDINGS

A. Following Sponsor's initial audit, Sponsor (or its Auditor) will provide ESI with a written report of suspected errors, if any. In order for ESI to evaluate Sponsor's audit report, Sponsor shall provide an electronic data file in a mutually agreed upon format containing up to 300 claims for further investigation by ESI.

B. Following Sponsor's initial audit of Medicare Part D compliance, Sponsor (or its Auditor) will provide ESI with a written report of suspected non-compliant issues and payment reconciliation issues, if any. In order for ESI to evaluate Sponsor's audit report, Sponsor shall provide ESI with specific regulatory criteria and Medicare Part D program requirements used to cite each suspected non-compliant and payment reconciliation issue.

C. ESI will use commercially reasonable best efforts to respond to the audit report in no more than forty-five (45) days from ESI's receipt of the report or at a later date if mutually determined to be more reasonable based on the number and type of findings. Please be aware, however, that audits that require evaluation of six (6) or more findings typically require additional time to respond due to the complex nature of such audits. Our pledge to respond within the foregoing timeframe is predicated on a good faith and cooperative effort between Sponsor and/or its Auditor and ESI.

D. Following ESI's evaluation of Sponsor's (or its Auditor's) audit report, if the audit findings warrant an increase in the Audit Period or the number of contracts reviewed, then ESI and Sponsor will mutually determine the scope of further analysis.

E. Sponsor agrees that once audit results are accepted by both parties, the audit shall be considered closed and final. To the extent the mutually accepted audit results demonstrate claims errors, ESI will reprocess the claims and make corresponding adjustments to Sponsor through credits to a future invoice(s). If we are unable to reprocess claims and issue corresponding credits to Sponsor through this process, ESI will make adjustments to Sponsor via a check or credit.

## 5. AUDITS BY GOVERNMENT ENTITIES

A. In the event CMS, the OIG, MEDIC, or another government agency has engaged in an audit of Sponsor and/or its "first tier" and "downstream entities", Sponsor shall contact the ESI Account Management team and provide a written copy of the audit notice or request from the government agency promptly upon receipt.

B. Sponsor agrees that CMS may have direct access to ESI's and any such "downstream entity's" pertinent contracts, books, documents, papers, records, premises and physical facilities, and that ESI and such "downstream entity" will provide requested information directly to CMS unless otherwise agreed upon by ESI and Sponsor.

C. Following the government audit of Sponsor and its "first tier" and "downstream entities", Sponsor shall provide ESI with a written report of suspected non-compliant issues noted in the government audit that relate to services provided by ESI, if any. If there are such findings, ESI will work with Sponsor and/or government agency to respond to any suspected non-compliant issues.

D. Support for all such audits by government entities will be subject to ESI's standard charges. All such fees shall be reasonable and based on ESI's costs for supporting such audits.

## 6. CONFIDENTIALITY

ESI's contracts are highly confidential and proprietary.  For this reason, ESI only permits on-site review rather than provide copies to our clients.  During on-site contract review, Sponsor (or its Auditor) may take and retain notes to the extent necessary to document any identified errors, but may not copy (through handwritten notes or otherwise) or retain any contracts (in part or in whole) or related documents provided or made available by ESI in connection with the audit. ESI will be entitled to review any notes to affirm compliance with this paragraph.

## EXHIBIT D

### FINANCIAL DISCLOSURE TO ESI PBM CLIENTS

This disclosure provides an overview of the principal revenue sources of Express Scripts, Inc. and Medco Health Solutions, Inc. (individually and collectively referred to herein as "ESI"), as well as ESI's affiliates. In addition to administrative and dispensing fees paid to ESI by our clients for pharmaceutical benefit management ("PBM") services, ESI and its affiliates derive revenue from other sources, including arrangements with pharmaceutical manufacturers, wholesale distributors, and retail pharmacies. Some of this revenue relates to utilization of prescription drugs by members of the clients receiving PBM services. ESI may pass through certain manufacturer payments to its clients or may retain those payments for itself, depending on the contract terms between ESI and the client.

Network Pharmacies – ESI contracts for its own account with retail pharmacies to dispense prescription drugs to client members. Rates paid by ESI to these pharmacies may differ among networks (e.g., Medicare, Worker's Comp, open and limited), and among pharmacies within a network, and by client arrangements. PBM agreements generally provide that a client pay ESI an ingredient cost, plus dispensing fee, for drug claims. If the rate paid by a client exceeds the rate contracted with a particular pharmacy, ESI will realize a positive margin on the applicable claim. The reverse also may be true, resulting in negative margin for ESI. ESI also enters into pass-through arrangements where the client pays ESI the actual ingredient cost and dispensing fee amount paid by ESI for the particular claim when the claim is adjudicated to the pharmacy. In addition, when ESI receives payment from a client before payment to a pharmacy, ESI retains the benefit of the use of the funds between these payments. ESI may maintain non-client specific aggregate guarantees with pharmacies. ESI may charge pharmacies standard transaction fees to access ESI's pharmacy claims systems and for other related administrative purposes.

