# EXHIBIT 3

**EXPRESS SCRIPTS, INC.**
**PHARMACY BENEFIT MANAGEMENT AGREEMENT**

THIS PHARMACY BENEFIT MANAGEMENT AGREEMENT ("Agreement") will be effective as of the date set forth in Section 6.1 and is entered into by and between EXPRESS SCRIPTS, INC., a Delaware corporation ("ESI"), and LAKE COUNTY ("Sponsor").

**RECITALS**

A.      ESI, either directly or through its subsidiaries, engages in pharmacy benefit management services, including, among other things, pharmacy network contracting; pharmacy claims processing; mail and specialty drug pharmacy; cost containment, clinical, safety, adherence, and other like programs; and formulary administration ("PBM Services").

B.      Sponsor provides or arranges for the provision of health benefits, including a prescription drug benefit.

C.      ESI and Sponsor desire that ESI be the exclusive provider of PBM Services for Sponsor's Plan (as defined below) under the terms and conditions set forth herein.

THEREFORE, in consideration of the mutual promises contained herein, the parties hereto agree as follows:

**TERMS OF AGREEMENT**

**ARTICLE I - DEFINITIONS**

"Ancillary Supplies, Equipment, and Services" or "ASES" means ancillary supplies, equipment, and services provided or coordinated by ESI Specialty Pharmacy in connection with ESI Specialty Pharmacy's dispensing of Specialty Products. ASES may include all or some of the following: telephonic and/or in-person training, nursing/clinical services, in-home infusion and related support, patient monitoring, medication pumps, tubing, syringes, gauze pads, sharps containers, lancets, test strips, other supplies, and durable medical equipment. The aforementioned list is illustrative only (not exhaustive) and may include other supplies, equipment, and services based on the patient's needs, prescriber instructions, payer requirements, and/or the Specialty Product manufacturer's requirements.

"Average Wholesale Price" or "AWP" means the average wholesale price of a prescription drug as identified by drug pricing services such as Medi-Span (currently in use as of the Effective Date) or other source recognized in the retail prescription drug industry selected by ESI (the "Pricing Source"). The applicable AWP shall be the 11-digit NDC for the product on the date dispensed, and for prescriptions filled in Participating Pharmacies, Mail Service Pharmacy and ESI Specialty Pharmacy will be the AWP for the original package size from which the prescription drug was dispensed. If the Pricing Source discontinues the reporting of AWP or Multi-Source Indicator code identifiers or materially changes the manner in which AWP is calculated or its Multi-Source Indicator code identifiers are reported, then ESI reserves the right to make an equitable adjustment as necessary to maintain the parties' relative economics and the pricing intent of this Agreement. ESI will notify Sponsor of any change to the Pricing Source within one hundred and twenty (120) days or as soon as commercially reasonable, whichever is shorter.

"Biosimilar Products" means a "biosimilar" biological product as defined in the Biologics Price Competition and Innovation Act of 2009 at 42 U.S.C. §262(i)(2) and approved under Section 351(k) of the Public Health Services Act. Biosimilar Products shall be excluded from all retail and mail pricing guarantees (including ingredient cost, dispensing fee, and Rebate guarantees) contained in this Agreement.

"Brand/Generic Algorithm" or "BGA" means ESI's standard and proprietary brand/generic algorithm, a copy of which may be made available for review by Sponsor or its Auditor upon request. The purposes of the algorithm are to utilize a comprehensive and logical algorithm to determine the brand or generic status of products in the ESI master drug file using a combination of industry standard attributes, to stabilize products "flipping" between brand and generic status as may be the case when a single indicator is used from industry pricing sources, and to reduce Sponsor, Member and provider confusion due to fluctuations in brand/generic

status. Sponsor or its Auditor may audit ESI's application of its BGA to confirm that ESI is making brand and generic drug determinations consistent with such algorithm.

"Brand Drug" means a prescription drug identified as such in ESI's master drug file using indicators from First Databank (or other source nationally recognized in the prescription drug industry) on the basis of a standard Brand/Generic Algorithm, a copy of which may be made available for review by Sponsor or its Auditor upon request. Notwithstanding the foregoing, certain prescription drug medications that are licensed and then currently marketed as brand name drugs, where there exists at least one (1) competing prescription medication that is a generic equivalent and interchangeable with the marketed brand name drug, may process as "Generic Drugs" for Prescription Drug Claim adjudication and Member Copayment purposes.

"Copayment" means that portion of the charge for each Covered Drug dispensed to the Member that is the responsibility of the Member (e.g., copayment, coinsurance and/or deductible) as indicated on the Set-Up Forms.

"Covered Drug(s)" means those prescription drugs, supplies, Specialty Products and other items that are covered under the Plan, each as indicated on the Set-Up Forms.

"Eligibility Files" means the list submitted by Sponsor to ESI in reasonably acceptable electronic format indicating persons eligible for drug benefit coverage services under the Plan.

"ESI National Plus Network" means ESI's broadest Participating Pharmacy network.

"ESI Specialty Pharmacy" means CuraScript, Inc., Accredo Health Group, Inc., Express Scripts Specialty Distribution Services, Inc., or another pharmacy or home health agency wholly-owned or operated by ESI or one or more of its affiliates that primarily dispenses Specialty Products or provides services related thereto; provided, however, that when the Mail Service Pharmacy dispenses a Specialty Product, it shall be considered an ESI Specialty Pharmacy hereunder.

"Formulary" means the list of FDA-approved prescription drugs and supplies developed by ESI's Pharmacy and Therapeutics Committee and/or customized by Sponsor, and which is selected and/or adopted by Sponsor. The drugs and supplies included on the Formulary will be modified by ESI from time to time as a result of factors, including, but not limited to, medical appropriateness, manufacturer Rebate arrangements, and patent expirations. Additions and/or deletions to the Formulary are hereby adopted by Sponsor, subject to Sponsor's discretion to elect not to implement any such addition or deletion through the Set-Up Form process, which such election shall be considered a Sponsor change to the Formulary. ESI will provide advance notice of annual Formulary changes to affected Members.

"Generic Drug" means a prescription drug, whether identified by its chemical, proprietary, or non-proprietary name, that is therapeutically equivalent and interchangeable with drugs having an identical amount of the same active ingredient(s) and approved by the FDA, and which is identified as such in ESI's master drug file using indicators from First Databank (or other source nationally recognized in the prescription drug industry) on the basis of a standard Brand/Generic Algorithm, a copy of which may be made available for review by Sponsor or its Auditor upon request.

"Ingredient Cost Charge" means the ingredient cost portion of the amount charged by ESI to Sponsor for each Prescription Drug Claim, subject to the "lesser of" logic set forth on Exhibit A, as applicable.

"MAC List" means a list of off-patent prescription drugs or supplies subject to maximum reimbursement payment schedules developed or selected by ESI. With the exception of U&C claims, the MAC List utilized for Mail Service Pharmacy claims will be at least as favorable as the MAC List utilized for Participating Pharmacy claims.

"Mail Service Pharmacy" means a pharmacy wholly-owned or operated by ESI or one or more of its affiliates, other than an ESI Specialty Pharmacy, where prescriptions are filled and delivered to Members via mail delivery service.

"Manufacturer Administrative Fees" means those administrative fees paid by manufacturers to ESI in connection with ESI's invoicing, allocating and collecting the Rebates under the Rebate program.

"Maximum Reimbursement Amount" or "MRA" means the maximum unit ingredient cost payable by Sponsor for a drug on the MAC List based on maximum reimbursement payment schedule(s) developed or selected by ESI. The application of MRA pricing may be subject to certain "dispensed as written" (DAW) protocols and Sponsor defined plan design and coverage policies.

"Member" means each person who Sponsor determines is eligible to receive prescription drug benefits as indicated in the Eligibility Files.

"Member Submitted Claim" means a paper claim submitted by a Member for Covered Drugs dispensed by a pharmacy for which the Member paid cash.

"Participating Pharmacy" means any licensed retail pharmacy with which ESI or one or more of its affiliates has executed an agreement to provide Covered Drugs to Members, but shall not include any mail order or specialty pharmacy affiliated with any such Participating Pharmacy. Participating Pharmacies are independent contractors of ESI.

"PEPM" means per employee per month, if applicable, as determined by ESI from the Eligibility Files.

"PMPM" means per Member per month fee, if applicable, as determined by ESI from the Eligibility Files.

"Plan" means any self-funded prescription drug benefit plan(s) administered by Sponsor or a subsidiary or affiliate of Sponsor (including any retiree or Medicare employer group waiver plans).

"Prescription Drug Claim" means a Member Submitted Claim, Subrogation Claim or claim for payment submitted to ESI by a Participating Pharmacy, Mail Service Pharmacy, or ESI Specialty Pharmacy as a result of dispensing Covered Drugs to a Member.

"Rebates" mean retrospective formulary rebates that are paid to ESI pursuant to the terms of a formulary rebate contract negotiated independently by ESI and directly attributable to the utilization of certain Covered Drugs by Members. For sake of clarity, Rebates do not include, for example, Manufacturer Administrative Fees; inflation payments; product discounts or fees related to the procurement of prescription drug inventories by ESI Specialty Pharmacy or the Mail Service Pharmacy; fees received by ESI from pharmaceutical manufacturers for care management or other services provided in connection with the dispensing of products; or other fee-for-service arrangements whereby pharmaceutical manufacturers generally report the fees paid to ESI or its wholly-owned subsidiaries for services rendered as "bona fide service fees" pursuant to federal laws and regulations (collectively, "Other Pharma Revenue"). Such laws and regulations, as well as ESI's contracts with pharmaceutical manufacturers, generally prohibit ESI from sharing any such "bona fide service fees" earned by ESI, whether wholly or in part, with any ESI client.

"Set-Up Forms" means any standard ESI document or form, which when completed and signed by Sponsor (electronic communications from Sponsor indicating Sponsor's approval of a Set-Up Form shall satisfy the foregoing), will describe the essential benefit elements and coverage rules adopted by Sponsor for its Plan.

"Specialty Product List" means the standard list of Specialty Products and their reimbursement rates applicable to Sponsor and maintained and updated by ESI from time to time. The Specialty Product List is available to Sponsor upon request.

"Specialty Products" means those injectable and non-injectable drugs on the Specialty Product List. Specialty Products, which may be administered by any route of administration, are typically used to treat chronic or complex conditions, and typically have one or more of several key characteristics, including frequent dosing adjustments and intensive clinical monitoring to decrease the potential for drug toxicity and increase the probability for beneficial treatment outcomes; intensive patient training and compliance assistance to facilitate therapeutic goals; limited or exclusive product availability and distribution (if a drug is only available through limited specialty pharmacy distribution it is always considered a Specialty Product); specialized product handling and/or administration requirements.

"Subrogation Claim" means subrogation claims submitted by any state or a person or entity acting on behalf of a state under Medicaid or similar United States or state government health care programs, for which

3

Sponsor is deemed to be the primary payor by operation of applicable federal or state laws.

"UM Company" means MCMC, LLC or other independent third party utilization management company contracted by ESI, subject to and as further described in Sections 2.3 (d) and (e).

"Usual and Customary Price" or "U&C" means the retail price charged by a Participating Pharmacy for the particular drug in a cash transaction on the date the drug is dispensed as reported to ESI by the Participating Pharmacy.

"Vaccine Claim" means a claim for a Covered Drug which is a vaccine.

"Vendor Transaction Fee" means the data interchange fee that ESI is charged by its third party vendor to convert Vaccine Claims submitted electronically by physicians to NCPDP 5.1 format in order for ESI to process the claim.

**ARTICLE II - PBM SERVICES**

2.1    Eligibility/Set Up.  Sponsor will submit completed Set-Up Forms and Eligibility Files (initial and updated) on a mutually determined basis, which ESI will accurately implement.  Changes to the Set-Up Forms must be documented on ESI's standard amendment forms.  Eligibility performed manually by ESI for Sponsor, or material changes to the Eligibility File processes requested by Sponsor during the term may be subject to additional fees set forth on Exhibit A.  Sponsor will be responsible for all Prescription Drug Claims during the period of the Member's eligibility as indicated on the Eligibility File including for retroactively termed Members, except in the event of ESI's negligence.

2.2    Pharmacy Network.

(a)    Participating Pharmacies.  ESI will maintain a network(s) of Participating Pharmacies as identified in Exhibit A, and will make available an updated list of Participating Pharmacies on-line. ESI maintains multiple networks and subnetworks, and periodically consolidates networks or migrates clients to other networks and subnetworks. ESI agrees to provide notice to Sponsor of material disruptions to the Participating Pharmacy network. If, due to an access concern, Sponsor requests that ESI attempt to add a particular retail pharmacy to the network of Participating Pharmacies serving Sponsor and its Members hereunder, ESI will make commercially reasonable efforts to add any such pharmacy to the Participating Pharmacy network for Sponsor, provided that such pharmacy meets ESI's network participation requirements and agrees to ESI's standard terms and conditions.  If any such pharmacy meets ESI's network participation requirements and agrees to ESI's standard terms and conditions except for ESI's standard network rates (i.e., the particular pharmacy will only agree to higher than standard reimbursement rates), and Sponsor nevertheless requests that ESI add such pharmacy, the rate charged to Sponsor for Prescription Drug Claims processed through such pharmacy (assuming ESI agrees to contract with such pharmacy) will be the net ingredient cost plus the dispensing fee paid by ESI to such Participating Pharmacy (plus applicable sales or excise tax or other governmental surcharge, if any).  All such Prescription Drug Claims will be excluded from the pricing guarantees set forth in Exhibit A.

(i)    ESI will require each Participating Pharmacy to meet ESI's network participation requirements, including but not limited to licensure, insurance and provider agreement requirements. ESI also provides a standard suite of pharmacy audit services to determine Participating Pharmacies' compliance with their provider agreement billing requirements.  ESI will attempt recovery of identified overpayments through offset, demand or other reasonable means; provided that ESI will not be required to institute litigation. 100% of recovered overpayments through ESI's Standard Network Pharmacy Audit Program are credited to Sponsor.  Copies of participation requirements and auditing processes are available upon request.

(ii)    ESI does not direct or exercise any control over the Participating Pharmacies or the professional judgment exercised by any pharmacist in dispensing prescriptions or otherwise providing pharmaceutical related services at a Participating Pharmacy.  ESI shall have no liability to Sponsor, any Member or any other person or entity for any act or omission of any Participating Pharmacy or it agents or employees.

4

(b)     Mail Service Pharmacy.     Members may have prescriptions filled through the Mail Service Pharmacy.  Subject to applicable law, ESI may communicate with Members regarding benefit design, cost savings, availability and use of the Mail Service Pharmacy, as well as provide supporting services.  ESI may suspend Mail Service Pharmacy services to a Member who is in default of any Copayment amount due ESI. Sponsor will be responsible for any unpaid Member Copayment amounts if payment has not been received from the Member within one hundred twenty (120) days following dispensing.  Sponsor will be billed following the one hundred twenty (120) day collection period, with payment due in accordance with the payment terms set forth in Section 3.2 of this Agreement.

(c)     Specialty Products and ASES.     Members may have prescriptions filled through ESI Specialty Pharmacy.  Subject to applicable law, ESI and ESI Specialty Pharmacy may communicate with Members and physicians to advise Members filling Specialty Products at Participating Pharmacies of the availability of filling prescriptions through ESI Specialty Pharmacy.  Except as specifically set forth in Exhibit A-1, Specialty Products will be excluded from any price guarantees set forth in the Agreement.  In no event will the Mail Service Pharmacy or Participating Pharmacy pricing specified in the Agreement apply to Specialty Products.

(i)     ESI will notify Sponsor no more frequently than monthly of new Specialty Products that are introduced to the market on or after the Effective Date of this Agreement with their applicable reimbursement rates ("Notice").  The parties agree as follows:

(A)     If Sponsor has expressly excluded a specific therapy class or product on a Set-Up Form, Specialty Products in such excluded classes will automatically be deemed excluded from coverage and will reject as "NDC Not Covered" through Participating Pharmacies, Mail Service Pharmacy and ESI Specialty Pharmacy; otherwise, subject to (B) below, all other Specialty Products will be implemented as Covered Drugs at the rate specified in the applicable Specialty Drug list or Notice.  If Sponsor desires to cover otherwise excluded Specialty Products, Sponsor must notify ESI in writing that it desires to cover the Specialty Product before ESI will adjudicate as a Covered Drug, and if ESI receives such confirmation of coverage from Sponsor such Specialty Product will be loaded thereafter as a Covered Drug at the applicable reimbursement rate set forth in the Notice.

(B)     Sponsor must notify ESI in writing if it wants to exclude the Specialty Product from coverage.  The exclusion will be implemented within seven (7) business days after the date of ESI's receipt of such notification.  There will not be any retroactive denials for Prescription Drug Claims processed prior to ESI's receipt of the rejection notice and implementation of the exclusion as provided above and Sponsor will be responsible for the payment of such Prescription Drug Claims processed prior to the rejection of coverage.

(ii)     For Specialty Products filled through ESI Specialty Pharmacy only, Members may receive the following services from ESI Specialty Pharmacy, depending on the particular therapy class or disease state:  ASES; patient intake services; pharmacy dispensing services and/or social services (patient advocacy, hardship reimbursement support, and indigent and patient assistance programs).

(iii)     Subject to Sponsor's prior authorization requirements, if applicable, at the rates set forth in Exhibit A, ESI will provide or coordinate ASES for Members through ESI Specialty Pharmacy or through other specialty pharmacies or other independent third party providers of ASES when ASES is required.  If ESI or ESI Specialty Pharmacy engages a third party provider of ASES, ESI or ESI Specialty Pharmacy shall contractually obligate such third party provider of ASES to comply with all applicable laws, including, without limitation, all applicable laws relating to professional licensure. ESI does not direct or exercise any control over any third party provider of ASES in administering Specialty Products or otherwise providing ASES.

(iv)     Ancillary supplies, equipment, and services provided or coordinated in connection with the dispensing of Specialty Products at Participating Pharmacies (for example, limited distribution products not then available through ESI Specialty Pharmacy or overrides) will be billed to Sponsor at the cost charged to ESI for such ancillary supplies, equipment, and services provided or coordinated, unless such ancillary supplies, equipment, and services provided or coordinated are included in the ingredient cost of the Specialty Product.

5

2.3     Claims Processing.

(a)     Claims Processing.

(i)     ESI will perform claims processing services for Covered Drugs dispensed by Participating Pharmacies, Mail Service and ESI Specialty Pharmacy.

(ii)     In connection with each prescription submitted for processing on-line by a Participating Pharmacy, ESI will perform standard drug utilization review ("DUR") in order to assist the dispensing pharmacist and prescribing physician in identifying potential drug interactions, incorrect prescriptions or dosages, and certain other circumstances that may be indicative of inappropriate prescription drug usage.  ESI's DUR processes are not intended to substitute for the professional judgment of the prescriber, the dispensing pharmacist or any other health care professional providing services to the Member.

(iii)     If elected by Sponsor, ESI will process Member Submitted Claims in accordance with the rules in the Set-Up Forms and ESI's standard procedures.

(iv)     If authorized by Sponsor on the Set-Up Forms, ESI will process Subrogation Claims in accordance with applicable federal and state laws, in which case Sponsor will pay such Subrogation Claims in accordance with Article III and Exhibit A.  If Sponsor does not authorize ESI to process Subrogation Claims, ESI will reject the claim and refer claimants to Sponsor regarding such claims, in accordance with applicable federal and state laws.  ESI is not legally responsible to pay Subrogation Claims to the extent Sponsor is not timely paying ESI with respect to such Subrogation Claims.

(v)     Sponsor or its third party designee (as applicable) will have the final responsibility for all decisions with respect to coverage of a Prescription Drug Claim and the benefits allowable under the Plan, including determining whether any rejected or disputed claim will be allowed.

(b)     Prior Authorization.  For the fees set forth in the Clinical Addendum described in Exhibit A-2 (if applicable), ESI will provide prior authorization ("PA") services as specified and directed by Sponsor for drugs designated on the Set-Up Form.  Prior authorized drugs must meet Sponsor-approved guidelines ("Guidelines") before they are deemed to be Covered Drugs.  Unless Sponsor otherwise directs, Sponsor hereby authorizes coverage for an otherwise excluded use in the event of co-morbidities, complications and other factors not otherwise expressly set forth in the Guidelines.  In determining whether to authorize coverage of such drug under the PA Program, ESI will apply only the Guidelines and may rely entirely upon information about the Member and the diagnosis of the Member's condition provided to it from the prescriber.  ESI will not undertake to determine medical necessity, make diagnoses or substitute ESI's judgment for the professional judgment and responsibility of the prescriber.