Brand/Generic Classifications – Prescription drugs may be classified as either a "brand" or "generic;" however, the reference to a drug by its chemical name does not necessarily mean that the product is recognized as a generic for adjudication, pricing or copay purposes. ESI distinguishes brands and generics through a proprietary algorithm ("BGA") that uses certain published elements provided by First DataBank (FDB) including price indicators, Generic Indicator, Generic Manufacturer Indicator, Generic Name Drug Indicator, Innovator, Drug Class and ANDA. The BGA uses these data elements in a hierarchical process to categorize the products as brand or generic. The BGA also has processes to resolve discrepancies and prevent "flipping" between brand and generic status due to price fluctuations and marketplace availability changes. The elements listed above and sources are subject to change based on the availability of the specific fields. Updated summaries of the BGA are available upon request.

Maximum Allowable Cost ("MAC")/Maximum Reimbursement Amount ("MRA") – As part of the administration of the PBM services, ESI maintains a MAC List of drug products identified as requiring pricing management due to the number of manufacturers, utilization and/or pricing volatility. The criteria for inclusion on the MAC List are based on whether the drug has readily available generic product(s), is generally equivalent to a brand drug, is cleared of any negative clinical implications, and has a cost basis that will allow for pricing below brand rates. ESI also maintains MRA price lists for drug products on the MAC List based on current price reference data provided by MediSpan or other nationally recognized pricing source, market pricing and availability information from generic manufacturers and on-line research of national wholesale drug company files, and client arrangements. Similar to the BGA, the elements listed above and sources are subject to change based on the availability of the specific fields. Updated summaries of the MAC methodology are available upon request.

Manufacturer Formulary Rebates, Associated Administrative Fees, and PBM Service Fees – ESI contracts for its own account with manufacturers to obtain formulary rebates attributable to the utilization of certain brand drugs and supplies (and possibly certain authorized generics marketed under a brand manufacturer's new drug application). Formulary rebate amounts vary based on the volume of utilization as well as as formulary position applicable to the drug or supplies, and adherence to various formulary management controls, benefit design requirements, claims volume, and other similar factors, and in certain instances also may vary based on the product's market-share. ESI often pays an amount equal to all or a portion of the formulary rebates it receives to a client based on the client's PBM agreement terms. ESI retains the financial benefit of the use of any funds held until payment of formulary rebate amounts is made to the client. In addition, ESI provides administrative services to formulary rebate contracted manufacturers, which include, for example, maintenance and operation of the systems and other infrastructure necessary for managing and administering the PBM formulary rebate process and access to drug utilization data, as allowed by law, for purposes of verifying and evaluating the rebate payments and for other purposes related to the manufacturer's products. ESI receives administrative fees from the participating manufacturers for these services. These administrative fees are calculated based on the price of the rebated drug or supplies along with the volume of utilization and do not exceed the greater of (i) ▇▇▇▇ of the average wholesale price, or (ii) ▇▇▇▇ of the wholesale acquisition cost of the products. In its capacity as a PBM company, ESI also may receive service fees from manufacturers as compensation for the performance of various services, including, for example, formulary compliance initiatives, clinical services, therapy management services, education services, medical benefit management services, and the sale of non-patient identifiable claim information. These service fees are not part of the formulary rebates or associated administrative fees.

Copies of ESI's standard formularies may be reviewed at www.express-scripts.com/services/clientsadvisors. In addition to formulary considerations, other plan design elements are described in ESI's Plan Design Review Guide, which may be reviewed at www.express-scripts.com/services/clientadvisors.

206818.3

ESI Subsidiary Pharmacies – ESI has several licensed pharmacy subsidiaries, including our specialty pharmacies. These entities may maintain product purchase discount arrangements and/or fee-for-service arrangements with pharmaceutical manufacturers and wholesale distributors. These subsidiary pharmacies contract for these arrangements on their own account in support of their various pharmacy operations. Many of these subsidiary arrangements relate to services provided outside of PBM arrangements, and may be entered into irrespective of whether the particular drug is on one of ESI's national formularies. Discounts and fee-for-service payments received by ESI's subsidiary pharmacies are not part of the PBM formulary rebates or associated administrative fees paid to ESI in connection with ESI's PBM formulary rebate programs. From time to time, ESI and its affiliates also may pursue and maintain for its own account other supply chain sourcing relationships not described below as beneficial to maximize ESI's drug purchasing capabilities and efficiencies, and ESI or affiliates may realize an overall positive margin with regard to these initiatives.