(c)     Claims for Benefits.  ESI will process initial "claims for benefits" for Member Submitted Claims and PA requests consistent with the ERISA claims rules set forth in 29 CFR Part 2560 (or applicable state law if a non-ERISA plan) ("Claims Rules").  Sponsor may elect to have ESI perform appeals services in connection with denied "claims for benefits" for the fees set forth in Exhibit A, or facilitate such services through Sponsor or a third party of Sponsor's choice.  If Sponsor elects to conduct its own appeals or facilitate through a third party of Sponsor's choice, ESI will route Member appeals to Sponsor or other Sponsor designated entity.  If Sponsor elects to have ESI perform appeals services, Sponsor agrees that ESI may perform such services through the UM Company.  Through its contract with ESI, the UM Company has agreed to be, and will serve as, the named fiduciary for its performance of such appeals.  ESI also agrees to accept fiduciary status solely with respect to its performance of any appeal.

(d)     UM Company.  In the event ESI performs appeals services, or facilitates the performance of appeals services through the UM Company, ESI or the UM Company, as applicable, will be responsible for conducting the appeal on behalf of Sponsor in accordance with the Claims Rules.  ESI represents to Sponsor that UM Company has contractually agreed that: (A) UM Company will conduct appeals in accordance with the Claims Rules and Sponsor's plan, (B) Sponsor is a third party beneficiary of UM Company's agreement with ESI (a copy of which is available upon request) and the remedies set forth therein, and (C) UM Company will

6

indemnify Sponsor for third party claims caused by the UM Company's negligence or willful misconduct in providing the appeal services.

(e)     Underline External Review Services.

ESI will not conduct any external review services (as defined in the Patient Protection and Affordable Care Act of 2010 and its implementing regulations ("PPACA")); provided, however, Sponsor may elect to have UM Company facilitate the provision of external review services through UM company contracted IROs (as such term is defined in PPACA), for the fees set forth on Exhibit A below (if applicable). Sponsor must execute a standard ESI "External Appeals Services" Set-Up Form, which may be requested through ESI Account Management, in order to receive such services from UM Company.

In the event that Sponsor elects to utilize UM Company to facilitate the provision of external review services through UM Company contracted IROs, UM Company will be responsible for facilitating all such appeals (and the IROs will be responsible for providing all such appeals) in accordance with PPACA and all other applicable federal and state laws, and Sponsor hereby acknowledges and agrees that:

(i)     UM Company (with respect to facilitating the external reviews) and the IROs (with respect to performing the external reviews), and not ESI, will be providing external review services; UM Company is an independent contractor of ESI; the IROs are independent contractors of UM Company and not ESI; and ESI does not in any way control or direct either UM Company or the IROs with respect to facilitation or performance of external review services provided by each respectively.

(ii)     ESI represents to Sponsor that UM Company has contractually agreed that: (A) UM Company will facilitate all external review services in accordance with PPACA and all other applicable federal and state laws; (B) UM Company will contractually require its contracted IROs to perform all external reviews in accordance with PPACA and all other applicable federal and state laws; (C) to the extent not prohibited by law, UM Company will indemnify, defend and hold Sponsor harmless from and against any and all losses, damages, injuries, causes of action, claims, demands and expenses (including reasonable attorney's fees, costs and expenses), arising out of, resulting from, or related to any act, omission or default by the IROs in their performance of the external reviews; and (D) Sponsor has third party beneficiary rights to enforce the preceding indemnification and hold harmless provision.

(f)     Call Center. ESI will provide 24-hours a day, 7-days a week toll-free telephone, IVR and Internet support to assist Sponsor, Sponsor's agents and Members with Member eligibility and benefits verification, location of Participating Pharmacies or other related Member concerns.

2.4     Formulary Support and Rebate Management.

(a)     Formulary Adherence and Clinical Programs. ESI may provide clinical, safety, adherence, and other like programs as appropriate. The Clinical Addendum described in Exhibit A-2 sets forth certain available adherence, clinical, safety and/or trend programs that require additional fees hereunder. ESI will not implement any program for which Sponsor may incur an additional fee without Sponsor's prior written approval and election of such program.

(b)     Rebate Program. Subject to the remaining terms of this Agreement, ESI will pay to Sponsor the amounts set forth on Exhibit A.

2.5     Program Operations.

(a)     Reporting. ESI will make available to Sponsor ESI's on-line standard management information reporting applications. Upon Sponsor's request, ESI may develop special reporting packages or perform custom programming at ESI's standard hourly rate for such services, as set forth in Exhibit A.

(b)     Claims Data.

(i)     Claims Data Retention. ESI will retain Sponsor's claims data for a total of ten (10) years from the date the prescription is filled. Thereafter ESI will dispose of such data in accordance with

7

its standard policies and practices and applicable state and federal law. Disposition of PHI shall be in accordance with the Business Associate Agreement.

(ii) <u>Claims Data to Vendors</u>. Upon Sponsor's written request and at no additional charge, ESI will provide regular (typically monthly) prescription claims data in ESI's standard format(s) to Sponsor's vendors and consultants ("Vendors") for disease management, flexible savings account and other "payment," "treatment" and "healthcare operations" purposes (as defined under HIPAA). Requests for retrieval of data beyond thirty (30) months are subject to the hourly custom programming charge set forth in <u>Exhibit A</u>.

(iii) <u>De-Identified Claims Data</u>. ESI or its affiliates may use and disclose both during and after the term of this Agreement the anonymized claims data (de-identified in accordance with HIPAA) including drug and related medical data collected by ESI or provided to ESI by Sponsor for research; provider profiling; benchmarking, drug trend, and cost and other internal analyses and comparisons; clinical, safety and/or trend programs; ASES; or other business purposes of ESI or its affiliates, in all cases subject to applicable law.

(c) <u>Sponsor Audits</u>. Provided that this Agreement has been duly executed by Sponsor and Sponsor is current in the payment of invoices under this Agreement, Sponsor may, upon no less than thirty (30) days prior written request, audit ESI's provision of services hereunder, the scope of which shall be to verify compliance with the financial terms of this Agreement, on an annual basis consistent with the Audit Protocol set forth in <u>Exhibit B</u>. Sponsor may use an independent third party auditor ("Auditor"), so long as such Auditor is not engaged in providing services for Sponsor or otherwise that conflict with the scope or independent nature of the audit (as determined by ESI acting reasonably and in good faith), and provided that Sponsor's Auditor executes a mutually acceptable confidentiality agreement. Any request by Sponsor to permit an Auditor to perform an audit will constitute Sponsor's direction and authorization to ESI to disclose PHI to the Auditor.

2.6 <u>Pharmacy Management Funds ("PMF")</u>.

(a) ██████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
██████████████████

██ ██████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
█████████████████████████

██ ██████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████

(d) ██████████████████████████████████████████████████████

██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
███████████████████████████████████

## ARTICLE III - FEES; BILLING AND PAYMENT

3.1     <u>Fees</u>.  In consideration of the PBM Services provided by ESI, Sponsor will pay the applicable claims reimbursement amounts ("Claims Reimbursements") and other administrative fees ("Administrative Fees") pursuant to the terms set forth on <u>Exhibit A</u> ("Claims Reimbursements," "Administrative Fees" and any other charge or fee that is the responsibility of Sponsor as may be described elsewhere in this Agreement are hereinafter referred to collectively as "Fees").

3.2     <u>Billing and Payment</u>.

        (a)     <u>Billing</u>.  ESI will invoice Sponsor weekly for all applicable Fees.

        (b)     <u>Payment</u>.  Sponsor will pay ESI by wire, ACH transfer or pre-authorized debit within two (2) calendar days from the date of Sponsor's receipt of each ESI invoice.  Sponsor will be responsible for all costs of collection, and agrees to reimburse ESI for such costs and expenses, including reasonable attorneys' fees. All amounts not paid by the due date thereof will bear interest at the rate of 1.5% per month or, if lower, the highest interest rate permitted by law.  In addition to any rights under Section 6.2, ESI may apply Rebate amounts otherwise owed to Sponsor against any unpaid Fees.

        (c)     <u>Deposit</u>.  If, at any time: (i) Sponsor has two or more invoices past due and outstanding, or (ii) ESI has reasonable grounds to believe Sponsor may be delinquent in payment of fees based on Sponsor's financial data (e.g., persistent negative cash flow, bankruptcy or insolvency), ESI may require that the Sponsor provide to ESI a deposit in an amount equal to the average of the last three (3) months of billing history as the basis for determining the one (1) month deposit amount or, if three (3) months billing history is not available, the most recent month of billing history as the basis.  ESI will retain the deposit until the earlier of termination of this Agreement (following any run-off period), or six (6) consecutive months of timely payments of all Fees following submission of the deposit, and may apply the deposit to delinquent fees until return of the deposit.

## ARTICLE IV – HIPAA; CONFIDENTIAL INFORMATION

4.1     <u>HIPAA</u>.  The parties agree that as relates to use and disclosure of PHI, electronic transaction standards and security of electronic PHI under the Health Insurance Portability and Accountability Act of 1996, as amended, they are subject to the terms of the Business Associate Agreement set forth in <u>Exhibit C</u>. Notwithstanding the foregoing, the parties acknowledge that in providing services to Members, ESI Specialty Pharmacy and the Mail Service Pharmacy are acting as separate health care provider covered entities under HIPAA and not as business associates to the Plan covered by the Business Associate Agreement.  In providing services, ESI Specialty Pharmacy and the Mail Services Pharmacy shall abide by all HIPAA requirements applicable to covered entities and shall safeguard, use and disclose Member PHI accordingly.

4.2     <u>Confidential Information</u>.

        (a)     Each party agrees that the terms of this Agreement and information of the other party, including, but not limited to the following, will constitute confidential and proprietary information ("Confidential Information"):  (i) with respect to ESI: ESI's reporting and other web-based applications, eligibility and adjudication systems, system formats and databanks (collectively, "ESI's Systems"), clinical or formulary management operations or programs, fraud, waste and abuse tools and programs, anonymized claims data (de-identified in accordance with HIPAA); ESI Specialty Pharmacy and Mail Service Pharmacy data; information and contracts relating to Rebates and Manufacturer Administrative Fees, prescription drug evaluation criteria, drug pricing information, and Participating Pharmacy agreements; and (ii) with respect to Sponsor: Sponsor and Member identifiable health information and data, Eligibility Files, Set-Up Form information, business operations and strategies. Neither party will use the other's Confidential Information, or disclose it or this Agreement to any third party (other than Sponsor attorneys and accountants), at any time during or after termination of this

4027926.v1

Agreement, except as specifically contemplated by this Agreement or upon prior written consent, which will not unreasonably be withheld. Upon termination of this Agreement, each party will cease using the other's Confidential Information, and all such information will be returned or destroyed upon the owner's direction. Confidential Information does not include information which is or becomes generally available to the public; was within the recipient's possession or knowledge prior to its being furnished to the recipient pursuant to this Agreement, or is independently developed by the recipient under circumstances not involving a breach of this Agreement.

(b)     Sponsor will not, and will not permit any third party acting on Sponsor's behalf to, access, attempt to access, test or audit ESI's Systems or any other system or network connected to ESI's Systems. Without limiting the foregoing, Sponsor will not: access or attempt to access any portion or feature of ESI's Systems, by circumventing ESI's Systems access control measures, either by hacking, password "mining" or any other means; or probe, scan, audit or test the vulnerability of ESI's Systems, nor breach the security or authentication measures of ESI's Systems.

**ARTICLE V - COMPLIANCE WITH LAW; FIDUCIARY ACKNOWLEDGEMENTS; FINANCIAL DISCLOSURE**

5.1     <u>Compliance with Law; Change in Law</u>.  Each party shall be responsible for ensuring its compliance with any laws and regulations applicable to its business, including maintaining any necessary licenses and permits. Sponsor shall be responsible for any governmental or regulatory charges and taxes imposed upon or related to the services provided hereunder.  With respect to any Plan that is subject to the provisions of ERISA, the Sponsor or the plan sponsor shall ensure that its activities in regard to such program are in compliance with ERISA, and shall be responsible for disclosing to Members any and all information relating to the Plan and this Agreement as required by law to be disclosed, including any information relating to Plan coverage and eligibility requirements, commissions, rebates, discounts, or provider discounts referred to in Section 5.3 hereof.  If there is a new or change in federal or state laws or regulations or the interpretation thereof, or any government, judicial or legal action that, among other things, materially burdens ESI, requires ESI to increase payments or shorten payment times for Covered Drugs to Participating Pharmacies, or materially changes the scope of services hereunder (a "Change in Law"), then there shall be an appropriate modification of the services, reimbursement rates, Administrative Fees and/or Rebates hereunder.  ESI will notify Sponsor of any Change in Law and resulting modification within one hundred and twenty (120) days or as soon as commercially reasonable, whichever is shorter.  If the parties cannot agree on a modification or adjusted fee or rates, then either party may terminate the Agreement on thirty (30) days prior written notice to the other.

5.2     <u>Fiduciary Acknowledgements</u>.  ESI offers pharmacy benefit management services, products and programs ("PBM Products") for consideration by all clients, including Sponsor.  The general parameters of the PBM Products, and the systems that support these products, have been developed by ESI as part of ESI's administration of its business as a PBM.  The parties agree that they have negotiated the financial terms of this Agreement in an arm's-length fashion.  Sponsor acknowledges and agrees that, except for the limited purpose set forth in Section 2.3(c), neither it nor the Plan intends for ESI to be a fiduciary (as defined under ERISA or state law) of the Plan, and, except for the limited purpose set forth in Section 2.3(c), neither will name ESI or any of ESI's wholly-owned subsidiaries or affiliates as a "plan fiduciary."  Sponsor further acknowledges and agrees that neither ESI nor any of ESI's wholly-owned subsidiaries or affiliates: (a) have any discretionary authority or control respecting management of the Plan's prescription benefit program, except as set forth in Section 2.3(c), or (b) exercise any authority or control respecting management or disposition of the assets of the Plan or Sponsor.  Sponsor further acknowledges that all such discretionary authority and control with respect to the management of the Plan and plan assets is retained by Sponsor or the Plan.  Upon reasonable notice, ESI will have the right to terminate PBM Services to any Plan (or, if applicable, Members) located in a state requiring a pharmacy benefit manager to be a fiduciary to Sponsor, a Plan, or a Member in any capacity.

5.3     <u>Disclosure of Certain Financial Matters</u>.  In addition to the Administrative Fees paid to ESI by Sponsor, ESI and ESI's wholly-owned subsidiaries or affiliates derive revenue in one or more of the ways as further described in the Financial Disclosure to ESI PBM Clients set forth in <u>Exhibit D</u> hereto ("Financial Disclosure"), as updated by ESI from time to time.  To the extent that the terms of this Agreement are contradicted by the terms of the Financial Disclosure, the terms of the Agreement shall control.  Unlike the Administrative Fees, the revenues described in the Financial Disclosure are not direct or indirect compensation to ESI from Sponsor for services rendered to Sponsor or the Plan under this Agreement.  In negotiating any of the fees and revenues described in the Financial Disclosure or in this Agreement, ESI and ESI's wholly-owned subsidiaries and affiliates act on their own behalf, and not for the benefit of or as agents for Sponsor, Members or the Plan.  ESI

4027926.v1

and ESI's wholly-owned subsidiaries and affiliates retain all proprietary rights and beneficial interest in such fees and revenues described in the Financial Disclosure and, accordingly, Sponsor acknowledges that neither it, any Member, nor the Plan, has a right to receive, or possesses any beneficial interest in, any such fees or revenues; provided, that ESI will pay Sponsor amounts equal to the amounts expressly set forth on Exhibit A.

**ARTICLE VI - TERM AND TERMINATION; DEFAULT AND REMEDIES**

6.1     Term.

        (a)     This Agreement will commence effective as of January 1, 2017 ("Effective Date"), and will continue for a period of one (1) year ("Initial Term"), and may be terminated earlier or extended in accordance with the terms of Section 6.2 below.  Thereafter, this Agreement will automatically renew with the same terms and conditions as set forth herein for successive one (1) year renewal terms, subject to the right of termination as otherwise provided herein.

        (b)     Not less than ninety (90) days prior to the end of the Initial Term or any renewal term of this Agreement either party may notify the other party in writing that it desires to terminate this Agreement effective as of the end of the then current term.

6.2     Termination.

        (a)     Breach or Default.  Either party may give the other written notice of a material, substantial and continuing breach of this Agreement.  If the breaching party has not cured said breach within thirty (30) days from the date such notice was sent, this Agreement may be terminated at the option of the non-breaching party. If the amount of time commercially reasonable for the breach to be cured is longer than thirty (30) days, this Agreement may not be terminated by the non-breaching party pursuant to this provision until such commercially reasonable period of time has elapsed; provided, however, that in no event will such period exceed sixty (60) days.

        (b)     Non-Payment.  Notwithstanding anything to the contrary herein, ESI (and its wholly-owned subsidiaries) may terminate or suspend their performance hereunder and cease providing or authorizing provision of Covered Drugs to Members upon forty-eight (48) hours written notice if Sponsor fails to pay ESI or provide a deposit, if required, in accordance with the terms of this Agreement.  ESI attempts collection through written and verbal communications with Sponsor prior to sending the notice described herein.

        (c)     Obligations Upon Termination.  Upon notice of termination of this Agreement, the parties will mutually develop a run-off plan providing for:  (i) Sponsor notification to Members of the timing of any transition to a successor pharmacy benefit manager at least thirty (30) days prior to the effective date of such termination; (ii) ESI provision of open Mail Service Pharmacy refill files and standard claims data and PA files for transition to the successor pharmacy benefit manager in accordance with then existing industry protocol; and (iii) whether Sponsor elects for ESI to process Participating Pharmacy or Member Submitted Claims for prescriptions filled during the Term but filed with ESI after the effective date of termination ("Termination Date").  The services listed in (i)-(iii) above will be at no additional charge for up to twelve (12) months from the date such services begin, but in no event more than twelve (12) months from the Termination Date.  Additional run-off services may be available to Sponsor for a fee.  Sponsor will continue to pay ESI in accordance with this Agreement for any Fees for PBM Services provided during the term and any run-off period.  ESI will continue filing for Rebates for claims incurred prior to the Termination Date and will, subject to final reconciliation of any outstanding amounts owed by Sponsor to ESI, pay Sponsor Rebates for such claims in accordance with the Rebate payment schedule set out herein.  Notwithstanding anything in this Agreement to the contrary, ESI shall not be obligated to provide post-transition services following the transition to the successor pharmacy benefit manager and conclusion of the run-off period, including, but not limited to, the provision of continued data reporting, reporting, consultation, or analysis.

6.3     Remedies.

        (a)     Remedies Not Exclusive.  A party's right to terminate this Agreement under Article VI will not be exclusive of any other remedies available to the terminating party under this Agreement or otherwise, at law or in equity.

(b)  Force Majeure.  Neither party will lose any rights under this Agreement or be liable in any manner for any delay to perform its obligations under this Agreement that are beyond a party's reasonable control, including, without limitation, any delay or failure due to riots, earthquakes, storms, floods or other extreme weather conditions, fires, acts of terrorism, epidemics, embargoes, war or other outbreak of hostilities, government acts or regulations, the failure or inability of carriers, suppliers,  or telecommunications providers to provide services necessary to enable a party to perform its obligations hereunder, or any other reason where failure to perform is beyond the party's reasonable control, and is not caused by the negligence, intentional conduct or misconduct of the defaulting party; *provided, however*, that this clause may not be invoked to excuse a party's payment obligations hereunder.  ESI represents that it maintains and continually updates a business continuity plan designed to mitigate any disruption to the services provided by ESI under this Agreement.

(c)  Limitation of Liability.  Except for the indemnification obligations set forth in Section 6.3(d), each party's liability to the other hereunder will in no event exceed the actual proximate losses or damages caused by breach of this Agreement.  In no event will either party or any of their respective affiliates, directors, employees or agents, be liable for any indirect, special, incidental, consequential, exemplary or punitive damages, or any damages for lost profits relating to a relationship with a third party, however caused or arising, whether or not they have been informed of the possibility of their occurrence.

(d)  Indemnification.

(i)  In addition to any indemnification obligations set forth in the Business Associate Agreement, ESI will indemnify and hold Sponsor harmless from and against any loss, cost, damage, expense or other liability, including, without limitation, reasonable costs and attorney fees ("Costs") incurred in connection with any and all third party claims, suits, investigations or enforcement actions ("Claims") which may be asserted against, imposed upon or incurred by Sponsor and arising as a result of (A) ESI's negligent acts or omissions or willful misconduct (including those of the Mail Service Pharmacy and ESI Specialty Pharmacy), or (B) ESI's breach of this Agreement.