The following provides additional information regarding examples of ESI subsidiary discount arrangements and fee-for-service arrangements with pharmaceutical manufacturers, and wholesale distributors:

ESI Subsidiary Pharmacy Discount Arrangements – ESI subsidiary pharmacies purchase prescription drug inventories, either from manufacturers or wholesalers, for dispensing to patients. Often, purchase discounts off the acquisition cost of these products are made available by manufacturers and wholesalers in the form of either up-front discounts or retrospective discounts. These purchase discounts, obtained through separate purchase contracts, are not formulary rebates paid in connection with our PBM formulary rebate programs. Drug purchase discounts are based on a pharmacy's inventory needs and, at times, the performance of related patient care services and other performance requirements. When a subsidiary pharmacy dispenses a product from its inventory, the purchase price paid for the dispensed product, including applicable dispensing fees, may be greater or less than that pharmacy's acquisition cost for the product net of purchase discounts. In general, our pharmacies realize an overall positive margin between the net acquisition cost and the amounts paid for the dispensed drugs.

ESI Subsidiary Fee-For-Service Arrangements – One or more of ESI's subsidiaries, including, but not limited to, its subsidiary pharmacies also may receive fee-for-service payments from manufacturers or wholesalers in conjunction with various programs or services, including, for example, patient assistance programs for indigent patients, dispensing prescription medications to patients enrolled in clinical trials, various therapy adherence and fertility programs, administering FDA compliance requirements related to the drug, product reimbursement support services, and various other clinical or pharmacy programs or services. As a condition to having access to certain products, and sometimes related to certain therapy adherence criteria or FDA requirements, a pharmaceutical manufacturer may require a pharmacy to report selected information to the manufacturer regarding the pharmacy's service levels and other dispensing-related data with respect to patients who receive that manufacturer's product. A portion of the discounts or other fee-for-service payments made available to our pharmacies may represent compensation for such reporting.

Other Manufacturer Arrangements – ESI also maintains other lines of business that may involve discount and service fee relationships with pharmaceutical manufacturers and wholesale distributors. Examples of these businesses include a wholesale distribution business, a group purchasing organization, a medical benefit management company, and United BioSource Corporation ("UBC"). Compensation derived through these business arrangements is not part of the PBM formulary rebates or associated administrative fees paid to ESI in connection with ESI's PBM formulary rebate programs. Services related to these arrangements are provided to manufacturers irrespective of whether a drug is on one of ESI's national formularies. Of particular note, UBC partners with life sciences and pharmaceutical companies to develop, commercialize, and support safe, effective use and access to pharmaceutical products. UBC maintains a team of research scientists, biomedical experts, research operations professionals, technologists and clinicians who work with clients to conduct and support clinical trials, create, and validate and administer pre and post product safety and risk management programs. UBC also works on behalf of pharmaceutical manufacturers to provide product and disease state education programs, reimbursement assistance, and other support services to the patient public at large. Fees paid to UBC in connection with its services are unrelated to the ESI PBM formulary.

Third Party Data Sales – Consistent with any client contract limitations, ESI or its affiliates may sell non-patient identifiable claim information maintained in their capacity as a PBM, pharmacy, or otherwise to data aggregators, manufacturers, or other third parties on a fee-for-service basis. All such activities are conducted in compliance with applicable patient and pharmacy privacy laws and client contract restrictions.

**January 1, 2013**

**THIS EXHIBIT REPRESENTS ESI'S FINANCIAL POLICIES. ESI MAY PERIODICALLY UPDATE THIS EXHIBIT AND THE FINANCIAL DISCLOSURES CONTAINED HEREIN TO REFLECT CHANGES IN ITS BUSINESS PROCESSES; THE CURRENT FINANCIAL DISCLOSURE IS AVAILABLE UPON REQUEST AND ACCESSIBLE ON EXPRESS-SCRIPTS.COM FOR CLIENTS & ADVISORS.**

**EXHIBIT E**

**PERFORMANCE STANDARDS**

In the event that any failure by Express Scripts to meet any performance standard is due to a "force majeure" as defined in the agreement, failure of Sponsor to perform its obligations under the agreement, or actions or inactions of Sponsor that adversely impact Express Scripts' ability to maintain the subject standard (e.g., faulty eligibility, changes in benefit design not adequately communicated to members and benefit designs that substantially change the members' rights under the plan), Express Scripts will be excused from compliance with such performance standards until such circumstances have been resolved and any existing backlogs or other related effects have been eliminated.

Within ninety (90) days after the end of each year, Express Scripts shall report to Sponsor Express Scripts' performance under each performance standard. Notwithstanding the foregoing, for purposes of determining whether Express Scripts has met or failed to meet each performance standard, performance standards will be measured and reconciled on an annual basis and amounts due resulting from an Express Scripts failure to meet any performance standard(s), if any, shall be calculated and paid to Sponsor within thirty (30) days following Sponsors receipt of reconciliation report.

No performance penalties, if any, will be paid until this agreement is executed by Sponsor. In no event will the sum of the payments to Sponsor, as a result of Express Scripts' failure to meet the performance standards exceed ▆▆▆▆ per Member per year up to a maximum of ▆▆▆▆ per year for the annual performance standards.

The following performance standards are based on 5,700 members as of the effective date and throughout the term. Any material change below such number may result in a renegotiation of the standards and penalties set forth below.

Performance standards for the Express Scripts Pharmacy assume a minimum of 1,000 home delivery prescriptions submitted annually.

48





206818.3



51



206818.3