(ii)  Sponsor will indemnify and hold ESI harmless from and against any Costs for Claims which may be asserted against, imposed upon or incurred by ESI and arising as a result of (A) Sponsor's negligent acts or omissions or willful misconduct, benefit design and coverage decisions, or breach of this Agreement, or (B) any improper use Sponsor, an Auditor or Vendor may make of PHI or ESI System access provided to such party.

(iii)  As a condition of indemnification, the party seeking indemnification will notify the indemnifying party in writing promptly upon learning of any Claim for which indemnification may be sought hereunder, and will tender the defense of such claim to the indemnifying party.  No party will be obligated to indemnify the other with respect to any claim settled without the written consent of the other.

6.4  Survival.  The parties' rights and obligations under the Sections 2.5, Articles III, IV and V; and Sections 6.2(c), 6.3, 6.4, 7.2, 7.3, 7.4 and 7.6 will survive the termination of this Agreement for any reason.

**ARTICLE VII – MISCELLANEOUS**

7.1  Liability Insurance.  Each party will maintain such policies of general liability, professional liability and other insurance of the types, including self-insurance, and in amounts customarily carried by their respective businesses.  Proof of such insurance will be available upon request. ESI agrees, at its sole expense, to maintain during the term of this Agreement or any renewal hereof, commercial general liability insurance, pharmacists professional liability insurance for the Mail Service and ESI Specialty Pharmacy pharmacies, and managed care liability with limits, excess of a self-insured retention, in amounts of not less than $5,000,000 per occurrence and in the aggregate.  ESI does not maintain liability insurance on behalf of any Participating Pharmacy, but does contractually require such pharmacies to maintain a minimum amount of commercial liability insurance or, when deemed acceptable by ESI, to have in place a self-insurance program

7.2  Notice.  Any notice or document required or permitted to be delivered pursuant to this Agreement must be in writing and will be deemed to be effective upon mailing and must be either (a) deposited in the United States Mail, postage prepaid, certified or registered mail, return receipt requested, or (b) sent by recognized overnight delivery service, in either case properly addressed to the other party at the address set forth below, or

4027926.v1

at such other address as such party will specify from time to time by written notice delivered in accordance herewith:

> Express Scripts, Inc.
> Attn: President
> One Express Way
> St. Louis, Missouri 63121
> With copy to Legal Department
> Fax No. (800) 417-8163

> Lake County
> Attn: Karla Hasty
> 18 N. County
> Waukegan, Illinois 60085

7.3     Independent Parties.  No provision of this Agreement is intended to create or will be construed to create any relationship between ESI and Sponsor other than that of independent entities contracting with each other solely for the purpose of effecting the provisions of this Agreement.  Neither party, nor any of their respective representatives, will be construed to be the partner, agent, fiduciary, employee, or representative of the other and neither party will have the right to make any representations concerning the duties, obligations or services of the other except as consistent with the express terms of this Agreement or as otherwise authorized in writing by the party about which such representation is asserted.

7.4     Assignment and Subcontracting.  Sponsor may assign this Agreement upon first obtaining ESI's written consent, which consent will not be unreasonably withheld following a standard credit review of the proposed assignee.  Sponsor acknowledges and agrees that ESI may perform certain services hereunder (e.g., mail service pharmacy and specialty pharmacy services) through one or more ESI subsidiaries, affiliates, or designees.  ESI is responsible and liable for the performance of its subsidiaries and affiliates in the course of their performance of any such service.  To the extent that ESI subcontracts any PBM Service under this Agreement to a third party, ESI is responsible and liable for the performance of any such third party. In addition, ESI may contract with third party vendors to provide information technology support services and other ancillary services, which services are not PBM Services hereunder, but rather are services that support ESI's conduct of its business operations.  This Agreement will be binding upon, and inure to the benefit of and be enforceable by, the respective successors and permitted assigns of the parties hereto.

7.5     Integration; Amendments.  This Agreement and any Exhibits hereto constitute the entire understanding of the parties hereto and supersedes any prior oral or written communication between the parties with respect to the subject matter hereof.  If there is a separate Business Associate Agreement between the parties, such an agreement will be incorporated herein for all applicable purposes.  No modification, alteration, or waiver of any term, covenant, or condition of this Agreement will be valid unless in writing and signed by the parties or the agents of the parties who are authorized in writing, except as may be otherwise permitted pursuant to the terms and conditions of this Agreement or any Exhibit hereto.

7.6     Choice of Law.  This Agreement will be construed and governed in all respects according to the laws in the State of Missouri, without regard to the rules of conflict of laws thereof.

7.7     Waiver.  The failure of either party to insist upon the strict observation or performance of this Agreement or to exercise any right or remedy will not be construed as a waiver of any subsequent breach of this Agreement or impair or waive any available right or remedy.

7.8     Trademarks.  Each party acknowledges each other party's sole and exclusive ownership of its respective trade names, commercial symbols, trademarks, and servicemarks, whether presently existing or later established (collectively "Marks").  No party shall use the other party's Marks in advertising or promotional materials or otherwise without the owner's prior written consent.

7.9     Taxes and Assessments.  Any applicable sales, use, excise, or other similarly assessed and administered tax, surcharge, or fee imposed on items dispensed, or services provided hereunder, or the fees or revenues generated by the items dispensed or services provided hereunder, or any other amounts ESI or one or more of its subsidiaries or affiliates may incur or be required to pay arising from or relating to ESI's or its

subsidiaries' or affiliates' performance of services as a pharmacy benefit manager, third-party administrator, or otherwise in any jurisdiction, will be the sole responsibility of Sponsor or the Member. If ESI is legally obligated to collect and remit, or to incur or pay, any such sales, use, excise, or other similarly assessed and administered tax, surcharge, or fee in a particular jurisdiction, such amount will be reflected on the applicable invoice or subsequently invoiced at such time as ESI becomes aware of such obligation or as such obligation becomes due. ESI reserves the right to charge a reasonable administrative fee for collection and remittance services related to any such sales, use, excise, or other similarly assessed and administered tax, surcharge, or fee in a particular jurisdiction (not currently being provided as of the Effective Date) as referenced above.

7.10    Third Party Beneficiary Exclusion.  This Agreement is not a third party beneficiary contract, nor will this Agreement create any rights on behalf of Members as against ESI.  Sponsor and ESI reserve the right to amend, cancel or terminate this Agreement without notice to, or consent of, any Member.

7.11    Authority to Contract.  Sponsor hereby represents and warrants that it has obtained due and proper authority to enter into this Agreement through its governing body.

7.12    Open Records Requests.  ESI acknowledges that Sponsor, as a government entity, may be subject to applicable freedom of information or open records laws and must, upon request, disclose such materials as are covered by and not exempted from such laws.  Pursuant to Section 4.2 hereof, Sponsor acknowledges that certain information contained herein or subject to this Agreement is proprietary and confidential to ESI and shall be exempt from that Act to the fullest extent permitted by law.  Sponsor agrees to give ESI notice and the minimum statutory or regulatory period of time to oppose, request redactions or limitations on any disclosures under a third party freedom of information or open records request pertaining to this Agreement or any proposal related hereto.  This provision shall survive termination of the Agreement.

7.13    EGWP Addendum.  The parties agree to comply with the terms and conditions of the EGWP Addendum attached hereto as Exhibit F.

IN WITNESS WHEREOF, the undersigned have executed this Pharmacy Benefit Management Agreement as of the day and year below set forth.

EXPRESS SCRIPTS, INC.                          LAKE COUNTY

By: _____                  By: _____

Printed Name: _____                  Printed Name: _RuthAnne K. Hall_

Title: _David L. Brodsky_                        Title: _Purchasing Agent_
       _Vice President - Commercial Division_

Date: _2/14/2017_                                Federal ID Number: _36-6006600_

                                                 Date: _2/13/17_

**EXHIBIT A**

**PHARMACY PROGRAM FEES**

ESI shall be Sponsor's exclusive provider of PBM Services for Sponsor's Plans offering a prescription benefit.  The financial terms set forth in <u>Exhibit A</u> are conditioned on such exclusive arrangement and all other specified conditions expressly incorporated in such exhibits, including, but not limited to the adoption by Sponsor of the specified network, qualifying co-payment structures, Formulary, a minimum of 5,000 Members implemented on the Effective Date of this Agreement for the commercial benefit, a minimum of 100 Members implemented on the Effective Date of this Agreement for the EGWP benefit, no Members in a 100% co-payment plan, and no greater than ten percent of total utilization (as compared to utilization data supplied by Sponsor) for all Plans attributable to a consumer driven health plan (CDHP).  In the event one or more of the following occurs (whether between the date of the Cost Proposal and the Effective Date, or during the Term), ESI will have the right, upon notice, to make an equitable adjustment to the rates, Administrative Fees and/or Rebates, solely as necessary to return ESI to its contracted economic position as of the effective date of such event:

(a)     There is a material (10%) change in the size (decrease), demographics or gender distribution of Sponsor's Membership compared to data provided by Sponsor; and/or

(b)     Sponsor changes its Formulary, benefit designs, implements OTC plans, clinical or trend programs or otherwise takes an action that has the effect of lowering the amount of Rebates earned hereunder or materially impacting any guarantee.  (For the avoidance of doubt, ESI agrees to advise Sponsor of the estimated modification required by any such change, communicated to ESI in advance, no later than thirty (30) days following the date of notice by Sponsor to ESI); and/or

(c)     Sponsor elects to use on-site clinics or pharmacies to dispense prescription drugs to Members which materially reduces Rebates and/or the number of Covered Drug claims submitted on-line; and/or

(d)     More than 5% (increase, as compared to utilization data supplied by Sponsor) of claims are incurred in Massachusetts, Hawaii, Alaska, or Puerto Rico; and/or

(e)     Rebate revenue is materially decreased because Brand Drugs unexpectedly move off-patent to generic status or due to a Change in Law.

<u>Exhibit A includes the following:</u>

**<u>Exhibit A-1</u>**

<u>Pharmacy Reimbursement Rates</u>

**<u>Exhibit A-2</u>**

<u>Administrative and Clinical Program Fees</u>

**<u>Exhibit A-3</u>**

<u>Rebates – Non-Specialty Products</u>

**<u>Exhibit A-4</u>**

<u>Rebates – Specialty Products</u>

**Exhibit A-1**

**Pharmacy Reimbursement Rates**

I.      **Annual Average Ingredient Cost Discount Guarantees (Does Not Apply to Specialty Products)**

     (a)      Commercial Rates

| | Brand | Generic |
|---|---|---|
| **Participating Pharmacy** (1-83 Days Supply) ESI National Plus Network | ■■■■■■ | |
| **Participating Pharmacy** (84-90 Days Supply)[1] ESI National Plus Network | ■■■■■■ | ■■■■■■ |
| **Mail Service Pharmacy** | ■■■■■■ | ■■■■■■ |

[1] Certain Participating Pharmacies have agreed to participate in the extended (84 – 90) day supply network ("Maintenance Network") for maintenance drugs. Pricing in the 84 – 90 Days' Supply column in the table set forth above is applicable only if Sponsor implements a plan design that requires Members to fill such days' supply at a Maintenance Network Participating Pharmacy (i.e., Sponsor must implement a plan design whereby Members who fill extended days' supply prescriptions at a Participating Pharmacy other than a Maintenance Network Participating Pharmacy do not receive benefit coverage under the Plan for such prescription). If no such plan design is implemented, the pricing for such days' supply will be the same as for Prescription Drug Claims for less than an 84 days' supply, and pricing for an 84 – 90 days' supply in the table set forth above shall not apply, even if a Maintenance Network Participating Pharmacy is used.

     (b)      EGWP Rates

| | Brand | Generic |
|---|---|---|
| **Participating Pharmacy** (1-34 Days Supply) Medicare Preferred Network | ■■■■■■ | ■■■■■■ |
| **Participating Pharmacy** (35-90 Days Supply)[1] Medicare Preferred Network | ■■■■■■ | ■■■■■■ |
| **Mail Service Pharmacy** | ■■■■■■ | ■■■■■■ |

[1] Certain Participating Pharmacies have agreed to participate in the extended (35 – 90) day supply network ("Maintenance Network") for maintenance drugs. Pricing in the 35 – 90 Days' Supply column in the table set forth above is applicable only if Sponsor implements a plan design that requires Members to fill such days' supply at a Maintenance Network Participating Pharmacy (i.e., Sponsor must implement a plan design whereby Members who fill extended days' supply prescriptions at a Participating Pharmacy other than a Maintenance Network Participating Pharmacy do not receive benefit coverage under the Plan for such prescription). If no such plan design is implemented, the pricing for such days' supply will be the same as for Prescription Drug Claims for less than an 84 days' supply, and pricing for an 35 – 90 days' supply in the table set forth above shall not apply, even if a Maintenance Network Participating Pharmacy is used.

Subject to annual reconciliation of the above average guarantees, Sponsor will pay to ESI on a per Prescription Drug Claim basis amounts determined pursuant to the following, net of applicable Copayments:

Participating Pharmacy – Brand: ██████████████████████████
████

Participating Pharmacy – Generic: ██████████████████████████
██████████

Mail Service Pharmacy – Brand: ████████████████████

Mail Service Pharmacy – Generic: ██████████████████████████
██████████

A Member's Copayment charged for a Covered Drug will be the lesser of the applicable Copayment, Ingredient Cost Charge, or U&C.

Applicable dispensing fees as well as additional per/Rx Administrative Fees, if any, are set forth in the table in Section II. below.  Sales or excise tax or other governmental surcharge, if any, will be the responsibility of Sponsor.

All compound Prescription Drug Claims shall be excluded from the average annual ingredient cost discount guarantees set forth in the table above and will be paid by Sponsor at the lesser of U&C or combined AWP (discounted for each ingredient drug) plus applicable service fee for Participating Pharmacy.

Application of the average annual ingredient cost discount guarantees set forth in the table above shall be subject to the following criteria and reconciliation provisions:

A.     **Guarantee Methodology.** Notwithstanding anything in this Agreement to the contrary, the Generic average annual ingredient cost discount guarantees set forth above will include only those Prescription Drug Claims that processed to Sponsor for payment where the underlying prescription drug product was identified by Medi-Span as having a Multi-Source Indicator code identifier of "Y" on the date dispensed (or was identified by Medi-Span as having a Multi-Source Indicator identifier of an "M", "N", or "O" on the date dispensed, but was substituted and dispensed by the Mail Service Pharmacy as its "house generic"), unless such Prescription Drug Claim is otherwise excluded above.  The Brand average annual ingredient discount guarantees set forth above will include only those Prescription Drug Claims that processed to Sponsor for payment where the underlying prescription drug product was identified by Medi-Span as having a Multi-Source Indicator code identifier of "M", "N", or "O" on the date dispensed (except in cases where the underlying prescription drug product was substituted and dispensed by the Mail Service Pharmacy as its "house generic"), unless such Prescription Drug Claim is otherwise excluded above.

B.     **Guarantee Exclusions.**  Prescription Drug Claims for OTCs, compounds, Member Submitted Claims, Subrogation Claims, vaccines, Specialty Products, Biosimilar Products, long term care pharmacy claims, home infusion, I/T/U, IHS, and products filled through in-house or 340b pharmacies (if applicable) shall be excluded from the reconciliation of all guarantees.

C.     **Guarantee Calculation.**   Separately for each pricing component in the table above, the following calculation will be performed on an aggregated basis for all Prescription Drug Claims processed during the applicable contract year in order to reconcile against the average annual ingredient cost discount guarantees set forth in the table above:

$$1 - (A/B)$$

A =     For Participating Pharmacy – Brand Prescription Drug Claims, the lesser of the Ingredient Cost Charge or U&C, and prior to application of Copayments

17

For Participating Pharmacy – Generic Prescription Drug Claims, the lesser of the Ingredient Cost Charge, MRA, or U&C, and prior to application of Copayments

For Mail Service Pharmacy – Brand Prescription Drug Claims, the Ingredient Cost Charge, and prior to application of Copayments

For Mail Service Pharmacy – Generic Prescription Drug Claims, the lesser of the Ingredient Cost Charge or MRA, and prior to application of Copayments

B = The actual AWP for the Covered Prescription

**D.** **Guarantee Reconciliation.** Guarantees will be measured and reconciled on an annual basis within ninety (90) days of the end of each contract year. The above guarantees are annual guarantees - if this Agreement is terminated prior to the completion of the then current contract year (hereinafter, a "Partial Contract Year"), then the above guarantees will not apply for such Partial Contract Year. To the extent Sponsor changes its benefit design or Formulary during the term of the Agreement, the guarantee will be equitably adjusted if there is a material impact on the discount achieved. Subject to the remaining terms of this Agreement, ESI will pay the difference attributable to any shortfall between the actual result and the guaranteed result. Ingredient Cost Discount guarantees are separate and may not be used to offset other Ingredient Discount guarantees or any other guarantee(s) in this Agreement.

**II.** **Per Prescription Drug Claim Dispensing Fee Guarantees and Administrative Fees (Does Not Apply to Specialty Products).**

(a) Commercial Rates

| ESI National Plus Network | Brand | Generic |
|---|---|---|
| **Participating Pharmacy Dispensing Fee/Rx** (1-83 Days Supply) | ■■■ | ■■■ |
| **Participating Pharmacy Dispensing Fee/Rx** (84-90 Days Supply) [(1)] | ■■■ | ■■■ |
| **Participating Pharmacy Administrative Fee/Rx** | ■■■ | ■■■ |
|  |  |  |
| **Mail Service Pharmacy Dispensing Fee/Rx** | ■■■ | ■■■ |
| **Mail Service Pharmacy Administrative Fee/Rx** | ■■■ | ■■■ |

[(1)] Certain Participating Pharmacies have agreed to participate in the extended (84 – 90) day supply network ("Maintenance Network") for maintenance drugs. Pricing in the 84 – 90 Days' Supply column in the table set forth above is applicable only if Sponsor implements a plan design that requires Members to fill such days' supply at a Maintenance Network Participating Pharmacy (i.e., Sponsor must implement a plan design whereby Members who fill extended days' supply prescriptions at a Participating Pharmacy other than a Maintenance Network Participating Pharmacy do not receive benefit coverage under the Plan for such prescription). If no such plan design is implemented, the pricing for such days' supply will be the same as for Prescription Drug Claims for less than an 84 days' supply, and pricing for an 84 – 90 days' supply in the table set forth above shall not apply, even if a Maintenance Network Participating Pharmacy is used.

(b)     EGWP Rates

| Medicare Preferred Network | Brand | Generic |
|---|:---:|:---:|
| **Participating Pharmacy Dispensing Fee/Rx** (1-34 Days Supply) | ▇ | ▇ |
| **Participating Pharmacy Dispensing Fee/Rx** (35-90 Days Supply) **(1)** | ▇ | ▇ |
| **Participating Pharmacy Administrative Fee/Rx** | ▇ | ▇ |
| | | |
| **Mail Service Pharmacy Dispensing Fee/Rx** | ▇ | ▇ |
| **Mail Service Pharmacy Administrative Fee/Rx** | ▇ | ▇ |

**(1)** Certain Participating Pharmacies have agreed to participate in the extended (35 – 90) day supply network ("Maintenance Network") for maintenance drugs. Pricing in the 35 – 90 Days' Supply column in the table set forth above is applicable only if Sponsor implements a plan design that requires Members to fill such days' supply at a Maintenance Network Participating Pharmacy (i.e., Sponsor must implement a plan design whereby Members who fill extended days' supply prescriptions at a Participating Pharmacy other than a Maintenance Network Participating Pharmacy do not receive benefit coverage under the Plan for such prescription). If no such plan design is implemented, the pricing for such days' supply will be the same as for Prescription Drug Claims for less than an 84 days' supply, and pricing for an 35 – 90 days' supply in the table set forth above shall not apply, even if a Maintenance Network Participating Pharmacy is used.

**Guarantee Exclusions.** Prescription Drug Claims for OTCs, compounds, Member Submitted Claims, Subrogation Claims, vaccines, Specialty Products, Biosimilar Products, long term care pharmacy claims, home infusion, I/T/U, IHS, and products filled through in-house or 340b pharmacies (if applicable) shall be excluded from the reconciliation of all guarantees.

**III.     Commercial Generic Dispensing Rate Guarantee.** For the commercial benefit, ESI will guarantee that Generic Drugs will be dispensed from Participating Pharmacies and the Mail Service Pharmacy at the percentages reflected below:

| Commercial Generic Drug Dispensing Rate Guarantee | | |
|---|---|---|
| Contract Year | Participating Pharmacies | Mail Service Pharmacy |
| 1 | ▇ | ▇ |

The guarantees will be calculated as follows:

(a)     The total Participating Pharmacy Generic Prescription Drug Claims divided by total Participating Pharmacy Generic and Brand Prescription Drug Claims (and the same for Mail Service Pharmacy Prescription Drug Claims).

(b)     The Generic Drug dispensing guaranteed percentage baseline in contract years two and three will be set to the preceding year's actual Generic Drug dispensing percentage *plus* the increment guaranteed for Participating Pharmacies and Mail Service Pharmacy, respectively.

(c)     ESI will pay a penalty for any shortfall between the actual percentage result and the guaranteed percentage for each of the Participating Pharmacy and Mail Service Pharmacy guarantees, respectively. If the actual Generic Drug dispensing percentage for a contract year is below the guaranteed percentage, the penalty will be calculated as the guaranteed Generic Drug dispensing percentage for the contract year minus the actual

19

Generic Drug dispensing percentage for the contract year times the actual claims volume times the applicable Payment Factor below.  Separate calculations will be performed for Participating Pharmacies and Mail Service Pharmacy and for each contract year.

| Payment Factor | | |
|---|---|---|
| Contract Year | Participating Pharmacies | Mail Service Pharmacy |
| 1 | ███████ | ███████ |

(d)     Guarantees will be measured and reconciled separately for Participating Pharmacy and Mail Service Pharmacy on an annual basis within ninety (90) days of the end of each contract year.  Any excess achieved in either the Participating Pharmacies or Mail Service Pharmacy guarantee will be used to offset a shortfall in the other guarantee, if any.  To the extent Sponsor changes its utilization management programs, benefit design or Formulary, or there are material changes to the demographics and geography of the Members during the term of the Agreement, the guarantee will be equitably adjusted if there is a material impact on the Generic Drug dispensing percentage achieved.

(e)     The maximum Generic Dispensing Rate Guarantee penalty that will be paid by ESI in any year will be $50,000 for the Participating Pharmacy Generic Dispensing Rate Guarantee and $50,000 for the Mail Service Pharmacy Generic Dispensing Rate Guarantee.

(f)     Specialty Products shall not be included in the calculation of the Generic Dispensing Rate Guarantee.

IV.   **Specialty Products**

(a)     Commercial Care

Exclusive Care.  ESI Specialty Pharmacy is the exclusive provider of Specialty Products for the reimbursement rates shown on the Exclusive ESI Specialty Pharmacy Specialty Product List.  Any Specialty Product dispensed at a Participating Pharmacy (for example, limited distribution products not then available through ESI Specialty Pharmacy or overrides) will be reimbursed at the standard Participating Pharmacy Specialty Product rates shown below.  Upon ESI Specialty Pharmacy acquisition of limited distribution products, Members will obtain prescriptions through ESI Specialty Pharmacy.

| | Ingredient Cost | Dispensing Fee |
|---|---|---|
| Exclusive ESI Specialty Pharmacy | ████████████████ | ████ |
| Participating Pharmacy Specialty Products | ████████████████<br>████████ | ████ |

(b)     EGWP Care

Open Care.  Specialty Products shall be available through ESI Specialty Pharmacy and at Participating Pharmacies for the Participating Pharmacy Specialty Product reimbursement rates.

| | Ingredient Cost | Dispensing Fee |
|---|---|---|
| Exclusive ESI Specialty Pharmacy | ██████████████████ | ████ |
| Open ESI Specialty Pharmacy | ████████████ | ████ |
| Participating Pharmacy Specialty Products | ██████████████<br>████████ | ████ |

(c)     For Specialty Products needing an additional charge to cover costs of all ASES required to administer the Specialty Products, the following standard per diem and nursing fee rates shall apply.

| Therapeutic Class | Brand Name | Nursing & Per Diem |
|---|---|---|
|  |  |  |

(d)     In no event will the Mail Service Pharmacy or Participating Pharmacy pricing terms specified in the Agreement, including, but not limited to, the annual average ingredient cost discount guarantees, apply to Specialty Products.

(e)     Unless otherwise set forth in an agreement directly between ESI Specialty Pharmacy and Sponsor, if a Specialty Product dispensed or ASES provided by ESI Specialty Pharmacy is billed to Sponsor directly by ESI Specialty Pharmacy instead of being processed through ESI, Sponsor agrees to timely pay ESI Specialty Pharmacy for such claim pursuant to the rates above and within thirty (30) days of Sponsor's, or its designee's, receipt of such electronic or paper claim from ESI Specialty Pharmacy. ESI Specialty Pharmacy shall have 360 days from the date of service to submit such electronic or paper claim.

(f)     Notwithstanding the Specialty Product pricing terms set forth above, ESI will guarantee an average aggregate annual ingredient cost discount for commercial (non-EGWP) Specialty Products dispensed through ESI Specialty Pharmacy as follows:

| Type of Guarantee | ESI Specialty Pharmacy | Claims Excluded |
|---|---|---|
| Average Aggregate Annual Ingredient Cost Discount Guarantee | ██████(1) | All Specialty Products Prescription Drug Claims that are not dispensed through ESI Specialty Pharmacy are excluded, as well as Limited Distribution medications dispensed through ESI Specialty Pharmacy |

(1)This guarantee shall only apply if Sponsor elects the ESI Specialty Pharmacy "exclusive" option.

The above Specialty Product guarantee will be reconciled in accordance with the terms of Section I above.

**V.     Vaccine Claims (No vaccine claims will be included in any pricing or rebate guarantee set forth in the Agreement).**

(a)  General Terms applicable to Vaccine Claims

(i)  Vaccine Claims shall adjudicate at the lower of U&C or the amounts shown in the table below. In the case of Vaccine Claims, the U&C shall be the retail price charged by a Participating Pharmacy for the particular vaccine, plus administration and dispensing fees, in a cash transaction on the date the vaccine is dispensed as reported to ESI by the Participating Pharmacy.

(ii)  The Vaccine Administration Fee for Vaccine Claims for Members enrolled in Sponsor's Medicaid programs, if any, will be capped at the maximum reimbursable amount under the state Medicaid program in which the Member is enrolled.

(iii)  All Vaccine Claims will be subject to any Administrative Fees set forth in the Agreement.

(iv)  Vaccine Claims will be charged a program fee of $2.50 per Vaccine Claim.  The Vaccine Program Fee will be billed separately to Sponsor as part of the administrative invoice according to the billing frequency set forth in this Agreement.

(b)  Vaccine Claim Pricing

| | Participating Pharmacy INFLUENZA | Participating Pharmacy ALL OTHER VACCINES | Member Submitted Vaccine Claims (excluding foreign claims) |
|---|---|---|---|
| Vaccine Administration Fee | | | |
| Ingredient Cost | | | |
| Dispensing Fee | | | |
| Administrative Fee/Vaccine Claim | | | |
| Vaccine Program Fee | | | |

**Exhibit A-2**

**Administrative Services and Clinical Program Fees**

**I.      Commercial Administrative Services**

| PBM Services – No Additional Fee | |
|---|---|
| ████████████████ | ██████████████ |
| ██████████████████ | ████████ |
| █████████████████ | ███████████████████████ |
| ██████████ | |
| ██████ | |
| ██████████████ | |
| █████████████ | ██████████████ |
| █████████████ | ███████████████████ |
| ███████████████████ | ████████████████ |
| ██████████ | |
| █████████ | █████████████████ |
| ██████████ | |
| ████████████████████ | ████████████████████████ |
| ██████████████ | ███████████████████ |
| ████████████████████ | █████████ |
| █████████ | |
| ███████████████████████████████████ | |
| ████████ | |
| ███████████████████████ | ███████████████████████████ |
| ████████████████████ | █████████████████████████ |
| █ | █████ |
| ████████████████████ | ████████████████████████ |
| █████████████████████ | █████████████████████████ |
| ████████████ | █████████ |
| ██████████████████ | |
| ███████████████ | |
| ███████████████ | |
| █████████████████████ | |
| ██████████████ | ██████████ |
| ██ | |
| ████████████████ | █████████████████████ |
| | █ ████████████ |
| | █ ████████████ |
| | █ █████████ |

| PBM Services | Fees |
|---|---|
| ██████████████ | ████████████████ |
| █████████████████ | ████ |
| ████████████████ | ████ |
| █████████ | ███████████████████████████ |
| | ███████████████ |

| PBM Services | Fees |
|---|---|
| ██████████████ | ████████████ |
| | ██████████████████████████ |
| | ████████████████████████████ |
| | ████████████████████████████ |
| | █████████████████████████████ |
| | ███████████████████████████ |
| | █████████████████████████████ |
| | ████████████████████████ |
| | ████████ |
| | ██████████████ |
| | ████████████████████████████ |
| | ██████████████████ |
| | █████████████████████████████ |
| | ████████ |
| ███████████████ | █████████████████ |
| █████████████████████████ | |
| ████████████████████ | ███████████████ |
| ██████████████████ | ███████████████ |
| ████████████ | |
| ████████████████████████ | ██████████████████████████ |
| | ████████ |
| ██████████████████ | |
| ████████████████████████ | █████████████████████████ |
| █ | |
| ████████ | |
| ████████ | |
| ███████████ | |
| ████████████████████████ | ████████ |
| ██████████████████ | |
| █ ████████████ | |
| █ ██████████████ | |
| █ ████████████ | |
| █ ██████████ | |
| █ ████████████████ | |
| █ | |
| █ ███████████████████ | |
| █ ████████████ | |
| █ ████████████ | |
| ████████████████████ | ████████████████████████ |
| ███ | ████████ |
| █████████████████████ | ██████████████████████ |
| ██████████ | ████████████ |
| ████████████████████ | ████████████ |

| PBM Services | Fees |
|---|---|
| ██████████████████████████ | |
| ██████████████████████████ | |
| ████████████████ | ████████████████████████████ |
| ████████ | |
| ███████████████████████████ | |
| ████████████████████████ | |
| █████████████████ | |
| █████████████ | ████████████████████████████ |
| ███████████████████████████ | ███████████████████████████ |
| ███████████████████ | ████████ |
| ███████████████████████████ | |
| ██████████████████ | ████████████████████ |
| ████████ | |
| ███████████████████████████ | █████████████████████████████████ |
| ███████████████████ | |
| █████████ | █████████████████████████████ |
| ███████████████████████████ | █████████████████████████████ |
| ███████████████████ | ██████ |
| ██████████████████ | |
| █████████████ | |
| ███████████████████ | ████████████████████████████████ |
| ██████████████████████████ | ████████████████████████████████ |
| ████████████████████████ | ███ |
| ██████████████████████████ | █████████████████████████████████ |
| ██████████████████████████ | ██████████████████████ |
| ██████████████████████████ | ████████████████████ |
| ██████████████ | ██████ |
| ████████████████ | |
| ██████████████████████████ | ██████████████████████████████████ |
| █████ | ███████████ |
| ███████████████ | ████████████████ |
| ██████████████████ | █████████████████████████████████ |
| ███████████████ | ███████████ |
| █████████████ | |
| ██████████████████ | █████████ |
| ███████████████████████████ | |
| ███████████████████████ | |
| ████████████████████ | |
| ████████████ | |
| ██████████████ | |
| ███████████████ | |
| ████████████ | |
| ████████████ | |
| █████████████████ | ███████████████████████ |
| ████████████ | ██████████████████████████████ |
| █████████████████ | █████████ |
| ████████████████ | █████████ |

II.   **Clinical/Trend Programs**.

███████████████████████████████████████████████████████
██████████████████████████████████████████████████████

███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████

███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
█████████████████████████████

████████████████████████████████████████████

III.   **EGWP Administrative Fees**

**Optional PBM Services**

| Additional PBM Services | Fees |
|---|---|
| ████████████ | |
| ████████████████████████████████ | ██████████████ |
| ██████████████████ | |
| ████████████████████████████████ | ██████████████████████ |
| ████████████████ | |
| ███████ | |
| ██████████████████ | ████████████████████ |
| ████████████████████ | |
| ████████████████████ | ██████████████████ |
| ████████████████ | ██████████████████ |
| ████████████ | ██████████████ |
| ████████████████ | ██████████████ |
| ███████████ | |
| ████████████████████████████████ | ███████████████████ |
| | ██████████████████████████ |
| ██████████████████████████ | ████████████ |
| ████████████ | |
| ██████████████████████████ | ██████████████ |
| ████████████████████ | |
| ████████████████████ | |
| ██████████████████████████ | █████████████████ |
| ████████████ | |
| ████████████████████████████████ | ██████████████████████ |
| ████████████ | |
| ██████████████████ | |
| | |
| ██████████████████ | |

**PDP Services**

█████████ ████████████████████ ████████

██████████████████████████████████████

4027926.v1

**Specialty Pharmacy Services**





29



IV.     EGWP **Clinical/Trend Programs**.

4027926.v1

**EXHIBIT A-3**

**Rebates**
**(Does Not Apply to Specialty Products)**

1.  **Rebate Amounts**

    Subject to: (i) the conditions set forth in Sections 2. – 4. below and elsewhere in this Agreement; and (ii) Sponsor meeting the Plan design conditions identified in the table below, ESI will pay to Sponsor the following guaranteed amounts, excluding claims for Specialty Products:

    (a)     Commercial Rebates

| Formulary: | ESI National Preferred | | |
|---|---|---|---|
| Copayment Design: | Minimum $15 Copayment Differential | | |
| | **Participating Pharmacies** | | **Mail Service Pharmacy** |
| Per Prescription Drug Claim | Year 1: $▮ | Year 1: $▮ | Year 1: $▮ |
| Based on the following days' supply: | 1-83 | 84-90 | 90 days |

(1) Certain Participating Pharmacies have agreed to participate in the extended (84 – 90) day supply network ("Maintenance Network") for maintenance drugs. Rebate Amounts in the 84 – 90 Days' Supply column in the table set forth above are applicable only if Sponsor implements a plan design that requires Members to fill such days' supply at a Maintenance Network Participating Pharmacy (i.e., Sponsor must implement a plan design whereby Members who fill extended days' supply prescriptions at a Participating Pharmacy other than a Maintenance Network Participating Pharmacy do not receive benefit coverage under the Plan for such prescription). If no such plan design is implemented, Rebate Amounts for such days' supply will be the same as for Prescription Drug Claims for less than an 84 days' supply, and Rebate Amounts for an 84 – 90 days' supply in the table set forth above shall not apply, even if a Maintenance Network Participating Pharmacy is used.

    (b)     EGWP Rebates

| Formulary: | Premier Access | | |
|---|---|---|---|
| Copayment Design: | Minimum $15 Copayment Differential | | |
| | **Participating Pharmacies** | | **Mail Service Pharmacy** |
| Per Prescription Drug Claim | Year 1: $▮ | Year 1: $▮ | Year 1: $▮ |
| Based on the following days' supply: | 1-34 | 35-90 | 90 days |

(1) Certain Participating Pharmacies have agreed to participate in the extended (35 – 90) day supply network ("Maintenance

Network") for maintenance drugs. Rebate Amounts in the 35 – 90 Days' Supply column in the table set forth above are applicable only if Sponsor implements a plan design that requires Members to fill such days' supply at a Maintenance Network Participating Pharmacy (i.e., Sponsor must implement a plan design whereby Members who fill extended days' supply prescriptions at a Participating Pharmacy other than a Maintenance Network Participating Pharmacy do not receive benefit coverage under the Plan for such prescription). If no such plan design is implemented, Rebate Amounts for such days' supply will be the same as for Prescription Drug Claims for less than an 84 days' supply, and Rebate Amounts for an 35 – 90 days' supply in the table set forth above shall not apply, even if a Maintenance Network Participating Pharmacy is used.

2. **Exclusions**

Member Submitted Claims, Specialty Products, Subrogation Claims, Biosimilar Products, OTC products, claims older than 180 days, claims through Sponsor-owned, in-house, or on-site pharmacies, 340b pharmacies, and claims pursuant to a 100% Member Copayment plan are not eligible for the guaranteed Rebate amounts set forth in Section 1.A.(ii) above.

3. **Rebate Payment Terms**

Subject to the conditions set forth herein, ESI shall pay Sponsor the guaranteed amounts set forth in Section 1 above within approximately one hundred and fifty (150) days following the end of each calendar quarter for utilization occurring during such quarter.

4. **Conditions**

A. ESI contracts for Rebates on its own behalf and for its own benefit, and not on behalf of Sponsor. Accordingly, ESI retains all right, title and interest to any and all actual Rebates received. ESI will pay Sponsor amounts equal to the Rebate amounts allocated to Sponsor, as specified above, from ESI's general assets (neither Sponsor, its Members, nor Sponsor's plan retains any beneficial or proprietary interest in ESI's general assets). Sponsor acknowledges and agrees that neither it, its Members, nor its Plan will have a right to interest on, or the time value of, any Rebate payments received by ESI during the collection period or moneys payable under this Section. No amounts for Rebates will be paid until this Agreement is executed by Sponsor. ESI will have the right to apply Sponsor's allocated Rebate amount to unpaid Fees.

B. Sponsor acknowledges that it may be eligible for Rebate amounts under this Agreement only so long as Sponsor, its affiliates, or its agents do not contract directly or indirectly with anyone else for discounts, utilization limits, rebates or other financial incentives on pharmaceutical products or formulary programs for claims processed by ESI pursuant to the Agreement, without the prior written consent of ESI. In the event that Sponsor negotiates or arranges for Rebates or similar discounts for any Covered Drugs hereunder, but without limiting ESI's right to other remedies, ESI may immediately withhold any Rebate amounts earned by, but not yet paid to, Sponsor as necessary to prevent duplicative rebates on Covered Drugs. To the extent Sponsor knowingly negotiates and/or contracts for discounts or rebates on claims for Covered Drugs without prior written approval of ESI, such activity will be deemed to be a material breach of this Agreement, entitling ESI to suspend payment of Rebate amounts hereunder and to renegotiate the terms and conditions of this Agreement.

C. Under its Rebate program, ESI may implement ESI's Formulary management programs and controls, which may include, among other things, cost containment initiatives, and communications with Members, Participating Pharmacies, and/or physicians. ESI reserves the right to modify or replace such programs from time to time. Guaranteed Rebate amounts, if any, set forth herein, are conditioned on adherence to various Formulary management controls, benefit design requirements, claims volume, and other factors stated in the applicable pharmaceutical manufacturer agreements, as communicated by ESI to Sponsor from time to time. If any government action, change in law or regulation, change in the interpretation of any law or regulation, or any action by a pharmaceutical manufacturer has an adverse effect on the availability of Rebates (collectively "Adverse Event"), then ESI may make an adjustment to the Rebate terms and guaranteed Rebate amounts, if any, hereunder. ESI will notify Sponsor of any Adverse Event and resulting adjustment within one hundred and twenty (120) days or as soon as commercially reasonable, whichever is shorter.

33

D. Rebate amounts paid to Sponsor pursuant to this Agreement are intended to be treated as "discounts" pursuant to the federal anti-kickback statute set forth at 42 U.S.C. §1320a-7b and implementing regulations. Sponsor is obligated if requested by the Secretary of the United States Department of Health and Human Services, or as otherwise required by applicable law, to report the Rebate amounts and to provide a copy of this notice. ESI will refrain from doing anything that would impede Sponsor from meeting any such obligation.

## EXHIBIT A-4

## Rebates (Specialty Products)

1.   **Rebate Amounts**

     Subject to: (i) the conditions set forth in Sections 2. – 4. below and elsewhere in this Agreement; and (ii) Sponsor meeting the Plan design conditions identified in the table below, ESI will pay to Sponsor the following guaranteed amounts:

     (a)     Commercial Rebates

| Formulary: | ESI National Preferred | | |
|---|---|---|---|
| Copayment Design: | Minimum $15 Copayment Differential | | |
| | Participating Pharmacies | | ESI Specialty Pharmacy |
| **Per Prescription Drug Claim** | Year 1: $▮ | Year 1: $▮ | Year 1: $▮ |
| **Based on the following days' supply:** | 1-83 | 84-90 | 90 days |

     (b)     EGWP Rebates

| Formulary: | ESI National Preferred | | |
|---|---|---|---|
| Copayment Design: | Minimum $15 Copayment Differential | | |
| | Participating Pharmacies | | ESI Specialty Pharmacy |
| **Per Prescription Drug Claim** | Year 1: $▮ | Year 1: $▮ | Year 1: $▮ |
| **Based on the following days' supply:** | 1-34 | 35-90 | 90 days |

2.   **Exclusions**

     Member Submitted Claims, Subrogation Claims, Biosimilar Products, OTC products, claims older than 180 days, claims through Sponsor-owned, in-house, or on-site pharmacies, 340b pharmacies, and claims pursuant to a 100% Member Copayment plan are not eligible for the guaranteed Rebate amounts set forth in Section 1.A.(ii) above.

3.  **Rebate Payment Terms**

Subject to the conditions set forth herein, ESI shall pay Sponsor the guaranteed amounts set forth in Section 1 above within approximately one hundred and fifty (150) days following the end of each calendar quarter for utilization occurring during such quarter.

4.  **Conditions**

A.  ESI contracts for Rebates on its own behalf and for its own benefit, and not on behalf of Sponsor. Accordingly, ESI retains all right, title and interest to any and all actual Rebates received. ESI will pay Sponsor amounts equal to the Rebate amounts allocated to Sponsor, as specified above, from ESI's general assets (neither Sponsor, its Members, nor Sponsor's plan retains any beneficial or proprietary interest in ESI's general assets). Sponsor acknowledges and agrees that neither it, its Members, nor its Plan will have a right to interest on, or the time value of, any Rebate payments received by ESI during the collection period or moneys payable under this Section. No amounts for Rebates will be paid until this Agreement is executed by Sponsor. ESI will have the right to apply Sponsor's allocated Rebate amount to unpaid Fees.

B.  Sponsor acknowledges that it may be eligible for Rebate amounts under this Agreement only so long as Sponsor, its affiliates, or its agents do not contract directly or indirectly with anyone else for discounts, utilization limits, rebates or other financial incentives on pharmaceutical products or formulary programs for claims processed by ESI pursuant to the Agreement, without the prior written consent of ESI. In the event that Sponsor negotiates or arranges for Rebates or similar discounts for any Covered Drugs hereunder, but without limiting ESI's right to other remedies, ESI may immediately withhold any Rebate amounts earned by, but not yet paid to, Sponsor as necessary to prevent duplicative rebates on Covered Drugs. To the extent Sponsor knowingly negotiates and/or contracts for discounts or rebates on claims for Covered Drugs without prior written approval of ESI, such activity will be deemed to be a material breach of this Agreement, entitling ESI to suspend payment of Rebate amounts hereunder and to renegotiate the terms and conditions of this Agreement.

C.  Under its Rebate program, ESI may implement ESI's Formulary management programs and controls, which may include, among other things, cost containment initiatives, and communications with Members, Participating Pharmacies, and/or physicians. ESI reserves the right to modify or replace such programs from time to time. Guaranteed Rebate amounts, if any, set forth herein, are conditioned on adherence to various Formulary management controls, benefit design requirements, claims volume, and other factors stated in the applicable pharmaceutical manufacturer agreements, as communicated by ESI to Sponsor from time to time. If any government action, change in law or regulation, change in the interpretation of any law or regulation, or any action by a pharmaceutical manufacturer has an adverse effect on the availability of Rebates (collectively "Adverse Event"), then ESI may make an adjustment to the Rebate terms and guaranteed Rebate amounts, if any, hereunder. ESI will notify Sponsor of any Adverse Event and resulting adjustment within one hundred and twenty (120) days or as soon as commercially reasonable, whichever is shorter.

D.  Rebate amounts paid to Sponsor pursuant to this Agreement are intended to be treated as "discounts" pursuant to the federal anti-kickback statute set forth at 42 U.S.C. §1320a-7b and implementing regulations. Sponsor is obligated if requested by the Secretary of the United States Department of Health and Human Services, or as otherwise required by applicable law, to report the Rebate amounts and to provide a copy of this notice. ESI will refrain from doing anything that would impede Sponsor from meeting any such obligation.

**EXHIBIT B**

**AUDIT PROTOCOL**

1. **AUDIT PRINCIPLES**

ESI recognizes the importance of its clients ensuring the integrity of their business relationship by engaging in annual audits of their financial arrangements with ESI, and, where applicable (i.e., Medicare Part D), by auditing compliance with applicable regulatory requirements. ESI provides this audit right to each and every client. In granting this right, ESI's primary interest is to facilitate a responsive and responsible audit process. In order to accomplish this goal, for all clients, ESI has established the following Protocol. Our intent is in no way to limit Sponsor's ability to determine that ESI has properly and accurately administered the financial aspects of the Agreement or complied with applicable regulatory requirements, but rather to create a manageable process in order to be responsive to our clients and the independent auditors that they may engage.

ESI strongly encourages clients to have their auditors, without jeopardizing the independent nature of the audit, review the auditor's initial findings and reports with ESI prior to discussing with the client in order to avoid any unnecessary client confusion. In addition, clients should not initiate a new audit until all parties have agreed that the prior audit is closed. We have found often times that items identified as issues during the initial audit turn out to be non-findings once a dialogue takes place between the auditor and ESI. In other words, we believe it is in everyone's interest to ensure that the auditor and ESI are not simply "missing each other" in the exchange of information prior to the auditor reviewing its findings with the client.

2. **AUDIT PREREQUISITES**

A. There are four components of your arrangement with ESI eligible for audit on an annual basis from February through October:

- Retrospective Claims
- Rebates
- Performance Guarantees
- Compliance with Regulatory Requirements (i.e., Medicare Part D)

Balancing the need to adequately support the audit process for all ESI clients, with an efficient allocation of resources, we encourage clients to audit all four components, as applicable, through a single annual audit. If you choose to audit the above components separately throughout the year, rather than combining all components into a single annual audit, you will be subject to ESI's standard charges for each additional audit. All such fees shall be reasonable and based on ESI's costs for supporting such additional audits. However, as of the Effective Date, such fees are $35,000

B. ESI will provide all data reasonably necessary for Sponsor to determine that ESI has performed in accordance with contractual terms. ESI will use commercially reasonable best efforts to provide the retrospective claims and benefit information in no more than fifteen (15) days from audit kickoff call and having an executed confidentiality agreement. Our pledge to respond within the foregoing timeframe is predicated on a good faith and cooperative effort between Sponsor and/or its Auditor and ESI.

C. ESI engages a national accounting firm, at its sole cost and expense, to conduct a SSAE 16 audit on behalf of its clients. Upon request, ESI will provide the results of its most recent SSAE 16 audit. Testing of the areas covered by the SSAE 16 is not within the scope of Sponsor's audit rights (i.e., to confirm the financial aspects of the Agreement) and is therefore not permitted. However, if requested, ESI will explain the SSAE 16 audit process and findings to Sponsor in order for Sponsor to gain an understanding of the SSAE 16.

3. **AUDITS**

A. ESI recommends that the initial audit period for a claims audit cover a timeframe not to exceed twenty-four (24) months immediately preceding the request to audit (the "Audit Period"). This Audit Period allows a reasonable amount of time for both parties to conclude the audit before claims data is archived off the adjudication system. ESI will accommodate reasonable requests to extend the Audit Period, but this may delay ESI's response time to audit findings due to the age of the claims. Due to the additional resources necessary to pull claims data older than twenty-four (24) months, if you request to extend the Audit Period, you will be subject to ESI's standard charges for such additional data pulls. As of the Effective Date, such fees are $35,000. All such fees shall be reasonable and based on ESI's additional costs associated with retrieval and reporting of such data. If the parties mutually determine, acting in good faith, that the initial audit demonstrates in any material respects that ESI has not administered the financial arrangement consistent with the contract terms of the Agreement, then ESI will support additional auditing beyond the Audit Period at no additional charge.

B. CMS generally modifies its requirements for administering the Medicare Part D annually. For this reason, ESI recommends that the initial audit period for a Medicare Part D compliance audit cover a timeframe not to exceed the twelve (12) months immediately preceding the request to audit (collectively, the "Medicare Part D Audit Period"). This Medicare Part D Audit Period is intended to assist our clients with the CMS annual oversight requirements.

37

Due to the additional resources necessary to pull data older than twelve (12) months, if you request to extend the Audit Period, you will be subject to ESI's standard charges for such additional data pulls. All such fees shall be reasonable and based on ESI's additional costs associated with retrieval and reporting of such data.

C.   When performing a Rebate audit, Sponsor may perform an on-site review of the applicable components of manufacturer agreements, selected by Sponsor, as reasonably necessary to audit the calculation of the Rebate payments made to Sponsor by ESI. Our ability to drive value through the supply chain and in our negotiations with manufacturers is dependent upon the strict confidentiality and use of these agreements. Providing access to these agreements to third parties that perform services in the industry beyond traditional financial auditing jeopardizes our ability to competitively drive value. For this reason, unless otherwise agreed by the Parties, access to and audit of manufacturer agreements is restricted to a mutually agreed upon independent firm whose audit department is a separate stand-alone division of the business, which carries insurance for professional malpractice of at least Two Million Dollars ($2,000,000).

D.   ESI recommends that Sponsor select an initial number of manufacturer contracts to enable Sponsor to audit fifty percent (50%) of the total Rebate payments due to Sponsor for two (2) calendar quarters during the twelve (12) month period immediately preceding the audit (the "Rebate Audit Scope and Timeframe"). Sponsor may extend this Rebate Audit Scope and Timeframe, subject to ESI's standard charges for such additional audit support. All such fees shall be reasonable and based on ESI's additional costs. If the parties mutually determine, acting in good faith, that the initial Rebate audit demonstrates in any material respects that ESI has not administered Rebates consistent with the contract terms of the Agreement, then ESI will support additional auditing beyond the Rebate Audit Scope and Timeframe at no additional charge.

E.   If you have a Pass-Through pricing arrangement for Participating Pharmacy claims, ESI will provide the billable and payable amount for a sampling of claims provided by you or your auditor (i.e., ESI will provide the actual documented claim record) during the audit to verify that ESI has administered such Pass-Through pricing arrangement consistent with the terms of the Agreement. If further documentation is required, ESI may provide a statistically valid sample of claims remittances to the Participating Pharmacies to demonstrate ESI's administration of Pass-Through pricing. In any instance where the audit demonstrates that the amount billed to you does not equal the Pass-Through amount paid to the Participating Pharmacy, you or your auditor may perform an on-site audit of the applicable Participating Pharmacy contract rate sheet(s).

## 4.   AUDIT FINDINGS

A.   Following Sponsor's initial audit, Sponsor (or its Auditor) will provide ESI with suspected errors, if any. In order for ESI to evaluate Sponsor's suspected errors, Sponsor shall provide an electronic data file in a mutually agreed upon format containing up to 300 claims for further investigation by ESI. ESI will use commercially reasonable best efforts to respond to the suspected errors in no more than sixty (60) days from ESI's receipt of such findings. Our pledge to respond within the foregoing timeframe is predicated on a good faith and cooperative effort between Sponsor and/or its Auditor and ESI.

B.   Following initial audit of Medicare Part D compliance, Sponsor (or its Auditor) will provide ESI with a written report of suspected non-compliant issues, if any. In order for ESI to evaluate Sponsor's suspected errors, Sponsor shall provide ESI with specific regulatory criteria and Medicare Part D program requirements used to cite each suspected non-compliant and payment reconciliation issue. ESI will use commercially reasonable best efforts to respond to the audit report in no more than thirty (30) days from ESI's receipt of the report. Please be aware, however, that audits that require evaluation of six (6) or more findings typically require additional time to respond. Our pledge to respond within the foregoing timeframe is predicated on a good faith and cooperative effort between Sponsor and/or its Auditor and ESI.

C.   Upon receipt and review of ESI's responses to Sponsor (or its Auditor), Sponsor (or its Auditor) will provide ESI with a written report of draft findings and recommendations. ESI will use commercially reasonable best efforts to respond to the audit report in no more than fifteen (15) days from ESI's receipt of the report. Our pledge to respond within the foregoing timeframe is predicated on a good faith and cooperative effort between Sponsor and/or its Auditor and ESI.

D.   Sponsor agrees that once audit results are accepted by both parties, the audit shall be considered closed and final. To the extent the mutually accepted audit results demonstrate claims errors, ESI will reprocess the claims and make corresponding adjustments to Sponsor through credits to a future invoice(s). If we are unable to reprocess claims and issue corresponding credits to Sponsor through this process, ESI will make adjustments to Sponsor via a check or credit.

## 5.   AUDITS BY GOVERNMENT ENTITIES

A.   In the event CMS, the OIG, MEDIC, or another government agency has engaged in an audit of Sponsor and/or its "first tier" and "downstream entities", Sponsor shall contact the ESI Account Management team and provide a written copy of the audit notice or request from the government agency promptly upon receipt.

B.   Sponsor agrees that CMS may have direct access to ESI's and any such "downstream entity's" pertinent contracts, books, documents, papers, records, premises and physical facilities, and that ESI and such "downstream entity" will provide requested information directly to CMS unless otherwise agreed upon by ESI and Sponsor.

38

C.  Following the government audit of Sponsor and its "first tier" and "downstream entities", Sponsor shall provide ESI with a written report of suspected non-compliant issues noted in the government audit that relate to services provided by ESI, if any.  If there are such findings, ESI will work with Sponsor and/or government agency to respond to any suspected non-compliant issues.

D.  Support for all such audits by government entities will be subject to ESI's standard charges.  All such fees shall be reasonable and based on ESI's costs for supporting such audits.


**6.   CONFIDENTIALITY**

ESI's contracts are highly confidential and proprietary.  For this reason, ESI only permits on-site review rather than provide copies to our clients.  During on-site contract review, Sponsor (or its Auditor) may take and retain notes to the extent necessary to document any identified errors, but may not copy (through handwritten notes or otherwise) or retain any contracts (in part or in whole) or related documents provided or made available by ESI in connection with the audit.  ESI will be entitled to review any notes to affirm compliance with this paragraph.

**EXHIBIT C**

**BUSINESS ASSOCIATE AGREEMENT**

Express Scripts, Inc. and one or more of its subsidiaries ("ESI"), and Sponsor or one of its affiliates ("Sponsor"), are parties to an agreement ("PBM Agreement") whereby ESI provides certain pharmacy benefit management services to the Sponsor's prescription drug plan (Sponsor and Sponsor's prescription drug plan collectively referred to hereinafter as "Plan"). The PBM Agreement addresses the parties' rights and obligations concerning the use and disclosure of patients' protected health information. The HIPAA Rules (as defined below) require ESI and Plan to enter into a "business associate agreement" to comply with applicable sections of the HIPAA Rules.

1.      **Definitions.**

(a)      "Breach" shall have the same meaning as the term "breach" in 45 C.F.R. § 164.402.

(b)      "Designated Record Set" shall have the same meaning as the term "designated record set" in 45 C.F.R. § 164.501.

(c)      "Electronic Health Record" shall mean an electronic record of health-related information on an Individual that is created, gathered, managed, and consulted by authorized health care clinicians and staff.

(d)      "Electronic PHI" shall have the same meaning as the term "electronic protected health information" in 45 C.F.R. § 160.103.

(e)      "HIPAA Rules" means the collective privacy, transaction and code sets, and security regulations promulgated pursuant to the Health Insurance Portability and Accountability Act, as codified at 45 C.F.R. Parts 160, 162 and 164, as amended from time to time.

(f)      "Individual" shall have the same meaning as the term "individual" in 45 C.F.R. § 160.103 and shall include a person who qualifies as a personal representative in accordance with 45 C.F.R. § 164.502(g).

(g)      "Privacy Rule" shall mean the Standards for Privacy of Individually Identifiable Health Information at 45 C.F.R. Part 160 and 45 C.F.R. Part 164, Subpart A and Subpart E, as amended from time to time.

(h)      "Protected Health Information" or "PHI" shall have the same meaning as the term "protected health information" in 45 C.F.R. § 160.103, limited to the information created or received by ESI from or on behalf of Plan.

(i)      "Required by Law" shall have the same meaning as the term "required by law" in 45 C.F.R. § 164.103.

(j)      "Secretary" shall mean the Secretary of the Department of Health and Human Services or his/her designee.

(k)      "Security Incident" shall have the same meaning as "security incident" in 45 C.F.R. § 164.304

(l)      "Security Standards" shall mean the Security Standards, 45 C.F.R. Part 164, Subpart C, as amended from time to time.

(m)      "Transactions Standards" shall mean the Standards for Electronic Transactions, 45 C.F.R. Part 162, Subpart I, as amended from time to time.

(n)      "Unsecured PHI" shall have the same meaning as the term "unsecured protected health information" in 45 C.F.R. § 164.402.

Capitalized terms used, but not otherwise defined, in this Business Associate Agreement shall have the same meaning as those terms in the HIPAA Rules.

2.      **General Use and Disclosure Provisions.** ESI and Plan acknowledge and agree as follows:

(a)      *Use or Disclosure.* ESI agrees not to use or further disclose PHI other than as expressly permitted or required by this Business Associate Agreement or the HIPAA Rules or as Required by Law.

(b)      *Minimum Necessary.* ESI will take reasonable efforts to limit requests for, use and disclosure of PHI to the minimum necessary to accomplish the intended request, use or disclosure.

40

(c)     *Specific Use or Disclosure Provisions.*  Except as otherwise limited in this Business Associate Agreement, ESI may use and disclose PHI to properly provide, manage and administer the services required under the PBM Agreement and consistent with applicable law to assist Plan in its operations, as long as such use or disclosure would not violate the HIPAA Rules if done by Plan, or such use or disclosure is expressly permitted in (i) through (iii) below:

> (i)     ESI may use PHI for the proper management and administration of ESI or to carry out ESI's legal responsibilities.

> (ii)    ESI may disclose PHI to third parties for the proper management and administration of ESI or to carry out the legal responsibilities of ESI provided that the disclosures are Required by Law, or ESI obtains reasonable assurances from the person to whom the information is disclosed that: (A) the information will remain confidential, (B) the information will be used or further disclosed only as Required by Law or for the purpose for which it was disclosed to the person, and (C) the person notifies ESI of any instances of which it is aware in which the confidentiality of the information has been breached.

> (iii)   ESI may use PHI to perform Data Aggregation services on behalf of Plan as permitted by 45 C.F.R. § 164.504(e)(2)(i)(B).

(d)     *Reporting.*  ESI agrees to promptly notify the Plan if ESI has knowledge that PHI has been used or disclosed by ESI in a manner that violates this Business Associate Agreement.  To the extent that ESI creates, receives, maintains or transmits Electronic PHI, ESI agrees to report promptly to the Plan any Security Incident, as determined by ESI, involving PHI of which ESI becomes aware.  ESI shall comply with 45 C.F.R. § 164.402 and shall, following the discovery of a Breach of Unsecured PHI, notify the Plan of such Breach, in accordance with 45 C.F.R. § 164.410.

(e)     *Safeguards.*  ESI agrees to use appropriate safeguards, consistent with applicable law, to prevent use or disclosure of PHI in a manner that would violate this Business Associate Agreement.  ESI shall provide Plan with such information concerning such safeguards as Plan may reasonably request from time to time.  To the extent that ESI creates, receives, maintains or transmits Electronic PHI, ESI agrees to use appropriate administrative, physical and technical safeguards, and comply with the Security Standards, to protect the confidentiality, integrity and availability of the Electronic PHI that ESI creates, receives, maintains or transmits on behalf of Plan.

(f)     *Mitigation.*  ESI agrees to mitigate, to the extent practicable, any harmful effect that is known to ESI of a use or disclosure of PHI by ESI in violation of this Business Associate Agreement or the PBM Agreement.

(g)     *Subcontractors and Agents.*  ESI agrees to ensure that any agent, including a Subcontractor, to whom it provides PHI received from, or created or received by ESI on behalf of Plan, agrees, in writing, to the same restrictions, terms and conditions that apply through this Agreement to ESI with respect to such information, including the requirement that it implement reasonable and appropriate safeguards and comply with Subpart C of 45 C.F.R. Part 164, to protect any Electronic PHI that is disclosed to it by ESI.

(h)     *Access.*  Within fifteen (15) business days of a request by Plan, ESI shall provide access to Plan to PHI in a Designated Record Set in order to meet the requirements under 45 C.F.R. § 164.524.  If ESI receives a request directly from an Individual, or if requested by Plan that access be provided to the Individual, ESI shall provide access to the Individual to PHI in a Designated Record Set within thirty (30) days in order to meet the requirements under 45 C.F.R. § 164.524.

(i)     *Amendment.*  Within sixty (60) days of a request by Plan or subject Individual, ESI agrees to make any appropriate amendment(s) to PHI in a Designated Record Set that Plan directs or agrees to pursuant to 45 C.F.R. § 164.526.

(j)     *Accounting.*  Within thirty (30) days of a proper request by Plan, ESI agrees to document and make available to Plan, for a reasonable cost-based fee (under conditions permitted by HIPAA if an Individual requests an accounting more than once during a twelve month period), such disclosures of PHI and information related to such disclosures necessary to respond to such request for an accounting of disclosures of PHI, in accordance with 45 C.F.R. § 164.528.  Within sixty (60) days of proper request by subject Individual, ESI agrees to make available to the Individual the information described above.  ESI shall retain copies of any accountings for a period of six (6) years from the date the accounting was created.

(k)     *Restrictions on Use or Disclosure.*  Within fifteen (15) business days of a request of Plan, ESI agrees to consider restrictions on the use or disclosure of PHI agreed to by Plan on behalf of an Individual in accordance with 45 C.F.R. § 164.522.

(l)      *Audit and Inspection.*  ESI agrees to make internal practices, books, and records relating to the use and disclosure of PHI received from, or created or received by ESI on behalf of Plan, available to Plan within ten (10) business days, or at the request of Plan or the Secretary, to the Secretary in a time and manner directed by the Secretary, for purposes of the Secretary determining Plan's compliance with the HIPAA Rules.  Any release of information regarding ESI's practices, books and records is proprietary to ESI and shall be treated as confidential and shall not be further disclosed without the written permission of ESI, except as necessary to comply with the HIPAA Rules.

(m)      *Privacy of Individually Identifiable Health Information.* To the extent ESI is to carry out one or more of Plan's obligations under Subpart E of 45 C.F.R. Part 164, ESI agrees to comply with the requirements of subpart E that apply to the covered entity in the performance of such obligations.

**3.      Plan Obligations.**

(a)      Plan shall notify ESI of any limitation(s) in the notice of privacy practices of Plan in accordance with 45 C.F.R. § 164.520, to the extent that such limitation may affect ESI's use or disclosure of PHI.

(b)      Plan shall notify ESI of any changes in, or revocation of, permission by an Individual to use or disclose PHI, to the extent that such changes may affect ESI's use or disclosure of PHI.

(c)      Plan shall notify ESI of any restriction to the use or disclosure of PHI that Plan has agreed to in accordance with 45 C.F.R. § 164.522, to the extent that such restriction may affect ESI's use or disclosure of PHI.

(d)      Plan shall not request that ESI use or disclose PHI in any manner that would exceed that which is minimally necessary under the HIPAA Rules or that would not be permitted by a Covered Entity.

(e)      Plan agrees that it will have entered into "Business Associate Agreements" with any third parties (e.g., case managers, brokers or third party administrators) to which Plan directs and authorizes ESI to disclose PHI.

**4.      Transactions Standards.**  The HIPAA Rules provide for certain Transactions Standards for transfer of data between trading partners.  While certain of the standards may or may not be adopted by Plan (e.g., for eligibility), ESI will be prepared to accept the following in accordance with 45 C.F.R. Part 162.1502:  ASC X12N 834 – Benefit Enrollment and Maintenance.  In addition, to the extent applicable, ESI shall comply with other applicable transactions standards for claims processing functions between ESI and provider pharmacies.   Each party hereby agrees that it shall not change any definition, data condition or use of a data element or segment in a standard, add any data elements or segment to the maximum defined data set, use any code or data elements that are either marked "not used" in the standard's implementation specification or are not in the implementation specification, or change the meaning or intent of the implementation specification.

**5.      Material Breach of Business Associate Agreement; Termination.**

(a)      Without limiting the termination rights of the parties pursuant to the PBM Agreement, upon either party's knowledge of a material breach by the other of this Business Associate Agreement, the non-breaching party shall notify the breaching party of such material breach and the breaching party shall have thirty (30) days to cure such material breach.  In the event the breach is not cured, or cure is infeasible, the non-breaching party shall have the right to immediately terminate this Business Associate Agreement and the PBM Agreement or if cure of the material breach is infeasible, report the violation to the Secretary.

(b)      To the extent feasible, upon termination of the PBM Agreement for any reason, ESI shall, and shall cause any subcontractors and agents to, return or destroy and retain no copies of all PHI received from, or created or received by ESI on behalf of, Plan.  If ESI determines, in its sole discretion, that return or destruction of such information is not feasible, ESI shall continue to limit the use or disclosure of such information as set forth in this Agreement as if the PBM Agreement had not been terminated.

**6.      Indemnification.**  Each party (the "Indemnifying Party") shall indemnify and hold the other party and its officers, directors, employees and agents (each an "Indemnified Party") harmless from and against any claim, cause of action, liability, damage, cost or expense ("Liabilities") to which the Indemnified Party becomes subject to as a result of third party claims (including reasonable attorneys' fees and court or proceeding costs) brought against the Indemnified Party, which arise as a result of: (i) the material breach of this Business Associate Agreement by the Indemnifying Party; or (ii) the gross negligence or willful misconduct of the Indemnifying Party, except to the extent such Liabilities were caused by the Indemnified Party.  A party entitled to indemnification under this Section 6 shall give prompt written notification to the Indemnifying Party of the commencement of any action, suit or proceeding relating to a third party claim for which indemnification is sought, subject to applicable confidentiality constraints.  The Indemnifying Party shall be entitled to assume control of the defense of such action, suit, proceeding or claim with competent counsel of its choosing. Indemnification shall not be required if any claim is settled without the Indemnifying Party's consent, which such consent

shall not be unreasonably withheld.  **NOTWITHSTANDING THE FOREGOING PROVISIONS OF THIS SECTION 6, IN NO EVENT WILL AN INDEMNIFYING PARTY BE LIABLE TO AN INDEMNIFIED PARTY UNDER CONTRACT, TORT, OR ANY OTHER LEGAL THEORY FOR INCIDENTAL, CONSEQUENTIAL, INDIRECT, PUNITIVE, OR SPECIAL LOSSES OR DAMAGES OF ANY KIND.**

7.     **Miscellaneous.**

(a)     **Amendment**.  The parties acknowledge that the foregoing provisions are designed to comply with the mandates of the HIPAA Rules.  ESI shall provide written notice to Plan to the extent that any regulation or amendment to regulations promulgated by the Secretary requires changes to this Business Associate Agreement.  Such written notice shall include any additional amendment required by any such final regulation and the Business Associate Agreement shall be automatically amended to incorporate the changes set forth in such amendment provided by ESI to Plan, unless Plan objects to such amendment in writing within fifteen (15) days of receipt of such written notice.  In the event that Plan objects timely to such amendment, the parties shall work in good faith to reach agreement on an amendment to the Business Associate Agreement that complies with the final regulations.  If the parties are unable to reach agreement regarding an amendment to the Business Associate Agreement within thirty (30) days of the date that ESI receives any written objection from Plan, either ESI or Sponsor may terminate this Business Associate Agreement upon ninety (90) days written notice to the other party.  Any other amendment to this Business Associate Agreement unrelated to compliance with applicable law and regulations shall be effective only upon execution of a written agreement between the parties.

(b)     **Effect on PBM Agreement**.  Except as relates to the use, security and disclosure of PHI and electronic transactions, this Business Associate Agreement is not intended to change the terms and conditions of, or the rights and obligations of the parties under, the PBM Agreement.

(c)     **No Third-Party Beneficiaries**.  Nothing express or implied in the PBM Agreement or in this Business Associate Agreement is intended to confer, nor shall anything herein confer, upon any person other than the parties and the respective successors or assigns of the parties, any rights, remedies, obligations or liabilities whatsoever.

(d)     **Interpretation**.  Any ambiguity in this Business Associate Agreement shall be resolved in favor of a meaning that permits both parties to comply with the HIPAA Rules.

(e)     **Effective Date**.  This Business Associate Agreement shall be effective as of the effective date of the PBM Agreement.

4027926.v1

## EXHIBIT D
### FINANCIAL DISCLOSURE TO ESI PBM CLIENTS

This disclosure provides an overview of the principal revenue sources of Express Scripts, Inc. and Medco Health Solutions, Inc. (individually and collectively referred to herein as "ESI"), as well as ESI's affiliates. In addition to administrative and dispensing fees paid to ESI by our clients for pharmaceutical benefit management ("PBM") services, ESI and its affiliates derive revenue from other sources, including arrangements with pharmaceutical manufacturers, wholesale distributors, and retail pharmacies. Some of this revenue relates to utilization of prescription drugs by members of the clients receiving PBM services. ESI may pass through certain manufacturer payments to its clients or may retain those payments for itself, depending on the contract terms between ESI and the client.

Network Pharmacies – ESI contracts for its own account with retail pharmacies to dispense prescription drugs to client members. Rates paid by ESI to these pharmacies may differ among networks (e.g., Medicare, Worker's Comp, open and limited), and among pharmacies within a network, and by client arrangements. PBM agreements generally provide that a client pays ESI an ingredient cost, plus dispensing fee, for drug claims. If the rate paid by a client exceeds the rate contracted with a particular pharmacy, ESI will realize a positive margin on the applicable claim. The reverse also may be true, resulting in negative margin for ESI. ESI also enters into pass-through arrangements where the client pays ESI the actual ingredient cost and dispensing fee amount paid by ESI for the particular claim when the claim is adjudicated to the pharmacy. In addition, when ESI receives payment from a client before payment to a pharmacy, ESI retains the benefit of the use of the funds between these payments. ESI may maintain non-client specific aggregate guarantees with pharmacies and may realize positive margin. ESI may charge pharmacies standard transaction fees to access ESI's pharmacy claims systems and for other related administrative purposes.

Brand/Generic Classifications – Prescription drugs may be classified as either a "brand" or "generic;" however, the reference to a drug by its chemical name does not necessarily mean that the product is recognized as a generic for adjudication, pricing or copay purposes. For the purposes of pharmacy reimbursement, ESI distinguishes brands and generics through a proprietary algorithm ("BGA") that uses certain published elements provided by First DataBank (FDB) including price indicators, Generic Indicator, Generic Manufacturer Indicator, Generic Name Drug Indicator, Innovator, Drug Class and ANDA. The BGA uses these data elements in a hierarchical process to categorize the products as brand or generic. The BGA also has processes to resolve discrepancies and prevent "flipping" between brand and generic status due to price fluctuations and marketplace availability changes. The elements listed above and sources are subject to change based on the availability of the specific fields. Updated summaries of the BGA are available upon request. Brand or generic classification for client reimbursement purposes is either based on the BGA or specific code indicators from Medi-Span or a combination of the two as reflected in the client's specific contract terms. Application of an alternative methodology based on specific client contract terms does not affect ESI's application of its BGA for ESI's other contracts.

Maximum Allowable Cost ("MAC")/Maximum Reimbursement Amount ("MRA") – As part of the administration of the PBM services, ESI maintains a MAC List of drug products identified as requiring pricing management due to the number of manufacturers, utilization and/or pricing volatility. The criteria for inclusion on the MAC List are based on whether the drug has readily available generic product(s), is generally equivalent to a brand drug, is cleared of any negative clinical implications, and has a cost basis that will allow for pricing below brand rates. ESI also maintains MRA price lists for drug products on the MAC List based on current price reference data provided by MediSpan or other nationally recognized pricing source, market pricing and availability information from generic manufacturers and on-line research of national wholesale drug company files, and client arrangements. Similar to the BGA, the elements listed above and sources are subject to change based on the availability of the specific fields. Updated summaries of the MAC methodology are available upon request.

Manufacturer Programs Formulary Rebates, Associated Administrative Fees, and PBM Service Fees – ESI contracts for its own account to obtain formulary rebates attributable to the utilization of certain brand drugs and supplies (and possibly certain authorized generics marketed under a brand manufacturer's new drug application). Formulary rebate amounts received vary based on client specific utilization, the volume of utilization as well as formulary position applicable to the drug or supplies, and adherence to various formulary management controls, benefit design requirements, claims volume, and other similar factors, and in certain instances also may vary based on the product's market-share. ESI often pays an amount equal to all or a portion of the formulary rebates it receives to a client based on the client's PBM agreement terms. ESI or its affiliates may maintain non-client specific aggregate guarantees and may realize positive margin. In addition, ESI provides administrative services to contracted manufacturers, which include, for example, maintenance and operation of systems and other infrastructure necessary for invoicing and processing rebates, pharmacy discount programs, access to drug utilization data, as allowed by law, for purposes of verifying and evaluating applicable payments, and for other purposes related to the manufacturer's products. ESI receives administrative fees from the participating manufacturers for these services. These administrative fees are calculated based on the price of the drug or supplies along with the volume of utilization and do not exceed the greater of ▮▮▮▮ of the average wholesale price, or ▮▮▮▮ of the wholesale acquisition cost of the products. In its capacity as a PBM company, ESI also may receive other compensation from manufacturers for the performance of various programs or services, including, for example, formulary compliance initiatives, clinical services, therapy management services, education services, inflation protection programs, medical benefit management services, cost containment programs, discount programs, and the sale of non-patient identifiable claim information. This compensation is not part of the formulary rebates or associated administrative fees, and ESI may realize positive margin between amounts paid to clients and amounts received from pharmaceutical manufacturers. ESI retains the financial benefit of the use of any funds held until payment is made to the client.

44

Copies of ESI's standard formularies may be reviewed at www.express-scripts.com/wps/portal/. In addition to formulary considerations, other plan design elements are described in ESI's Plan Design Review Guide, which may be reviewed at www.express-scripts.com/wps/portal/.

ESI Subsidiary Pharmacies – ESI has several licensed pharmacy subsidiaries, including our specialty pharmacies. These entities may maintain product purchase discount arrangements and/or fee-for-service arrangements with pharmaceutical manufacturers, wholesale distributors, and other health care providers. These subsidiary pharmacies contract for these arrangements on their own account in support of their various pharmacy operations. Many of these subsidiary arrangements relate to services provided outside of PBM arrangements, and may be entered into irrespective of whether the particular drug is on one of ESI's national formularies. Discounts and fee-for-service payments received by ESI's subsidiary pharmacies are not part of the PBM formulary rebates or associated administrative fees paid to ESI in connection with ESI's PBM formulary rebate programs. However, certain purchase discounts received by ESI's subsidiary pharmacies, whether directly or through ESI, may be considered for formulary purposes if the value of such purchase discounts is used by ESI to supplement the discount on the ingredient cost of the drug to the client based on the client's PBM agreement terms. From time to time, ESI and its affiliates also may pursue and maintain for its own account other supply chain sourcing relationships not described below as beneficial to maximize ESI's drug purchasing capabilities and efficiencies, and ESI or affiliates may realize an overall positive margin with regard to these initiatives.

The following provides additional information regarding examples of ESI subsidiary discount arrangements and fee-for-service arrangements with pharmaceutical manufacturers, and wholesale distributors:

ESI Subsidiary Pharmacy Discount Arrangements – ESI subsidiary pharmacies purchase prescription drug inventories, either from manufacturers or wholesalers, for dispensing to patients. Often, purchase discounts off the acquisition cost of these products are made available by manufacturers and wholesalers in the form of either up-front discounts or retrospective discounts. These purchase discounts, obtained through separate purchase contracts, are not formulary rebates paid in connection with our PBM formulary rebate programs. Drug purchase discounts are based on a pharmacy's inventory needs and, at times, the performance of related patient care services and other performance requirements. When a subsidiary pharmacy dispenses a product from its inventory, the purchase price paid for the dispensed product, including applicable dispensing fees, may be greater or less than that pharmacy's acquisition cost for the product net of purchase discounts. In general, our pharmacies realize an overall positive margin between the net acquisition cost and the amounts paid for the dispensed drugs.

ESI Subsidiary Fee-For-Service Arrangements – One or more of ESI's subsidiaries, including, but not limited to, its subsidiary pharmacies also may receive fee-for-service payments from manufacturers, wholesalers, or other health care providers in conjunction with various programs or services, including, for example, patient assistance programs for indigent patients, dispensing prescription medications to patients enrolled in clinical trials, various therapy adherence and fertility programs, administering FDA compliance requirements related to the drug, 340B contract pharmacy services, product reimbursement support services, and various other clinical or pharmacy programs or services. As a condition to having access to certain products, and sometimes related to certain therapy adherence criteria or FDA requirements, a pharmaceutical manufacturer may require a pharmacy to report selected information to the manufacturer regarding the pharmacy's service levels and other dispensing-related data with respect to patients who receive that manufacturer's product. A portion of the discounts or other fee-for-service payments made available to our pharmacies may represent compensation for such reporting.

Other Manufacturer Arrangements – ESI also maintains other lines of business that may involve discount and service fee relationships with pharmaceutical manufacturers and wholesale distributors. Examples of these businesses include a wholesale distribution business, group purchasing organizations (and related group purchasing organization fees), a medical benefit management company, and United BioSource Corporation ("UBC"). Compensation derived through these business arrangements is not considered for PBM formulary placement, and is in addition to other amounts described herein. Of particular note, UBC partners with life sciences and pharmaceutical companies to develop, commercialize, and support safe, effective use and access to pharmaceutical products. UBC maintains a team of research scientists, biomedical experts, research operations professionals, technologists and clinicians who work with clients to conduct and support clinical trials, create, and validate and administer pre and post product safety and risk management programs. UBC also works on behalf of pharmaceutical manufacturers to provide product and disease state education programs, reimbursement assistance, and other support services to the public at large. These service fees are not part of the formulary rebates or associated administrative fees.

Third Party Data Sales – Consistent with any client contract limitations, ESI or its affiliates may sell HIPAA compliant information maintained in their capacity as a PBM, pharmacy, or otherwise to data aggregators, manufacturers, or other third parties on a fee-for-service basis or as a condition of discount eligibility. All such activities are conducted in compliance with applicable patient and pharmacy privacy laws and client contract restrictions.

**October 1, 2015**

**THIS EXHIBIT REPRESENTS ESI'S FINANCIAL POLICIES. ESI MAY PERIODICALLY UPDATE THIS EXHIBIT AND THE FINANCIAL DISCLOSURES CONTAINED HEREIN TO REFLECT CHANGES IN ITS BUSINESS PROCESSES; THE CURRENT FINANCIAL DISCLOSURE IS AVAILABLE UPON REQUEST AND ACCESSIBLE ON EXPRESS-SCRIPTS.COM AT WWW. EXPRESS-SCRIPTS.COM/WPS/PORTAL/.**

**EXHIBIT E**

**PERFORMANCE STANDARDS**

In the event that any failure by ESI to meet any performance standard is due to a "force majeure" as defined in the Agreement, failure of Sponsor to perform its obligations under the Agreement, or actions or inactions of Sponsor that adversely impact ESI's ability to maintain the subject standard (e.g., faulty eligibility, changes in benefit design not adequately communicated to Members and benefit designs that substantially change the Members' rights under the Plan), ESI will be excused from compliance with such performance standards until such circumstances have been resolved and any existing backlogs or other related effects have been eliminated.

Within ninety (90) days after the end of each year, ESI shall report to Sponsor ESI's performance under each performance standard. Notwithstanding the foregoing, for purposes of determining whether ESI has met or failed to meet each performance standard, performance standards will be measured and reconciled on an annual basis and amounts due resulting from an ESI failure to meet any performance standard(s), if any, shall be calculated and paid to Sponsor within thirty (30) days following Sponsors receipt of reconciliation report.

No performance penalties, if any, will be paid until this Agreement is executed by Sponsor. In no event will the sum of the payments to Sponsor, as a result of ESI's failure to meet the performance standards exceed ▮▮▮▮▮▮ per Member per year for the annual performance standards.

The following performance standards are based on 5,500 Members as of the Effective Date and throughout the Term. Any material change below such number may result in a renegotiation of the standards and penalties set forth below.

Performance standards for ESI's Mail Service Pharmacy assume a minimum of 1,000 Mail Service Pharmacy prescriptions submitted annually.

**COMMERCIAL ONLY**

| Service Feature | Guarantee | Penalty |
|---|---|---|
| **Contact Center** | | |
| ▮▮▮▮▮▮▮▮ | ▮▮▮▮▮▮ ▮▮ ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮ | ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮ |
| ▮▮▮▮▮ ▮▮▮▮ | ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ ▮▮▮▮▮ | ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮ ▮▮▮▮▮▮ ▮▮▮▮▮▮▮ ▮▮▮▮▮ |
| ▮▮▮▮▮▮▮▮ | ▮▮▮▮▮▮▮ ▮▮▮▮ | ▮▮▮▮▮▮▮ ▮▮▮▮▮▮ ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮ ▮▮▮▮ |

4027926.v1

| Service Feature | Guarantee | Penalty |
|---|---|---|
| ███████████ | ████████████████████████ ████████ | █████████████████████ ████████████████████ ██████████████████ ████████████ |
| ████████████████ | | |
| ███████████ | ████████████████████████ ████ | █████████████████████ █████████████████████ ████████████████ ████████████████████ █████████████████████ █████ |
| ████████████████ ████████████ | ████████████████████████ ████████████████████████ | ████████ ███████████████ █████████████ ███████████ |
| █████████████ ████████████████ ███████ | ████████████████████████ ████████████ | █████████████████████ ███████████████ ██████████████ █████████████ |
| ████████████ | | |
| ███████████████████ █████████ | ████████████████████████ ████████████████████████ ████████████████████████ ████████████████ ███████████ | █████████████████████ ██████████████████ █████████████████████ ████████████████ ██████████████████ ████████ |
| ████████████████████ | | |
| ███████████████ █████████ | ████████████████████████ ████████████████████████ ████████████████████████ ███████████████ | ████████████████ ████████████ |
| ████████ | | |
| ████████████████ ████████ | ████████████████████████ ████████████████████████ | ████████████████ ████████████████ |

4027926.v1

**EXHIBIT F**

**Employer-Only Sponsored Group Waiver Plan (EGWP) Addendum**

1.      **Construction.**  Unless otherwise stated herein, the terms and conditions of the Agreement shall apply to services provided by ESI by and through its affiliate, Medco Containment Life Insurance Company, a Pennsylvania corporation, ("MCLIC") only insofar as such services are provided to Sponsor's EGWP Members (as defined herein).  In addition, the terms and conditions set forth in this EGWP Addendum shall apply to services provided by MCLIC to Sponsor's EGWP Members.  In the event there is a conflict between the terms and conditions in the Agreement and in this EGWP Addendum, the terms and conditions in this EGWP Addendum shall control, but only as they relate to services provided to EGWP Members.  Capitalized terms not otherwise defined in this EGWP Addendum shall have the meaning ascribed to them in the Agreement.

2.      **Acknowledgements.**  The parties agree and acknowledge as follows:

A.      MCLIC is an approved CMS-contracted prescription drug plan ("PDP") sponsor for an Employer Group Waiver Plan PDP in accordance with CMS regulations and has received approval from the Centers for Medicare and Medicaid Services ("CMS") to serve as a Prescription Drug Plan Sponsor (a "PDP Sponsor") and to provide prescription drug coverage that meets the requirements of, and pursuant to, the Voluntary Prescription Drug Benefit Program set forth in Part D of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, 42 U.S.C. §1395w-101 through 42 U.S.C. §1395w-152 (the "Act") and all applicable and related rules, regulations, and guidance promulgated, issued or adopted by CMS or other governmental agencies with jurisdiction over enforcement of the Act, including, but not limited to, 42 C.F.R. §423.1 through 42 C.F.R. §423.910 (with the exception of Subparts Q, R, and S), and the terms of any PDP Sponsor contract between CMS and MCLIC (collectively, the "Medicare Drug Rules"); and

B.      Pursuant to the waivers granted by CMS under 42 U.S.C. §1395w-132(b), MCLIC offers employer-only sponsored group waiver plans ("EGWPs") to employers that wish to provide prescription drug benefits to their Part D Eligible Retirees (as defined below) in accordance with the Medicare Drug Rules; and

C.      MCLIC provides services hereunder through itself and its affiliates, including Express Scripts, Inc. ("ESI"); and

D.      Sponsor currently provides a prescription drug benefit (the "Current Benefit") to its Part D Eligible Retirees (as defined below) pursuant to a non-Medicare, self-insured welfare benefit plan; and

E.      Sponsor desires to contract with MCLIC to offer a prescription drug benefit to Sponsor's Part D Eligible Retirees pursuant to an EGWP that is substantially similar in design to the Current Benefit (the "EGWP Benefit," as further defined below); and

F.      Provided that the EGWP Benefit meets the actuarial equivalence standards of the Medicare Drug Rules, as more fully described below, MCLIC desires to offer the EGWP Benefit to Sponsor's Part D Eligible Retirees in accordance with the Medicare Drug Rules and pursuant to the terms and conditions of the Agreement and this EGWP Addendum.

3.      **Definitions.**

"Commercial Benefit" means the prescription drug benefit covering Sponsor's Members and administered pursuant to the Agreement.

"Coverage Gap" means the stage of the benefit between the initial coverage limit and the catastrophic coverage threshold, as described in the Medicare Part D prescription drug program administered by the United States federal government.

48

"Coverage Gap Discount" means the manufacturer discounts available to eligible Medicare Part D beneficiaries receiving applicable, covered Medicare Part D drugs, while in the Coverage Gap.

"Coverage Gap Discount Program" means the Medicare program that makes manufacturer discounts available to eligible Medicare Part D beneficiaries receiving applicable, covered Medicare Part D drugs, while in the Coverage Gap.

"EGWP Eligibility File" means the list(s) submitted by Sponsor to MCLIC, in accordance with Article II, indicating the Part D Eligible Retirees that Sponsor has submitted for enrollment in the EGWP Benefit, as verified by MCLIC through CMS eligibility files. For all other purposes under the Agreement, the "EGWP Eligibility File" shall also be considered an "Eligibility File."

"EGWP Benefit" means the prescription drug benefit to be administered by MCLIC under this EGWP Addendum, as defined in the Recitals above and as further described in the Sponsor plan document, its summary plan description, and its summary of benefits, as may be amended from time to time in accordance with the terms of this EGWP Addendum.

"EGWP Member" means each Part D Eligible Retiree who is enrolled in the EGWP Benefit in accordance with the terms of this EGWP Addendum. For all other purposes under the Agreement, every EGWP Member shall also be deemed to be a Member.

"EGWP Plus" means a prescription drug benefit plan design that provides non-Medicare EGWP coverage supplemental to the standard Part D benefit, and is defined by CMS as other health or prescription drug coverage, and as such, the Coverage Gap Discount is applied before any additional coverage beyond the standard Part D benefit.

"Late Enrollment Penalty" or "LEP" means the financial penalty incurred under the Medicare Drug Rules by Medicare Part D beneficiaries who have had a continued gap in creditable coverage of sixty-three (63) days or more after the end of the beneficiary's initial election period, adjusted from time to time by CMS.

"Medicare Formulary" means the list of prescription drugs and supplies developed, implemented and maintained in accordance with the Medicare Drug Rules for the EGWP Benefit.

"Medicare Rebate Program" means MCLIC's or its affiliates' manufacturer rebate program under which MCLIC or its affiliates contract with pharmaceutical manufacturers for Rebates payable on selected Covered Drugs that are reimbursed, in whole or in part, through Medicare Part D, as such program may change from time to time.

"Part D" or "Medicare Part D" means the Voluntary Prescription Drug Benefit Program set forth in Part D of the Act.

"Part D Eligible Retiree" means an individual who is (a) eligible for Part D in accordance with the Medicare Drug Rules, (b) not enrolled in a Part D plan (other than the EGWP Benefit), and (c) eligible to participate in Sponsor's Current Benefit.

"Prescription Drug Plan" or "PDP" shall have the meaning set forth in the Medicare Drug Rules.

"True Out-of-Pocket Costs" or "TrOOP" means costs incurred by an EGWP Member or by another person on behalf of an EGWP Member, such as a deductible or other cost-sharing amount, with respect to Covered Drugs, as further defined in the Medicare Drug Rules.

"Vaccine Claim" means a claim for a Covered Drug which is a vaccine.

4.    **Plan Status Under Applicable Laws; Enrollment and Disenrollment in the EGWP Benefit.**

    A.    <u>Medicare Part D</u>.  Sponsor and MCLIC acknowledge and agree as follows:

1. The design of and administration of the EGWP Benefit is subject to the applicable requirements of the Medicare Drug Rules. Sponsor shall provide all information and documents as may be reasonably required to administer the EGWP Benefit.

2. If the number of Sponsor's Part D Eligible Retirees is materially reduced or eliminated for any reason, MCLIC may communicate with those persons at MCLIC's expense regarding alternative Medicare Part D options, including alternative Medicare Part D services offered by MCLIC or one or more of its affiliates, and the program pricing terms hereunder may be equitably modified by MCLIC to reflect the reduction or elimination of the number of Part D Eligible Retirees.

B. <u>Group Enrollment</u>. Subject to each individual's right to opt out, as described below, Sponsor shall enroll Part D Eligible Retirees in the EGWP Benefit through a group enrollment process, as further described in and permitted under the Medicare Drug Rules. Sponsor agrees that it will comply with all applicable requirements for group enrollment in EGWPs as set forth in the Medicare Drug Rules, and as described and required by MCLIC's policies and procedures.

C. <u>EGWP Eligibility File</u>. No later than sixty (60) days prior to the Effective Date and the first day of each EGWP Benefit enrollment period thereafter, so long as this EGWP Addendum is in effect, Sponsor shall provide an EGWP Eligibility File to MCLIC via the communication medium reasonably requested by MCLIC that lists those Part D Eligible Retirees for whom Sponsor intends to make application for enrollment in the EGWP Benefit (i.e., those Part D Eligible Retirees who have not opted out of the group enrollment process) for that contract year. Sponsor represents and warrants that all information it provides to MCLIC in the EGWP Eligibility File will be complete and correct. Sponsor shall communicate all new enrollments (i.e., individuals who become eligible to participate in the EGWP Benefit outside of an annual election period), requested retroactive enrollments of Part D Eligible Retirees, and disenrollments from the EGWP Benefit via the communication medium reasonably requested by MCLIC. MCLIC agrees to process retroactive enrollment requests pursuant to the requirements of the Medicare Drug Rules.

D. <u>Implementation</u>.

1. <u>MCLIC's Responsibilities</u>. MCLIC shall implement the EGWP Eligibility File following confirmation of the Medicare Part D eligibility of the Part D Eligible Retirees listed on the EGWP Eligibility File with CMS eligibility files. A Part D Eligible Retiree will not be enrolled in the EGWP Benefit unless such individual is listed on both the EGWP Eligibility File submitted by Sponsor and the CMS eligibility files. Sponsor acknowledges and agrees that MCLIC may update in the EGWP Eligibility File any information concerning Part D Eligible Retirees upon receipt of corrected information from CMS, and MCLIC may use such corrected information to obtain a Part D Eligible Retiree's enrollment. For all Part D Eligible Retirees that have been included by Sponsor in the EGWP Eligibility File, but who are ultimately determined to be ineligible for participation in the EGWP Benefit, MCLIC or its affiliates shall notify the individual of his or her ineligibility in the EGWP Benefit and take all other action as required by applicable law. MCLIC shall communicate to Sponsor any changes to a Part D Eligible Retiree's information in the EGWP Eligibility File based upon updates or corrections received from CMS.

2. <u>Incomplete EGWP Eligibility File Information</u>. Sponsor's submission to MCLIC of an inaccurate or incomplete EGWP Eligibility File (e.g., missing Health Insurance Claim Number, date of birth, last name, first name, gender, address, etc.) or otherwise incomplete information with respect to any individual Part D Eligible Retiree may result in a rejection of the Part D Eligible Retiree's enrollment in the EGWP Benefit. Sponsor acknowledges and agrees that MCLIC may contact Sponsor's Part D Eligible Retirees to obtain the information required hereunder and that MCLIC will update the EGWP Eligibility File on Sponsor's behalf to reflect additional information needed to complete enrollment of the Part D Eligible Retirees. If MCLIC, using reasonable efforts, is not able to obtain all missing information from a Part D Eligible Retiree within twenty-one

(21) days after receiving Sponsor's initial request for enrollment of the Part D Eligible Retiree in the EGWP Benefit, then Sponsor's request shall be deemed cancelled and MCLIC or its affiliates shall notify the individual of his or her enrollment denial and non-enrollment in the EGWP Benefit and shall take all other action as required by applicable law.

3. Effective Date of Enrollment into EGWP Benefit.  Notwithstanding any provision of this EGWP Addendum to the contrary, the effective date of enrollment for any Part D Eligible Retiree who MCLIC seeks to enroll in the EGWP Benefit hereunder shall be the date of enrollment requested for that Part D Eligible Retiree by Sponsor on the EGWP Eligibility File, subject to any adjustments that MCLIC may make relating to eligibility verification or eligibility processing rules reasonably agreed upon by the parties.

E.  Involuntary Disenrollment.    If Sponsor determines that an EGWP Member is no longer eligible to participate as an EGWP Member in the EGWP Benefit for reasons such as loss of Sponsor's eligibility or residence outside of the service area (an "Ineligible Enrollee"), Sponsor shall notify MCLIC at least twenty-five (25) days before disenrollment effective date.  Such Ineligible Enrollee shall be notified about involuntary disenrollment and disenrolled in accordance with the Medicare Drug Rules.  If CMS determines that an EGWP Enrollee is no longer eligible to participate as an EGWP Enrollee in the EGWP Benefit (an "Ineligible Enrollee"), upon notification to MCLIC, such Ineligible Enrollee shall be notified and disenrolled in accordance with the Medicare Drug Rules.

F.  Voluntary Disenrollment.  If an EGWP Member makes a voluntary request to be disenrolled from the EGWP Benefit (the "Voluntary Disenrollee") to Sponsor, then Sponsor shall notify MCLIC within two (2) business days of its receipt of the request for disenrollment, in a manner and format agreed upon by the parties.  If Sponsor does not timely notify MCLIC of such Voluntary Disenrollee's disenrollment in the EGWP Benefit, then MCLIC shall submit a retroactive disenrollment request to CMS.  Sponsor acknowledges that CMS may only grant up to a ninety (90) day retroactive disenrollment in such instances.  If the Voluntary Disenrollee makes his or her request directly to MCLIC, then MCLIC shall direct the Voluntary Disenrollee to initiate the disenrollment with the Sponsor.

G.  Group Disenrollment.  If, upon the expiration of the then current term of this EGWP Addendum, Sponsor plans to disenroll its EGWP Members from the EGWP Benefit using a group disenrollment process, then Sponsor shall implement the following procedures:

1. Notification to EGWP Members.  Sponsor shall provide at least twenty-one (21) days (or such other minimum days' notice as required by the Medicare Drug Rules, if longer) prior written notice to each EGWP Member that Sponsor plans to disenroll him or her from the EGWP Benefit and shall include with such written notification an explanation as to how the EGWP Member may contact CMS for information on other Medicare Part D options that might be available to the EGWP Member; and

2. Information to MCLIC.  Sponsor shall provide all the information to MCLIC that is required for MCLIC to submit a complete disenrollment request transaction to CMS, as set forth in the Medicare Drug Rules.  Sponsor shall transmit the complete and accurate disenrollment file to MCLIC: (i) no later than twenty-five (25) days prior to the group disenrollment effective date, and (ii) in the case of a group disenrollment with an effective date of January 1 of the applicable calendar year, by no later than the deadline communicated to Sponsor by MCLIC.

H.  Responsibility for Claims After Loss of Eligibility or Disenrollment.  Sponsor shall be responsible for reimbursing MCLIC pursuant to the billing provisions of the Agreement for all Prescription Drug Claims processed by MCLIC, including those:  (a) with respect to an Ineligible Enrollee during any period in which the EGWP Eligibility File indicated that such Ineligible Enrollee was eligible; and (b) with respect to a Voluntary Disenrollee, in the event Sponsor did not provide timely notice to MCLIC of such disenrollment as set forth herein.

51

I. <u>Effect On Commercial Benefit</u>. By requesting a Member's enrollment as an EGWP Member in the EGWP Benefit, Sponsor represents that such EGWP Member's eligibility as a Member in the Commercial Benefit (except for EGWP supplemental coverage) will immediately terminate. Upon a Member's enrollment as an EGWP Member in the EGWP Benefit, Sponsor must communicate to MCLIC that the EGWP Member's eligibility as a Member in the Commercial Benefit has terminated through the Eligibility Files. Until Sponsor communicates to MCLIC that the Member's eligibility in the Commercial Benefit has terminated, coverage under the Commercial Benefit and the terms and conditions applicable thereto will remain in effect for that Member.

J. <u>Effect of Termination of Commercial Benefit</u>. Termination of services with respect to the Commercial Benefit will not automatically terminate the provision of services with respect to the EGWP Benefit.

K. <u>Retroactive Payments / Enrollment and Disenrollment</u>. MCLIC may receive or recoup payments from CMS based upon retroactive enrollments to the EGWP Benefit or retroactive disenrollments from the EGWP Benefit under this EGWP Addendum. To the extent MCLIC has agreed in this EGWP Addendum to pay Sponsor amounts equal to such payments, MCLIC shall pay such amounts to Sponsor within forty-five (45) days of MCLIC's receipt of payments from CMS; provided, further, that any related EGWP PMPM Fees (as defined below) associated with the retroactive enrollment or disenrollment shall be adjusted in accordance with the applicable terms of this EGWP Addendum.

**5. Prescription Drug Services.**

A. <u>Prescription Drug Services</u>. In exchange for the fees set forth in <u>Exhibit A</u> of the Agreement, MCLIC will administer the EGWP Benefit for EGWP Members in accordance with the terms and conditions of this EGWP Addendum. All such administrative services shall be provided by MCLIC in accordance with the Medicare Drug Rules and the terms of the EGWP Benefit.

B. <u>Actuarial Equivalence</u>. The EGWP Benefit must satisfy all actuarial equivalence standards set forth in the Medicare Drug Rules. If MCLIC performs a review, Sponsor hereby agrees to cooperate with MCLIC to perform the necessary actuarial equivalence calculations to determine whether the EGWP Benefit meets the foregoing actuarial equivalence standards prior to the Effective Date. If MCLIC determines that the EGWP Benefit does not meet the actuarial equivalence standards, then Sponsor shall cooperate with MCLIC to make necessary adjustments to the EGWP Benefit design to meet the actuarial equivalence standards.

C. <u>Changes to the EGWP Benefit</u>. Sponsor shall have the right to request changes to the terms of the EGWP Benefit from time to time by providing written notice to MCLIC. MCLIC shall implement any such requested changes, subject to the following conditions: (a) all changes to the EGWP Benefit must be consistent with and implemented in the time and manner permitted by the Medicare Drug Rules; (b) the EGWP Benefit, after implementation of such changes, must continue to meet the actuarial equivalence standards referenced above; and (c) any requested change that would increase MCLIC's costs of administering the EGWP Benefit without an equivalent increase in reimbursement to MCLIC from Sponsor shall not be implemented unless and until Sponsor and MCLIC agree in writing upon a corresponding amendment to the reimbursement terms of this EGWP Addendum.

D. <u>EGWP Member Communications</u>. All standard EGWP Member communications concerning the EGWP Benefit (e.g., benefit overview document, formulary booklet, etc.) shall be mutually developed by MCLIC and Sponsor pursuant to the Medicare Drug Rules, including the CMS Marketing Guidelines contained therein. Pursuant to the Medicare Drug Rules, MCLIC must ensure all such EGWP Member communications, whether created and/or distributed by either Sponsor or MCLIC, are CMS compliant, and provide such to CMS upon request. If CMS notifies MCLIC that any such EGWP Member communication is deficient, Sponsor agrees to assist MCLIC to make necessary revisions to correct such deficiency.

E. <u>Claims Processing</u>.

1. <u>COB</u>.  MCLIC will coordinate benefits with state pharmaceutical assistance programs and entities providing other prescription drug coverage consistent with the Medicare Drug Rules.

2. <u>TrOOP</u>.  MCLIC will establish and maintain a system to record EGWP Members' TrOOP balances, and shall communicate TrOOP balances to EGWP Members upon request.  MCLIC will provide 24-hours a day, 7-days a week toll-free telephone, IVR and Internet support to assist Sponsor and EGWP Members with TrOOP verification.

3. <u>EOBs</u>.  MCLIC will furnish EGWP Members, in a manner specified by CMS, a written or electronic explanation of benefits ("EOB") when prescription drug benefits are provided under qualified prescription drug coverage consistent with the requirements of the Medicare Drug Rules.

F.  <u>Formulary and Medication Management</u>.  MCLIC or its affiliates will maintain a pharmacy and therapeutics committee ("P&T Committee") in accordance with the Medicare Drug Rules, which will develop a Medicare Formulary to be selected by Sponsor for the EGWP Benefit.   All Covered Drugs on the Medicare Formulary shall be Part D drugs or otherwise permitted to be covered by a PDP under the Medicare Drug Rules.  Sponsor acknowledges and agrees that the Medicare Formulary may not be modified by removing Covered Drugs, adding additional utilization management restrictions, making the cost-sharing status of a drug less beneficial or otherwise modified in a manner not consistent with the Medicare Drug Rules.

G.  <u>Medication Therapy Management</u>.  For the fees identified on <u>Exhibit A</u> of the Agreement, MCLIC or its affiliates will implement a Medication Therapy Management program that is designed to ensure that Covered Drugs prescribed to targeted EGWP Members are appropriately used to optimize therapeutic outcomes through improved medication use; and reduce the risk of adverse events, including adverse drug interactions.

H.  <u>Late Enrollment Penalty</u>.   Sponsor agrees to and attests that it shall comply with the applicable CMS requirements of the LEP and shall comply with MCLIC's LEP policy, inducing participating with MCLIC in the following process:

1. Sponsor has an option to: (i) provide an initial global attestation to MCLIC to attest to creditable coverage for all of its EGWP Members; or (ii) periodically provide an attestation to MCLIC to attest to creditable coverage for its EGWP Members listed on the LEP report provided to Sponsor by MCLIC.

2. If Sponsor elects to periodically attest to MCLIC under the preceding subsection, then:

   a.  Sponsor's response shall be delivered to MCLIC within five (5) business days from the receipt of LEP report from MCLIC;

   b.  Sponsor shall provide MCLIC with the file listing all EGWP Members for whom Sponsor was unable to attest; and

   c.  MCLIC shall also mail an attestation to each EGWP Member that has a gap in coverage as defined by CMS.

3. Sponsor will provide MCLIC with an attestation in MCLIC's standard form, which will be provided to Sponsor upon request, and a file listing of all the EGWP Members included in the attestation.

4. MCLIC will collect responses to the attestations from Sponsor or EGWP Members and submits EGWP Members information to CMS for processing and determination of applicable LEP.

     5. CMS calculates the LEP amount and transmits the LEP amount to MCLIC on the daily TRR file, which is communicated to Sponsor. MCLIC shall invoice Sponsor for payment of the LEP. Sponsor may elect to either pay for the LEP on behalf of the EGWP Member, or seek reimbursement of the LEP amount from the EGWP Member. This election must be made prior to the beginning of each plan year and must be applied consistently by Sponsor for all EGWP Members throughout each plan year.

    I.  <u>Organized Health Care Arrangement</u>. The parties agree that with respect to the EGWP Benefit, Sponsor and MCLIC are party to an Organized Health Care Arrangement under 45 C.F.R. § 160.103.

**6.    Document Retention and Government Audit.**

    A.  <u>Document Retention</u>. MCLIC and Sponsor will maintain, for a period of the then current plan year plus an additional ten (10) years, the applicable books, contracts, medical records, patient care documentation, and other records relating to covered services under this Amendment, including those relating to the collection of monthly premiums as set forth herein. MCLIC and its affiliates may use and disclose both during and after the term of this EGWP Addendum the anonymized claims data (de-identified in accordance with HIPAA) including drug and related medical data collected by MCLIC or provided to MCLIC by Sponsor for research; provider profiling; benchmarking, drug trend, and cost and other internal analyses and comparisons; clinical, safety and/or trend programs; ASES; or other MCLIC business purposes, in all cases subject to applicable law.

    B.  <u>Government Audit</u>. MCLIC and Sponsor agree to allow the United States Department of Health and Human Services ("DHHS") and the Comptroller General, or their designees, the right to audit, evaluate, collect, and inspect books, contracts, medical records, patient care documentation and other records relating to covered services under this EGWP Addendum, as are reasonably necessary to verify the nature and extent of the costs of the services provided to EGWP Members under this EGWP Addendum, for a period of the then current plan year, plus an additional ten (10) years following termination or expiration of the EGWP Addendum for any reason, or until completion of any audit, whichever is later.

**7.    Monthly Premiums; Fees; Billing and Payment.**

    A.  <u>Monthly Premiums</u>.

        1.  <u>Collection of Monthly Premium Amounts</u>. In accordance with the Medicare Drug Rules, MCLIC hereby delegates the premium collection function to Sponsor and hereby directs Sponsor, on behalf of MCLIC, to collect all monthly premium payments due from EGWP Members for participation in the EGWP Benefit. In connection with MCLIC's delegation of the premium collection function to Sponsor under this Section 7.A.1, Sponsor hereby agrees as follows:

           a.  That in no event, including, but not limited to, nonpayment by MCLIC of any amounts due by MCLIC to Sponsor pursuant to this EGWP Addendum, MCLIC's insolvency, or MCLIC's breach of this EGWP Addendum, will Sponsor bill, charge, collect a deposit from, seek compensation, remuneration or reimbursement from, or have any recourse against an EGWP Member or persons acting on his or her behalf for payments that are the financial responsibility of MCLIC under this EGWP Addendum. The foregoing is not intended to prohibit Sponsor from collecting premium amounts due by EGWP Members for participation in the EGWP Benefit.

        2.  <u>Determination of Monthly Premium Amounts (if any) to be Subsidized by Sponsor</u>. In determining the amount of the EGWP Member's monthly premium for participation in the EGWP Benefit that Sponsor will subsidize, if any, Sponsor shall make such determination subject to the following restrictions and any other restrictions that may be imposed by CMS:

a.   Sponsor may subsidize different amounts for different classes of EGWP Members provided such classes are reasonable and based on objective business criteria, such as years of service, business location, job category, and nature of compensation (e.g., salaried vs. hourly).  Different classes cannot be based on eligibility for the Low Income Subsidy;

b.   Sponsor may not vary the premium subsidy for individuals within a given class of EGWP Members;

c.   Sponsor may not charge an EGWP Member more than the sum of his or her monthly beneficiary premium attributable to basic prescription drug coverage and 100% of the monthly beneficiary premium attributable to his or her supplemental prescription drug coverage, if any;

d.   MCLIC will, as directed by Sponsor, directly refund to the EGWP Member, within forty-five (45) days of original receipt from CMS of the Low Income Subsidy premium, the full premium subsidy amount up to the monthly beneficiary premium amount previously collected from the EGWP Member; provided, however, that to the extent there are Low Income Subsidy premium amounts remaining after MCLIC refunds the full monthly beneficiary premium amount to the EGWP Member, then that remaining portion of the Low Income Subsidy premium may be applied to the portion of the monthly premium paid by Sponsor;

e.   If Sponsor is not able to reduce the up-front monthly beneficiary premium as described in subsection (d) above, MCLIC, as directed by Sponsor, shall directly refund to the EGWP Member, within forty-five (45) days of original receipt from CMS of the Low Income Subsidy premium, the full premium subsidy amount up to the monthly beneficiary premium amount previously collected from the EGWP Member;

f.   If the Low Income Subsidy amount for which an EGWP Member is eligible is less than the portion of the monthly beneficiary premium paid by the EGWP Member, then MCLIC will communicate to the EGWP Member the financial consequences for the beneficiary of enrolling in the EGWP Benefit as compared to enrolling in another Medicare Part D plan with a monthly beneficiary premium equal to or below the Low Income Subsidy amount; and

g.   In the event of a change in an EGWP Member's Low Income Subsidy status or an EGWP Member otherwise becomes ineligible to receive the Low Income Subsidy after payment of the Low Income Subsidy premium amount to the EGWP Member, and upon MCLIC's receipt of notification from CMS that such Low Income Subsidy premium amount will be recovered from MCLIC or withheld from future payments to MCLIC, then MCLIC in its sole discretion will invoice Sponsor or set off from amounts otherwise owed from MCLIC to Sponsor, and in either case Sponsor shall reimburse MCLIC for, all amounts deemed by CMS to be ineligible Low Income Subsidy premium payments with respect to the EGWP Member.

3.   <u>Reporting and Auditing of Premium Amounts; Non-Payment by EGWP Members</u>. Upon reasonable advance written notice, MCLIC or its affiliates shall have access to Sponsor's records, including evidence of Sponsor's calculations of monthly premium amounts, in order to audit the monthly premium amounts collected from EGWP Members for the purposes of fulfilling reporting requirements under the Medicare Drug Rules or applicable state insurance laws related to collection of such premium amounts or to otherwise assess compliance with the Medicare Drug Rules in connection with the collection of such premium amounts.  Any audits performed by MCLIC or its affiliates pursuant to this Section 7.A.3 will be at MCLIC's expense.

Sponsor acknowledges and agrees that neither MCLIC nor its affiliates shall be responsible to Sponsor for non-payment by any EGWP Member of any monthly premium amount due by such EGWP Member for participation in the EGWP Benefit. Sponsor further acknowledges and agrees that in the event that either Sponsor or MCLIC (through any audit) determines that Sponsor has collected a greater premium amount from an EGWP Member than is due, that Sponsor shall promptly refund any such overpayment to the EGWP Member.

B.  Billing.  MCLIC or its affiliates will bill Sponsor for, and Sponsor shall pay MCLIC or its affiliates, (i) every two weeks for the EGWP Claims Reimbursement Amount (as defined below) for such billing period; and (ii) once per month for any EGWP Administrative Services Fees (as defined below) incurred by Sponsor during the previous month (or earlier if not yet invoiced to Sponsor) and EGWP PMPM Fees (as defined below) due for such period. The EGWP Claims Reimbursement Amount, EGWP PMPM Fees, and EGWP Administrative Services Fees shall be referred to collectively as "EGWP Fees".  For purposes of this Section 7.B:

1.  "EGWP Claims Reimbursement Amount" means, with respect to any period, the amount equal to the aggregate amount of reimbursement due from Sponsor to MCLIC for Covered Drugs dispensed to EGWP Members by the Pharmacies, and, if applicable, for Member Submitted Claims during such period, including dispensing fees and all associated claims processing administrative fees, based on the reimbursement rates and pricing terms set forth on Exhibit A of the Agreement;

2.  "EGWP PMPM Fees" means, with respect to any period, all per EGWP Member per month administrative fees as set forth on Exhibit A-2 of the Agreement for such period.

3.  "EGWP Administrative Services Fees" means the fees incurred by Sponsor, if any, for MCLIC's or its affiliates' performance of the administrative services listed in the EGWP Administrative Fees table set forth on Exhibit A of the Agreement.

C.  CMS Reimbursement.

1.  CMS Reimbursement Payment Terms.

(a)  CMS Reimbursement Payment Terms (Direct Subsidy/Low-Income Subsidy). MCLIC will pay Sponsor an amount equal to the total amount paid to MCLIC by CMS for the following: (1) advance direct subsidy monthly payments paid to MCLIC, if any, by CMS with respect to EGWP Members and (2) low-income subsidy payments paid to MCLIC by CMS, if any, with respect to EGWP Members and subject to the provisions of Section 5.1(b) of this Agreement (collectively, "CMS Subsidy Reimbursement").  MCLIC will pay amounts equal to the CMS Subsidy Reimbursement, allocated pursuant to the terms of this Agreement, on a monthly basis approximately thirty (30) days after MCLIC's receipt of the CMS Subsidy Reimbursement from CMS.  MCLIC and its affiliates retain all right, title and interest to any and all actual CMS Subsidy Reimbursement received from CMS, except that MCLIC shall pay Sponsor amounts equal to the CMS Subsidy Reimbursement amounts allocated to Sponsor, as specified in this Agreement, from MCLIC's or its affiliates' general assets (neither Sponsor nor its EGWP Member's retain any beneficial or proprietary interest in MCLIC's or its affiliates' general assets).  Sponsor acknowledges and agrees that neither it nor its EGWP Members shall have a right to interest on, or the time value of, any CMS Subsidy Reimbursement payments received by MCLIC or its affiliates during the collection period or moneys payable under this Section.  No CMS Subsidy Reimbursements shall be paid until this Agreement is executed by Sponsor.  MCLIC shall have the right to retain or apply Sponsor's allocated CMS Subsidy Reimbursement amounts or Rebates with respect to EGWP Member utilization to unpaid Fees and shall have the right to delay payment of CMS Subsidy Reimbursement amounts to allow for final adjustments upon termination of this Agreement.

56

(b)  CMS Reimbursement Payment Terms (Prospective Reinsurance).  MCLIC will pay Sponsor prospective reinsurance payments based on the lesser of the CMS defined per member per month prospective reinsurance for the effective plan year or the Sponsor's per member per month reinsurance for the most recent plan year closed by CMS for reconciliation purposes. For Sponsor's first year as an EGWP administered by MCLIC, MCLIC will pay Sponsor prospective reinsurance payments based on the lesser of the CMS defined per member per month prospective reinsurance for the effective plan year or the Sponsor's projected per member per month reinsurance for the effective plan year based on claims experience of Sponsor's EGWP Members. MCLIC will pay amounts on a monthly basis approximately thirty (30) days after MCLIC's receipt of the prospective reinsurance reimbursement from CMS ("Prospective Reinsurance CMS Reimbursement"). MCLIC and its affiliates retain all right, title, and interest to any and all actual Prospective Reinsurance CMS Reimbursement amounts allocated to Sponsor, except that MCLIC shall pay Sponsor Prospective Reinsurance CMS Reimbursement amounts allocated to Sponsor, as specified in this Agreement, from MCLIC's or its affiliates' general assets (neither Sponsor nor its EGWP Members retain any beneficial or proprietary interest in MCLIC's or its affiliates' general assets). Sponsor acknowledges and agrees that neither it nor its EGWP Members shall have a right to interest on, or the time value of, any Prospective Reinsurance CMS Reimbursement payments received by MCLIC or its affiliates during the collection period or moneys payable under this Section.  No Prospective Reinsurance CMS Reimbursements shall be paid until this Agreement is executed by Sponsor.  MCLIC shall have the right to retain or apply Sponsor's allocated Prospective Reinsurance CMS Reimbursement amounts or Rebates with respect to EGWP Member utilization to unpaid Fees and shall have the right to delay payment of Prospective Reinsurance CMS Reimbursement amounts to allow for final adjustments upon termination of this Agreement.

2.  CMS Reimbursement Reporting.  At least annually, MCLIC will provide Sponsor an accounting of all CMS Subsidy Reimbursement and Prospective Reinsurance CMS Reimbursement received by MCLIC from CMS pursuant to the Medicare Drug Rules with respect to the EGWP Benefit.

D.  CMS-Required Reconciliation / Reinsurance.

1.  End-of-Year Reconciliation.  The parties acknowledge that after the conclusion of each plan year, CMS will reconcile payment year disbursements with updated enrollment and health status data, actual low-income cost-sharing costs, actual allowable reinsurance costs, and other pertinent information.  Upon final CMS end-of-year reconciliation, the following shall occur:  (i) in the event that the actual incurred reinsurance amount calculated during reconciliation exceeds the prospective amounts paid to Sponsor by MCLIC, MCLIC will pay such amounts to Sponsor subject to the remaining terms of this agreement, and (ii) in the event that the actual incurred reinsurance amount calculated during reconciliation is less than the prospective amounts paid to Sponsor by MCLIC, Sponsor shall repay to MCLIC such amounts previously paid by MCLIC in accordance with the payment terms of the Agreement. MCLIC shall have the right to retain or apply Sponsor's allocated CMS End of Year Reconciliation amounts with respect to EGWP Member utilization to unpaid Fees and shall have the right to delay payment of CMS End of Year Reconciliation amounts to allow for final adjustments upon termination of this Agreement. MCLIC shall have the right to apply reconciliation amounts owed from Sponsor to rebates, CMS Subsidy Reimbursements, Prospective Reinsurance CMS Reimbursements, or Manufacturer Coverage Gap Discount amounts.     All such payments resulting from a CMS reconciliation will be paid to Sponsor no later than January 31 of the calendar year immediately following the date of MCLIC's receipt of the reconciliation payments from CMS. If CMS subsequently recovers any end of year reconciliation payments from MCLIC due to a CMS Plan Year reopening or other process described in the Medicare Drug Rules, then Sponsor shall be obligated to repay to MCLIC such amounts previously paid to Sponsor.  If CMS subsequently reimburses MCLIC for end

of year reconciliations payments due to a CMS Plan Year reopening or other process described in the Medicare Drug rules, then MCLIC will pay such amounts to Sponsor. MCLIC shall have the right to apply reconciliation amounts owed from Sponsor due to a CMS Plan Year reopening to rebates, CMS Subsidy Reimbursements, Prospective Reinsurance CMS Reimbursements, or Manufacturer Coverage Gap Discount amounts.

    2.   <u>Plan-to-Plan Reconciliation</u>.  MCLIC will perform plan-to-plan coordination of EGWP Members' prescription drug benefits with other provider of prescription drug coverage as set forth in the Medicare Drug Rules and any related reconciliation; provided, that no later than January 31 of the calendar year immediately following completion of such coordination or reconciliation process, MCLIC shall pay to Sponsor an amount equal to payments recovered for the EGWP Benefit, but at the same time MCLIC shall have a right to recoup from Sponsor any amount which MCLIC is obligated to pay to any other prescription drug plan pursuant to a plan-to-plan reconciliation.

   E.   <u>Manufacturer Coverage Gap Discount</u>.

    1.   Pursuant to its CMS contract, MCLIC has agreed to administer for EGWP Members at point-of-sale the Coverage Gap Discount authorized by section 1860D-14A of the Social Security Act.  In connection with the Coverage Gap Discount, CMS will coordinate the collection of discount payments from manufacturers, and payment to MCLIC, through a CMS contractor (the "Coverage Gap Discount Payments").  Subject to Section 5.4(a) above, MCLIC agrees to periodically remit to Sponsor amounts equal to 100% of the Coverage Gap Discount Payments received by MCLIC within forty-five (45) days of the CMS Manufacturer Payment Date.  MCLIC and its affiliates retain all right, title and interest to any and all actual Coverage Gap Discount Payments received from CMS, except that MCLIC shall pay Sponsor amounts equal to the Coverage Gap Discount Payments amounts allocated to Sponsor, as specified in this Agreement, from MCLIC's or its affiliates' general assets (neither Sponsor nor its EGWP Members retain any beneficial or proprietary interest in MCLIC's or its affiliates' general assets).  Sponsor acknowledges and agrees that neither it nor its EGWP Members shall have a right to interest on, or the time value of, any Coverage Gap Discount Payments received by MCLIC or its affiliates during the collection period or moneys payable under this Section.  No Coverage Gap Discount Payments shall be paid until this Agreement is executed by Sponsor.  MCLIC shall have the right to apply Sponsor's allocated Coverage Gap Discount Payments amount to unpaid Fees and shall have the right to delay payment of Coverage Gap Discount Payments to allow for final adjustments upon termination of this Agreement. Notwithstanding anything contained in this Section 7, Sponsor shall retain all right, title, and interest to the amounts that MCLIC is contractually obligated to pay Sponsor hereunder, and failure by MCLIC to pay such amounts will constitute a breach of this Agreement.

    2.   If the EGWP Benefit administered by MCLIC under this EGWP Addendum for Sponsor includes EGWP Plus design elements, then the Coverage Gap Discount will be coordinated with the Commercial Benefit consistent with the Medicare Drug Rules.

**8.**    **Term and Termination; Default and Remedies.**

   A.   <u>Termination of MCLIC's Contract with CMS</u>.  If at any time throughout the term of this EGWP Addendum, CMS either does not renew its contract with MCLIC or terminates its contract with MCLIC such that MCLIC may no longer provide services as a PDP Sponsor under the Medicare Drug Rules, then this EGWP Addendum shall be automatically terminated conterminously with such CMS contract termination.

   B.   <u>Obligations Upon Termination</u>.  Sponsor or its agent shall pay MCLIC, or its affiliate, in accordance with this Agreement for all claims for Covered Drugs dispensed and services provided to Sponsor and EGWP Members on or before the later of: (i) the effective date of

termination, or (ii) the final date that all EGWP Members have been transitioned to a new Part D plan, as applicable (the "Termination Date"). Claims submitted by Participating Pharmacies or EGWP Member Submitted Claims filed with MCLIC after the Termination Date shall be processed and adjudicated in accordance with a mutually determined run-off plan, provided that, in any event, and subject to all applicable payment terms of the Agreement: (i) MCLIC shall re-process or re-adjudicate claims originally processed and adjudicated on or before the Termination date, as necessary, for a period of five (5) years from the end of the plan year in which the applicable claim was processed and adjudicated; (ii) MCLIC shall process and adjudicate EGWP Member Submitted Claims for Covered Drugs dispensed and services provided on or before the Termination Date for a period of three (3) years from the termination of this Agreement; and (iii) MCLIC shall process and adjudicate claims submitted by Participating Pharmacies for Covered Drugs dispensed and services provided on or before the Termination Date for a period of ninety (90) days from the termination of this Agreement. The parties shall cooperate regarding the transition of Sponsor and its EGWP Members to a successor PDP Sponsor in accordance with all applicable Medicare Drug Rules and MCLIC will take all reasonable steps to mitigate any disruption in service to EGWP Members. Notwithstanding the preceding, MCLIC may (a) delay payment of any final CMS reimbursement amounts, Rebate amounts or other amounts due Sponsor, if any, to allow for final reconciliation of any outstanding amount owed by Sponsor to MCLIC, or (b) request that Sponsor pay a reasonable deposit in the event MCLIC is requested to process after the Termination Date claims incurred on or prior to such date. If CMS subsequently recovers any end of year reconciliation payments from MCLIC due to a CMS Plan Year reopening or other process described in the Medicare Drug Rules after the effective date of termination, then Sponsor shall be obligated to repay to MCLIC such amounts previously paid to Sponsor. If CMS subsequently reimburses MCLIC for end of year reconciliations payments due to a CMS Plan Year reopening or other process described in the Medicare Drug rules after the effective date of termination, then MCLIC will pay such amounts to Sponsor.

IN WITNESS WHEREOF, the undersigned have executed this EGWP Addendum as of the day and year below set forth.

MEDCO CONTAINMENT LIFE INSURANCE COMPANY

LAKE COUNTY

By: _____

Printed Name: _____

Title: David L. Brodsky Vice President - Commercial Division

Date: 2/14/2017

By: _____

Printed Name: Ruth Anne K. Hall

Title: Purchasing Agent

Date: 1/26/17

Federal ID Number: 36-6006600

4027926.v1